**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

STATE OF ILLINOIS, *et al.*,

              *Plaintiffs*,

  v.

FEDERAL EMERGENCY
MANAGEMENT AGENCY, *et al.*,

              *Defendants.*

No. 1:25-cv-206-WES-PAS

**PLAINTIFF STATES'
MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 3

    A.    Congress's Longstanding Support For State Emergency Preparation And Response. ................................................................................................ 3

    B.    Plaintiff States And Their Efforts to Secure and Protect Their Residents. ............ 7

    C.    The Department's Attempt To Conscript States In Immigration Enforcement Using The Funds Congress Has Appropriated For Emergencies and Threats. ..... 12

ARGUMENT .................................................................................................... 16

I.    Plaintiffs Are Likely To Succeed On The Merits. ........................................... 16

    A.    The Department Lacks Authority To Impose The Conditions. ........................... 16

        1.    The Department lacks freestanding authority to impose a categorical rule requiring grantees to assist in enforcing federal immigration law..... 17

        2.    The relevant grant statutes likewise do not authorize the Department to impose any such rule.......................................................................... 18

    B.    The Imposition Of The Conditions Is Arbitrary And Capricious. ........................ 22

        1.    The Department failed to consider whether grant-authorizing statutes permit it to impose the Conditions and instead considered a factor irrelevant to the statutory schemes............................................................. 23

        2.    The Department failed to consider the States' reliance interests in billions of dollars in federal funding........................................................ 26

        3.    The Department failed to consider the Conditions' effects on public safety. ......................................................................................... 29

        4.    The Department failed to consider alternatives to its sweeping policy. ... 30

    C.    The Conditions Are Unconstitutional. .................................................... 31

        1.    The Conditions are not reasonably related to the funding programs to which they apply. .......................................................................... 31

        2.    The Conditions are coercive because they leave the States with "no real option" but to comply.................................................................... 33

        3.    The Conditions are unlawfully ambiguous. ............................................. 35

II.     The Equities Compel Preliminary Relief. ........................................................... 38

        A.     Preliminary Relief Is Needed To Avert Irreparable Harm. ................................... 38

        B.     The Balance of Equities And Public Interest Favor Preliminary Relief. .............. 46

CONCLUSION ....................................................................................................................... 49

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
    570 U.S. 205 (2013)...............................................................................................32

*Am. Council of the Blind v. Mnuchin*,
    878 F.3d 360 (D.C. Cir. 2017) ..........................................................................47

*Am. Petroleum Inst. v. U.S. Envtl. Prot. Agency*,
    52 F.3d 1113 (D.C. Cir. 1995)...........................................................................20

*Bredesen v. Rumsfeld*,
    No. 05-cv-0640, 2005 WL 2175175 (M.D. Tenn. Sept. 7, 2005) ...........................46

*BST Holdings, L.L.C. v. OSHA*,
    17 F.4th 604 (5th Cir. 2021)..............................................................................25

*Camelot Banquet Rooms, Inc. v. U.S. Small Bus. Admin.*,
    24 F.4th 640 (7th Cir. 2022)..............................................................................46

*City of Arlington v. FCC*,
    569 U.S. 290 (2013)....................................................................................17, 22

*City & Cnty. of San Francisco v. Barr*,
    965 F.3d 753 (9th Cir. 2020) ............................................................................37

*City & Cnty. of San Francisco v. Sessions*,
    349 F. Supp. 3d 924 (N.D. Cal. 2018) ..........................................................37, 40

*City & Cnty. of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) ..........................................................................41

*City of Philadelphia v. Att'y Gen. of United States*,
    916 F.3d 276 (3d Cir. 2019) ..........................................................................5, 40

*City of Philadelphia v. Sessions*,
    280 F. Supp. 3d 579 (E.D. Pa. 2017) .........................................................38, 41, 42

*City of Philadelphia v. Sessions*,
    309 F. Supp. 3d 289 (E.D. Pa. 2018) .................................................................40

*City of Chicago v. Barr*,
    961 F.3d 882 (7th Cir. 2020)............................................................................25

*City of Chicago v. Sessions*,
    264 F. Supp. 3d 933 (N.D. Ill. 2017) ...................................................................38

*City of Chicago v. Sessions*,
    321 F. Supp. 3d 855 (N.D. Ill. 2018) ...................................................................41

*City of Chicago v. Sessions*,
    888 F.3d 272 (7th Cir. 2018) ....................................................................41, 48

*City of Chicago v. Sessions*,
    No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018) ......................................41

*City of Evanston v. Barr*,
    412 F. Supp. 3d 873 (N.D. Ill. 2019) ...................................................................42

*City of Evanston v. Sessions*,
    No. 18-cv-4853, 2018 WL 10228461 (N.D. Ill. Aug. 9, 2018) ...............................40

*City of Providence v. Barr*,
    954 F.3d 23 (1st Cir. 2020) ..................................................5, 17, 19, 21, 24, 29

*Cnty. of Ocean v. Grewal*,
    475 F. Supp. 3d 355 (D.N.J. 2020) .............................................................10, 29

*Cnty. of Santa Clara v. Trump*,
    250 F. Supp. 3d 497 (N.D. Cal. 2017) .........................................................40, 42

*Colorado v. U.S. Dep't of Just.*,
    455 F. Supp. 3d 1034 (D. Colo. 2020)..................................................................40

*Commodity Futures Trading Comm'n v. Brit. Am. Commodity Options Corp.*,
    434 U.S. 1316 (1977)...........................................................................................41

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
    67 F.4th 1027 (9th Cir. 2023) .........................................................................23, 26

*Cummings v. Premier Rehab Keller, PLLC*,
    596 U.S. 212 (2022).............................................................................................17

*Detroit Int'l Bridge Co. v. Canada*,
    192 F. Supp. 3d 54 (D.D.C. 2016) ......................................................................23

*DHS v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020).....................................................................23, 26, 28, 30

*Francisco Sanchez v. Esso Standard Oil Co.*,
    572 F.3d 1 (1st Cir. 2009) ...................................................................................48

*Gonzales v. Oregon,*
    546 U.S. 243 (2006) ............................................................................20

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991) ............................................................................17

*Haight v. Thompson,*
    763 F.3d 554 (6th Cir. 2014) ...............................................................33

*Hikvision USA, Inc. v. FCC,*
    97 F.4th 938 (D.C. Cir. 2024) .............................................................25

*Int'l Org. of Masters, Mates & Pilots v. NLRB,*
    61 F.4th 169 (D.C. Cir. 2023) .............................................................28

*Kansas v. United States,*
    249 F.3d 1213 (10th Cir. 2001) ...........................................................40

*Kentucky v. Yellen,*
    54 F.4th 325 (6th Cir. 2020) ..........................................................17, 33

*La. Pub. Serv. Comm'n v. FCC,*
    476 U.S. 355 (1986) .........................................................................2, 17

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
    591 U.S. 657 (2020) .........................................................................23, 26

*Loper Bright Enters. v. Raimondo,*
    603 U.S. 369 (2024) ............................................................................17

*Lunn v. Commonwealth,*
    477 Mass. 517 (2017) ..........................................................................11

*Massachusetts v. United States,*
    435 U.S. 444 (1978) ............................................................................31

*McHenry Cnty. v. Raoul,*
    44 F.4th 581 (7th Cir. 2022) ...............................................................11

*Miranda-Olivares v. Clackamas County,*
    No. 12-cv-2317, 2014 WL 1414305 (D. Or. Apr. 11, 2014) ...............36

*Morales v. Chadbourne,*
    793 F.3d 208 (1st Cir. 2015) ...............................................................36

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) .......................................................22, 23, 25, 26, 29

*Nat'l Council of Nonprofits v. OMB*,
    No. 25-cv-239, 2025 WL 597959 (D.D.C. Feb. 25, 2025) ....................................................30

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) ..........................................................................................33, 34, 35, 36

*News-Press v. U.S. Dep't of Homeland Sec.*,
    489 F.3d 1173 (11th Cir. 2007) ........................................................................................48

*New York v. Trump*,
    No. 25-cv-39, 2025 WL 715621 (D.R.I. Mar. 6, 2025) ......................................................30

*Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*,
    969 F.3d 12 (1st Cir. 2020) ..............................................................................................16

*Ocean Cnty. Bd. Of Commissioners v. Att'y Gen. of State of New Jersey*,
    8 F.4th 176 (3d Cir. 2021) ..........................................................................................10, 11

*Ohio v. EPA*,
    603 U.S. 279 (2024) ........................................................................................................40

*Oklahoma v. Castro-Huerta*,
    597 U.S. 629 (2022) ........................................................................................................30

*Or. Nat. Res. Council v. Thomas*,
    92 F.3d 792 (9th Cir. 1996) ..............................................................................................23

*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981) ................................................................................................24, 36, 38

*Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*,
    946 F.3d 1100 (9th Cir. 2020) ..........................................................................................20

*P.R. Conservation Found. v. Larson*,
    797 F. Supp. 1066 (D.P.R. 1992) ......................................................................................48

*Printz v. United States*,
    521 U.S. 898 (1997) ........................................................................................................11

*Rio Grande Cmty. Health Ctr. v. Rullan*,
    397 F.3d 56 (1st Cir. 2005) ..............................................................................................39

*Robbins v. Reagan*,
    780 F.2d 37 (D.C. Cir. 1985) ............................................................................................20

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
    217 F.3d 8 (1st Cir. 2000) ..........................................................................................41, 46

*State Highway Comm'n of Mo. v. Volpe*,
    479 F.2d 1099 (8th Cir. 1973) ................................................................24

*Steward Mach. Co v. Davis*,
    301 U.S. 548 (1937)..............................................................................33

*South Dakota v. Dole*,
    483 U.S. 203 (1987)...............................................31, 33, 34, 35, 36, 38

*Tennessee v. Dep't of Educ.*,
    104 F.4th 577 (6th Cir. 2024) ...............................................................39

*Tenn. Valley Auth. v. Tenn. Elec. Power Co.*,
    90 F.2d 885 (6th Cir. 1937)...................................................................46

*United States v. California*,
    921 F.3d 865 (9th Cir. 2019) ...........................................................11, 37

*United States v. Morrison*,
    529 U.S. 598 (2000)................................................................................9

*United States v. North Carolina*,
    192 F. Supp. 3d 620 (M.D.N.C. 2016)..................................................42

*U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
    481 U.S. 1301 (1987) (Rehnquist, C.J., in chambers) ..........................48

*Va. Dep't of Educ. v. Riley*,
    106 F.3d 559, 566 (4th Cir. 1997) (en banc) ........................................18

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)...................................................................................46

*Worman v. Healey*,
    922 F.3d 26 (1st Cir. 2019) ...................................................................34

## Constitutional Provisions, Statutes, and Regulations

Pub. L. No. 81-875, 64 Stat. 1109.............................................................3

Pub. L. No. 100-707, 102 Stat. 4689 .........................................................3

Pub. L. No. 106-386, 114 Stat. 1464........................................................29

Pub. L. No. 107-56, 115 Stat. 272..............................................................4

Pub. L. No. 107-295, 116 Stat. 2064..........................................................4

Pub. L. No. 107-296, 116 Stat. 2135 ................................................................................4

Pub. L. No. 109-295, 120 Stat. 1355 ................................................................................4

5 U.S.C. § 706 ..................................................................................................16, 17, 22

6 U.S.C.
    § 316 ..........................................................................................................................4
    § 605 ............................................................................................................5, 18, 19
    § 608 ..................................................................................................................18, 19
    § 609a ..........................................................................................................................21
    § 665g ........................................................................................................5, 19, 25
    § 762 ................................................................................................5, 18, 29, 25

33 U.S.C.
    § 467f ........................................................................................................................19
    § 467j ........................................................................................................................19

42 U.S.C.
    § 4102 ....................................................................................................................6, 21
    § 4104c ..................................................................................................................6, 21
    § 5121 ..............................................................................................................3, 22, 32
    § 5154a ..................................................................................................................21
    § 5155 ......................................................................................................................21
    § 5170 ......................................................................................................................21
    § 5170a ..............................................................................................................21, 22
    § 5170b ....................................................................................................................21
    § 5170c ....................................................................................................................27
    § 5191 ......................................................................................................................21
    § 7704 ....................................................................................................................6, 21

46 U.S.C.
    § 13102 ..............................................................................................................19, 31
    § 13104 ....................................................................................................................19
    § 70107 ......................................................................................................................6

5 Ill. Comp. Stat.
    805/1 *et seq.* ..........................................................................................................9
    805/15 ................................................................................................................10, 11

Cal. Gov. Code
    § 7282 ........................................................................................................................9
    § 7282.5 ................................................................................................................9, 10
    § 7283 ........................................................................................................................9
    § 7284 ........................................................................................................................9
    § 7284.6 ..............................................................................................................10, 11

Colo. Rev. Stat. § 24-76.6-102 ........................................................................................9

N.J. Att'y Gen. Directive 2018-6 ....................................................................9, 10, 11

Wash. Rev. Code Ann.
  § 10.93.160.............................................................................................................9
  § 43.10.315.............................................................................................................9


**Other Authorities**

Congressional Budget Office, *FEMA's Disaster Relief Fund: Budgetary History and Projections* (Nov. 2022), https://www.cbo.gov/publication/58840.............................................7

Doc. 50, *United States v. Illinois*,
  No. 1:25-cv-1285 (N.D. Ill. Apr. 1, 2025) ............................................................37

Doc. 93, *City & Cnty. of San Francisco v. Trump*,
  No. 3:25-cv-1350 (N.D. Cal. Mar. 31, 2025).........................................................25

Exec. Order No. 14159,
  90 Fed. Reg. 8443 (Jan. 20, 2025) ..................................................................12, 32

Exec. Order No. 14287,
  90 Fed. Reg. 18761 (Apr. 28, 2025) ......................................................................32

88 Fed. Reg. 62098 (2023) ............................................................................................43

Manning, Dale T. & Jesse Burkhardt, *The Local Effects of Federal Law Enforcement Policies: Evidence from Sanctuary Jurisdictions and Crime*, 40 Contemp. Econ. Pol'y 423 (2021) ....29

U.S. Citizenship & Immigration Servs., *DHS to Begin Screening Aliens' Social Media Activity for Antisemitism* (Apr. 9, 2025), https://www.uscis.gov/newsroom/news-releases/dhs-to-begin-screening-aliens-social-media-activity-for-antisemitism.............................................47

U.S. Dep't of Just., *General Policy Regarding Charging, Plea Negotiations, and Sentencing* (Feb. 5, 2025), https://www.justice.gov/ag/media/1388541/dl................................................37

U.S. Government Accountability Office, *Disaster Relief Fund: Lessons Learned from COVID-19 Could Improve FEMA's Estimates* (July 9, 2024), https://www.gao.gov/assets/gao-24-106676.pdf ..................................................................................................................8

## INTRODUCTION

For over 70 years, Congress, the federal executive branch, and the States have worked together to fund, oversee, and manage the complex infrastructure for preventing and responding to disasters and emergencies that befall the Nation. Congress has authorized—and, each year, appropriates billions of dollars to support—dozens of grant programs that fund longstanding state emergency-management efforts geared at preparing for floods, wildfires, cyberattacks, and more, and assisting States in responding to disasters of this sort when they occur. Plaintiff States have worked hand-in-glove with the Federal Emergency Management Agency ("FEMA"), which administers these grant programs, to ensure that their residents are shielded from the worst effects of natural disasters and other threats, overseeing the expenditure of billions of dollars annually in disaster-preparedness and- response funds to protect their residents and support them in the wake of tragedy.

