**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

STATE OF ILLINOIS, et al.,

              *Plaintiffs*,

   v.

FEDERAL EMERGENCY
MANAGEMENT AGENCY, et al.,

             *Defendants.*

No. 1:25-cv-206-WES-PAS

# EXHIBIT 10

## Declaration of Gina Buccieri-Harrington

## DECLARATION OF GINA BUCCIERI-HARRINGTON

I, Gina Buccieri-Harrington, declare as follows:

1.      I am over the age of 18 years. I know the following facts based on my own personal knowledge and on my review of information and records gathered by California Governor's Office of Emergency Services (Cal OES) staff in the ordinary course of business, and if called as a witness, I could and would testify competently to the matters set forth below.

2.      I currently serve as a special advisor to the Grants Management Directorate with the Governor's Office of Emergency Services (Cal OES) where I work on several specialized administration and legislative initiatives, while also advising and assisting in the development of the new Grants Management platform. Cal OES is a cabinet level agency that oversees and coordinates emergency preparedness, response, recovery and homeland security activities in California. Cal OES's mission is to protect lives and property, build capabilities, and support communities for a resilient California.

3.      I began my employment with Cal OES in 2004, when the Governor's Office of Criminal Justice Planning (OCJP) merged with Cal OES. During my entire tenure at Cal OES, I have worked in the Grants Management Directorate which is responsible for the administration of federal awards for homeland security, emergency management, public safety, and victim services programs. Prior to my current role as special advisor, I served as the Assistant Director of Grants Management at Cal OES. As Assistant Director, my job duties included supervising a team of individuals in managing grants received by Cal OES from the United States federal government and administering subgrants that Cal OES issues to local government entities and community-based organizations.

4.      Before starting at Cal OES, I served in the OCJP where I was also responsible for

grants management. In total, I have over 38 years of experience managing grants at either Cal

OES or the OCJP. Over the course of my career, I have had experience administering hundreds

of grants that the State has received from a variety of federal agencies including DHS.

     5.     I have reviewed and am familiar with the Fiscal Year (FY) 2025 Department of

Homeland Security (DHS) Standard Terms and Conditions that I understand will apply to all new

federal grant awards issued by DHS and its components.

## Background

     6.     As part of my regular job duties as Assistant Director, I oversaw federal grant

managers who manage preparedness grants. These grants provide funding to assist state and local

government entities, community-based organizations, and tribal governments in responding to,

preparing for, and protecting against acts of terrorism, improving emergency management and

preparedness capabilities, and enhancing cybersecurity capabilities. This includes the: (1)

Homeland Security Grant Program (HSGP); (2) Emergency Operations Center Grant Program

(EOC); (3) State and Local Cybersecurity Grant Program (SLCGP); (4) Nonprofit Security Grant

Program (NSGP); and (5) Emergency Management Performance Grant (EMPG). Typically, these

grant programs are on a three-year funding cycle contingent upon release of the Notice of

Funding Opportunity by DHS/FEMA.

## California's Annual Receipt of DHS Preparedness Grants

     7.     Cal OES is the State Administrative Agency designated by the Governor to apply

for, receive, and administer these five grants. The Homeland Security and Emergency

Management (HSEM) Branch of the Grants Management Directorate has managed and

administered the HSGP, EMPG, and NSGP for approximately two decades and EOC and

SLCGP for the past several years. A loss of these grants would severely obstruct and undermine

Cal OES's mission even if the funding were restored at a later date.

8.    The chart below shows the funds that go to state and local governmental entities, tribes, and community-based organizations for each fiscal year since 2022.

|  | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|
| Homeland Security Grant Program | 168,338,253 | 166,359,920 | 151,295,884 |
| Emergency Operations Center Funds | 4,775,000 | 7,918,995 | 7,966,590 |
| State and Local Cybersecurity Funds | 7,577,949 | 15,085,522 | 11,497,827 |
| Nonprofit Security Funds | 17,738,627 | 22,838,522 | 43,740,311 |
| Emergency Management Performance Funds | 17,631,430 | 15,202,198 | 14,202,198 |
| **Total** | **216,061,259** | **227,405,157** | **228,702,810** |

