**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

ILLINOIS, *et al.*,

      Plaintiffs,

*v.*

FEDERAL EMERGENCY MANAGE-
MENT AGENCY, *et al.*,

      Defendants.

Civil Action No.
25-cv-206-WES-PAS

**DEFENDANTS' RESPONSE IN OPPOSITION**
**TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................2

STANDARD OF REVIEW .................................................................................................5

    I.       Preliminary Injunction ............................................................................. 5

    II.      Subject Matter Jurisdiction ...................................................................... 6

ARGUMENT........................................................................................................................7

    I.       The Court Should Dismiss Plaintiffs' Claims Concerning Programs to
           Which Defendants Have Decided Not to Apply the Contested
           Conditions. ............................................................................................... 7

    II.      Plaintiffs' Claims Regarding the Remaining FEMA Grant Programs Are
           Not Ripe .................................................................................................... 8

    III.    Because the Tucker Act Grants Exclusive Jurisdiction Over Plaintiffs'
           Claims to the Court of Federal Claims, This Court Lacks Subject Matter
           Jurisdiction. .......................................................................................... 11

    IV.    Plaintiffs Have Not Established a Likelihood of Success on the Merits .................. 15

        A.     Congress Did Not Preclude the Implementation of Specific Terms and
               Conditions ..........................................................................................15

        B.     The Constitution Permits Agencies to Set Terms and Conditions ......................16

             1.      DHS Has Limited Potential Application of the Challenged
                     Conditions to Grants Reasonably Related to National Security ..............19

             2.      Requiring Compliance with Federal Law Is Constitutional ....................21

        C.     Plaintiffs Have Not Established a Likelihood of Success on Their APA
                Claims ................................................................................................22

    V.      Plaintiffs Do Not Sufficiently Allege Harm That Is Irreparable .............................. 25

    VI.    The Balance of the Equities and the Public Interest Weigh in the Federal
           Government's Favor ................................................................................ 26

    VII.    The Court Should Limit Any Preliminary Injunctive Relief to the
           Challenged Conditions That Require More Than Compliance With Federal
           Law, to the Grant Programs Identified in Plaintiffs' Complaint, and to the
           Plaintiff States ....................................................................................... 27

    VIII.   Any Injunctive Relief Should Be Stayed Pending Appeal and
           Accompanied by a Bond ......................................................................... 28

CONCLUSION....................................................................................................................28

## INTRODUCTION

Plaintiffs' motion for a preliminary injunction seeks immediate relief enjoining the Department of Homeland Security ("DHS" or "Agency") from implementing certain new immigration conditions that DHS has added to its standard grant program terms and conditions. By this request, Plaintiffs ask this Court to invalidate the new conditions and require DHS and its component agencies—here, the Federal Emergency Management Agency and the U.S. Coast Guard—to provide funding to each state regardless of whether the recipient complies with federal law, takes steps to impede DHS's efforts to fulfill its immigration enforcement responsibilities, or cooperates with DHS's requests for assistance. Plaintiffs also seek this injunction across all of DHS's grant programs administered by FEMA, even where the purpose of the FEMA-administered grants and the challenged conditions relate to Congressional objectives delegated to DHS and its subagencies.

Plaintiffs' challenge, however, is moot concerning 12 of the 18 programs at issue in this case—namely, the Disaster and Mitigation programs and two of the Preparedness programs identified in the Complaint. Consistent with the March 25, 2025 memo attached to Plaintiffs' filings (*see* ECF 1-2, 21-4), DHS and FEMA have reached a final determination to exempt these programs from the Immigration Conditions to which Plaintiffs object and Plaintiffs do not need to comply with the challenged Immigration Conditions in order to receive funding under these 12 grant programs. *See* Declaration of David Richardson, Senior Official Performing the Duties of the FEMA Administrator, ("Richardson Decl."), ¶¶ 6-7, 13-15.

For the remaining grant programs, this case is, at its essence, a dispute about changes by one party to grant agreement language, and therefore it is a contract dispute that must be heard in the Court of Federal Claims. Even if that were not so, Congress intended for the FEMA grant programs at issue to address national security and terrorism concerns that rely on the cooperation that the conditions promote. Congress did not preclude the placement of the challenged conditions on the grant programs at issue, and Plaintiffs have not established a likelihood of success on the merits with respect to these programs.

Plaintiffs may disagree with the federal government's immigration policies, but that disagreement is not sufficient to preliminarily enjoin the Agency's requirements as unconstitutional or unlawful. Plaintiffs' view of what the federal government should do differs from what the federal government may lawfully do. Should the Court disagree and be inclined to enter a preliminary injunction, the government respectfully submits that any such injunction should not apply to the grant conditions that require compliance with existing federal law, to grant programs beyond those identified in Plaintiffs' Complaint, or to entities beyond the Plaintiff states.

## BACKGROUND

**February 19, 2025 Memo**. On February 19, 2025, DHS Secretary Kristi Noem issued a memo titled "Restricting Grant Funding for Sanctuary Jurisdictions," which instructed Agency components to "review all federal financial assistance awards" to determine what, if any, funds are going to sanctuary jurisdictions and to report on their compliance with the Noem Memo in 30 days.

**March 25, 2025 Memo[1]**. On March 25, 2025, DHS Secretary Noem signed a memorandum outlining which grant programs might apply immigration enforcement-related conditions. (*See* ECF 1-2, Exhibit B to Plaintiffs' Complaint; Richardson Decl. ¶ 6.) The March 25 Memo notes that DHS/FEMA application of any conditions or restrictions on grant program applications or funding would vary based on the structure, purpose, and statutory authority of each respective program. After reviewing each of FEMA's grant programs and authorizing statutes, the March 25 Memo made a determination regarding which grant programs are *exempt* from immigration enforcement conditions, and which required further review. Richardson Decl. ¶ 6.

---

[1] Plaintiffs refer to this memorandum as the March 20, 2025 memo, but because it was signed by the Secretary on March 25, 2025, Defendants refer to March 25 as the operative date.

**April 18, 2025 DHS Standard Terms and Conditions**. On April 18, 2025,[2] DHS publicized updated standard terms and conditions for DHS grants, which apply to federal awards that occur in FY 2025 ("April Terms").

The updated conditions include the following terms ("Immigration Conditions"):

- C.IX.1.a: Grant recipients "must comply with the requirements of 8 U.S.C. §§ 1373 and 1644 . . . [which] prohibit restrictions on information sharing by state and local government entities with DHS regarding the citizenship or immigration status, lawful or unlawful, of any individual . . . ."

- C.IX.1.b: Grant recipients "must comply with other relevant laws related to immigration . . . ." (listing specific examples)

- C.IX.1.c: Grant recipients "will honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer. A jurisdiction does not fail to comply with this requirement merely because it lacks the necessary resources to assist in a particular instance."

- C.IX.1.d: Grant recipients "will provide access to detainees . . . ."

- C.IX.1.e: Grant recipients "will not leak or otherwise publicize the existence of an immigration enforcement operation."