This spring, the Department of Homeland Security ("DHS"), which oversees FEMA, made an about-face that threatens to deprive Plaintiff States and their residents of the emergency funding that Congress has appropriated and FEMA has long administered. Congress has for decades acted to ensure that emergency funds are available to the States—to *all* States—according to need-based criteria, ranging from States' populations to the President's declaration of a national disaster. Six weeks ago, however, DHS—without warning or explanation—revised the standard terms and conditions that govern all federal funds it oversees, including the billions of dollars that Congress has appropriated for disaster preparedness and response. DHS's new terms and conditions require state and local grantees to agree to support the political priorities of the current administration as a condition of obtaining all federal funds—specifically, to certify that they will "coordinat[e] and cooperat[e] with federal immigration authorities" to enforce civil immigration law. The effect of these terms—the Civil Immigration Conditions—is to strip Plaintiff States and their emergency

1

preparedness agencies of access to billions of dollars in federal funds that Congress has authorized and appropriated unless they obey executive branch instructions to divert law-enforcement and other public resources to federal civil immigration enforcement in a manner that finds no support in federal law.

DHS's effort to impose the Civil Immigration Conditions is unlawful in multiple respects, and the Court should enjoin their enforcement and application. First, and most fundamentally, DHS lacks the authority to impose the conditions. An administrative agency "has no power to act . . . unless and until Congress confers power upon it," *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986), and here DHS cites no statute authorizing it to condition the receipt of *all* federal funds on States' assisting it in enforcing federal civil immigration law. Indeed, the various grant statutes that Congress has enacted and charged FEMA with overseeing—supporting state efforts to respond to and mitigate the effects of catastrophic events ranging from floods to wildfires to terrorist attacks—plainly preclude imposition of the Civil Immigration Conditions. Second, and separately, DHS violated the Administrative Procedure Act by acting arbitrarily and capriciously in imposing the Conditions. Indeed, DHS's decision was unreasoned in multiple respects: It failed to consider whether any of the statutes authorizing its grant programs permitted imposition of the conditions; it ignored the States' reliance interests on federal funds and neglected the conditions' impact on public safety; and it overlooked obvious alternatives to imposing the conditions. Finally, DHS violated the Spending Clause by imposing the Conditions: The federal government cannot lawfully coerce the States into enacting its preferred policy goals, but that is just what defendants are attempting to do here, threatening to withhold billions annually in necessary federal emergency and disaster funds to extract policy changes from the States that they could not lawfully command. The Conditions are unlawful, and the Court should enjoin their enforcement and application.

**BACKGROUND**

A.    **Congress's Longstanding Support For State Emergency Preparation And Response.**

1.    For over 70 years, Congress has addressed the threat of unpredictable disasters and emergencies by providing robust and unflagging financial support—today totaling tens of billions of dollars annually—for a complex infrastructure of emergency preparedness and response, anchored by FEMA but administered in the first instance by the States. Congress first created a general emergency funding infrastructure in 1950, enacting the Disaster Relief Act to "provide an orderly and continuing means of assistance by the Federal Government to States and local governments in carrying out their responsibilities to alleviate suffering and damage resulting from major disasters." Pub. L. No. 81-875, § 1, 64 Stat. 1109, 1109. Over the following decades, Congress has steadily expanded its support for state emergency disaster management, establishing additional programs and providing ever greater support for the States and their residents. In 1988, Congress enacted the Disaster Relief and Emergency Assistance Amendments, which formally renamed the federal government's disaster authority the Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act"). Pub. L. No. 100-707, 102 Stat. 4689. The Stafford Act sets out a framework for responding to natural disasters that still governs today, directing federal funds to flow to States and their residents following a presidential disaster declaration. *See* 42 U.S.C. § 5121 *et seq.*

Congress once again overhauled the federal emergency-management infrastructure during the Bush Administration, in the wake of multiple significant disasters on American soil. First, after the September 11, 2001 terrorist attacks, Congress added funding programs to support States and localities in counterterrorism measures, with the goal of ensuring that a disaster of that sort never happens again. In October 2001, Congress passed the USA PATRIOT Act, establishing grant

programs to States "to prepare for and respond to terrorist acts." Pub. L. No. 107-56, § 1014, 115 Stat. 272, 399. Congress went on to pass the Homeland Security Act of 2002, Pub. L. No. 107-296, § 430, 116 Stat. 2135, 2191, and the Maritime Transportation Security Act of 2002, Pub. L. No. 107-295, § 102, 116 Stat. 2064, 2075, which likewise increased support for state preparedness measures in areas of vulnerability. Finally, in the wake of Hurricane Katrina, Congress passed—and President Bush signed into law—the Post-Katrina Emergency Management Reform Act of 2006, Pub. L. No. 109-295, tit. VI, § 611, 120 Stat. 1355, 1400, which comprehensively overhauled all federal emergency assistance grant programs and granted FEMA the authority to administer them. That statute expressly prohibits the DHS Secretary from "substantially or significantly reduc[ing] . . . the authorities, responsibilities, or functions of [FEMA] or the capability of [FEMA] to perform [its] missions, authorities, [or] responsibilities, except as otherwise specifically provided" by law. 6 U.S.C. § 316(c)(1).

2.      The federal grant programs that Congress has authorized and that FEMA and other DHS sub-agencies administer vary in scope and purpose, but they are united by a common theme: They provide support to States and localities based on objective criteria that center on States' actual need to prepare for and respond to emergencies and similar threats to their residents' safety and security. Congress did not, in authorizing these programs and appropriating funds to support them, confer on FEMA or other DHS sub-agencies any freestanding authority to pick and choose among funding recipients according to the political priorities of the administration in office. Nor did Congress authorize DHS or its sub-agencies to attach conditions to funds unrelated to the primary purpose of the funding programs: supporting States in preparing for and responding to emergencies and similar hazards.

*First*, many of the grant programs that Congress has authorized and that FEMA and other DHS sub-agencies administer are so-called "formula" grant programs—grants that are disbursed to States based on specific factors, such as a State's population. *See, e.g.*, *City of Philadelphia v. Att'y Gen. of United States*, 916 F.3d 276, 280 (3d Cir. 2019) (setting out the statutory factors determining eligibility for one specific formula grant); *see also City of Providence v. Barr*, 954 F.3d 23, 27 (1st Cir. 2020) (similar).

For instance, the Emergency Management Performance Grant Program—which Congress created during the Bush Administration to provide direct support to the state agencies that oversee emergency management functions—provides over $300 million annually to States, allocated on a fixed basis: 0.75% of the total appropriated amount to each State, with the remainder apportioned strictly by population. *See* 6 U.S.C. § 762(b), (d) (FEMA Administrator "***shall*** . . . make grants to States" based on this formula (emphasis added)). Likewise, after the September 11, 2001, terrorist attacks, Congress established a program to support state and local counterterrorism measures—the State Homeland Security Grant Program—through which it annually distributes over $350 million to States, again guaranteeing each State a minimum amount of funding. *See id.* § 605(e)(1) (FEMA Administrator "***shall*** ensure that . . . each State receives . . . not less than an amount equal to" a portion of total appropriated funds (emphasis added)). More recently, as part of the Infrastructure Investment and Jobs Act of 2021, Congress established (and appropriated $1 billion to support) the State and Local Cybersecurity Grant Program, which supports state cybersecurity measures, and again specified exactly how the funds it made available should be distributed: 1% of the appropriated funds per State, with the remainder apportioned by population. *See id.* § 665g(*l*) (DHS "***shall*** apportion" funds in this manner (emphasis added)). These programs direct how emergency

funds are to be apportioned to States and afford DHS and its sub-agencies no discretion to impose their own funding conditions that deviate from Congress's instructions.

*Second*, even those grant programs that permit FEMA and other DHS sub-agencies some degree of discretion over the disbursement of federal funds nonetheless set out objective criteria—criteria centered on States' need to prepare for and respond to emergencies and other threats—that the sub-agencies are required to use in allocating the funds that Congress has appropriated. To take one example, Congress established the Flood Mitigation Assistance Program "to provide financial assistance to States and communities . . . for planning and carrying out activities designed to reduce the risk of flood damage to structures" insured by the National Flood Insurance Program. 42 U.S.C. § 4104c(a). Although States must prepare a "flood risk mitigation plan" in order to seek and obtain funds pursuant to this program, *id.* § 4104c(b), Congress provided specific factors for FEMA to use in evaluating those plans: The plans must propose to "(1) constrict the development of land which is exposed to flood damage where appropriate, (2) guide the development of proposed construction away from locations which are threatened by flood hazards, (3) assist in reducing damage caused by floods, and (4) otherwise improve the long-range land management and use of flood-prone areas." *Id.* § 4102(c); *see id.* § 4104c(c)(3) (describing specific eligible activities). The same is true for other grant programs that Congress has created and that FEMA administers: Such programs are established for specific purposes, *see, e.g.*, *id.* § 7704(a)(2)(B)(i) (to "promote the adoption of earthquake hazards reduction measures by Federal, State, and local governments"); 46 U.S.C. § 70107(b) (to correct "vulnerabilities in port security"), and do not confer unfettered authority on FEMA (or any other DHS sub-agency) to award funds based on the political priorities of a particular presidential administration.

6

Today, the robust support system that Congress created for state emergency preparation and response is critical to States and their residents. FEMA provides nearly $2 billion annually in funds to States to support "preparedness" activities—i.e., efforts States undertake to prepare for emergencies and other threats (ranging from floods to fires to terrorist attacks) *before* they occur. *See* Fed. Emergency Mgmt. Agency, *DHS Announces Funding Allocations for Fiscal Year 2024 Preparedness Grants* (Aug. 23, 2024) (Ex. 1); Compl. ¶ 48. And, under the Stafford Act, *supra* p. 3, FEMA likewise provides **tens of billions** of dollars annually to States and other recipients to help recover from and mitigate the effects of major disasters, an amount that has only increased in recent years. *See* Cong. Budget Office, *FEMA's Disaster Relief Fund: Budgetary History and Projections* (Nov. 2022)[1]; Office of Inspector Gen., U.S. Dep't of Homeland Sec., *FEMA Followed Applicable Laws and Reporting Requirements for Transferring Disaster Relief Funds* 3 (Jan. 23, 2025) (Ex. 2). Since 2017, excluding COVID-19 disaster declarations, FEMA has obligated over $22 billion from the Disaster Relief Fund to Plaintiff States. *See* Compl. ¶¶ 148–149.

### B.    Plaintiff States And Their Efforts to Secure and Protect Their Residents.

1.    Plaintiffs are the States of Illinois, California, New Jersey, Rhode Island, Colorado, Connecticut, Delaware, Hawai'i, Maine, Maryland, Massachusetts, the People of the State of Michigan, Minnesota, Nevada, New Mexico, New York, Oregon, Vermont, Washington, and Wisconsin ("Plaintiff States"). For decades, Plaintiffs have relied on grant programs established by Congress and administered by FEMA and other sub-agencies to protect their residents from emergencies and other catastrophic threats to their safety.

Plaintiff States use funds appropriated by Congress for a range of purposes. Federal funds for state emergency management include dozens of grant programs, addressing everything from

---

[1] https://www.cbo.gov/publication/58840.

homeland security (the State Homeland Security Program and the Urban Area Security Initiative) to port security (Port Security Grant Program) to cybersecurity (State and Local Cybersecurity Grant Program) to dam safety (National Dam Safety Program). Federal dollars help States secure schools and houses of worship at risk for extremist attacks (Nonprofit Security Grant Program) and pay the salaries of statewide emergency coordination personnel (Emergency Management Performance Grant). When disaster does strike, the federal government awards money to States for food aid, debris removal, and permanent infrastructure repairs, paid out from a federal Disaster Relief Fund. Collectively, Plaintiff States received over $1 billion in non-disaster funds in each of the last three years to support emergency preparedness, and FEMA has obligated over $22 billion in disaster relief funding in connection with non-COVID-19 presidentially declared disasters to the Plaintiff States since 2017, ranging from major wildfires to severe tornados to Superstorm Sandy. *See* Compl. ¶¶ 148–149, 155–157, 163, 167.[2]

States rely heavily on the programs that Congress has authorized—and the funds Congress has appropriated to support those programs—to lead their communities through disasters and other emergencies. For example, Plaintiff States rely on DHS grant money to, among other things: (1) fund state and local SWAT teams and bombs squads, Ex. 22 (Khayyat Decl.), ¶¶ 24–25; Ex. 24 (Maulawin Decl.), ¶ 9; Ex. 18 (Higgins Decl.), ¶ 22; (2) pay local emergency managers, Ex. 29 (Sweeney Decl.), ¶¶ 33, 77; Ex. 44 (Pappas Decl.), ¶ 18; Ex. 47 (Ezelle Decl.), ¶¶ 53–54; (3) deploy cybersecurity software to protect local governments from cyberattacks, Ex. 24 (Maulawin Decl.), ¶ 15; Ex. 37 (Bray Decl.), ¶¶ 45, 64; Ex. 31 (Cunningham Decl.), ¶ 29; (4) install security

---

[2] The COVID-19 disaster declarations accounted for an additional $125 billion in disaster relief obligations to all States between 2020 and 2023. *See* U.S. Gov't Accountability Office, *Disaster Relief Fund: Lessons Learned from COVID-19 Could Improve FEMA's Estimates* 1 (July 9, 2024), https://www.gao.gov/assets/gao-24-106676.pdf.

systems at religious institutions, Ex. 16 (Haney Decl.), ¶¶ 48–49; Ex. 32 (Doran Decl.), ¶ 33; Ex. 37 (Bray Decl.), ¶ 72; (5) reduce flood risks through flood control infrastructure and paid relocation, Ex. 18 (Higgins Decl.), ¶ 56; Ex. 25 (Strickland Decl.), ¶¶ 121–123; Ex. 40 (McMahon Decl.), ¶ 63; (6) restore and protect electrical infrastructure after powerful storms, Ex. 16 (Haney Decl.), ¶¶ 79, 86; Ex. 22 (Khayyat Decl.), ¶ 104; Ex. 49 (Engle Decl.), ¶ 80; and (7) cover the sudden and uncontrollable outlays needed to fight major wildfires, Ex. 12 (Owen Decl.), ¶¶ 10–12; Ex. 17 (Kitchell Decl.) ¶¶ 22–23; Ex. 47 (Ezelle Decl.), ¶¶ 79–80.