9.    Cal OES also retains funding for management and administration of these grant funds, as well as funding for the State Threat Assessment Center (STAC), the California Cybersecurity Integration Center (Cal-CSIC), California Specialized Training Institute (CSTI), Office of Access & Functional Needs (OAFN), Emergency Preparedness and Response Planning Coordination, Tribal coordination, Law Enforcement coordination, Earthquake & Tsunami preparedness, support for UASI risk management, and supporting fusion centers (which serve as hubs for different agencies to facilitate information sharing and coordination). These funds for grant management and state initiatives help the State of California meet the goals and objectives of each program. These grants support approximately 200-300 personnel within Cal OES. The chart below shows the amount of funds that Cal OES retains from each of the five grant programs for each fiscal year since 2022.

|  | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|
| Homeland Security Grant Program | 36,174,370 | 35,838,798 | 30,772,889 |
| Emergency Operations Center Funds | 0 | 382,788 | 0 |
| State and Local Cybersecurity Funds | 398,839 | 793,975 | 605,149 |
| Nonprofit Security Funds | 933,611 | 1,202,027 | 2,187,016 |
| Emergency Management Performance Funds | 14,079,775 | 12,139,883 | 10,263,598 |
| **Total** | **51,586,595** | **50,357,471** | **43,828,652** |

1. **California's Use of Homeland Security Grants**

10.     The Homeland Security Grant Program (HSGP) provides funding to support

planning, personnel, equipment, training, and exercise activities in order to strengthen the

capabilities of state and local governments to prevent, prepare for, protect against, and respond to

terrorist attacks and other hazards that pose the most significant risk to the security of the United

States. For example, the State Homeland Security Program (SHSP) generally assists state, local,

tribal, and territorial efforts in building, sustaining, and delivering these capabilities necessary to

prevent, prepare for, protect against, and respond to acts of terrorism. The Urban Area Security

Initiative (UASI) specifically assists high-threat, high-density urban areas in building. sustaining,

and delivering the capabilities necessary to prevent, prepare for, protect against, and respond to

acts of terrorism.

11.     DHS awards HSGP funding based in part on risk, utilizing a comprehensive risk

methodology focused on threat, vulnerability, and consequence. For example, some factors that

determine the relative risk score include the states' targeted infrastructure, special events,

4

international borders, international waters, economic concentration, total population density, gross domestic product, and daily visitors. For the fifth consecutive year, California had the highest risk ranking in the nation in FY 2024, and it is expected to maintain this ranking in FY 2025, illustrating the significance of these funds for our State.

12.    Cal OES currently distributes Homeland Security grant funding to 72 local government entities and select major metropolitan urban areas, including the five state designated fusion centers. In addition, the HSGP provides funding to tribal governments and state agencies through a competitive proposal process.

13.    These programs all help jurisdictions nationwide address threats and acts of terrorism across five core mission areas identified by FEMA: **(1) Prevention**: stop acts of terrorism; **(2) Protection**: protect citizens, residents, visitors, and assets against the greatest threats and hazards; **(3) Mitigation**: lessen the impact of future disasters; **(4) Response**: respond quickly to meet needs in the aftermath of a catastrophic event; and **(5) Recovery**: restore the infrastructure, housing, economy, and fabric of impacted communities.

14.    Cal OES understands that DHS will soon release its Notice of Funding Opportunity for FY 2025 HSGP funding. Cal OES was planning on applying for FY 2025 HSGP funding, which would be subject to the new terms and conditions released by DHS.

**2.  California's Use of the Emergency Operations Center Grant Program (EOCGP)**

15.    Funding through the EOCGP is provided to State, local, and tribal governments to assist their efforts in preparing for hazards and natural disasters, such as earthquakes and wildfires.

16.    Cal OES currently distributes EOCGP grant funding to 20 local government entities. This program assists in creating and augmenting emergency operations centers that

allow for continuity of operations and government in the face of major natural disasters or other emergencies. EOC grant funding allows Emergency Operations Centers to renovate or rebuild to address identified deficiencies and needs, as fully capable centers are an essential element of a comprehensive national emergency management system.

17.     There is currently no EOCPG funding for FY 2025, however Cal OES intends to apply for EOCPG funding when it is next available.

**3.  California's Use of State and Local Cybersecurity Grant Program (SLCGP)**

18.     Cal OES is in the process of distributing SLCGP funding to 111 state and local government and tribal entities. These programs assist in identifying state and local cybersecurity threats and building the capacity and partnerships necessary to protect against and counter these threats. Projects supported by SLCGP funding provide critical, real-time cybersecurity threat monitoring, detection, prevention, and response for state, local, and tribal government entities in California, including small municipalities and those in rural areas, who otherwise would not have access to these capabilities. In addition, this funding helps mitigate cybersecurity risks, threats, and potential attacks by developing workforce cyber awareness and strengthening the knowledge, skills, and abilities of government information technology and information security staff through training and exercises.