- C.IX.2: Grant recipients "must certify . . . that [they] will comply with the requirements of this term. . . ."

- C.IX.3: Grant recipients "agree[] that compliance with this term is material to the Government's decision to make or continue with this award and that the Department of homeland Security may terminate this grant, or take any other allowable enforcement action, if the recipient fails to comply with this term."

- C.XVII(2)(a)(iii): "By accepting the grant award, recipients are certifying that . . . [t]hey do not, and will not during the term of this award, operate any program that benefits illegal immigrants or incentivizes illegal immigration."

(ECF 1-3, Exhibit C to Plaintiffs' Complaint).

With respect to the grant programs identified in Plaintiffs' Complaint, DHS and FEMA have made a final determination that the Immigration Conditions do not apply to the following grant programs:

---

[2] DHS also published updated Standard Terms and Conditions on March 27, 2025, which contained challenged immigration conditions. The government references the April 18, 2025 version herein because they are the current, operative version.

**Disaster Relief:**

- Public Assistance Programs

- Disaster Case Management (DCM)

- Hazard Mitigation Grant Program (HMGP)

- Fire Management Assistance Grant (FMAG)

**Mitigation:**

- National Earthquake Hazards Reduction Program – Individual State Earthquake Assistance (NEHRP-ISEA)

- Flood Mitigation Assistance (FMA)

- National Dam Safety Program (NDSP)

- Community Assistance Program – State Support Services Element (CAP-SSSE)

- National Urban Search & Rescue Response System (US&R)

- Cooperating Technical Partners Program (CTP)

**Preparedness:**

- State and Local Cybersecurity Grant Program (SLCGP)

- Nonprofit Security Grant Program (NSGP)

Richardson Decl. ¶¶ 13-14.

DHS is currently in the process of completing additional analysis for the remaining five FEMA grant programs at issue in this case that were identified in the March 25 Memo as requiring additional review to determine whether it should apply conditions related to federal immigration enforcement to each program and, if so, the scope of those conditions. Richardson Decl. ¶ 12. DHS has not yet made any final decision regarding the application of the Immigration Conditions to the following five grant programs:

- Emergency Management Performance Grant (EMPG)

- Homeland Security Grant Program – State Homeland Security Program (SHSP)

- Homeland Security Grant Program – Urban Area Security Initiative (UASI)

- Port Security Grant Program (PSGP)

- Presidential Residence Protection Assistance (PRPA)

Richardson Decl. at ¶ 12.

On May 13, 2025, 20 states filed a complaint in this Court seeking to enjoin the application of these conditions across the grant programs administered by DHS and the Coast Guard, identifying specific FEMA grant programs at issue. On May 19, 2025, the Plaintiffs moved for a preliminary injunction. For the reasons discussed below, the Court should deny the motion. In the alternative, the Court should not enjoin DHS and FEMA from implementing the challenged conditions with respect to the requirements to comply with federal law, to grant programs beyond those identified in Plaintiffs' Complaint, or to entities beyond the Plaintiff states.[3]

## STANDARD OF REVIEW

### I.    Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Cushing v. Packard*, 30 F.4th 27, 35 (1st Cir. 2022). A plaintiff must establish that: (i) it is likely to succeed on the merits; (ii) absent preliminary relief, it likely will suffer irreparable harm; (iii) the balance of the equities tips in its favor; and (iv) an injunction is in the public interest. *New Jersey v. Trump*, 131 F.4th 27, 33 (1st Cir. 2025) (citing *Winter*, 555 U.S. at 20). The third and fourth factors "merge when the government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."). "In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987). "The party seeking the preliminary injunction

---

[3] Plaintiffs bring claims against both DHS and the Coast Guard regarding the implementation of DHS's Standard Terms and Conditions. With respect to the sole Coast Guard program grant program identified in the Complaint—State Recreational Boating Safety ("RBS")—the Coast Guard has implemented DHS's Standard Terms and Conditions, and thus the government's arguments in this brief focus on DHS's authority to set its Standard Terms and Conditions. The Court should not enjoin the Immigration Conditions with respect to RBS for the reasons presented in Sections III-VI below.

bears the burden of establishing that these four factors weigh in its favor[,]" using evidence to support its conclusions. *Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006).

To evaluate whether the Plaintiffs have met the most important requirement—likelihood of success on the merits—the Court must keep in mind that the merits need not be "conclusively determine[d]"; instead, at this stage, decisions "are to be understood as statements of probable outcomes only." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 93 (1st Cir. 2020) (partially quoting *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991)). "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam) (quoting *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010)).

## II.    Subject Matter Jurisdiction

To proceed on their claims, the Plaintiff states must first establish subject matter jurisdiction in this Court—specifically, by showing whether Congress has waived sovereign immunity and, if so, whether this Court may hear their claims. *See, e.g.*, *Hanley v. United States*, No. 94-1315, 1994 WL 723678, at *2 (1st Cir. Oct. 5, 1994) (per curiam) (affirming R. 12(b)(1) dismissal) ("A plaintiff has the burden of showing a waiver of sovereign immunity."). "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) (citing cases); *United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."); *Griffith v. Bowen*, 678 F. Supp. 942, 944 (D. Mass. 1988) ("[T]his Court must decide whether it has jurisdiction over the subject matter of the dispute before it may proceed any further.").

Federal courts "presume [they] lack jurisdiction unless the contrary appears affirmatively from the record." *Renne v. Geary*, 501 U.S. 312, 316 (1991) (cleaned up). The test for deciding whether sovereign immunity has been waived is "stringent," the waiver must be "unmistakably

clear," and the Court must "indulge every reasonable presumption against" waiver. *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675, 678, 682 (1999) (cleaned up); *FAA v. Cooper*, 566 U.S. 284, 290 (2012) ("A waiver of sovereign immunity must be une-quivocally expressed in statutory text.").

Thus, the Plaintiff states have the burden of alleging facts sufficient to establish the Court's subject matter jurisdiction. *See Aversa v. United States*, 99 F.3d 1200, 1209 (1st Cir. 1996); *see also Padilla-Mangual v. Pavía Hosp.*, 516 F.3d 29, 31 (1st Cir. 2008) ("Once challenged, the party invoking subject matter jurisdiction . . . has the burden of proving by a preponderance of the evidence the facts supporting jurisdiction.").

## ARGUMENT

### I.    The Court Should Dismiss Plaintiffs' Claims Concerning Programs to Which Defendants Have Decided Not to Apply the Contested Conditions.