2.       Plaintiff States are likewise responsible for maintaining the day-to-day safety of all residents of their communities. Plaintiff States enact statutes and establish policies about the best use of law-enforcement time and energy to ensure that their residents are protected from crime and violence. *See United States v. Morrison*, 529 U.S. 598, 618 (2000) ("Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims."). One critical choice that Plaintiff States must make in doing so is whether, when, and how to task their law-enforcement officers with assisting the federal government in enforcing federal civil immigration law.

Many Plaintiff States have chosen to use state and local law-enforcement resources on state and local matters, not federal matters—and so limit the circumstances under which state and local law enforcement may participate in federal civil immigration enforcement. *See, e.g.*, 5 Ill. Comp. Stat. 805/1 *et seq.*; Cal. Gov. Code §§ 7282–7282.5, 7283–7283.2, 7284–7284.12; N.J. Att'y Gen. Directive 2018-6 ("N.J. Directive"); Wash. Rev. Code Ann. §§ 10.93.160, 43.10.315; Colo. Rev. Stat. § 24-76.6-101 to -103. These States have concluded that such policies best promote public safety, both because they ensure that state and local law enforcement spend their time addressing

crime, rather than civil immigration enforcement, and because undocumented immigrants and their families are less willing to engage with law enforcement (for instance, if they have been victims or witnesses to a crime) if doing so could risk deportation. *See* N.J. Directive at 1 (recognizing the fear of engaging with state and local law enforcement "makes it more difficult for officers to solve crimes and bring suspects to justice"); Ex. 13 (Rosen Decl.), ¶ 8; Ex. 33 (Gaimari Decl.), ¶ 9; Ex. 45 (Perez Decl.), ¶ 13; *see also Cnty. of Ocean v. Grewal*, 475 F. Supp. 3d 355, 363 n.5 (D.N.J. 2020) (noting "studies that confirm that immigration-related fears prevent individuals from reporting crimes"), *aff'd sub nom. Ocean Cnty. Bd. Of Comm'rs v. Att'y Gen. of State of N.J.*, 8 F.4th 176 (3d Cir. 2021).

Many of these state policies seek to promote law-enforcement cooperation by ensuring a clear distinction between the roles of state and local officers who enforce state criminal law and the federal immigration officers who enforce federal civil immigration law. Illinois's TRUST Act, for instance, restricts state and local law-enforcement officers from voluntarily assisting in the civil enforcement of federal immigration law, including by arresting or detaining individuals on the basis of their immigration status; by providing federal civil immigration officials with access to state or local law-enforcement facilities; or by notifying civil immigration officials of detainees' upcoming release dates from state custody. 5 Ill. Comp. Stat. 805/15; *see also, e.g.*, Cal. Gov't Code § 7284.6(a); N.J. Directive at 3–4. But most of these statutes and directives contain important exceptions to ensure compliance with federal law and protect the public from violent criminals. Many authorize state and local law enforcement to work with federal civil immigration officials to facilitate the removal of certain criminals, *e.g.*, 5 Ill. Comp. Stat. 805/15(h), (i); Cal. Gov't Code §§ 7282.5(a), 7284.6(a)(1)(C), 7284.6(a)(4); N.J. Directive at §§ II.B.5–.6, and expressly allow officers to cooperate with immigration enforcement as required by federal law, 5 Ill. Comp. Stat.

805/15(h); Cal. Gov't Code § 7284.6(e); N.J. Directive at 1–2. Many of these policies have been in place for years, and many were passed with bipartisan support: Illinois's, for instance, was signed into law in 2017 by Republican Governor Bruce Rauner. And those policies that have been challenged in court have uniformly been upheld. *See, e.g.*, *McHenry Cnty. v. Raoul*, 44 F.4th 581 (7th Cir. 2022); *Ocean Cnty.*, 8 F.4th 176; *United States v. California*, 921 F.3d 865 (9th Cir. 2019).

Other Plaintiff States have not codified directives regarding the use of law-enforcement resources to assist in federal immigration law. Although these States have not imposed categorical *limitations* on the use of law-enforcement resources to assist in the enforcement of federal immigration law, they nonetheless do not impose categorical *requirements* of this kind on state and local law-enforcement officers, either. Many of these States have concluded that they can best protect their residents by maintaining control over state and local law-enforcement resources, and/or by empowering law-enforcement officials to exercise discretion in determining when it would best promote public safety to assist federal immigration-enforcement efforts, rather than requiring those officers to devote resources to federal immigration enforcement on the federal government's command. Others are subject to different rules in this context. For instance, some Plaintiff States must comply with state court rulings that prevent them from cooperating with civil immigration detainer requests. *See, e.g.*, *Lunn v. Commonwealth*, 78 N.E.3d 1143, 1146 (Mass. 2017). Still other Plaintiff States have concluded that participating in federal immigration-enforcement efforts imposes substantial costs on local jurisdictions, not only in the form of personnel and resources but also in the form of potential civil liability. While Plaintiff States' decisions in this area have differed, *all* are consistent with the basic rule that the States "remain independent and autonomous within their proper sphere of authority," *Printz v. United States*, 521

U.S. 898, 928 (1997)—a principle that has no greater force than in the context of States' exercise of their police powers for the protection of their residents.

### C.    The Department's Attempt To Conscript States In Immigration Enforcement Using The Funds Congress Has Appropriated For Emergencies and Threats.

In the seven decades in which the federal government has supported the States in protecting their residents against catastrophic disasters, to Plaintiffs' knowledge, no presidential administration has threatened to withhold emergency and disaster funds to conscript the States into adhering to its policy preferences. But the current administration has now taken that step. On January 20, 2025, his first day in office, President Trump expressly directed DHS to "ensure that so-called 'sanctuary' jurisdictions do not receive access to Federal funds." Exec. Order No. 14159, § 17, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025). Less than a month later, on February 19, the DHS Secretary issued a memorandum to all DHS agencies and offices titled "Restricting Grant Funding for Sanctuary Jurisdictions," directing DHS agencies to review all federal financial assistance and cease federal funding to sanctuary jurisdictions. *See* Ex. 3. The then-Senior Official Performing the Duties of the FEMA Administrator, Cameron Hamilton, subsequently sent a memorandum to the Secretary that reviewed FEMA's grant programs and identified twelve specific grant programs that, in Hamilton's view, might be lawfully limited to non-"sanctuary" jurisdictions. *See* Ex. 4 at 2. But he expressly recommended *against* attempting to apply conditions of this sort to "disaster grants, non-disaster mitigation grants, and grants to fire departments" and other similar organizations. *Id.*[3]

---

[3] Hamilton's memorandum provided no legal analysis to support its recommendation, and Plaintiff States do not agree that the statutes authorizing even these twelve programs would permit the kind of limitations that the memorandum appears to propose. *See infra* pp. 16–22. These statutes plainly do not permit the kind of across-the-board condition that DHS ultimately imposed.

But instead of following Hamilton's recommendations, on March 27, 2025, DHS revised the terms and conditions that govern *all* funding programs overseen by the agency to incorporate a sweeping new set of conditions that require all States to assist in enforcing federal immigration law in order to receive *any* federal funds from the agency. *See* Ex. 5.[4] The new terms purport to govern "*all* new federal awards of federal financial assistance (federal awards) for which the federal award date occurs in FY 2025." *Id.* (emphasis added).

The new terms and conditions require States to "comply with" a set of conditions "related to coordination and cooperation" with federal immigration officials. Ex. 6 at 4. Specifically, they require States to certify compliance with the following conditions:

1. *The Information Sharing Condition* (C.IX.1.a): Grant recipients must comply with the requirements of 8 U.S.C. §§ 1373 and 1644, which prohibit state restrictions on sharing information with DHS concerning the citizenship or immigration status, lawful or unlawful, of any individual.

2. *The Compliance Condition* (C.IX.1.b): Grant recipients must comply with various criminal laws, including 8 U.S.C. § 1324, that prohibit, among other things, "encouraging or inducing" noncitizens to unlawfully enter the United States.

3. *The Cooperation Condition* (C.IX.1.c): Grant recipients must "honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer."

4. *The Access Condition* (C.IX.1.d): Grant recipients must provide federal immigration agents "access to detainees" in correctional facilities to inquire as to such individuals' right to be or remain in the United States.

5. *The Publicization Condition* (C.IX.1.e): Grant recipients must not "leak or otherwise publicize the existence of" any federal immigration enforcement operations.

6. *The Certification and Monitoring Condition* (C.IX.2): Grant recipients must certify compliance with the above conditions and require subgrant recipients to do the same.

---

[4] The agency subsequently issued a revised version of the terms and conditions on April 18, 2025. *See* Ex. 5 (Mar. 27, 2025 version); Ex. 6 (Apr. 18, 2025 version); *see also* U.S. Dep't of Homeland Sec., *DHS Standard Terms and Conditions* (captured May 17, 2025) (Ex. 7) (identifying the date ranges where different versions of the standard terms and conditions apply).

*Id.* at 4–5. A separate term requires grantees to certify that "[t]hey do not, and will not during the term of this award, operate any program that benefits illegal immigrants or incentives illegal immigration." *Id.* at 6 (term C.XVII.2.a.iii, or the Benefits Condition). Plaintiff States refer to these terms together as the "Civil Immigration Conditions" (or the "Conditions").

2.    Plaintiff States have now been asked repeatedly to certify compliance with the new terms and conditions to obtain funds that are critical to their residents' safety—including funds for wildfire containment and recovery, cybersecurity, and more.

For instance, Washington relies heavily on FEMA for Fire Management Assistance Grants (FMAG)—funds authorized by Congress to assist States and localities in protecting against, managing, and controlling fires. Ex. 47 (Ezelle Decl.), ¶¶ 78–82. But it cannot obtain FMAG funds for this year's fire season without a signed disaster-management agreement with FEMA, and the agreement FEMA sent to Washington requires the State to accept the FY 2025 terms and conditions. *Id.* ¶¶ 84–85. Washington is thus put in the position of foregoing critical assistance for wildfire containment—totaling millions of dollars annually—or foregoing its right to control its own law-enforcement resources and the way they are spent. The same is true in New Jersey, where a major fire is estimated to have burned over 15,000 acres just last month, yet the imposed terms and conditions have thrown into doubt the availability of FMAG funds to assist with containment costs. *See* Ex. 35 (Ottobre Decl.), ¶¶ 72–73. In California, FEMA recently approved over $13 million in disaster relief to provide services to victims of the Los Angeles County wildfires declared a major disaster under the Stafford Act on January 8, 2025. Ex. 12 (Owen Decl.), ¶ 22 & Ex. B. Although California's disaster agreement with FEMA provides that the DHS standard terms

and conditions in effect on the date of the disaster declaration should apply, *id.* Ex. A § II.F.3, FEMA has nonetheless attached the Civil Immigration Conditions to this grant, *id.* ¶ 22 & Ex. B.[5]

FEMA and other DHS sub-agencies have likewise insisted that States comply with the new terms and conditions in other contexts. Almost all Plaintiff States have been awarded formula funds for FY 2025 through the Coast Guard's State Recreational Boating Safety Program, but can obtain them only if they sign the terms and conditions. *See* Ex. 23 (King Decl.), ¶¶ 51–52 & Ex. A (describing and attaching the email that went to all States); *see also* Ex. 11 (Fernandez Decl.), ¶¶ 15–19; Ex. 28 (Bowen Decl.), ¶¶ 19–24; Ex. 30 (Block Decl.), ¶ 24; Ex. 39 (Seward Decl.), ¶ 19; Ex. 41 (Warren Decl.), ¶¶ 7–9; Ex. 42 (Hoxsie Decl.), ¶¶ 13, 15. Illinois has been allocated over $6 million in formula funds for cybersecurity that it also cannot obtain unless it certifies its compliance with the terms and conditions. Ex. 22 (Khayyat Decl.), ¶ 52.

Finally, all States receive annual funding for homeland security through FEMA's preparedness grant portfolio—tens or hundreds of millions of dollars depending on the size of the State. Ex. 19 (Schall Decl.), ¶¶ 11–12; Ex. 25 (Strickland Decl.), ¶¶ 18–19; Ex. 37 (Bray Decl.), ¶¶ 16–17; Ex. 10 (Buccieri-Harrington Decl.), ¶ 8. In prior years, applications for these programs have typically opened in February to May, so the States will likely be asked to apply for fiscal year 2025 grants at any moment. *See* Ex. 22 (Khayyat Decl.), ¶ 9; Ex. 32 (Doran Decl.), ¶ 62.