19.     Cal OES understands that DHS will release its Notice of Funding Opportunity for FY 2025 SLCGP funding later this year. Cal OES was planning on applying for FY 2025 SLCGP funding, which would be subject to the new terms and conditions released by DHS.

**4.  California's Use of Nonprofit Security Grants**

20.     The NSGP provides funding to support the physical/cyber security of nonprofit organization facilities at risk of a terrorist or other extremist attack. Funding can go to a number of safety measures including planning, equipment, training and exercises, and security. In

practice, organizations have used NSGP funding to: (1) secure their facilities by installing critical items such as cameras, access control, bollards, fencing, and security lighting; (2) implementing trainings such as Active Shooter preparations; and (3) hiring contracted security personnel.

21.     The program also seeks to coordinate the preparedness activities of nonprofits that are at high risk of a terrorist or other extremist attack with broader state and local preparedness efforts and promote emergency preparedness coordination and collaboration activities between public and private community representatives as well as state and local government agencies.

22.     NSGP is competitive, and the amount awarded to each state varies depending on successful applications in the competitive process. NSGP funded 311 nonprofit organizations across California in FY 2024.

23.     Cal OES understands that DHS will release its Notice of Funding Opportunity for FY 2025 NSGP funding later this year. Cal OES was planning on applying for FY 2025 NSGP funding, which would be subject to the new terms and conditions released by DHS.

**5.  California's Use of Emergency Management Performance Grant**

24.     EMPG funding enables state, local, and tribal governments to prepare for all hazards, from man-made to natural disasters, through planning, training, exercises, and professional development. It also supports response capabilities, emergency operation centers responsible for coordinating responses during a disaster, mutual aid agreements that provide for the sharing of resources among multiple entities during an emergency, public outreach campaigns, and community alert and warning notification systems that allow for the quick dissemination of information through text messages, automated calls, or other resources.

25.     Cal OES currently distributes EMPG funding to 58 counties. In addition, the EMPG provides funding to tribal governments through a competitive process.

26.     Cal OES understands that DHS will release its Notice of Funding Opportunity for FY 2025 EMPG funding later this year. Cal OES intends to apply for FY EMPG funding, which would be subject to the new terms and conditions released by DHS.

## The FY 2025 Civil Immigration Conditions and its Impact on Cal OES Grant Administration

27.     On March 27, 2025, DHS posted a new version of its Standard Terms and Conditions applicable to new federal awards from DHS or its component agencies that are ratified in FY 2025.

28.     The 2025 Standard Terms and Conditions include a new Section IX titled "Communication and Cooperation with the Department of Homeland Security and Immigration Officials" (Civil Immigration Conditions). The new Section IX seeks certain commitments not only from all "recipients," but also from "other recipients of funds under this award," which would include all the units of local government and nonprofit organizations who might be subrecipients of the funding that Cal OES disburses.

29.     Among other things, the new Section IX purports to require grantees and subrecipients to "honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer" and not to "leak or otherwise publicize the existence of an immigration enforcement operation." I understand that these conditions require Cal OES to certify under penalty of perjury that it will comply with these conditions and require its subrecipients to comply with these conditions.

30.     On April 18, 2025, DHS posted a second revised version of its Standard Terms and Conditions applicable to new federal awards ratified in FY 2025. The new terms preserved Section IX, as described above. They also added a clause in the "Anti-Discrimination" section

requiring recipients to certify that "[t]hey do not, and will not during the term of this award, operate any program that benefits illegal immigrants or incentivizes illegal immigration."

31.    Before this FY, Cal OES has never had to agree to accept civil immigration enforcement conditions to receive DHS grants. In my years with Cal OES, I am not aware of Cal OES staff ever being required to enforce or participate in the enforcement of federal civil immigration law. Further, because Cal OES is responsible for duties related to disaster preparedness and emergency preparedness, staff has neither the expertise nor capacity to enforce immigration law. If Cal OES personnel themselves were required to participate in federal civil immigration enforcement to comply with these new conditions, Cal OES would incur costs in trainings, the creation of procedures and guidelines, and lost personnel time diverted away from tasks that serve Cal OES's mission and the purpose of the grants that Cal OES receives from DHS.