There is no relief for the Court to grant with respect to 12 of the grant programs that the Plaintiffs' Complaint identifies—namely the Disaster and Mitigation grant programs and two of the Preparedness grant programs identified in the Complaint. That is so because DHS and FEMA have made final decisions ***not*** to apply any of the Immigration Conditions that Plaintiffs challenge to those programs, and Plaintiffs do not need to comply with the Immigration Conditions in order to receive funding under these grant programs. Richardson Decl. ¶¶ 13-14. These programs are:

**Disaster Relief:**

- Public Assistance Programs

- Disaster Case Management (DCM)

- Hazard Mitigation Grant Program (HMGP)

- Fire Management Assistance Grant (FMAG)

**Mitigation:**

- National Earthquake Hazards Reduction Program – Individual State Earthquake Assistance (NEHRP-ISEA)

- Flood Mitigation Assistance (FMA)

- National Dam Safety Program (NDSP)

- Community Assistance Program – State Support Services Element (CAP-SSSE)
- National Urban Search & Rescue Response System (US&R)
- Cooperating Technical Partners Program (CTP)

**Preparedness:**

- State and Local Cybersecurity Grant Program (SLCGP)
- Nonprofit Security Grant Program (NSGP)

Richardson Decl. ¶ 14.

This determination supersedes the inclusion of the Immigration Conditions in DHS's April Terms. Richardson Decl. ¶ 15. When, as here, a "case loses its live-controversy character at any point in the proceedings, the mootness doctrine generally stops [a court] from pumping new life into the dispute (regardless of how fascinating the party's claims are) by 'oust[ing]' the federal courts of 'jurisdiction' and 'requir[ing]' [a court] to 'dismiss[ ]' the case." *Boston Bit Labs, Inc. v. Baker*, 11 F.4th 3, 8 (1st Cir. 2021) (quoting and citing *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 335 (1980)) (affirming dismissal of case as moot given recission of challenged executive action).

Because the very relief that Plaintiffs seek—exempting the challenged conditions as part of certain grants—has already been achieved by final agency action concerning these specified programs, there is nothing for the Court to do concerning these programs, and Plaintiffs' claims so far as they concern these programs should be dismissed as moot under Federal Rule of Civil Procedure 12(b)(1).

## II.    Plaintiffs' Claims Regarding the Remaining FEMA Grant Programs Are Not Ripe

The Court should deny the motion with respect to the five remaining FEMA grant programs at issue in this case because the Agency has not determined whether to apply the Immigration Conditions to these programs, and thus a preliminary injunction would short-circuit ongoing administrative processes at FEMA and would itself cause separation-of-powers complications. *See, e.g.*, *Downing/Salt Pond Partners, L.P. v. Rhode Island & Providence Plantations*, 643 F.3d 16,

17 (1st Cir.), *cert. denied*, 565 U.S. 977 (2011). "Ripeness is a justiciability doctrine" whose purpose is to prevent "courts from 'entangling themselves in abstract disagreements over administrative policies' and from improperly interfering in the administrative decision-making process." *City of Fall River v. Fed. Energy Regulatory Comm'n*, 507 F.3d 1, 6 (1st Cir. 2007) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)). "The burden to prove ripeness is on the party seeking jurisdiction." *Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318, 326 (1st Cir. 2016) (affirming dismissal of pre-enforcement judicial review on ripeness grounds).

Courts apply a two-part test to determine whether a case is ripe for review, and both favor denial of the Plaintiffs' motion. First, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998); *see also City of Fall River*, 507 F.3d at 6 (declining to review agency's conditional project approval for lack of ripeness). Agency action is not ripe for judicial review until an agency has made a final decision. *Abbott Labs.*, 387 U.S. at 149. And, for an agency review to be final, it must be both (a) "the consummation of the agency's decisionmaking process," and (b) a decision "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177 (1997); *Abbott Labs.*, 387 U.S. at 148-49.

DHS and FEMA have not issued any Notices of Funding Opportunity ("NOFOs") for the remaining five grant programs at issue in this case for Fiscal Year 2025. Richardson Decl. ¶ 19. Until a NOFO issues, no funds are available to any state for that program for FY 2025. Richardson Decl. ¶ 17. For Preparedness and Mitigation grants, states are not required to acknowledge DHS's Terms until they apply for a NOFO. Richardson Decl. ¶ 18. A NOFO establishes DHS's guidance concerning various aspects of a particular grant program for a specific fiscal year. Those aspects include the program's objectives, the amount of money appropriated by Congress for the program, how states can demonstrate their eligibility for funding and how they must apply for it, and the terms and conditions that apply to those programs. Richardson Decl. ¶ 17. In addition, the

Agency's determination regarding whether the Immigration Conditions apply to the remaining FEMA grant programs at issue remains pre-decisional. Richardson Decl. ¶¶ 7, 12.

Without the Agency's determination regarding whether the Immigration Conditions apply to the remaining five FEMA grants at issue in this case – and without any NOFOs for states to apply for funding from those programs – there is no final agency action. Without this agency action, it is unclear what the Court would be assessing, how, and on what grounds, as well as what relief it could grant. *See, e.g.*, *Broderick v. di Grazia*, 504 F.2d 643, 645 (1st Cir.1974) (action for declaratory judgment that statement by Police Commissioner would deprive police officers of due process in future administrative proceedings not ripe because "[a] court could only guess at how [the statement] might be translated into practice"); *Carman v. Yellen*, 112 F.4th 386, 402 (6th Cir. 2024) (explaining that a pre-enforcement facial vagueness challenge is not ripe for review) ("We cannot invalidate [a law] based on scenarios that may never come to pass."); *City of Fall River*, 507 F.3d at 6 ("[A] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."); *Continental Air Lines, Inc. v. Civil Aeronautics Bd.*, 522 F.2d 107, 125 (D.C. Cir.1975) ("If the [agency's] position is likely to be abandoned or modified before it is actually put into effect, then its review wastes the court's time and interferes with the process by which the agency is attempting to reach a final decision."); *cf. Portela-Gonzalez v. Sec'y of the Navy*, 109 F.3d 74, 79 (1st Cir. 1997) ("Disregarding available administrative processes thrusts parties prematurely into overcrowded courts and weakens an agency's effectiveness by encouraging end-runs around it."). In addition, without final agency action, there can be no review under the APA. *See* 5 U.S.C. § 704; *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024).

Second, a court must consider the hardship to both parties, but there is no hardship to the Plaintiffs. Without a NOFO, there is no funding to even apply for, on whatever terms, for any of the remaining FEMA programs. Should FEMA decide to apply terms that Plaintiffs would contest for the same reasons as set forth in their Complaint and preliminary-injunction motion, they may challenge the Agency's decisionmaking before this Court if and when that contingency actually

occurs. *See City of Fall River*, 507 F.3d at 7; *see also Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 734 (1998) ("The [plaintiff] thus will have ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain."). If, instead, the Agency decides not to apply the challenged terms, as it did with its final decision not to apply any of the challenged conditions to the Disaster and Mitigation grant programs at issue in this case, Plaintiffs' claims will be moot and there will be nothing for the Court to decide. Therefore, until there is a final agency action for the Court to evaluate, Plaintiffs' motion should be denied.

### III.    Because the Tucker Act Grants Exclusive Jurisdiction Over Plaintiffs' Claims to the Court of Federal Claims, This Court Lacks Subject Matter Jurisdiction.