Plaintiff States are thus at a crossroads, facing irreparable harm no matter which path they choose. They can either comply with conditions that they believe are unlawful, unconstitutional, and imprudent—conditions that would interfere with their control over their own law-enforcement

---

[5] Plaintiff States disagree with FEMA's assertion that the new terms and conditions will apply to this funding, which is tied to a disaster declaration that predates their adoption. *See* Ex. 12 (Owen Decl.), ¶¶ 8–9, 21 & Ex. A. But FEMA's position nonetheless shows the serious uncertainty and impending crisis caused by defendants' indiscriminate imposition of the new terms and conditions.

officers, disrupt the relationships built between immigrant communities and local law enforcement, and compromise local crime reduction efforts—or they can forfeit millions of dollars of funds they rely on to protect against catastrophic events such as terrorist attacks, floods, tornadoes, wildfires, and earthquakes. The Conditions must be preliminarily enjoined to protect the States from having to make this intolerable choice.

## ARGUMENT

"When assessing a request for a preliminary injunction, a district court must consider (1) the movant's likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm; (3) the balance of equities; and (4) whether granting the injunction is in the public interest." *Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 22 (1st Cir. 2020) (internal quotation marks omitted). All four factors overwhelmingly support granting a preliminary injunction.

## I.    Plaintiffs Are Likely To Succeed On The Merits.

Plaintiffs are highly likely to succeed in establishing that DHS's promulgation of the Civil Immigration Conditions is unlawful. Indeed, it is unlawful in at least three separate respects: The agency lacked statutory authority to impose the conditions; its decision to adopt the conditions is arbitrary and capricious, violating the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2); and its attempt to use funding conditions to coerce Plaintiff States' law-enforcement officers into federal civil immigration enforcement violates the Constitution's Spending Clause.

### A.    The Department Lacks Authority To Impose The Conditions.

The Department's adoption of the Civil Immigration Conditions is legally infirm for the basic reason that the agency lacks the statutory authority to impose a categorical rule requiring the recipients of all DHS funding to assist it in enforcing federal immigration law. The Department

thus acted "in excess of statutory . . . authority," 5 U.S.C. § 706(2)(C), and ultra vires in promulgating the conditions.

### 1. The Department lacks freestanding authority to impose a categorical rule requiring grantees to assist in enforcing federal immigration law.

As relevant here, DHS and its sub-agencies are "charged with administering congressional statutes," which means that "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). Indeed, "an agency literally has no power to act . . . unless and until Congress confers power upon it," *La. Pub. Serv. Comm'n*, 476 U.S. at 374, especially in the area of federal funding, *see Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022) (emphasizing that it is Congress that "has broad power" to "set the terms on which it disburses federal funds"). "Any action that an agency takes outside the bounds of its statutory authority is ultra vires and violates the [APA]." *Providence*, 954 F.3d at 31 (citations omitted); 5 U.S.C. § 706(2)(C). "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).

Here, no federal statute authorizes the Department to establish the kind of categorical rule that the Conditions impose. DHS is asserting a power to require States to change their policies on participating in civil immigration enforcement as a condition of accessing ***all*** federal emergency funding—a power that would dramatically upset the federal-state balance. To justify that assertion of authority, DHS would need to identify a statute with a "clear statement" that Congress "in fact . . . intended to" alter the balance of federal-state power in this manner. *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989)); *see Kentucky v. Yellen*, 54 F.4th 325, 347 (6th Cir. 2022) (explaining courts "must employ a federalism-based clear-statement rule when construing spending legislation as a matter of statutory

interpretation" (emphasis omitted)). No federal law contains an "unambiguous statutory expression of congressional intent to condition the States' receipt of federal funds" on the States' participation in civil immigration enforcement. *Va. Dep't of Educ. v. Riley*, 106 F.3d 559, 566 (4th Cir. 1997) (en banc). Indeed, DHS has never even attempted to justify its categorical rule by reference to such a categorical grant of statutory authority.

### 2. The relevant grant statutes likewise do not authorize the Department to impose any such rule.

Not only is there no freestanding statute that could authorize the Department to impose the categorical rule set out in the Civil Immigration Conditions, but the statutes that Congress passed to govern the use of specific federal emergency funds likewise grant FEMA and other DHS sub-agencies no power to condition funds on adherence to the President's immigration priorities. Indeed, as explained, *supra* pp. 5–7, these statutes provide support to States and localities based on objective criteria that center on States' actual need to prepare for and respond to emergencies and similar threats to their residents' safety and security. They do not confer on DHS or FEMA the discretion to fund only those States that share the current administration's political priorities.

Congress has generally authorized FEMA and other DHS sub-agencies to provide funding to States through either (1) "formula" grant programs (i.e., grants disbursed to States on the basis of certain fixed factors, like state population) or (2) discretionary grant programs focused on specific threats, including floods, earthquakes, or other hazards. Under neither framework has Congress given the Department the power to limit funding to only those States that agree to cooperate in federal immigration-enforcement efforts.

That conclusion is straightforward for the many formula grants that provide Plaintiff States with a substantial portion of their preparedness funds. *See, e.g.*, 6 U.S.C. § 762(b), (d) (Emergency Management Performance Grant Program); *id.* §§ 605(e)(1), 608 (State Homeland Security Grant

18

Program); *id.* § 665g(*l*) (State and Local Cybersecurity Grant Program); 33 U.S.C. §§ 467f(e)(2), 467j(a)(2)(A) (National Dam Safety Program); 46 U.S.C. §§ 13102(a), 13104(a) (State Recreational Boating Safety Program). Although these statutes work in different ways, many of them direct DHS or its sub-agencies to provide States an annual allocation based on population, risk, or some other objective indicia, in some instances specifying the exact proportion—by statute—that each State is to receive. *See, e.g.*, *id.* § 665g(*l*) (agency "***shall*** apportion" State and Local Cybersecurity Grant Program funds according to population (emphasis added)); § 762(b), (d) (FEMA Administrator "***shall*** . . . make grants to States" under Emergency Management Performance Grant Program based on statutory formula (emphasis added)); 46 U.S.C. § 13104(a) (similar for State Recreational Boating Safety Program); 33 U.S.C. § 467j(a)(2)(A) (similar for National Dam Safety Program). Other FEMA programs operate differently—for instance, establishing a minimum amount of funds to which all States are entitled, while directing FEMA to establish an objective, risk-based allocation of the remaining funds, which are then made available to States annually. *See* 6 U.S.C. § 605(e)(1) (FEMA Administrator "shall ensure" that States receive minimum funding amounts under State Homeland Security Grant Program); *id.* § 608(a)(1) (enumerating factors that Administrator shall consider in allocating remaining funds). With respect to these programs, it is plain that the Department has no authority to impose unrelated substantive conditions on the receipt of funds. As the First Circuit explained in rejecting a similar attempt to conscript States and localities into federal immigration enforcement, "the statutory formula[s]" at issue in programs of this sort "simply do[] not allow [federal agencies] to impose by brute force conditions on [federal funds] to further [those agencies'] unrelated law enforcement priorities." *Providence*, 954 F.3d at 34–35. Indeed, the specificity of the statutory schemes at issue here "strongly implies that Congress did not intend to give [DHS] the power to advance its own

priorities by means of grant conditions." *Id.* at 35. DHS accordingly lacks authority to impose the Civil Immigration Conditions on these programs.

The same is true for the discretionary grants that FEMA and other sub-agencies administer. *Supra* p. 6. Although these agencies retain some discretion in disbursing funds, they must exercise that authority within the parameters set by Congress. "When Congress limits the purpose for which a grant can be made, it can be presumed that it intends that the dispersing agency make its allocations based on factors solely related to the goal of implementing the stated statutory purposes in a reasonable fashion, rather than taking irrelevant or impermissible factors into account." *Robbins v. Reagan*, 780 F.2d 37, 48 (D.C. Cir. 1985); *see also Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Hum. Servs.,* 946 F.3d 1100, 1113 (9th Cir. 2020) (holding that an agency's grant criterion was contrary to law because it deviated from the purposes of the authorizing statute). This principle flows from a broader rule of administrative law: Where Congress sets out specific grants of authority, the courts are "unwilling to construe the ambiguous provisions" as conferring authority for some other purpose. *Gonzales v. Oregon*, 546 U.S. 243, 258 (2006) (quoting *Fed. Mar. Comm'n v. Seatrain Lines, Inc.*, 411 U.S. 726, 744 (1973)); *Am. Petroleum Inst. v. U.S. EPA*, 52 F.3d 1113, 1119 (D.C. Cir. 1995) (holding that a federal agency "cannot rely on its general authority to make rules . . . when a specific statutory directive defines the relevant functions of [the agency] in a particular area").

The collection of discretionary grant programs that FEMA and other DHS sub-agencies administer have nothing to do with federal civil immigration enforcement. Each of these statutes identifies the specific hazards or other threats that Congress intended FEMA to support—ranging from floods to earthquakes to port security—and directs the agency to provide funds for *that* purpose, and no other. The Nonprofit Security Grant Program, for instance, provides hundreds of

millions of dollars annually to States to fund security measures at local nonprofits facing threats of violence, including churches, synagogues, and mosques, 6 U.S.C. § 609a; the Flood Mitigation Assistance Program is designed to help States mitigate the damaging effects of floods and more broadly "improve the long-range land management and use of flood-prone areas," 42 U.S.C. § 4102(c)(4); *see id.* § 4104c(b); and the National Earthquake Hazards Reduction Program was enacted to support state plans to "develop effective measures for earthquake hazards reduction," *id.* § 7704(a)(2). None of these statutes have anything to do with civil immigration enforcement, and DHS's authority to allocate these funds consistent with *Congress's* purposes does not give DHS the power to use the money that Congress has provided the States for *DHS's* preferred purposes—especially when those purposes have nothing to do with earthquakes, floods, and the like.

The same reasoning applies with even greater force to disaster- and emergency-relief funds. The Stafford Act specifies a procedure through which the President can declare a major disaster or emergency and authorize federal assistance, *see* 42 U.S.C. §§ 5170(a), 5191(a) (requiring that governor of affected State request presidential declaration based on specific factual findings), and includes a detailed list of permissible uses of federal funds—for example, distributing food and medicine, clearing debris, and performing search and rescue, *see, e.g.*, *id.* §§ 5170a, 5170b. The Act and related statutes also impose targeted restrictions on the availability of federal assistance. *See, e.g.*, *id.* § 5154a (prohibiting assistance for certain uninsured properties damaged by floods); *id.* § 5155 (barring provision of duplicative benefits for insured losses). Nothing in this intricate statutory scheme gives the agency authority to leverage relief funds to facilitate civil immigration enforcement. *See Providence*, 954 F.3d at 35 (a detailed scheme "strongly implies that Congress did not intend to give the [agency] the power to advance its own priorities by means of grant

21

conditions"). On the contrary, both the Act's statement of purpose and its operative provisions make clear Congress's purpose to "expedit[e] the rendering of aid, assistance, and emergency services, and the reconstruction and rehabilitation of devastated areas." 42 U.S.C. § 5121(a); *see, e.g., id.* § 5170a(6)(B) (allowing the President to forego certain procedural requirements where compliance would "delay or impede the rapid deployment, use, and distribution of critical resources to victims of a major disaster"). The Civil Immigration Conditions fit nowhere in the reticulated system Congress designed.

In the end, although each of the emergency funding programs Congress created operates in its own way, the material point remains the same: Congress instructed DHS on how to provide money to the States for emergency preparedness and response, and it gave the agency no authority to ignore or thwart the purposes for which those funds were appropriated. DHS cannot now assert the power to withhold those funds until States comply with the administration's political priorities. To permit an administrative agency to claim that power would be at odds with the basic rule of administrative law: that an agency's "power to act and how [it is] to act" are both "authoritatively prescribed by Congress." *City of Arlington*, 569 U.S. at 297.

**B.    The Imposition Of The Conditions Is Arbitrary And Capricious.**

The imposition of the Civil Immigration Conditions is also arbitrary and capricious in violation of the APA. *See* 5 U.S.C. § 706(2)(A). An agency's action is arbitrary and capricious when it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency, or [that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). When changing positions, an agency must also consider both the "alternatives that are within the ambit of the existing policy" and the

"serious reliance interests" engendered by the status quo. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (brackets and internal quotation marks omitted).

DHS's across-the-board imposition of the Civil Immigration Conditions bears all those hallmarks of unreasoned decisionmaking. The Conditions are arbitrary and capricious in at least four independent respects: DHS (1) failed to consider whether any of the statutes authorizing its grant programs permits the imposition of the Conditions and instead considered factors that are irrelevant to the statutory schemes; (2) ignored the States' profound reliance interests on federal funding; (3) neglected the Conditions' impact on criminal law enforcement and public safety; and (4) overlooked obvious alternatives.

### 1. The Department failed to consider whether grant-authorizing statutes permit it to impose the Conditions and instead considered a factor irrelevant to the statutory schemes.

As a general matter, whether the agency "entirely failed to consider an important aspect of the problem" or "relied on factors which Congress has not intended it to consider," *State Farm*, 463 U.S. at 43, necessarily "turns on what the relevant substantive statute makes important," *Or. Nat. Res. Council v. Thomas*, 92 F.3d 792, 799 (9th Cir. 1996) (internal quotation marks omitted); *see Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 67 F.4th 1027, 1039 (9th Cir. 2023). Put differently, the universe of information an agency must (and must not) consider depends on "the scope of the duty imposed on the agency by Congress in the relevant substantive statute." *Detroit Int'l Bridge Co. v. Gov't of Canada*, 192 F. Supp. 3d 54, 78 (D.D.C. 2016), *aff'd*, 883 F.3d 895 (D.C. Cir. 2018). It is thus arbitrary and capricious for the agency to neither "look to" nor "discuss" statutory "requirements," *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 682 (2020), or to "rel[y] on factors which Congress has not intended it to consider" in making its decision, *State Farm*, 463 U.S. at 43; *see Ctr. for Biological Diversity*, 67 F.4th at 1039.