32.    While Cal OES has cultivated strong relationships with its federal partners and routinely coordinates and cooperate with them on criminal and counter-terrorism matters, and commits to continue doing so, the ambiguity of the new funding conditions, especially when combined with the Trump Administration's previous statements about California law and its stated interpretation of federal immigration law, make it unclear what compliance would look like in practice.

33.    For example, the Civil Immigration Conditions require Cal OES to certify under penalty of perjury that it will comply with 8 U.S.C. § 1373, which prohibits restrictions on government agencies from exchanging information regarding immigration or citizenship status. While I understand, based on information and belief, that courts have held that California law complies with 8 U.S.C. § 1373, I understand that the Trump Administration has a more

expansive interpretation of that statute than the law provides. Thus, Cal OES does not know whether the condition requires that Cal OES certify compliance with 8 U.S.C. § 1373, as legally construed, or certify compliance with the Trump Administration's expansive interpretation of that statute.

34.     I understand another condition requires Cal OES, among other things, to "honor requests for cooperation, such as participation in join operations, sharing of information." Because the condition does not define or explain what "cooperation" or "joint operations" are required by the condition and what type of "information" is required to be shared, Cal OES does not know what the condition requires and whether it could accept that condition.

35.     Cal OES also does not understand what DHS means to include within the broad phrase "any program that benefits illegal immigrants" in the condition that it added on April 18. Cal OES cannot identify the innumerable individual people who might "benefit" from one of the programs it administers. Even if these individuals could somehow be identified before grant funds are obligated, which is impossible, Cal OES further lacks any capacity or authority to verify individuals' immigration status.

36.     There would be devastating consequences to the State if Cal OES does not receive FY 2025 DHS funding due to these new conditions. The lack of future funding will hinder jurisdictions across the State in protecting residents, visitors, and assets and providing critical resources for responding to disasters and mitigating the loss of life.

37.     The loss or suspension of federal funding will jeopardize Cal OES's ability to provide uninterrupted support for the critical programs that are funded by DHS's Preparedness grants. Subrecipients request reimbursement for completed projects at regular intervals for the duration of the subaward. Community-based organizations and governmental entities are allowed

to submit their reimbursement requests as expenditures are incurred. Consistent with California Government Code section 927, the State responds to an invoice received from a community-based organization requesting payment within 45 days. Once Cal OES has processed a request, the State Controller's Office will issue a check within fifteen days. Based on my experience in grant administration, I understand that timely processing of reimbursement requests is critical to sustaining programs, as most entities operate on tight budgets.

38.    Cal OES currently has plans to commit funding from the five Preparedness grant programs discussed to the following number of grant subawards and unique subrecipients:

| Federal Program | Number of Subrecipients |
|---|---|
| Homeland Security Grant Program | 7 |
| Emergency Operations Center | 10 |
| State and Local Cybersecurity Grant Program | 111 |
| Nonprofit Security Grant Program | 311 |
| Emergency Management Performance Grant | 58 |

39.    Cal OES does not have any other appropriation in its budget that could cover the loss of these five grants, which for FY 2024, totaled $228,702,810.[1] These five grant programs are passthrough grants, where Cal OES applies for the funding and administers the grant but passes through most or all of the funds to other state agencies, local or tribal governments, or

---

[1] Subrecipients do revert unspent funds to Cal OES, and the difference in federal and state fiscal years results in a certain amount of unallocated funds that Cal OES can draw upon. However, unspent funds are insufficient to offset lost federal funds.

11

non-profit organizations who perform the work. DHS generally does not provide the awarded funds to the state upfront. Rather, Cal OES or a subrecipient uses its own funds to perform the work on the grant funded initiatives. Cal OES will then submit drawdown reimbursement requests to DHS for such work. Cal OES can only be reimbursed for its work or reimburse subrecipients for their work once DHS releases those funds to Cal OES.

40.    If Cal OES cannot access federal funds, Cal OES will not have funds to immediately cover at minimum 562 subrecipients under these five programs.

41.    Without access to FY 2025 grant funding, Cal OES cannot commit funding for furtherance of these programs. Historically, Cal OES receives grant funding at the end of the federal fiscal year, which runs from October 1 to September 30. If Cal OES is not able to access FY 2025 funds by September 2025, it would hinder California's continued ability to respond to, prepare for, protect against, and respond to acts of terrorism, improve emergency management and preparedness capabilities, and enhance cybersecurity capabilities. The uncertainty of whether Cal OES will be able to receive these grant dollars in FY 2025 has already undermined the ability of Cal OES and subgrantees to plan for the FY 2025 grant program as it is impossible to discern which projects can be funded and ensure subgrantees continuity in funding.