The core of Plaintiffs' claims is that the government has unfairly and unilaterally changed the standard terms of its grant agreements, and they seek an order that the government must provide grant funding regardless of each state's compliance with DHS's grant conditions. These claims are based on the Plaintiffs' contractual relationships with the federal government, including the government's ability to alter the terms of those contractual relationships, and thus this Court lacks jurisdiction to provide the relief that Plaintiffs seek.

The Tucker Act grants exclusive jurisdiction to the Court of Federal Claims over "any claim against the United States founded" on "any express or implied contract with the United States" for amounts over ten thousand dollars. 28 U.S.C. § 1491(a). That court may hear "claim[s] against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." *Id.* § 1491(a)(1). Thus, where a party seeks funding that it believes the government is obligated to pay under a contract, the proper remedy is suit under the Tucker Act, not the APA, and that suit must proceed only in the Court of Federal Claims. *See, e.g.*, *Burgos v. Milton*, 709 F.2d 1, 3 (1st Cir. 1987) (vacating district court judgment; concluding district court lacked jurisdiction under 5 U.S.C. § 702 to award money judgment); *id.* ("[E]ven if we agreed with [claimant] that the award was equitable and did not constitute 'money damages,' we would still find that section 702 did not remove

the defense of sovereign immunity."); *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 62 (1st Cir. 1978) (no district court jurisdiction under APA even where plaintiff alleged violations of the agency's regulations and due process of law because the Court of Claims provided "an adequate remedy" for the claims, which were grounded in contract).

In determining whether "a particular action" is "at its essence a contract action" that is subject to the Tucker Act or, instead, is a challenge properly brought under the APA, courts have looked at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982); *see also, e.g.*, *Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 403 (2d Cir. 2017) (applying *Megapulse* test); *Califano*, 571 F.2d at 63 (evaluating whether "the essence of the action is in contract").

In April, the Supreme Court stayed a district court order to make payments based on grant agreements because the government was "likely to succeed in showing that the District Court lacked jurisdiction" to bar termination of various education-related grants. *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025). The Court held the injunction was effectively an order "to enforce a contractual obligation to pay money" and thus was not covered by the limited waiver of sovereign immunity in Section 702 of the APA. Instead, the Court held, the Tucker Act grants the Court of Federal Claims exclusive jurisdiction over such suits. *Id.*

Here, Plaintiffs essentially argue that DHS has unilaterally changed its standard grant terms in a way that risks ending Plaintiffs' longstanding receipt of funding from DHS and its component subagencies, which includes FEMA, and the Coast Guard. Under the first prong of the familiar *Megapulse* test, any right that Plaintiffs would have to this funding is not in the various statutes that create the grant programs, but in the language of the grant agreements themselves. Those grant agreements provide the detailed criteria that determines whether Plaintiffs are in fact eligible for funding, based on whether they meet the specified conditions. No statute requires FEMA or DHS to award grants to Plaintiffs' even if they do not meet its terms and conditions.

For example, if a state did not submit an application for a grant by the deadline instituted by DHS, even for a formula grant, the state would not be entitled to that grant funding. Similarly,

if a grant applicant were delinquent in their repayment of any federal debt, they would not be eligible for grant funding. *See* April Terms, at XIX (ECF 1-3). Under the applicable regulations for federal grants, if a state "fails to comply with the U.S. Constitution, Federal statutes, regulations, *or terms and conditions of the Federal award*," DHS has the authority to "implement specific conditions," including "suspend[ing] or terminat[ing] the Federal award in part or in its entirety." 2 C.F.R. § 200.339 (emphasis added). This is because Congress has given DHS broad authority to implement grant programs, and no statute provides any rights to an individual state to obtain those funds regardless of whether they meet DHS's terms and conditions for the grant.

A review of the statutory language with respect to the grants at issue in this case also shows that Congress did not entitle states to funding notwithstanding any Agency-imposed conditions. For example, the Port Security Grant Program, intended "to support increased port-wide risk management and protect critical marine transportation system infrastructure from acts of terrorism, major disasters, and other emergencies," (*see* ECF 1 at ¶ 122), states that in administering the grant program DHS "shall take into account national economic, energy, and strategic defense concerns based upon the most current risk assessments available." 46 U.S.C. § 70107(a). The statute then lists the types of costs that would be eligible for reimbursement under the program and the minimum requirements for approving an application, but does not require the Agency to award grants to any particular state applicant. The statute does not give any particular state the right to funding—that could only come, if at all, once DHS has actually awarded grant funds to a state.

By arguing that their right to funding comes from statutes, Plaintiffs contend they are entitled to funding even if they don't meet the qualifications that the Agency sets. But that cannot be the case. Congress intended for the Agency to set terms and conditions, *see generally* 2 C.F.R. § 200 *et seq*. (providing uniform requirements for federal awards, authorized by 31 U.S.C. §§ 503, 6101-6106, 6307, and 7501-7507), and this dispute is about a change in those terms. That means the source of Plaintiffs' claims are contractual in nature, and this Court lacks subject-matter jurisdiction. *See Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (court

lacks subject-matter jurisdiction because asserted right to payment "in no sense . . . exist[ed] independently of [its] contract").

Whether labeled as APA claims or constitutional claims, in determining whether a plaintiff's suit is to be heard in district court or the Court of Federal Claims, a court "must look beyond the form of the pleadings to the substance of the claim. We have cautioned litigants that dressing up a claim for money as one for equitable relief will not remove the claim from Tucker Act jurisdiction to make it an APA case." *Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 480 F.3d 1116, 1124 (Fed. Cir. 2007); *see also Christopher Vill., L.P. v. United States*, 360 F.3d 1319, 1328 (Fed. Cir. 2004) ("[A] party may not circumvent the Claims Court's exclusive jurisdiction by framing a complaint in the district court as one seeking injunctive, declaratory or mandatory relief where the thrust of the suit is to obtain money from the United States.") (citation omitted); *Consol. Edison Co. of New York, Inc. v. U.S. Dep't of Energy*, 247 F.3d 1378 (Fed. Cir. 2001) ("This court and its sister circuits will not tolerate a litigant's attempt to artfully recast its complaint to circumvent the jurisdiction of the Court of Federal Claims."); *Vill. West Assocs. v. R.I. Hous. & Mortg. Fin. Corp.*, 618 F.Supp.2d 134, 139-40 (D.R.I. 2009) (rejecting as "without merit" the "familiar argument" that by seeking a prospective declaration regarding future agency actions, the Court of Federal Claims could not provide adequate relief in cases where the Tucker Act applies).

A request for an order that the government "must perform" under an agreement is one that "must be resolved by the Claims Court." *U.S. Conference of Catholic Bishops v. Dep't of State*, No. 25-cv-00465, 2025 WL 763738, at *5 (D.D.C. Mar. 11, 2025) (quoting *Ingersoll-Rand* Co. v. United States, 780 F.2d 74, 80 (D.C. Cir. 1985)); *see California*, 145 S. Ct. at 968. It makes no difference that Plaintiffs frame the relief they seek as an injunction barring Defendants from implementing a term of the grants, rather than a specified amount of damages—the heart of this dispute is about the unilateral change of grant terms used year after year by the parties and that could prevent Plaintiffs from recovering federal funds if implemented. That is a dispute for the Court of Federal Claims.