23

These principles are even more pressing in the grant context. "*Congress* may fix the terms on which it shall disburse federal money to the States," meaning that any "federally imposed conditions" on States must square with the relevant "legislation enacted pursuant to the spending power." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (emphasis added). The statutory authorization for a grant program, by definition, sets forth the factors that Congress requires—and permits—an agency to consider in issuing funds. As the First Circuit has explained, the agency cannot "create qualification requirements unrelated to the [statutory] grant program simply to advance its own policy priorities." *Providence*, 954 F.3d at 39; *see also, e.g.*, *State Highway Comm'n of Mo. v. Volpe*, 479 F.2d 1099, 1114 (8th Cir. 1973) (agency cannot set spending requirements "remote and unrelated" to the underlying statute). So an agency cannot impose any grant conditions without first ensuring that the relevant statute supports them. *See New York v. Trump*, No. 25-cv-39, 2025 WL 715621, at *12 (D.R.I. Mar. 6, 2025) (McConnell, C.J.) (agencies acted arbitrarily and capriciously by failing to consider whether action "fell within the bounds of their statutory authority"), *appeal docketed*, No. 25-1236 (1st Cir. Mar. 10, 2025).

But DHS has made *no effort whatsoever* to ascertain whether each of the many applicable funding statutes permits the imposition of the Civil Immigration Conditions. Indeed, DHS appears to have sidestepped a March 2025 proposal by then-Senior Official Performing the Duties of the FEMA Administrator Hamilton to impose restrictions and conditions on open and future awards under twelve specific FEMA grant programs—programs, in his view, whose authorizing statutes would have permitted the imposition of immigration-related terms that would "vary based on the structure or authority of each respective program." Ex. 4 at 2.[6] That list expressly excluded

---

[6] Again, *supra* p. 12 n.3, the memorandum did not explain or support this recommendation, and Plaintiff States do not agree that the statutes authorizing even these twelve programs would permit

"disaster grants, non-disaster mitigation grants, and grants to fire departments" and other similar organizations. *Id.* Seven days later, the Department imposed the Conditions on **all** DHS funds, including disaster funds. *See* Ex. 5. Elsewhere, the United States has correctly conceded that "the degree of agency discretion in implementing grant programs varies depending on the type of grant program and the terms of the authorizing legislation." Doc. 93 at 20, *City & Cnty. of San Francisco v. Trump*, No. 3:25-cv-1350 (N.D. Cal. Mar. 31, 2025). But that is exactly what DHS ignored here. Its decision to impose a one-size-fits-all funding condition without regard for the underlying authorizing statutes was "arbitrarily broad." *E.g.*, *Hikvision USA, Inc. v. FCC*, 97 F.4th 938, 949–50 (D.C. Cir. 2024); *see also BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 612 (5th Cir. 2021) (rejecting agency's "one-size-fits-all sledgehammer").

The agency's failure to examine its own statutory authority was compounded by its reliance on a factor that "Congress ha[d] not intended it to consider," *State Farm*, 463 U.S. at 43—namely, whether state and local grant recipients assist the federal government in enforcing immigration law or instead choose to exercise control over the use of their law-enforcement resources. As discussed, *supra* pp. 16–22, the relevant statutes do not permit DHS to condition funding on States' willingness to assist in immigration enforcement; indeed, they do not even contemplate that factor as one the agency is permitted to consider. Many of the funding programs administered by FEMA and other DHS sub-agencies are formula programs, meaning that funds must be disbursed according to a "structured, precise calculation." *City of Chicago v. Barr*, 961 F.3d 882, 921 (7th Cir. 2020); *see supra* pp. 5–6, 18–20; 6 U.S.C. § 762(b), (d) (Emergency Management Performance Grant Program); *id.* § 665g(*l*) (State and Local Cybersecurity Grant Program). Even

---

the kind of limitations that the memorandum appears to propose. *See supra* pp. 16–22. And these statutes plainly do not permit the kind of *across-the-board* condition that DHS ultimately imposed.

those that afford some discretion to the agency have nothing to do with immigration but instead are designed to support state efforts to prepare for and mitigate the effects of wildfires, floods, and other disasters. *See supra* pp. 6, 20–21. By engaging in no effort to consider its statutory authority, and instead basing its *entire* funding decision on States' willingness to cooperate with immigration-enforcement efforts, DHS transparently "relied on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43; *see Ctr. for Biological Diversity*, 67 F.4th at 1039 (explaining that, where a detailed statutory scheme required an agency to examine certain factors, agency could not base its decision on other considerations). DHS thus acted arbitrarily and capriciously both by "failing to consider an important aspect of the problem," *Little Sisters*, 591 U.S. at 682—namely, whether it actually had authority to impose the Conditions in the first place— and by considering States' willingness to cooperate in immigration-enforcement efforts even when the statutory schemes made that factor irrelevant, *see State Farm*, 463 U.S. at 43.

### 2. The Department failed to consider the States' reliance interests in billions of dollars in federal funding.

Imposition of the Civil Immigration Conditions is also arbitrary and capricious because DHS "failed to address whether there was legitimate reliance on" the existing funding landscape— which there was. *Regents*, 591 U.S. at 30 (internal quotation marks omitted). As the Supreme Court has explained, "[w]hen an agency changes course," it is "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* at 30, 33. To "ignore" the "serious reliance interests" that "longstanding policies may have engendered" is arbitrary and capricious. *Id.* at 30 (internal quotation marks omitted).

Again, that is exactly what DHS did here. The States rely heavily on the annual receipt of funds that the Civil Immigration Conditions now endanger. For one, Plaintiff States rely on billions

of dollars in federal funding annually to support critical preparedness programs—programs that help prepare for the possibility of catastrophic events that range from floods to tornadoes to acts of extremist violence. For instance, as DHS itself has explained, the National Network of Fusion Centers—which FEMA funding supports in many States through the Homeland Security Grant Program to which the Conditions now attach, Ex. 24 (Maulawin Decl.), ¶ 9; Ex. 37 (Bray Decl.), ¶ 30; Ex. 44 (Pappas Decl.), ¶ 25; Ex. 49 (Engle Decl.), ¶ 23—helps share threat-related information among different levels of government. U.S. Dep't of Homeland Sec., *Fusion Centers* (captured May 14, 2025) (Ex. 8). DHS admits "that no other federal or local organization can replicate" that "unique perspective on threats to" states and localities. *Id.* But DHS's decision to implement the Civil Immigration Conditions will imperil the continued vitality of this critical support structure in many or all Plaintiff States—a cost DHS made no attempt to justify.

The States likewise rely on billions of dollars of federal support in the wake of catastrophic disasters under programs established pursuant to the Stafford Act. In the immediate aftermath of a major disaster, States rely on the Public Assistance Program for "crucial immediate support," including both "extraordinary life-saving measures like search and rescue and distribution of food aid" and longer-term repair of physical infrastructure. Ex. 22 (Khayyat Decl.), ¶ 102; *accord* Ex. 16 (Haney Decl.), ¶ 79; Ex. 37 (Bray Decl.), ¶ 102. Disaster relief and recovery would proceed more slowly without federal Public Assistance funding. *See* Ex. 22 (Khayyat Decl.), ¶ 103; Ex. 35 (Ottobre Decl.), ¶ 84. As just one recent example, Public Assistance funding has aided recovery in the wake of the devastating 2023 Maui wildfires. Ex. 20 (Mark Decl.), ¶¶ 40, 51. Also tied to presidential disaster declarations are Hazard Mitigation Grant Program funds, which aim to reduce loss of life and property in future, similar disasters. *See* 42 U.S.C. § 5170c; Ex. 47 (Ezelle Decl.), ¶ 71. For instance, Washington and Oregon are using Hazard Mitigation funds to retrofit or replace

water storage facilities in the Cascadia Subduction Zone to prevent catastrophic failures in the next significant earthquake, which would otherwise not only render water systems inoperable but also endanger lives. *Id.* ¶ 73(a); Ex. 40 (McMahon Decl.), ¶ 96.

The States have also structured their budgets and operations based on the reasonable expectation of continued funding via annual preparedness grants, which they cannot make up from other sources. Ex. 18 (Higgins Decl.), ¶¶ 20, 30, 84, 88; Ex. 26 (Brantley Decl.), ¶ 78; Ex. 46 (Chapman-See Decl.), ¶ 9. Every year, for example, the New Jersey legislature appropriates expected federal funding to individual state agencies, Ex. 36 (Shabazz Decl.), ¶ 4, and New Jersey expects to count on approximately $130 million in DHS funding in state fiscal year 2026, *id.* ¶ 6. If the current uncertainty continues through the spring, New Jersey will need to begin contingency planning for how to wind down or substantially cut program activities that relied on federal funding, imposing a significant operational burden. Ex. 35 (Ottobre Decl.), ¶ 83; Ex. 32 (Doran Decl.), ¶ 61. Plaintiff States' "interest in planning future programs" is an "important" one, *Bowen v. Massachusetts*, 487 U.S. 879, 906–07 (1988), but DHS did not heed it.

In imposing the Civil Immigration Conditions, DHS not only failed to "weigh" these longstanding, substantial reliance interests "against competing policy concerns"; it "ignore[d]" them altogether. *Regents*, 591 U.S. at 30, 33 (internal quotation marks omitted). Because the Conditions were adopted "with no regard for the [States'] reliance interests," and DHS "did not acknowledge—much less justify—its adoption" of the new requirements, they must be vacated "for want of reasoned decision making." *Int'l Org. of Masters, Mates & Pilots v. NLRB*, 61 F.4th 169, 179–80 (D.C. Cir. 2023).

### 3. The Department failed to consider the Conditions' effects on public safety.

Another "important aspect of the problem" that DHS "entirely failed to consider" is the adverse impact adhering to the Civil Immigration Conditions would have on States' enforcement of criminal law and efforts to maintain public safety. *State Farm*, 463 U.S. at 43. Under the Conditions, States "must agree that they will comply" with requirements "related to coordination and cooperation with [DHS] and immigration officials." Ex. 6 at 4. But many Plaintiff States limit their participation in federal civil immigration enforcement to preserve their resources for core public-safety missions and to "build trust between their law enforcement agencies and immigrant communities and ensure that noncitizens feel comfortable reporting crimes, cooperating with investigators, and serving as witnesses." *Providence*, 954 F.3d at 30. Congress recognized this reality in creating the U-visa program for immigrant crime victims. *See* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, § 1513(a)(2), 114 Stat. 1464, 1533–34 (visa program for crime victims "will encourage law enforcement officials to better serve immigrant crime victims and to prosecute crimes committed against aliens" and "will facilitate the reporting of crimes to law enforcement").

Empirical evidence supports Plaintiff States and Congress's view. *See, e.g.*, Ex. 14 (Wong Decl.), ¶¶ 11–16; *Cnty. of Ocean*, 475 F. Supp. 3d at 363 n.5 (citing "studies that confirm that immigration-related fears prevent individuals from reporting crimes"); Dale T. Manning & Jesse Burkhardt, *The Local Effects of Federal Law Enforcement Policies: Evidence from Sanctuary Jurisdictions and Crime*, 40 Contemp. Econ. Pol'y 423, 435–36 (2021) (finding "a decrease in crime rates" because of such policies, which is "consistent" with the notion that they "enhance trust in local law enforcement, improve reporting, and deter potential criminals from offending" (citation omitted)). And the testimony of many senior law-enforcement officials in Plaintiff States

substantiates this view. *See* Ex. 13 (Rosen Decl.) (District Attorney of Santa Clara County, California); Ex. 33 (Gaimari Decl.) (Chief of Police of Bridgeton, New Jersey). Even in Plaintiff States without such policies, DHS's categorical requirement that state agencies devote scarce resources to civil federal immigration enforcement prevents States from exercising discretion on how best to allocate resources to protect the public and ensure safety. The Civil Immigration Conditions thus run up against the States' "strong sovereign interest in ensuring public safety and criminal justice." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 651 (2022).

At minimum, DHS was required to consider the States' interest in maintaining public safety and "weigh" that interest "against competing policy concerns." *Regents*, 591 U.S. at 33. Its failure to do so is arbitrary and capricious. *Id.*

### 4.    The Department failed to consider alternatives to its sweeping policy.

Finally, in promulgating the Civil Immigration Conditions and requiring States to certify compliance with them in order to receive *any* agency funding, DHS overlooked the "alternatives" that were "within the ambit of the existing" landscape. *Id.* at 30 (brackets omitted) (quoting *State Farm*, 463 U.S. at 51). As *Regents* explained, it is arbitrary and capricious for an agency to change a federal program wholesale without first assessing whether it should instead alter specific aspects of the program. *See id.* at 26–30. And DHS never assessed several less drastic alternatives to its sweeping Civil Immigration Conditions. Namely, if the agency had statutory and constitutional authority to do so, it could have limited the condition to certain grants—as then-Senior Official Performing the Duties of the FEMA Administrator Hamilton proposed—rather than announcing a sweeping policy spanning multiple grant programs and billions in annual funds to the States. *Cf., e.g.*, *Nat'l Council of Nonprofits v. OMB*, No. 25-cv-239, 2025 WL 597959, at *14 & n.10 (D.D.C. Feb. 25, 2025) (distinguishing "targeted pauses of funding for specific projects" from a "nationwide suspension of *all* federal financial assistance"). Alternatively, the agency could have

sought permission from Congress to establish a new grant program that *was* meant for the purpose of enforcing immigration law, rather than repurposing programs Congress established for different purposes. Instead, DHS sought to "cut the fuel supply . . . without any consideration for the consequences of that decision," an approach that is "not—and could never be—rational." *Id.* at *14.

### C.    The Conditions Are Unconstitutional.

Finally, the Civil Immigration Conditions also violate the Constitution's Spending Clause in several respects. The Conditions impose requirements that are not reasonably related to the purposes of the grants themselves, are unconstitutionally coercive, and are unlawfully ambiguous. Each of these defects is independently fatal.