42.    Sound security and response capabilities require reliable and consistent safety measures and protocols and the ability to quickly leverage resources to respond to threats. As such, even a temporary disruption in funding would cause operational disruptions in the State's emergency management and preparedness capabilities that could risk the security and safety of the State's residents.

43.    Homeland Security and Emergency Management grants support planning, training, and exercises vital for preparing for and responding to various threats, including natural

disasters, terrorism, and other emergencies. Cuts to these grants would hinder efforts to build and maintain these crucial preparedness capabilities. Since these funds are awarded annually, state and local jurisdictions count on these funds to plan current and future projects. Grant funding often supports multi-year projects that take time to plan and implement. Reduction or elimination of funding could lead to the termination of these projects before they are completed, resulting in wasted funds and incomplete capability building. For example, these critical Homeland Security grant funds continue to help support the Los Angeles area Emergency Management and Law Enforcement ongoing preparedness efforts as Los Angeles prepares to host three major events between 2026 and 2028, including the 2026 FIFA World Cup, 2027 Super Bowl LXI, and the 2028 Summer Olympics.

44. Projects to support these efforts are currently underway using HSGP funds; any reduction or elimination of these funds will halt all efforts to continue these crucial planning efforts and would result in vulnerabilities to our homeland security.

45. The longer Cal OES cannot access these Preparedness Grant funds, the greater the risk to the security of the state, specifically:

* Reduced Counterterrorism Capabilities: Limited ability to prevent targeted violence, threats to critical infrastructure, and malign foreign influence.

 * Weakened Intelligence Support:  Diminished tactical and strategic intelligence sharing with law enforcement and border patrol agencies, increasing risks related to narcotics trafficking, weapon smuggling, human trafficking, and terrorism.

 * Cybersecurity and Infrastructure Vulnerabilities: Decreased capacity to protect critical infrastructure, notify local businesses of cyber vulnerabilities, and maintain cybersecurity preparedness.

13

\* Emergency Response Gaps:  Delays and uncertainty in funding are causing disruptions in disaster preparedness, mitigation, response, and recovery, especially during critical periods like fire and flood season.

\* Erosion of Local Response Capabilities: Smaller and rural communities risk losing essential equipment, emergency operations center (EOC) support, and first responder trainings.

\* Operational and Staff Instability: Uncertainty in grant reimbursement is causing loss of experienced personnel and interrupting ongoing security, prevention, and response projects.

### Monitoring and Technical Assistance Obligations

46.         Cal OES currently engages in technical assistance and monitoring of subrecipients. Throughout the year, Cal OES conducts several technical assistance sessions for its subrecipients to provide guidance on related programmatic changes and requirements for each of the DHS programs discussed above. A team of Cal OES grant administrators spend months preparing for these technical assistance sessions. These sessions are designed to be concise and consistent with federal and state rules and regulations governing grant administration and other compliance issues.

47.         Cal OES does not have the capabilities or subject matter expertise to monitor sub-grantees' level of cooperation and coordination in civil immigration enforcement. In order to possess those capabilities, Cal OES would be required to allocate additional funds annually to hire staff to monitor these specified duties which could redirect resources from programmatic funding. I also understand that Cal OES's subrecipients, particularly California law enforcement agencies, may be unable to provide the type of cooperation with immigration authorities that are called for by these conditions.

48.         Cal OES does not currently provide, and has never provided, technical assistance

and/or monitoring of any of its subrecipients for compliance with Civil Immigration Conditions or with federal immigration law more broadly, since that is not within the purview of OES. Cal OES has not received and is not aware of any guidance from DHS about the condition or about what grantees must do to assist or monitor subrecipient compliance with the new requirement. Cal OES would need to modify current technical assistance and monitoring materials and protocols, develop a new technical assistance training, and develop a delivery system for this new training in order to satisfy the Civil Immigration Conditions, although it is unclear how Cal OES would be able to accomplish that, particularly given the uncertainty as to the scope, interpretation, or application of these conditions to subrecipients and the communities they serve.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on May 17, 2025, in Sacramento, California.

_____
**Gina Buccieri Harrington**