The government acknowledges that courts are divided on whether the Tucker Act precludes claims in district court regarding changes to grant funding. *Compare, e.g.*, *Colorado v. U.S. Dep't of Health & Human Servs.*, No. 25-cv-00121-MSM-LDA; 2025 WL 1426226, at *6-*7 (D.R.I. May 16, 2025) (holding that the Tucker Act did not apply to certain grant terminations); *Rhode Island v. Trump*, No. 25-cv-00128-JJM-LDA; 2025 WL1303868, at *5-*6 (D.R.I. May 6, 2026), *appeal pending*, No. 25-1477 (docketed May 20, 2025); *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 25-cv-00097-MSM-PAS, 2025 WL 1116157, at *12 (D.R.I. Apr. 15, 2025), *appeal pending*, No. 25-1428 (docketed May 1, 2025), *with Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, No. 25-cv-30041-RGS, 2025 WL 1225481 (D. Mass. Apr. 14, 2025) (granting a motion to dissolve TRO in a case involving grant terminations based on *California*). The government respectfully submits that in this case, because Plaintiffs' rights to funding are dependent on whether they are qualified to receive funding under the terms and conditions of the grants, and because the relief they seek is for the government to be compelled to remove certain contract conditions and provide funding to the Plaintiffs, their claims are only within the jurisdiction of the Court of Federal Claims.

## IV. Plaintiffs Have Not Established a Likelihood of Success on the Merits

### A. Congress Did Not Preclude the Implementation of Specific Terms and Conditions

Should the Court conclude that it has jurisdiction over any of Plaintiffs' claims, it should still not enter a preliminary injunction because Plaintiffs have not established a likelihood of success on the merits. Plaintiffs focus much of their argument on the absence of specific statutory language from Congress listing the exact immigration conditions at issue here within the broader authority given by Congress to the Agency to provide grant funding. However, such specific Congressional authority for each grant condition is not required by either the Constitution or the APA. Instead, the statutes at issue provide discretion to the Agency to set grant terms and conditions, without specifying or limiting all the contours of those conditions. Thus, Congress has given DHS the discretion to implement appropriate standard terms and conditions to its grant programs that

follow from the Agency's core purpose and goals, which include the promotion of national security through immigration enforcement. Should Congress wish to limit this discretion by setting specific terms and conditions, it has the power to do so.

**B.    The Constitution Permits Agencies to Set Terms and Conditions**

To succeed in their facial challenge, Plaintiffs must show that the Immigration Conditions would be unconstitutional in all their applications. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) (facial challenge must establish that "no set of circumstances exists under which [the enactment] would be valid"); *see also Am. Fed'n of State, Cty. & Mun. Employees v. Scott*, 717 F.3d 851, 857-58 (7th Cir. 2013); *NTEU v. Bush*, 891 F.2d 99, 101 (5th Cir. 1989). Plaintiffs do not meet this standard, however, because Congress frequently authorizes the executive branch to impose discretionary conditions on the receipt of federal grants.

As the Supreme Court has held, "Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (quotation marks omitted). The *Dole* Court outlined certain limitations including that "the exercise of the spending power must be in pursuit of 'the general welfare,'" that conditions on the receipt of federal funds must be stated "unambiguously" so that recipients can "exercise their choice knowingly, cognizant of the consequences of their participation," that conditions may be a concern if unrelated to the federal interest in particular national projects or programs, and that the conditions are otherwise constitutional. *Id.* at 207.

Plaintiffs' assumption that Spending Clause doctrine requires Congress to set out by statute every requirement of a grant program in order for the requirement to be enforceable is not supported by Supreme Court precedent, including the Supreme Court's decision upholding agency-imposed conditions on the Medicare and Medicaid programs in *Biden v. Missouri*. 595 U.S. 87, 90, 94 (2022) (per curiam) (finding that a new condition of participation in Medicare and Medicaid

requiring that facilities ensure that staff are vaccinated against COVID-19 did not exceed the applicable statutory authority, as HHS had "established long lists of detailed conditions with which facilities must comply to be eligible to receive Medicare and Medicaid funds" and is not limited to issuing "bureaucratic rules regarding the technical administration of" the programs); *see also Bennett v. Ky. Dep't of Educ.,* 470 U.S. 656 (1985) (stating that Congress cannot "prospectively resolve every possible ambiguity concerning particular applications of the requirements"); *West Virginia v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1148 (11th Cir. 2023) ("[W]e do not question an agency's authority to fill in gaps that may exist in a spending condition."); *Guardians Ass'n v. Civ. Serv. Comm'n of City of N.Y.*, 463 U.S. 582, 629-30 & n.22 (1983) (Marshall, J., dissenting) (noting that assurances of compliance with Title VI as part of applications for federal assistance are "given in consideration of" federal aid, "and the federal government extends assistance in reliance on the assurance of compliance"). Disagreement with the type of requirement is not a sufficient basis to claim its unconstitutionality.

Plaintiffs contend that the contested terms here cannot apply to FEMA grants because those terms allegedly "coerce" the states' compliance, as the Supreme Court found that new Medicaid initiatives improperly did in *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012). Under the Plaintiffs' overbroad reading of *NFIB*, all such widely imposed conditions would be unconstitutionally coercive, simply because so much of local governments' funding derives from the federal government. But that is not the law. To the contrary, the Court's *NFIB* opinion stressed (and as Justice Ginsburg's concurrence observed) that the coercion in that case arose from the unexpected imposition on the states to accept a new, dramatically broadened, independent grant program at the risk of losing all federal assistance of longstanding, traditional Medicaid coverage. *Id*. at 579-81; *id*. at 624-25 (Ginsburg, J., concurring in judgment).

Unlike the agency in *NFIB*, FEMA is not creating new grant programs, but instead modified its existing standard terms and conditions that apply to selected, existing grant programs. The Immigration Conditions, on their face, require compliance with federal law and cooperation with federal law enforcement, but do not require states to expand any particular program broadly. To

the contrary, the new terms specifically say that with respect to cooperation, "[a] jurisdiction does not fail to comply with this requirement merely because it lacks the necessary resources to assist in a particular instance." *See* April Terms, at IX(1)(c) (ECF 21-6). In addition, the funding at issue in this case, as compared to Medicaid, represents a much smaller portion of federal funding to each state—another factor motivating the Court's *NFIB* decision that does not apply here. 576 U.S. at 579-80.

Plaintiffs rely on the *City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020), with respect to the federal government's prior efforts to implement similar requirements under a specific grant program administered by DOJ. However, the First Circuit's analysis in that case was focused on the statutory language at issue, which required grant applicants to comply with "all other applicable Federal laws," and the duties and functions of the Assistant Attorney General as delegated by the statute. *See generally id.* at 36-39. Here, the grants at issue are authorized by different statutes using different language for administration by a different agency with a different purpose, and thus the questions in this case are distinct from the First Circuit's statute-specific analysis in *City of Providence*.