### 1.    The Conditions are not reasonably related to the funding programs to which they apply.

First, the Civil Immigration Conditions are unconstitutional because they are too unrelated to the purposes of DHS's grants. The Spending Clause requires any conditions imposed on federal grants to be "reasonably related to the federal interest in particular national projects or programs." *Massachusetts v. United States*, 435 U.S. 444, 461 (1978); *accord South Dakota v. Dole*, 483 U.S. 203, 207 (1987). But the Civil Immigration Conditions bear no relationship to the grants Congress has tasked FEMA and other DHS sub-agencies with administering. Take the State Recreational Boating Safety Program, which Congress created to "encourage greater State participation and uniformity in boating safety efforts" and enable "States to assume the greater share of boating safety education, assistance, and enforcement activities." 46 U.S.C. § 13102(a). There is no rational connection between promoting boating safety and co-opting local law enforcement for immigration-enforcement purposes. The same is true of countless other DHS grant programs. For example, Congress created an elaborate statutory scheme to "expedit[e] the rendering of aid,

assistance, and emergency services, and the reconstruction and rehabilitation of devastated areas," 42 U.S.C. § 5121(a), and it has appropriated billions in funding to support that goal. Pressing States into service in federal civil immigration enforcement does nothing to advance that purpose, and defendants have never argued that it does. Instead, the Civil Immigration Conditions impermissibly "seek to leverage funding to regulate [States' activities] outside the contours of the [grant] program[s]," *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013) (applying similar principle in First Amendment context), contrary to hornbook federalism principles.

Indeed, defendants' have admitted publicly that they view the Civil Immigration Conditions not as a lawful exercise of authority granted them by Congress but as a way of coercing the States into exercising their police power "outside the contours of the [grant] program[s]" at issue. *Id.* at 215. The President, for instance, issued an executive order directing the Attorney General and the DHS Secretary to "ensure that so-called 'sanctuary' jurisdictions . . . do not receive access to Federal funds." Exec. Order No. 14159, § 17, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025).[7] Secretary Noem, in turn, issued a memorandum directing that "[s]tate and local governments that refuse to cooperate with, refuse to share information with, or even actively obstruct federal immigration enforcement" not receive "a single dollar of the Department's money unless Congress has specifically required it." Ex. 3 at 1. Defendants' public statements, in other words, reflect not an exercise of any statutory discretion to impose reasonable conditions on the use of public funds;

---

[7] The President later issued another executive order directed to all executive agencies, not just the Attorney General and DHS, directing them to "identify appropriate Federal funds to sanctuary jurisdictions, including grants and contracts, for suspension or termination." Exec. Order No. 14287, § 3(a), 90 Fed. Reg. 18761, 18762 (Apr. 28, 2025). This order also directed DHS to "publish a list of" so-called "sanctuary jurisdictions" by May 28, 2025. *Id.* § 2(a).

they reflect an attempt to impermissibly leverage preexisting funds to obtain outcomes not contemplated by Congress and that the executive branch could not otherwise achieve.

### 2. The Conditions are coercive because they leave the States with "no real option" but to comply.

Second, and independently, the Civil Immigration Conditions attempt to coerce the States by withholding a staggering sum of money—billions of dollars in federal emergency funding that the States cannot realistically turn down. The Spending Clause affords Congress some power to "cajole the states to enact policies indirectly (through a spending inducement) that it could never directly order them to perform with its other enumerated powers." *Yellen*, 54 F.4th at 347 (emphasis omitted). But that comes with a unique danger—"allow[ing] Congress to exceed its otherwise limited and enumerated powers by regulating in areas that the vertical structural protections of the Constitution would not otherwise permit." *Haight v. Thompson*, 763 F.3d 554, 568 (6th Cir. 2014). In particular, the Supreme Court has cautioned against enabling the federal government to impose conditions that place so much "pressure" on the States that it "turns into compulsion," allowing Congress to effectively command a nationwide policy via funding measures alone. *Steward Mach. Co v. Davis*, 301 U.S. 548, 590 (1937). The Court has explained that, for a spending condition to remain permissible, a State must remain free from "coercion" and must be able to reject the condition and decline the funds "not merely in theory but in fact." *Dole*, 483 U.S. at 211–12.

To determine "where persuasion gives way to coercion," courts must examine all relevant facts and circumstances, including both "the programs at issue" and "the nature of the threat" posed by the condition. *Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 580, 585 (2012) (opinion of Roberts, C.J.). A condition that merely provides "mild encouragement" is permissible—as in *Dole*, where the funding condition deprived the States of only "5% of the funds

otherwise obtainable under specified highway grant programs" if they did not adopt a minimum drinking age of 21. 483 U.S. at 211. That condition left States free to reject the condition and to spend the remaining 95% of their federal highway funds to ensure that roads within their states were safe. *See id.* (observing that the "argument as to coercion is shown to be more rhetoric than fact"). The *NFIB* Court, by contrast, held that the federal government had crossed the line when it imposed as its condition for a State refusing to expand Medicaid the loss of not "merely 'a relatively small percentage' of its existing Medicaid funding, but *all* of it." 567 U.S. at 580 (opinion of Roberts, C.J.) (quoting *Dole*, 483 U.S. at 211); *accord id.* at 689 (Scalia, J., dissenting).

The Civil Immigration Conditions cross that line. As an initial matter, DHS has admitted that the Conditions are designed to ensure that so-called "sanctuary" States "not receive a single dollar of the Department's money." Ex. 3 at 1. The Conditions are thus undoubtedly intended "as a means of pressuring the States to accept policy changes." *NFIB*, 567 U.S. at 580 (opinion of Roberts, C.J.). And the imposition of the Civil Immigration Conditions on literally every dollar of federal emergency and disaster funding is not merely "mild encouragement," but "a gun to the head." *Id.* at 581 (internal quotation marks omitted). Put simply, Plaintiff States lack "a realistic option," *id.* at 681 (opinion of Scalia, J.), to turn down access to the federal funding that Congress has provided for emergency preparedness and disaster relief. As the First Circuit has recognized, "few interests are more central to a state government than protecting the safety and well-being of its citizens." *Worman v. Healey*, 922 F.3d 26, 39 (1st Cir. 2019). And over the past five years, Plaintiff States have received billions of dollars in funding through the grant programs at issue— easily surpassing $3 billion annually, even excluding COVID-19 disaster funds, Compl. ¶¶ 48, 63, 78, 91, 106, 148–149, 238 (citing DHS data)—amounting to a substantial—and irreplaceable— part of their disaster and terrorism preparedness and response budgets. *See supra* pp. 7–9; Ex. 26

(Brantley Decl.), ¶ 73; Ex. 36 (Shabazz Decl.), ¶ 5; Ex. 38 (Clayton Decl.), ¶ 7; Ex. 50 (Thomas Decl.), ¶ 7. And, as in *NFIB*, but unlike in *Dole*, Plaintiff States stand to lose not just some portion of their DHS funding, "but *all* of it," *NFIB*, 567 U.S. at 581 (opinion of Roberts, C.J.). That is "economic dragooning" that, as in *NFIB*, "leaves the States with no real option" to turn down the funds. *Id.* at 582.

And "the nature of the threat and the programs at issue," *NFIB*, 567 U.S. at 580 (opinion of Roberts, C.J.), makes the threat more coercive: Foregoing billions of dollars in DHS funding would force Plaintiff States to abruptly terminate ongoing public safety and disaster preparedness and response initiatives, putting them and millions of their residents at risk. *See* Ex. 22 (Khayyat Decl.), ¶¶ 142–147; Ex. 29 (Sweeney Decl.), ¶ 8; Ex. 43 (Longolucco Decl.), ¶¶ 34–37; Ex. 47 (Ezelle Decl.), ¶ 96. Moreover, due to the preexisting commitment of state resources, Plaintiff States cannot simply pay for these programs and continue operating them in the absence of federal funds without cutting other important state programs. Ex. 22 (Khayyat Decl.), ¶ 139; Ex. 32 (Doran Decl.), ¶ 66; Ex. 46 (Chapman-See Decl.), ¶ 9. And DHS's decision to apply the Civil Immigration Conditions not only to preparedness funds, but also to *disaster* funds, means that Plaintiff States face the real risk of confronting the next natural disaster—whether a wildfire, a hurricane, or some other threat—without any federal support whatsoever, absent a promise to devote state and local law-enforcement resources to federal civil immigration enforcement. That result is untenable. The Spending Clause does not permit the executive branch to wield billions of dollars of federal emergency money as a cudgel to threaten the States in such a manner.

### 3. The Conditions are unlawfully ambiguous.

Finally, the Civil Immigration Conditions violate the Spending Clause for the separate reason that they are hopelessly unclear and leave Plaintiff States and their agencies guessing at what is required to comply. The Spending Clause requires that, when the federal government

imposes conditions on federal funds, those conditions must be unambiguous, such that States can "exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207; *see also NFIB*, 567 U.S. at 577 (opinion of Roberts, C.J.); *Pennhurst*, 451 U.S. at 17, 24–25. Here, the Civil Immigration Conditions fail to pass muster.

For instance, the Cooperation Condition (C.IX.1.c) requires grant recipients to "honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer." Ex. 6 at 4. But the condition offers no explanation of what "cooperation" might entail, what "joint operations" might be required, or what "information" grant recipients are being asked to share. Nor does it make clear whether "requests for short term detention of an alien pursuant to a valid detainer" would require States to hold individuals beyond their scheduled release dates and times—asking them to potentially violate the Fourth Amendment or similar state constitutional guarantees. *See Morales v. Chadbourne*, 793 F.3d 208, 218 (1st Cir. 2015); *Miranda-Olivares v. Clackamas Cnty.*, No. 12-cv-2317, 2014 WL 1414305, at *11 (D. Or. Apr. 11, 2014). Read literally, the Cooperation Condition would allow DHS to commandeer whatever state or local resources it desires, so long as it invokes enforcing federal civil immigration law when it does so.

The Information Sharing (C.IX.1.a) and Compliance (C.IX.1.b) Conditions are likewise ambiguous. Each condition asks grantees to certify compliance with various federal statutes, *see* Ex. 6 at 4, but the current administration has in other contexts taken extreme positions about the interpretation of these statutes, many of which have been rejected by courts. For instance, the current administration has taken the position that 8 U.S.C. § 1373 prohibits States from limiting state and local officials' authority to share not only "information regarding the *citizenship or immigration status*, lawful or unlawful, of any individual" with the federal government, as the

statute expressly states, but also officials' authority to share *any* information about noncitizens. *See, e.g.*, Doc. 50 at 35, *United States v. Illinois*, No. 1:25-cv-1285 (N.D. Ill. Apr. 1, 2025) (arguing that "'information regarding citizenship or immigration status' also covers aliens' contact information and release dates"). That interpretation has been rejected by federal courts, *see, e.g.*, *California*, 921 F.3d at 891–93, but Plaintiff States do not know whether defendants are asking them to certify compliance with that understanding of this provision or not, *see, e.g., City & Cnty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 958 (N.D. Cal. 2018) (finding § 1373 compliance condition violated the Spending Clause where "DOJ's evolving interpretations of the [§ 1373] certification condition further demonstrate ambiguities that prevent applicants from deciding whether to accept the funds 'cognizant of the consequences of their participation'" (quoting *Dole*, 483 U.S. at 207)), *aff'd in part, vacated in part on other grounds sub nom. City & Cnty. of San Francisco v. Barr*, 965 F.3d 753 (9th Cir. 2020). Likewise, although the Compliance Condition asks States to certify that they do not violate 8 U.S.C. § 1324 and other unnamed "laws related to immigration," it neither identifies what laws Plaintiff States would be obligated to certify compliance with nor states whether DHS is requiring Plaintiff States to certify compliance with a faulty interpretation of § 1324 under which their laws somehow have the effect of violating that statute. *Cf.* U.S. Dep't of Just., *General Policy Regarding Charging, Plea Negotiations, and Sentencing* 2 (Feb. 5, 2025) (instructing Justice Department to investigate state actors for prosecution under § 1324 for "failing to comply with lawful immigration-related commands and requests") (Ex. 9).

The Benefits Condition (C.XVII.2.a.iii)—which requires States to certify that "[t]hey do not, and will not during the term of this award, operate any program that benefits illegal immigrants or incentivizes illegal immigration," Ex. 6 at 6—is likewise hopelessly ambiguous. Plaintiff States'

agencies cannot possibly identify the many individuals (and their citizenship statuses) who might "benefit" from any of the many programs they administer, Ex. 10 (Buccieri-Harrington Decl.), ¶ 35; Ex. 23 (King Decl.), ¶ 70; Ex. 42 (Hoxsie Decl.), ¶ 20; Ex. 47 (Ezelle Decl.), ¶ 11; let alone understand what DHS believes might "incentivize[] illegal immigration." For instance, does putting out a wildfire that threatens the homes of both American citizens and undocumented noncitizens confer a disqualifying "benefit"? What about rebuilding a road after a hurricane? Plaintiff States cannot accept such vague and unbounded conditions "knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207 (quoting *Pennhurst*, 451 U.S. at 17).

The Civil Immigration Conditions would subject the States' control over their own public safety operations to unbounded intrusions by the federal government. They thus run afoul of the constraints imposed by the Spending Clause and should be enjoined on that basis as well.

## II.    The Equities Compel Preliminary Relief.

### A.    Preliminary Relief Is Needed To Avert Irreparable Harm.

Absent preliminary relief from this Court, Plaintiff States will be severely and irreparably harmed by DHS's imposition of the Civil Immigration Conditions. With no injunction, Plaintiff States face a choice between two stark alternatives: foregoing billions in federal funding to prepare for and respond to emergencies and disasters threatening their residents or relinquishing their sovereign right to decide how to use their own law-enforcement officers and other public resources. This impossible choice itself constitutes irreparable harm. *See, e.g.*, *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 950 (N.D. Ill. 2017) ("a 'Hobson's choice' can establish irreparable harm") (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992)); *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 657 (E.D. Pa. 2017) (being faced with a choice "between, on the one hand, complying with a law [one] credibly believes is unconstitutional, and on the other hand, foregoing funds [one] plans to use for life-saving projects" establishes

irreparable harm). As discussed below, so too would each option standing alone. *See Rio Grande Cmty. Health Ctr. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005) (asking if plaintiffs would suffer "irreparable harm" because injuries "cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy").