The federal government may, constitutionally, create incentives for states to act in accordance with federal law and policies. *See Dole*, 483 U.S. at 210 (rejecting the argument that the Spending Clause imposes "a prohibition on the indirect achievement of objectives which Congress is not empowered to achieve directly"). Congress has given DHS the authority to fund many different projects, and by allowing DHS to administer federally funded programs, Congress has necessarily given the Agency the authority to apply standard terms and conditions in line with Agency and program goals. Plaintiffs do not argue that Congress has in any way prohibited the immigration conditions, nor do they argue that any condition is unknown to the Plaintiffs at the time of its addition to the standard terms and conditions. As discussed below, DHS has articulated why the conditions are related to the federal interest in the grant programs to which the conditions apply. The simple fact that Congress did not spell out every conceivable condition of DHS funding by

statute is not itself sufficient to declare the condition invalid or unconstitutional, and thus is not a sufficient basis for the entry of preliminary injunctive relief.

### 1.    DHS Has Limited Potential Application of the Challenged Conditions to Grants Reasonably Related to National Security

In addition to the broad authority that Congress delegated to DHS for the implementation of terms and conditions, at a more general level, the remaining five FEMA grants at issue in this case to which the Agency might apply the Immigration Conditions are funded by DHS. DHS is the overarching agency tasked by Congress with enforcing federal law and policy encompassing complementary emergency, national security, and immigration objectives. *E.g.*, 6 U.S.C. § 111(b). The requirement that states that receive DHS funding not impede DHS's duties to enforce federal law follow from DHS's purpose and responsibilities. This is true particularly of the preparedness grants that Plaintiffs have identified, and to which the FEMA is potentially applying the Immigration Conditions. Each of these five grant programs are intended, based on Plaintiffs' own description, to support national security efforts, including protecting against terrorist or extremist attacks. These include the Homeland Security Grant Programs (which provide funding to prevent, prepare for, protect again, and respond to acts of terrorism) (ECF 1 at ¶¶ 50, 66) and the Port Security Grant Program (which supports port-wide risk management and critical marine transportation system infrastructure from acts of terrorism, major disasters, and other emergencies) (ECF 1 at ¶ 122).

As noted above, the Port Security Grant Program specifically states that, in awarding grants, the Agency must take into account "national economic, energy, and strategic defense concerns based upon the most current risk assessments available." 46 U.S.C. § 70107(a). The statute also states that the Agency "shall require eligible port authorities, facility operators, and State and local agencies required to provide security services, to submit an application, at such time, in such form, and containing such information and assurances as the Secretary may require . . . ." 46 U.S.C. § 70107(i)(1). Notably, the statute also provides that DHS must ensure that each grant awarded for multi-year plans is "coordinated with any applicable State or Urban Area Homeland Security Plan." 46 U.S.C. § 70107(f)(2). Similarly, the Urban Area Security Initiative grant, a

Homeland Security Grant Program, is also intended to "to assist high-risk urban areas in preventing, preparing for, protecting against, and responding to acts of terrorism." 6 U.S.C. § 604(a).

All of the below statutes authorizing grant programs identified in the Complaint are similarly intended to protect against national security threats, including terrorist or extreme acts:

| Preparedness Grant Program | Statutory Authority & Program Purpose |
|---|---|
| **Emergency Management Performance Grant** | 6 U.S.C. § 762: to "continue implementation of an emergency management performance grants program" where "emergency management" means "the government function that coordinates and integrates all activities necessary to build, sustain, and improve the capability to prepare for, protect against, respond to, recover from, or mitigate against threatened or actual natural disasters, acts of terrorism, or other man-made disasters" (§ 701(7)) |
| **Homeland Security Grant Program—State Homeland Security Program** | 6 U.S.C. § 605(a): "to assist . . . in preventing, preparing for, protecting against, and responding to acts of terrorism." |
| **Homeland Security Grant Program—Urban Area Security Initiative** | 6 U.S.C. § 604(a): "to assist high-risk urban areas in preventing, preparing for, protecting against, and responding to acts of terrorism." |
| **Presidential Residence Protection Assistance Program** | Annual appropriations acts; *e.g.*, Section 530 of the Department of Homeland Security Appropriations Act, 2023, PL 117-328, 136 Stat 4459, 4753: "for providing reimbursement of extraordinary law enforcement or other emergency personnel costs for protection activities directly and demonstrably associated with any residence of the President that is designated or identified to be secured by the United States Secret Service"<br><br>DHS NOFO FY 2023: "the FY 2023 PRPA Grant Program supports the [DHS Strategic Plan] goal to Counter Terrorism and Homeland Security Threats, Objective 1.3: Protect Designated Leadership, Events, and Soft Targets." *See* DHS NOFO FY23 PRPA, at Section A.10.b, available at https://www.fema.gov/sites/default/files/documents/fema_prpa_grant-program-nofo_fy2023.pdf. |
| **Port Security Grant Program** | 46 U.S.C. §§ 70101, 70103, 70107: for implementation of Area Maritime Transportation Security Plans, to deter "transportation security incidents" defined as a "security incident resulting in a significant loss of life, environmental damage, transportation system disruption, or economic disruption in a particular area" |

Plaintiffs' contention that these grants are unrelated to immigration enforcement ignores the fact that immigration enforcement and national security are related, and that these five grants

promote DHS's core, national security mission, 6 U.S.C. § 111(b), including by preventing, preparing for, protecting against, and responding to acts of terrorism and extremism. Each of these five programs is designed to provide federal funding to build state and local capabilities to prevent and potentially respond to acts of terrorism. And because partnership and coordination are essential elements of the terrorism prevention and national security mission, and because that mission includes immigration enforcement, DHS and FEMA could reasonably determine that state and local governments that refuse to cooperate with, refuse to share information with, or actively obstruct immigration enforcement hinder their ability to build effective terrorism prevention capabilities. While these statutes do not specifically discuss immigration enforcement, all of them are intended to promote national security, including by preventing, preparing for, protecting against, and responding to acts of terrorism and extremism. Thus, DHS may reasonably determine that the Immigration Conditions promote these complementary national security and immigration goals that are central to the mission of DHS and its subagencies, including FEMA.

Federal agencies have a legitimate interest in ensuring state cooperation to protect national security interests. Plaintiff states have declared that they will not agree to comply with the Immigration Conditions. (*See, e.g.*, ECF 21-15 at ¶¶ 27-28; ECF 21-18 at ¶¶ 79-80). It follows, then, that DHS may determine that those entities are not appropriate recipients of DHS funding for grants designed to support coordinated and cooperative national security efforts, including preventing and responding to acts of terror. Thus, Plaintiffs have not sufficiently established a likelihood of success on the merits with respect to grant programs related to national security, including the preparedness grants listed above, and preliminary injunctive relief with respect to these programs is inappropriate.