The coercive effect of the Civil Immigration Conditions is being felt right now—and grows worse by the day. *Supra* pp. 14–16. Multiple States with existing grants for emergency relief and other critical functions have been asked to agree to the Civil Immigration Conditions now or lose access to those funds. For example, without relief from this Court, Washington and New Jersey must either accede to the challenged conditions or imminently lose eligibility for critical funding for wildfire response—potentially millions of dollars, depending on the severity of this year's fire season. Ex. 47 (Ezelle Decl.), ¶¶ 84–86; Ex. 35 (Ottobre Decl.), ¶¶ 69–72. All Plaintiff States will soon face a similar choice: The application cycle for FY 2025 preparedness grants will open shortly, with applications due soon thereafter and funding decisions made within three to four months. *See, e.g.*, Ex. 29 (Sweeney Decl.), ¶¶ 10–11; Ex. 18 (Higgins Decl.), ¶¶ 10–11; Ex. 16 (Haney Decl.), ¶¶ 9–10. Without intervention from this Court, Plaintiff States will have to either give up their chance to obtain this critical funding—on which they have relied for years—or give up an essential component of their sovereignty.

Either path leads to irreparable harm. Acceding to the Civil Immigration Conditions to preserve access to critical grant funds would intrude on Plaintiff States' sovereignty. The impact of an invasion of state sovereignty "cannot be economically quantified" and thus constitutes irreparable harm. *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024) (alterations omitted) (quoting *Kentucky v. Biden*, 23 F.4th 585, 611 n.19 (6th Cir. 2022)). States suffer an

"irreparable" injury when forced to abandon their "sovereign interests and public policies." *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001); *see also Ohio v. EPA*, 603 U.S. 279, 291 (2024) (impairment of States' "sovereign interests in regulating their own industries and citizens" is irreparable harm). Forcing Plaintiff States to abandon specific public policies governing their limited law-enforcement resources is exactly what the Civil Immigration Conditions require.

Courts uniformly viewed this same type of demand as a source of irreparable harm during the first Trump Administration. When presented with similar immigration-related grant conditions from the Department of Justice, multiple courts held that States and localities would suffer "an affront to their sovereignty" if the United States were "permitted to direct their behavior in an unauthorized way." *City of Evanston v. Sessions*, No. 18-cv-4853, 2018 WL 10228461, at *4 (N.D. Ill. Aug. 9, 2018). These "Tenth Amendment violations constitute[d] irreparable harm." *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 340 (E.D. Pa. 2018), *aff'd in part, vacated in part on other grounds*, 916 F.3d 276; *see also Colorado v. U.S. Dep't of Just.*, 455 F. Supp. 3d 1034, 1061 (D. Colo. 2020); *City & Cnty. of San Francisco*, 349 F. Supp. 3d at 970; *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537–38 (N.D. Cal. 2017).

The sovereign harm that would result from accepting the unlawful Conditions is hardly abstract—entanglement of local officials in federal immigration enforcement will make it less likely that victims and witnesses will report crimes in Plaintiff States. As multiple declarations from law enforcement in Plaintiff States attest, a clear line between local police and federal immigration enforcement builds trust with immigrant communities and, in doing so, helps solve crimes and protect crime victims. *See* Compl. ¶ 242–243; Ex. 13 (Rosen Decl.), ¶¶ 5–11; Ex. 33 (Gaimari Decl.), ¶¶ 6–22; Ex. 45 (Perez Decl.), ¶¶ 10–14; *see also* Ex. 14 (Wong Decl.), ¶¶ 10–22; 30–53, 55, 57–61. That is one reason that many Plaintiff States have implemented express

policies designed to foster trust between immigrant communities and local police. *See* Compl. ¶¶ 241–251. Acquiescing to the Civil Immigration Conditions would damage those relationships and, as a result, materially disadvantage Plaintiff States in their enforcement of state and local criminal law—a result that many courts held constituted irreparable harm in similar cases. *See City of Chicago v. Sessions*, 888 F.3d 272, 291 (7th Cir. 2018) (crediting state and local governments' conclusion that "the safety of their communities is furthered by a relationship of trust with the undocumented persons and lawful immigrants residing therein");[8] *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 877–78 (N.D. Ill. 2018) ("Trust once lost is not easily restored, and as such, this is an irreparable harm for which there is no adequate remedy at law."); *Philadelphia*, 280 F. Supp. 3d at 657 (compliance with conditions would inflict "irreparable reputational harm"); *accord Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000) ("Because injuries to goodwill and reputation are not easily quantifiable, courts often find this type of harm irreparable.").

The other path left open by the Civil Immigration Conditions—foregoing billions in federal funds—also leads to irreparable harm. The scale of the potential funding loss to Plaintiff States— billions of dollars annually, Compl. ¶¶ 48, 148–149—makes the harm irreparable. Just as the risk of being "driven out of business" constitutes "irreparable harm" in the commercial context, a significant loss of funding for a government can also be catastrophic such that money damages are inadequate. *Commodity Futures Trading Comm'n v. Brit. Am. Commodity Options Corp.*, 434 U.S. 1316, 1320 (1977); *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018).

---

[8] Limited en banc review of this decision was initially granted, but subsequently vacated, exclusively on the issue of whether the injunctive relief should extend nationwide. *See City of Chicago v. Sessions*, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018), *vacated*, No. 17-2991, 2018 WL 4268814 (7th Cir. Aug. 10, 2018). The government did not challenge the district court's irreparable harm ruling on appeal.

Here, the consequences of foregoing billions of dollars in emergency funds are immense. Depriving Plaintiff States of these funds will oblige them to lay off staff and terminate entire program capabilities. At the Massachusetts Emergency Management Agency, 85 out of 93 full-time employees rely on federal funds for a portion of their salaries. Ex. 26 (Brantley Decl.), ¶ 77; *see also* Ex. 18 (Higgins Decl.), ¶ 9 (preparedness grants fund approximately 30 full-time employees in Connecticut); Ex. 28 (Bowen Decl.), ¶ 18 (Michigan's Recreational Boating Safety Grant supports staff salaries, equivalent to 34 full-time employees); Ex. 30 (Block Decl.), ¶ 26 (salaries of nine employees). In the area of recreational boating safety, where the Coast Guard is actively demanding certification with the new Civil Immigration Conditions, Plaintiff States rely pervasively on federal funds to maintain the basic elements of their boating safety programs. *E.g.,* Ex. 23 (King Decl.), ¶¶ 54–55, 73; Ex. 30 (Block Decl.), ¶¶ 9–10; Ex. 39 (Seward Decl.), ¶¶ 10–12, 20–21; Ex. 41 (Warren Decl.), ¶¶ 5, 15. Plaintiff States do not have the capacity to re-allocate already-strained budgets to ensure that existing programs can survive a loss of federal funds. *E.g.,* Ex. 46 (Chapman-See Decl.), ¶ 9; Ex. 26 (Brantley Decl.), ¶ 78; Ex. 27 (Stanton Decl.), ¶ 34; Ex. 44 (Pappas Decl.), ¶ 51. That is true even of a temporary disruption. Ex. 22 (Khayyat Decl.), ¶¶ 140–144. Loss of this funding will therefore "have an immediate impact on [Plaintiff States'] ability to provide critical resources to the public, causing damage that would persist regardless of whether funding is subsequently reinstated." *United States v. North Carolina*, 192 F. Supp. 3d 620, 629 (M.D.N.C. 2016); *see also City of Evanston v. Barr*, 412 F. Supp. 3d 873 (N.D. Ill. 2019) (budget uncertainty causes irreparable injury); *Santa Clara*, 250 F. Supp. 3d at 537 (same).

The functions for which Plaintiff States use these grant funds are, at least in some instances, matters of life and death. *See Philadelphia*, 280 F. Supp. 3d at 579 (likely "loss of human life" constitutes irreparable harm). Defendants' own words confirm as much: "For decades, FEMA has

provided federal assistance to aid states in building and sustaining capabilities to measurably improve the nation's readiness in preventing, preparing for, protecting against, and responding to terrorist attacks and other hazards." 88 Fed. Reg. 62098, 62098–99 (2023). If deprived of funds under programs administered by DHS, Plaintiff States would have to scale back or shut down a wide range of efforts directed at protecting and preserving human life. For example, Congress established the terrorism-prevention assistance programs at issue in this suit through legislation passed in direct response to the horrific events of September 11, 2001. *See supra* at 3–4. Plaintiff States and their political subdivisions rely heavily on the anti-terrorism funding that DHS provides under that congressional mandate. For example, in fiscal year 2024, to prevent and respond to terrorist attacks, DHS obligated over $26 million to Colorado, $115 million to Illinois, $60 million to New Jersey, $288 million to New York, and over $24 million to Wisconsin. Ex. 16 (Haney Decl.), ¶ 6; Ex. 22 (Khayyat Decl.), ¶ 13; Ex. 32 (Doran Decl.), ¶ 64; Ex. 37 (Bray Decl.), ¶ 17; Ex. 49 (Engle Decl.), ¶ 13.

Losing this funding makes communities in each of these Plaintiff States more vulnerable to terrorist violence. If defendants have their way, funding will be cut for programs that have enabled security measures at the Hawaiʻi Supreme Court and the Colorado 17th Judicial District. Ex. 21 (Pace Decl.), ¶ 19; Ex. 15 (Buhse Decl.), ¶ 16. Funding will be cut for security equipment at defenseless nonprofits like churches, synagogues, mosques, and other houses of worship. Ex. 16 (Haney Decl.), ¶ 95; Ex. 18 (Higgins Decl.), ¶ 85; Ex. 22 (Khayyat Decl.), ¶ 136; Ex. 32 (Doran Decl.), ¶ 33; Ex. 49 (Engle Decl.), ¶ 98. Funding will be cut for the mutual aid networks that coordinate local law-enforcement agencies' response efforts after a catastrophe. Ex. 16 (Haney Decl.), ¶ 93; Ex. 18 (Higgins Decl.), ¶ 83; Ex. 22 (Khayyat Decl.), ¶¶ 133–34. Funding will be cut for port security operations in the Port of New York and New Jersey, Chicago, East St. Louis, and

43

Seattle, the last of which is preparing to ramp up security operations for the 2026 FIFA World Cup. Ex. 23 (King Decl.), ¶ 16–19; Ex. 35 (Ottobre Decl.), ¶¶ 40, 85(d); Ex. 48 (Susewind Decl.), ¶¶ 18–20. Requiring Plaintiff States to accept these heightened risks as a condition of maintaining their sovereignty constitutes irreparable harm.

FEMA funds also allow Plaintiff States to proactively plan for and mitigate the risks from specific hazards to human life. Using a Hazard Mitigation grant, Washington is at this very moment removing "dangerously high wildfire fuel loads" from residential neighborhoods. Ex. 47 (Ezelle Decl.), ¶ 73(c); *see also* Ex. 16 (Haney Decl.), ¶ 86 (similar Colorado project). If a major wildfire does break out, Fire Management Assistance Grants activate federal resources within hours, providing critical support to Plaintiff States like California and Washington that face increasingly severe and frequent wildfire risk (and that are rapidly approaching their highest-risk fire seasons). Ex. 12 (Owen Decl.), ¶¶ 10–12; Ex. 47 (Ezelle Decl.), ¶¶ 78–82. Flood mitigation funding enables local communities to build flood protection infrastructure, relocate residents in danger of repeated flood damage, and plan for improved floodplain management. Ex. 22 (Khayyat Decl.), ¶ 89; Ex. 18 (Higgins Decl.), ¶ 56; Ex. 26 (Brantley Decl.), ¶ 45. Dam safety funding helps put in place emergency action plans so that local first responders know just what to do if disaster strikes. Ex. 23 (King Decl.), ¶¶ 30–31; Ex. 34 (Kreipke Decl.), ¶ 30. A loss of these funds threatens imminent, catastrophic harm to Plaintiff States, their political subdivisions, and their residents.

Finally, because defendants have chosen to apply the new terms and conditions even to the funds Congress has authorized and appropriated under the Stafford Act, which funds state efforts to recover from major disasters—floods, wildfires, and the like—foregoing that funding, even on a temporary basis, carries profound risk to human welfare. After a presidentially declared major disaster, Plaintiff States depend critically on FEMA public assistance funds for immediate support

of search-and-rescue efforts and, later, the repair of roads, bridges, water control facilities, and other permanent infrastructure. Ex. 22 (Khayyat Decl.), ¶ 102; Ex. 26 (Brantley Decl.), ¶ 61. Disaster funding eclipses even the preparedness grants in the fiscal impact on state budgets: California has 24 open major disaster declaration awards involving FEMA public assistance funds, totaling over $5.2 billion in awards since 2010 (excluding COVID-19 pandemic funding). Ex. 12 (Owen Decl.), ¶ 6. New York has 17 open public assistance awards, including a $14 billion award arising from Hurricane Sandy that remains open. Ex. 37 (Bray Decl.), ¶¶ 93, 99. Illinois has seven open disasters with obligations to date totaling over $2.4 billion, Ex. 22 (Khayyat Decl.), ¶ 92–94, 100; Colorado has over $2.6 billion on five disasters, Ex. 16 (Haney Decl.), ¶¶ 68–70; Michigan has over $2 billion on four disasters, Ex. 29 (Sweeney Decl.), ¶¶ 56–58. Massachusetts received $2.7 billion in public assistance funding over the past three years. Ex. 26 (Brantley Decl.), ¶ 59. The States' need for these funds is particularly acute, and particularly time-sensitive: Absent the prompt availability of Stafford Act funds, States will be stymied in responding to significant disasters, like wildfires in California, tornadoes and flooding in Upstate New York, or flooding and landslides on the Hawaiian island of Kaua'i. *See* Ex. 12 (Owen Decl.), ¶¶ 7–8; Ex. 37 (Bray Decl.), ¶ 93; Ex. 20 (Mark Decl.), ¶ 40. Washington State is currently seeking federal funding for a November 2024 bomb cyclone that caused at least $34 million in damage to six counties. Ex. 47 (Ezelle Decl.), ¶ 93. But defendants' imposition of the Civil Immigration Conditions requires the States to choose between retaining their sovereignty and foregoing these funds. Under-funded or poorly coordinated responses to catastrophes can lead directly to loss of human life. The impetus for some of the programs at issue here—the massive and avoidable loss of life during Hurricane Katrina—testify to this fact.