### 2. Requiring Compliance with Federal Law Is Constitutional

While Plaintiffs challenge all of the new Immigration Conditions, the challenged conditions include two requirements that recipients comply with federal law. *See* April Terms, at IX(1)(a), (b) (ECF 21-87). These requirements state that grant recipients must comply with 8 U.S.C. §§ 1373 and 1644, which prohibit restrictions on information sharing by state and local

government entities with DHS regarding the citizenship or immigration status, as well as other relevant laws related to immigration, including prohibitions on encouraging individuals to enter the United States in violation of law, transporting individuals who are here without authorization, or concealing the detection of individuals who are here without authorization. *Id.*

A requirement that a grantee abide by existing law cannot be vague. The Due Process Clause requires that laws "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" and "provide explicit standards for those who apply them." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

The requirement to comply with the laws, and not obstruct them, "does not place upon a recipient any unanticipated burdens because any recipient must anticipate having to comply with the law." *Guardians*, 463 U.S. at 630 (Marshall, J., dissenting). Moreover, to the extent Plaintiffs object to certifying that their compliance is material to the government for purposes of the False Claims Act, a grant recipient "relying on a good faith interpretation of [the law] is not subject to liability" under the False Claims Act. *U.S. ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 464 (9th Cir. 1999).

The requirement that Plaintiffs comply with federal law existed long before the updated DHS Standard Terms and Conditions identified specific provisions by citation, and the federal government has a significant interest in making sure that its funds are not used in a way that violates federal law, particularly when those funds are being disbursed by the same agency whose core function is the implementation of those same laws. Should Plaintiffs disagree with the Agency with respect to whether any specific action or policy actually violates federal law, they remain free to challenge the Agency's position in the appropriate forum. However, the simple requirement that DHS grant recipients not violate federal law related to DHS's law enforcement obligations and priorities should not be the basis for preliminary injunctive relief.

## C.    Plaintiffs Have Not Established a Likelihood of Success on Their APA Claims

The APA provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law." 5 U.S.C. § 706(2)(A).[4] The scope of review under the "arbitrary and capricious" standard under § 706 is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

This standard "deems the agency action presumptively valid provided the action meets a minimum rationality standard." *Sierra Club v. EPA*, 353 F.3d 976, 978 (D.C. Cir. 2004) (citation omitted); *see also Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015) (noting narrowness of arbitrary-and-capricious standard and that "a reviewing court 'may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions.'") (citing *River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009)). At bottom, this deferential standard requires

---

[4] The APA does not permit judicial review of "agency action" that "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Agencies have broad discretion in creating, awarding, and terminating specific grants, and thus review of the terms and conditions set by agencies, within the limits set by Congress, is outside of the jurisdiction of the Court. In *Lincoln v. Vigil*, the Supreme Court held that the Indian Health Service's decision to discontinue a program it had previously funded and to instead reallocate those funds to other programs was committed to agency discretion by law and thus not reviewable under the APA's reasoned-decision-making standards. 508 U.S. 182, 185-88 (1993). Indeed, "an agency's allocation of funds from a lump-sum appropriation requires 'a complicated balancing of a number of factors which are peculiarly within its expertise': whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'" *Id*. at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)). "Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Id.* But as long as the agency abides by the relevant statutes (and whatever self-imposed obligations may arise from regulations or grant instruments), the APA "gives the courts no leave to intrude." *Id*. Although *Lincoln* involved lump-sum appropriations, its logic extends to funding programs that leave to the agency "the decision about how the moneys" for a particular program "could best be distributed consistent with" the statute. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Such decisions—like decisions regarding how best to allocate lump-sum appropriations—"clearly require[] 'a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise.'" *Id.* at 752 (citation omitted); *see Policy & Research, LLC v. U.S. Dep't of Health & Human Servs.*, 313 F. Supp. 3d 62, 75-76 (D.D.C. 2018) (Jackson, J.)

To the extent that Plaintiffs challenge discretionary grants, the APA does not allow for judicial review. For example, the Port Security Grant Program Port Security Grant Program broadly instructs the Agency to take into account "national economic, energy, and strategic defense concerns based upon the most current risk assessments available" without requiring funding to any particular state. *See* 46 U.S.C. § 70107(a).

only that "agency action be reasonable and reasonably explained." *F.C.C. v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The explanation need only be clear enough for "the agency's path [to] reasonably be discerned" and to facilitate effective review, not an explanation of "ideal clarity." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

DHS's priorities in this context are matters of policy discretion and not of "factual findings." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). And all the APA requires for a policy change is that an agency "display awareness that it *is* changing position." *Id.* The agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.*

Plaintiffs' argument that the Agency's actions were contrary to law rests on Plaintiffs' contention that the Defendants violated the Spending Clause of the Constitution. For the reasons discussed above, the Plaintiffs have not established a likelihood of success on the merits that all applications of the challenged conditions would violate the Constitution, and thus they also have not established a likelihood of success on the merits of their claim that the challenged conditions are contrary to law under the APA. *See* Section IV.B *supra*.

With respect to Plaintiffs' arbitrary and capricious claims, as discussed above, the grants at issue in this case come from the agency tasked with enforcing federal immigration law, and the requirement that states that receive DHS funding comply with federal law, and do not impede with DHS's duties to enforce federal law, follow from DHS's core purpose. It is neither arbitrary nor capricious for DHS to ensure that states will provide such cooperation when receiving funding specifically for those purposes. These are all "rational reasons" that support the Agency's decision to add the new challenged condition and withstand arbitrary and capricious review. *See Ohio v. Becerra*, 87 F.4th 759, 775 (6th Cir. 2023) (upholding HHS's implementation of a requirement that Title X projects offer pregnant patients with an opportunity to receive information and non-directive counseling on all options, including abortion).

Although Plaintiffs claim that DHS failed to consider an important aspect of the problem, the reality is that DHS implemented these conditions precisely because it had recognized a significant problem: states impeding the enforcement of federal law. While the Plaintiff states may have valid concerns regarding the use of limited resources or law enforcement strategies, so too does the federal government. And the federal government's primary immigration enforcement agency took the action it determined was needed to ensure that state partners who receive DHS funding to promote national security do not act in a way that impedes DHS's efforts to do the same.

Plaintiffs argue that the government failed to consider the states' reliance on the federal funding, the effects on public safety, and alternative options, but as discussed above, the immigration conditions are designed with the stated goal of improving public safety, and the states' reliance on federal funding from these grants is limited in that they make up a small portion of overall federal funding. The fact that Plaintiffs disagree with DHS's assessment of the efficacy or need for these conditions is not sufficient to establish a likelihood of success on their APA claims.

## V.    Plaintiffs Do Not Sufficiently Allege Harm That Is Irreparable

A motion for a preliminary injunction motion can, and should, be denied if the plaintiff has failed to demonstrate irreparable harm. "Preliminary injunctions are strong medicine" and "should not issue except to prevent a real threat of harm." *Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004). "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc*., 370 F.3d 151, 162 (1st Cir. 2004) ("In most cases—and the case at hand is no outlier—irreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief."); *see also Narragansett Indian Tribe*, 934 F.2d at 6-7 ("[S]peculative injury does not constitute a showing of irreparable harm." (quoting *Pub. Serv. Co. of N.H. v. Town of W. Newbury*, 835 F.2d 380, 383 (1st Cir. 1987)).