### B.    The Balance of Equities And Public Interest Favor Preliminary Relief.

Last, "the balance of equities tips in [Plaintiff States'] favor," and "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Through the Civil Immigration Conditions, DHS aims to conscript state and local officials as enforcers of federal immigration law or, failing that, to withhold funding to Plaintiff States under all programs administered by any component of DHS. Either result would impose great hardship on Plaintiff States and contravene the public interest. Enjoining this unconstitutional action, on the other hand, would impose no cognizable hardship on defendants. It would simply maintain the status quo that has existed for the last 70 years. Therefore, "the hardship to the nonmovant if enjoined" pales in comparison to "the hardship to the movant if no injunction issues." *Ross-Simons*, 102 F.3d at 15. Plaintiff States are thus entitled to a preliminary injunction barring defendants from applying and enforcing the Civil Immigration Conditions with respect to Plaintiff States (including their subdivisions and instrumentalities) and as to all grants under defendants' control.

As detailed above, Plaintiff States rely extensively on the funding at issue for counter-terrorism efforts, disaster relief, flood mitigation, and many other purposes. *See supra* pp. 8–9, 41–45. The public interest weighs heavily against "jeopardizing national security." *Winter*, 555 U.S. at 33. Plaintiff States also "have an overarching public interest in retaining the resources already allotted to them" to provide "critical resources to provide immediate relief efforts" after a disaster. *Bredesen v. Rumsfeld*, No. 05-cv-0640, 2005 WL 2175175, at *11 (M.D. Tenn. Sept. 7, 2005); *see also, e.g.*, *Tenn. Valley Auth. v. Tenn. Elec. Power Co.*, 90 F.2d 885, 894 (6th Cir. 1937) (describing the "the catastrophic effect upon great areas of overflowing rivers" as "too recent and too painful to permit of any doubt either as to the existence or extent of the public interest" at issue).

The public interest also "takes into account the effects of a decision on non-parties." *Camelot Banquet Rooms, Inc. v. U.S. Small Bus. Admin.*, 24 F.4th 640, 644 (7th Cir. 2022); *see*

*also Am. Council of the Blind v. Mnuchin*, 878 F.3d 360, 368 (D.C. Cir. 2017) (same). Withholding preliminary-injunctive relief would impose catastrophic risks on many non-parties. Houses of worship, senior centers, and service organizations at risk of terrorist attack will lose access to protective measures, with no ability to make up the losses from other sources of funding. Ex. 16 (Haney Decl.), ¶ 95; Ex. 18 (Higgins Decl.), ¶ 85; Ex. 32 (Doran Decl.), ¶ 67. In particular, even as DHS touts its dedication to combatting "antisemitic terrorism,"[9] synagogues and other Jewish organizations at risk of terrorist attack will be among the primary victims of its current actions. Colorado has granted Nonprofit Security Grant funds to at least 26 synagogues and other Jewish organizations, Ex. 16 (Haney Decl.), ¶ 49, and Illinois to at least 21 synagogues in fiscal year 2023 alone, Ex. 22 (Khayyat Decl.), ¶ 64. In New York, the Nonprofit Security Grant program has enabled synagogues to purchase security cameras, hire security guards, install fencing, and undertake other protective measures. Ex. 37 (Bray Decl.), ¶ 72. A Maryland Jewish cultural organization suffered a hate-crime arson attack in August 2024, and it is currently awaiting decision on a Nonprofit Security Grant application to fund on-site security personnel. Ex. 25 (Strickland Decl.), ¶ 90.

Given DHS's indiscriminate imposition of the Civil Immigration Conditions across all grant programs, there will be numerous other third-party victims as well, too many to list here. Focusing on harms not already discussed, the Flood Mitigation Assistance Program enables homeowners who live in hazardous floodplains but cannot afford to move to relocate to higher ground. Ex. 22 (Khayyat Decl.), ¶¶ 89–90; Ex. 25 (Strickland Decl.), ¶¶ 122–123; Ex. 40 (McMahon Decl.), ¶ 63. The Community Assistance Program provides technical support to

---

[9] U.S. Citizenship & Immigration Servs., *DHS to Begin Screening Aliens' Social Media Activity for Antisemitism* (Apr. 9, 2025), https://www.uscis.gov/newsroom/news-releases/dhs-to-begin-screening-aliens-social-media-activity-for-antisemitism.

communities to ensure that they remain qualified for the National Flood Insurance Program, where failure to do so would cause property values to plummet. Ex. 23 (King Decl.), ¶ 42; Ex. 34 (Kreipke Decl.), ¶ 33. Earthquake preparedness efforts will falter, putting untold numbers of lives at risk. Ex. 20 (Mark Decl.), ¶¶ 32–38; Ex. 47 (Ezelle Decl.), ¶ 61. Boaters will face greater dangers as Plaintiff States lose funding to place navigational buoys and run other boating safety initiatives. Ex. 23 (King Decl.), ¶ 57; Ex. 30 (Block Decl.), ¶¶ 10, 26; Ex. 39 (Seward Decl.), ¶¶ 10–11. These diverse consequences underscore that DHS has imposed the Conditions without any consideration of the purposes of the funds at issue.

On the other side of the ledger, defendants would suffer no harm by simply maintaining the status quo, in which they allocate these congressionally mandated funds without the Civil Immigration Conditions attached. *See Sessions*, 888 F.3d at 291 (no harm to the government where it can "distribute the funds without mandating the conditions—as has been done for over a decade"). "Continuation of [that] status quo will not work an irreparable harm" on defendants. *U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 481 U.S. 1301, 1303 (1987) (Rehnquist, C.J., in chambers); *see also Francisco Sanchez v. Esso Standard Oil Co.*, 572 F.3d 1, 19 (1st Cir. 2009) ("[T]he purpose of a preliminary injunction is to preserve the status quo *before* the merits have been resolved."). Put another way, "if any injury to defendants ensues, it would be self-inflicted, the result of improper agency decision to steamroll the implementation of its plans." *P.R. Conservation Found. v. Larson*, 797 F. Supp. 1066, 1072–73 (D.P.R. 1992). In the end, defendants have the "awesome statutory responsibility to prepare the nation for, and respond to, all national incidents, including natural disasters and terrorist attacks." *News-Press v. U.S. Dep't of Homeland Sec.*, 489 F.3d 1173, 1178 (11th Cir. 2007). They cannot complain of an injunction

that merely obliges them to perform that duty without attaching sweeping funding conditions never contemplated by Congress.

## CONCLUSION

The Court should preliminarily enjoin defendants from applying and enforcing the Civil Immigration Conditions to Plaintiff States.

May 19, 2025

Respectfully submitted,

**ROB BONTA**
  ATTORNEY GENERAL OF CALIFORNIA

Michael L. Newman
  *Senior Assistant Attorney General*
Joel Marrero
James E. Stanley
  *Supervising Deputy Attorneys General*
Luke Freedman
Newton Knowles
Christopher Medeiros
Alexis Piazza
Deylin Thrift-Viveros
Delbert Tran
  *Deputy Attorneys General*

/s/ Lee I. Sherman
Lee I. Sherman
  *Deputy Attorney General*
California Department of Justice
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6000
lee.sherman@doj.ca.gov

*Attorneys for the State of California*

**KWAME RAOUL**
  ATTORNEY GENERAL OF ILLINOIS

/s/ Alex Hemmer
Alex Hemmer
  *Deputy Solicitor General*
Christopher G. Wells
  *Chief of the Public Interest Division*
Darren Kinkead
  *Public Interest Counsel*
R. Sam Horan
Michael M. Tresnowski
R. Henry Weaver
  *Assistant Attorneys General*
Office of the Illinois Attorney General
115 LaSalle Street
Chicago, IL 60603
(773) 590-7932
alex.hemmer@ilag.gov

*Attorneys for the State of Illinois*

**MATTHEW J. PLATKIN**
  ATTORNEY GENERAL OF NEW JERSEY

/s/ Shankar Duraiswamy
Shankar Duraiswamy
  *Deputy Solicitor General*
Mayur P. Saxena
  *Assistant Attorney General*
Surinder K. Aggarwal
Anaiis Gonzalez
Christopher J. Ioannou
Olivia C. Mendes
Phoenix N. Meyers
Sarah Nealon
Daniel Resler
  *Deputy Attorneys General*
New Jersey Office of Attorney General
25 Market Street, PO Box 093
Trenton, NJ 08625-0093
(609) 376-2745
shankar.duraiswamy@law.njoag.gov

*Attorneys for the State of New Jersey*


**PHILIP J. WEISER**
  ATTORNEY GENERAL OF COLORADO

/s/ David Moskowitz
David Moskowitz
  *Deputy Solicitor General*
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov

*Attorneys for the State of Colorado*


**PETER F. NERONHA**
  ATTORNEY GENERAL OF RHODE ISLAND

/s/ Keith D. Hoffmann
Keith D. Hoffmann (RI Bar No. 9874)
  *Chief of Policy*
  *Assistant Attorney General*
Paul Meosky (RI Bar No. 10742)
  *Special Assistant Attorney General*
Rhode Island Attorney General's Office
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 1882
khoffmann@riag.ri.gov
pmeosky@riag.ri.gov

*Attorneys for the State of Rhode Island*


**WILLIAM TONG**
  ATTORNEY GENERAL OF CONNECTICUT

/s/ Ashley Meskill
Ashley Meskill
  *Assistant Attorney General*
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5270
ashley.meskill@ct.gov

*Attorneys for the State of Connecticut*

KATHLEEN JENNINGS
  ATTORNEY GENERAL OF DELAWARE

/s/ Ian R. Liston
Ian R. Liston
  *Director of Impact Litigation*
Vanessa L. Kassab
  *Deputy Attorney General*
Delaware Department of Justice
820 North French Street
Wilmington, DE 19801
(302) 683-8899
ian.liston@delaware.gov

*Attorneys for the State of Delaware*

ANNE E. LOPEZ
  ATTORNEY GENERAL OF HAWAIʻI

/s/ Kalikoʻonālani D. Fernandes
David D. Day
  *Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes
  *Solicitor General*
Department of the Hawaiʻi Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Attorneys for the State of Hawaiʻi*

AARON M. FREY
  ATTORNEY GENERAL OF MAINE

/s/ Vivian A. Mikhail
Vivian A. Mikhail
  *Deputy Attorney General*
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800
vivian.mikhail@maine.gov

*Attorneys for the State of Maine*

ANTHONY G. BROWN
  ATTORNEY GENERAL OF MARYLAND

/s/ James C. Luh
James C. Luh
  *Senior Assistant Attorney General*
Office of the Maryland Attorney General
200 Saint Paul Place
20th Floor
Baltimore, MD 21202
(410) 576-6411
jluh@oag.state.md.us

*Attorneys for the State of Maryland*

**ANDREA JOY CAMPBELL**
  ATTORNEY GENERAL OF MASSACHUSETTS

/s/ Hannah C. Vail
Katherine Dirks
  *Chief State Trial Counsel*
Hannah C. Vail
  *Assistant Attorney General*
Office of the Massachusetts Attorney General
1 Ashburton Place
Boston, MA 02108
(617) 963-2512
katherine.dirks@mass.gov
hannah.vail@mass.gov

*Attorneys for the Commonwealth of
  Massachusetts*

**DANA NESSEL**
  ATTORNEY GENERAL OF MICHIGAN

/s/ Neil Giovanatti
Neil Giovanatti
Adam de Bear
  *Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa Street
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
deBearA@michigan.gov

*Attorneys for the People of the State of
  Michigan*

**KEITH ELLISON**
  ATTORNEY GENERAL OF MINNESOTA

/s/ Brian S. Carter
Brian S. Carter
  *Special Counsel*
Minnesota Attorney General's Office
445 Minnesota Street
Suite 1400
St. Paul, MN 55101
(651) 757-1010
brian.carter@ag.state.mn.us

*Attorneys for the State of Minnesota*

**AARON D. FORD**
  ATTORNEY GENERAL OF NEVADA

/s/ Heidi Parry Stern
Heidi Parry Stern
  *Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
hstern@ag.nv.gov

*Attorneys for the State of Nevada*

**RAÚL TORREZ**
  ATTORNEY GENERAL OF NEW MEXICO

/s/ Steven Perfrement
Steven Perfrement
  *Senior Litigation Counsel*
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
sperfrement@nmdoj.gov

*Attorneys for the State of New Mexico*

**LETITIA JAMES**
  ATTORNEY GENERAL OF NEW YORK

/s/ Julie Dona
Julie Dona
  *Special Counsel*
Zoe Levine
  *Special Counsel for Immigrant Justice*
Rabia Muqaddam
  *Special Counsel for Federal Initiatives*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-8494
julie.dona@ag.ny.gov

*Attorneys for the State of New York*

**DAN RAYFIELD**
  ATTORNEY GENERAL OF OREGON

/s/ Thomas H. Castelli
Thomas H. Castelli
  *Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
thomas.castelli@doj.oregon.gov

*Attorneys for the State of Oregon*

**CHARITY R. CLARK**
  ATTORNEY GENERAL OF VERMONT

/s/ Julio A. Thompson
Julio A. Thompson
  *Co-Director, Civil Rights Unit*
Officer of the Vermont Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-5519
julio.thompson@vermont.gov

*Attorneys for the State of Vermont*

**NICHOLAS W. BROWN**
  ATTORNEY GENERAL OF WASHINGTON

/s/ Tyler Roberts
Tyler Roberts
Benjamin Seel
Cristina Sepe
Marsha Chien
  *Assistant Attorneys General*
Washington State Office of the Attorney
  General
800 Fifth Avenue
Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Tyler.Roberts@atg.wa.gov
Benjamin.Seel@atg.wa.gov
Cristina.Sepe@atg.wa.gov
Marsha.Chien@atg.wa.gov

*Attorneys for the State of Washington*

**JOSHUA L. KAUL**
  ATTORNEY GENERAL OF WISCONSIN

/s/ Frances Reynolds Colbert
Frances Reynolds Colbert
  *Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-9226
frances.colbert@wisdoj.gov

*Attorneys for the State of Wisconsin*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 19, 2025, I provided a copy of the foregoing motion for a preliminary injunction and its exhibits to individuals at the U.S. Department of Justice by electronic mail:

> Kevin Love Hubbard
> Civil Division Chief
> United States Attorney's Office, District of Rhode Island
> Kevin.Hubbard@usdoj.gov

/s/ Alex Hemmer<br>Alex Hemmer