At this time, there are no pending NOFO for any of the FEMA grant programs at issue in this case to which DHS is considering applying the Immigration Conditions, Richardson Decl. ¶

25

19, and therefore Plaintiffs have not established a need for immediate injunctive relief in order to avoid irreparable harm.

Plaintiffs seek an order from the Court that would force the federal government to provide them with federal funding. Thus, their claims are for money damages. It is "well settled that economic loss does not, in and of itself, constitute irreparable harm." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also, e.g., Akebia Therapeutics, Inc. v. Azar*, 443 F. Supp. 3d 219, 230 (D. Mass. 2020) ("[E]conomic loss alone does not usually rise to the level of irreparable harm which a party must establish to obtain a preliminary injunction") (cleaned up); *Seafreeze Shore-side, Inc v. U.S. Dep't of Interior*, No. 1:22-cv-11091-IT, 2023 WL 3660689, at *7 (D. Mass. May 25, 2023) ("Plaintiffs have not demonstrated 'irreparable harm,' but at most, economic loss."); *see also e.g., Weinberger*, 456 U.S. at 312 ("The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies."); *Danielson v. Local 275, Laborers Int'l Union*, 479 F.2d 1033, 1037 (2d Cir. 1973) ("Irreparable injury is suffered where monetary damages are difficult to ascertain or are inadequate.").

Even if the Court were to find that portions of the Immigration Conditions do not comport with the APA, the Court should remand to the agency for further consideration or explanation. If that is the final relief Plaintiffs would theoretically be entitled to, preliminary relief should go no further. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation[.]"); *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 60 (D.C. Cir. 2015) ("[B]edrock principles of administrative law preclude us from declaring definitively that the Secretary's decision was arbitrary and capricious without first affording her an opportunity to articulate, if possible, a better explanation.").

## VI.    The Balance of the Equities and the Public Interest Weigh in the Federal Government's Favor

Even if Plaintiffs could establish irreparable harm, they have not shown that "the balance of equities and consideration of the public interest" favor a preliminary injunction. *Winter*, 555

26

U.S. at 32. Traditionally, a court first determines whether the movant's likely harm "will outweigh the harm which granting the injunction would inflict on [the defendant]." 7-*Eleven, Inc. v. Grewal*, 60 F. Supp. 3d 272, 283 (D. Mass. 2014). Thus, Plaintiffs must demonstrate that their claimed injury outweighs any harm that granting the injunctive relief would inflict upon Defendants. *Lancor v. Lebanon Hous. Auth.*, 760 F. 2d 361, 362 (1st Cir. 1985). Next, courts consider whether "[t]he public interest weighs in favor of granting" the preliminary injunction. 7-*Eleven, Inc.*, 60 F. Supp. 3d at 285. But where, as here, the government is the defendant, these factors simply "merge." *Nken*, 556 U.S. at 435.

As noted above, a preliminary injunction in this case would short-circuit ongoing administrative processes at FEMA. In addition, there are no pending NOFOs for any of the FEMA grant programs at issue in this case to which DHS is considering applying the Immigration Conditions. Richardson Decl. ¶ 19. Furthermore, if the Court compels distributions notwithstanding the absence of states' agreement to the Immigration Conditions, the Defendants will be left with no meaningful recourse even if they prevail. Accordingly, the public interest here weighs against the entry of a preliminary injunction.

### VII. The Court Should Limit Any Preliminary Injunctive Relief to the Challenged Conditions That Require More Than Compliance With Federal Law, to the Grant Programs Identified in Plaintiffs' Complaint, and to the Plaintiff States

Injunctive relief should not provide "a remedy beyond what [is] necessary." *Lewis v. Casey*, 518 U.S. 343, 360 (1996). Accordingly, to the extent the Court intends to grant the Plaintiffs' request for a preliminary injunction, such relief should be narrowly tailored to apply only to the Plaintiff states and only to specific actions where the Court finds immediate, irreparable harm absent an injunction. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."); *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) ("Universal injunctions have little basis in traditional equitable practice."); *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1282 (11th Cir. 2021) (noting that the "appropriate circumstances" for issuing a nationwide injunction "are rare").

Here, if the Court is inclined to issue preliminary relief, it should not be issued as to the basic requirement that funding recipients comply with federal law, and it should not be issued as to grant programs or states beyond those identified in the Complaint. Thus, any preliminary injunction should (1) not enjoin the defendants from implementation of Sections C.IX(1)(a) or C.IX(1)(b) of the April Terms, (2) not enjoin the potential implementation of the Immigration Conditions to grant programs not identified in Plaintiffs' Complaint, and (3) only apply to grants to the Plaintiff states.

### VIII.    Any Injunctive Relief Should Be Stayed Pending Appeal and Accompanied by a Bond

If the Court grants Plaintiffs' Motion for a Preliminary Injunction, it should stay any such order pending any appeal, because Defendants are likely to succeed on appeal and will face irreparable harm absent a stay. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) (setting forth the factors "regulating the issuance of a stay"). On the whole, as argued above, a stay is warranted. At a minimum, the Court should administratively stay any injunctive relief it intends to order for a period of seven days to allow the United States to seek an emergency, expedited stay from the Court of Appeals if an appeal is authorized.

The Defendants also respectfully requests that any injunctive relief accompany a bond under Federal Rule of Civil Procedure 65(c), which provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A bond is appropriate here given that any preliminary relief would potentially mandate that the agencies spend money that may not be recouped once distributed.

### CONCLUSION

For the foregoing reasons, the Defendants ask the Court to deny Plaintiffs' preliminary injunction motion.

Dated: June 9, 2025

Respectfully submitted,

FEDERAL EMERGENCY MANAGEMENT
AGENCY; UNITED STATES DEPART-
MENT OF HOMELAND SECURITY;
UNITED STATES COAST GUARD; DAVID
RICHARDSON, in his official capacity as Sen-
ior Official Performing the Duties of the Ad-
ministrator of the Federal Emergency Manage-
ment Agency; KRISTI NOEM, in her official
capacity as Secretary of the Department of
Homeland Security; and KEVIN E. LUNDAY,
in his official capacity as Acting Commandant
of the U.S. Coast Guard,

By their Attorneys,

SARA MIRON BLOOM
Acting United States Attorney

*/s/ Bethany N. Wong*
BETHANY N. WONG
Assistant United States Attorney
One Financial Plaza, 17th Floor
Providence, RI 02903
(401) 709-5000
(401) 709-5001 (Fax)
Email: Bethany.Wong@usdoj.gov

## CERTIFICATION OF SERVICE

I hereby certify that on June 9, 2025, I electronically filed the foregoing and it is available for viewing and downloading from the Court's CM/ECF system, and that the participants in the case that are registered CM/ECF users will be served electronically by the CM/ECF system.

*/s/ Bethany N. Wong*
Bethany N. Wong
Assistant United States Attorney