# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| State of Illinois, *et al.*,<br><br>             Plaintiffs,<br>v.<br><br>Federal Emergency Management Agency, *et al.*,<br><br>             Defendants. | Case No. 1:25-cv-00206-WES-PAS<br>Judge William E. Smith |

## IMMIGRATION LAW REFORM INSTITUTE'S PROPOSED AMICUS BRIEF IN SUPPORT OF DEFENDANTS

Joseph S. Larisa, Jr.
Larisa Law
50 South Main Street
Suite 311
Providence, RI 02903
401-743-4700
Fax: 401-633-6296
Email: joe@larisalaw.com

Jonathon P. Hauenschild*
**IMMIGRATION REFORM LAW INSTITUTE**
25 Massachusetts Ave., NW,
Suite 335
Washington, DC 20001
(202) 232-5590
jhauenschild@irli.org

*Counsel for Amicus Curiae*
\* Not admitted in this jurisdiction

## CORPORATE DISCLOSURE STATEMENT

Amicus curiae the Immigration Reform Law Institute ("IRLI") is a 501(c)(3) not for profit charitable organization incorporated in the District of Columbia. IRLI has no parent corporation. It does not issue stock.

**INTEREST OF AMICUS CURIAE**

Amicus curiae Immigration Reform Law Institute ("IRLI") is a non-profit 501(c)(3) public interest law firm dedicated to litigating immigration-related cases on behalf of, and in the interests of, United States citizens, and to assisting courts in understanding and accurately applying federal immigration law. IRLI has litigated or filed amicus curiae briefs in a wide variety of cases, including *Trump v. Hawaii*, 585 U.S. 667 (2018); *United States v. Texas*, 599 U.S. 670 (2023); *Ariz. Dream Act Coalition v. Brewer*, 855 F.3d 957 (9th Cir. 2017); *Wash. All. Tech Workers v. U.S. Dep't of Homeland Sec.*, 50 F.4th 164 (D.C. Cir. 2022); and *Matter of Silva-Trevino*, 26 I. & N. Dec. 826 (B.I.A. 2016).

## SUMMARY OF THE ARGUMENT

Illinois and the other Plaintiff states ask this Court to protect certain of their policies with an injunction. But because these policies, in a variety of ways, are unlawful, Plaintiffs, and especially Illinois, lack standing to seek injunctive relief, and they also cannot show irreparable harm, as is necessary for such relief.

Plaintiffs aver that they have standing because Defendants' withholding of funds if the "Civil Immigration Conditions" are not met "harm[s] [Plaintiffs'] sovereignty, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of this policy is permanently enjoined." Complaint, ECF 1 at ¶ 31, *see also* Plaintiff States' Motion for Preliminary Injunction, ECF 20, pp. 9-11. By Plaintiffs' own admission, though, the "interests" they claim the withholding threatens are simply those in maintaining certain policies that prevent them from meeting various factors announced by the Department of Homeland Security (DHS), Federal Emergency Management Agency (FEMA), and Coast Guard to award funds. Complaint, ECF 1, at ¶ 271.

These State policies are unlawful. By standing as obstacles to congressional purposes behind several federal laws, and by interfering with federal officers in the performance of their duties under federal law, they violate the Supremacy Clause of the United States Constitution. These policies also violate information sharing requirements of federal statutory law.

Because Plaintiffs' claimed harm would consist either in the discontinuation of these illegal policies or the loss of funding due to their continuation, they cannot show injury, necessary for standing, to a legally protected interest. There is no cognizable interest in the continuation of unlawful government policies; nor is an injury, such as a loss of funding, caused

2

by the continuation of such policies cognizable. For the same reason, Plaintiffs cannot show the irreparable harm necessary to support injunctive relief.

While this brief will focus on Illinois, Plaintiffs all admit that they cannot comply with FEMA's standards due to their own similar laws, policies, practices, or decisions. *See*, *e.g.* Complaint, ECF 1, at ¶¶ 244-254, 271. The analysis contained in this brief thus applies to them and their laws, policies, and directives, as well.

## ARGUMENT

### I. THE STATE'S POLICIES ARE UNLAWFUL.

In 2017, Illinois enacted the Illinois TRUST Act ("TRUST Act") and amended it in 2021 through the Illinois Way Forward Act ("Way Forward Act"). *See* ILL. PUB. ACT 100-0463 (2017) and ILL. PUB. ACT 102-0234 (2021), collectively codified at 5 ILL. COMP. STAT. §§ 805/1, *et seq*. The Way Forward's amendments to the TRUST Act prohibit law enforcement officials throughout the State from, among other things, "provid[ing] information in response to any immigration agent's inquiry or request for information regarding any individual in the agency's custody," or providing "any immigration agent information not otherwise available to the public relating to an individual's release or contact information, or otherwise facilitate for an immigration agent to apprehend or question an individual for immigration enforcement." ILL. PUB. ACT 102-0234, § 15(h), 5 ILL. COMP. STAT. §§ 805/15(h).[1]

By standing as obstacles to the accomplishment of congressional purposes behind the Immigration and Nationality Act, Pub. L. No. 82-414 (1952), codified, as amended, at 8 U.S.C.

---

[1] The Way Forward Act added significant requirements to the TRUST Act. In its original, 2017 version, the TRUST Act simply prohibited law enforcement officials throughout the state from stopping, detaining, or arresting individuals based on their immigration status or based on a "non-judicial immigration warrant." ILL. PUB. ACT 100-0463, § 15. While the original provisions of the TRUST Act were bipartisan, but those added by the Way Forward Act are far more objectionable, and partisan, than Plaintiffs represent. Complaint, ECF 1, at ¶ 244.

§§ 1101, *et seq.*, and by commanding that local officials impede federal officers in the pursuance of their official business—namely, the enforcement of federal immigration law—the TRUST Act violates the Supremacy Clause. These policies also violate information-sharing provisions of the INA directly.

    A. *The State's policies stand as an obstacle to the purposes of Congress.*

The Supremacy Clause provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Under this clause, Congress has the power to preempt state laws. *Arizona v. United States*, 567 U.S. 387, 399 (2012) (citing *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000)); *see also Hines v. Davidowitz*, 312 U.S. 52 (1941), *National Foreign Trade Council v. Natsios*, 181 F.3d 38 (1st Cir. 1999), and *Pedraza v. Shell Oil Co.*, 942 F.2d 48, 50 (1st Cir. 1991) ("The Supremacy Clause of the United States Constitution operates to preempt state laws which unduly interfere with federal law or policy.").

Preemption may be either express or implied, and implied preemption includes both field preemption and conflict preemption. *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 52 (1st Cir. 2024), *see also Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992), *National Foreign Trade Council*, 181 F.3d at 73-74, *Pedraza*, 942 F.2d at 50-51. Conflict preemption can occur in one of two ways: where "compliance with both federal and state regulations is a physical impossibility," or "where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Lozano*, 724 F.3d at 303 (citing *Arizona*, 567 U.S. at 399) (internal quotation marks and citations omitted). "If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field

4

else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power." *Savage v. Jones*, 225 U.S. 501, 533 (1912), quoted in *Hines*, 312 U.S. at 67 n.20. The judgment of courts about what constitutes an unconstitutional impediment to federal law is "informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby*, 530 U.S. at 373. And preemption "will be more easily found where states legislate in areas traditionally reserved to the federal government." *National Foreign Trade Council*, 181 F.3d at 73.

Underlying the doctrine of obstacle preemption is the necessity of cooperation between state and federal sovereignties for our federal system to function properly. As the Second Circuit has explained:

> A system of dual sovereignties cannot work without informed, extensive, and cooperative interaction of a voluntary nature between sovereign systems for the mutual benefit of each system. The operation of dual sovereigns thus involves mutual dependencies as well as differing political and policy goals. Without the Constitution, each sovereign could, to a degree, hold the other hostage by selectively withholding voluntary cooperation as to a particular program(s). The potential for deadlock thus inheres in dual sovereignties, but the Constitution has resolved that problem in the Supremacy Clause, which bars states from taking actions that frustrate federal laws and regulatory schemes.

*City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999) (internal citations omitted) (holding 8 U.S.C. § 1373 constitutional).

By design, the laws frustrate the INA in one of its central purposes—the federal-state cooperation Congress intended to foster in immigration enforcement. As the Supreme Court has recognized, "consultation between federal and officials is an important feature of the immigration system." *Arizona v. United States*, 567 U.S. 387, 411 (2012).[2] For example, in passing the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"),[3] which

---

[2] *See also Hines*, 312 U.S. at 66, above n. 1.
[3] Division C of Pub. L. No. 104-208, 110 Stat. 3009-546 (2012).

5

includes 8 U.S.C. § 1373, Congress intended unimpeded communication among federal, state, and local governments in sharing immigration status information, as well as unobstructed cooperation in ascertaining the whereabouts of illegal aliens. The Senate Judiciary Committee Report accompanying IIRIRA makes this general intent clear:

> Effective immigration law enforcement requires a cooperative effort between all levels of government. The acquisition, maintenance, and exchange of immigration-related information by State and Local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the Immigration and Nationality Act.

S. Rep. No. 104-249, at 19-20 (1996) (emphasis added), quoted in *City of New York*, 179 F.3d at 32-33. Thus, in drafting § 1373, Congress intended a cooperative effort among local, state, and federal law enforcement to enforce immigration law.

A review of additional federal immigration provisions further underscores this intent. Shortly before enacting IIRIRA, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA).[4] Entitled "Communication between State and local government agencies and Immigration and Naturalization Service," Section 434 of this law, now 8 U.S.C. § 1644, is nearly identical to § 1373. This provision of PRWORA forbids any prohibitions or restrictions on the ability of state or local governments to send to or receive from the federal government information about the immigration status, lawful or unlawful, of an alien in the United States. Going further than the Senate Judiciary Committee Report accompanying IIRIRA, in the Conference Report accompanying PRWORA, Congress made clear its intent in passing Section 434: to bar any restriction on local police in their communications with ICE. The scope includes the whereabouts of illegal aliens, which obviously includes notice of their release from detention.

---

[4] Pub. L. No. 104-193, 110 Stat. 2105 (1996).

> The conference agreement provides that no State or local government entity shall prohibit, or in any way restrict, any entity or official from sending to or receiving from the INS information regarding the immigration status of an alien or the presence, whereabouts, or activities of illegal aliens. It does not require, in and of itself, any government agency or law enforcement official to communicate with the INS. The conferees intend to give State and local officials the authority to communicate with the INS regarding the presence, whereabouts, or activities of illegal aliens. This provision is designed to prevent any State or local law, ordinance, executive order, policy, constitutional provision, or decision of any Federal or State court that prohibits or in any way restricts any communication between State and local officials and the INS. The conferees believe that immigration law enforcement is as high a priority as other aspects of Federal law enforcement, and that illegal aliens do not have the right to remain in the United States undetected and unapprehended.

H.R. Rep. No. 104-725 (1996) (Conf. Rep.) at 383 (1996) (emphases added), quoted in *City of New York*, 179 F.3d at 32.

Another federal statute also has the purpose of fostering cooperation in immigration enforcement. In 8 U.S.C. § 1357(g), Congress made clear that no agreement is needed for state or local law enforcement officials "to communicate with [federal immigration authorities] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States." § 1357(g)(10)(A). Likewise, Congress has refused to require any formal agreement for state and local officials to "cooperate with [federal immigration authorities] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." § 1357(g)(10)(B).

And it is not as though the State was within its rights, under the Tenth Amendment, to deny its cooperation. *See* Complaint, ECF 1 at ¶¶ 3-5, 287, and Motion for Preliminary Injunction, ECF 20, at 39-40, 43-44. A State may not use the Tenth Amendment, even where it has a "strong state interest," to "make an otherwise unconstitutional state law constitutional." *National Foreign Trade Council*, 181 F.3d at 61.

The seminal cases delimiting such rights are *New York v. United States*, 505 U.S. 144 (1992), and *Printz v. United States*, 521 U.S. 898 (1997). In *New York*, the Court took up a statute that required states to enact legislation to take possession and dispose of nuclear waste produced in their state. In *Printz*, the Court considered the Brady Act, which required state employees to do background checks of firearm purchasers. The Court ruled that both of these two kinds of federal imperatives constituted commandeering in violation of the Tenth Amendment. *New York*, 505 U.S. at 158; *Printz*, 521 U.S. at 935.

Relevantly here, however, the Supreme Court has carved out a safe harbor for federal law controlling state activity when such law regulates information flow in or affecting a domain of federal authority. In this realm, the Court has ruled favorably for federal law both mandating state actions and prohibiting state actions. See also *City of New York*, 179 F.3d at 33-35 (distinguishing *New York* and *Printz* and rejecting a Tenth Amendment challenge to § 1373).

In *Reno v. Condon*, 528 U.S. 141 (2000), the Court considered a suit by the State of South Carolina enjoining enforcement of the Driver's Privacy Protection Act of 1994 ("the DPPA"), 18 U.S.C. §§ 2721-25. The DPPA forbade state departments of motor vehicles personnel from disclosing the personal information of drivers for most purposes, though in some circumstances it mandated such disclosure. 18 U.S.C. § 2721. In a unanimous decision, the Court held that the DPPA was consistent with the federalism required by the Tenth Amendment, despite the heavy resource expenditure states needed to make to enforce the Act, and even states' need to pass laws to comply with it. *Condon*, 528 U.S. at 150 151.

The Court distinguished the federal legislation in *Condon* from that in *Printz* and *New York*. The statute in *Condon* regulated state activities, and the legislation required and man hours employed were a byproduct. *Condon*, 528 U.S. at 150 151. By contrast, the statute in *Printz*

8

directly required state employers to fulfill a federal law enforcement function, and the statute in *New York* directly commanded state legislative initiatives and expenditures to dispose of property (waste). As the Court held:

> [T]he DPPA does not require the States in their sovereign capacity to regulate their own citizens. The DPPA regulates the States as the owners of databases. It does not require the South Carolina Legislature to enact any laws or regulations, and it does not require state officials to assist in the enforcement of federal statutes regulating private individuals. We accordingly conclude that the DPPA is consistent with the constitutional principles enunciated in New *York* and *Printz*.

*Id.* at 151.

In affirming the validity of the DPPA, the Court noted that the statute requires the disclosure of certain information:

> The DPPA's prohibition of nonconsensual disclosures is also subject to a number of statutory exceptions. For example, the DPPA requires disclosure of personal information for use in connection with matters of motor vehicle or driver safety and theft, to carry out the purposes of [federal statutes].

*Id.* at 145 (internal quotation marks and ellipses omitted). The Court explained: "'That a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity is a commonplace that presents no constitutional defect.'" *Id.* at 150-51 (quoting *South Carolina v. Baker*, 485 U.S. 505, 514-15 (1988)). *Cf. Arizona v. United States*, 567 U.S. 387, 412-13 (holding that an Arizona law making verification of immigration status by local officials mandatory was not preempted by federal immigration law because 8 U.S.C. § 1644,[5] the constitutionality of which the Court did not question, encouraged the sharing of information).

Indeed, finding Illinois's laws contravening the Federal Constitution and statutes protected under the Tenth Amendment would mark something of a revolution in Tenth

---

[5] 8 U.S.C. § 1644 is worded almost identical to that of 8 U.S.C. § 1373.

9

Amendment jurisprudence. For example, the Crime Control Act of 1990 compels states to report missing children and prohibits them from allowing their state law enforcement agencies to delay or delete missing child reports:

> **State requirements**
>
> Each State reporting under the provisions of this title shall—
> (1) ensure that no law enforcement agency within the State establishes or maintains any policy that requires the observance of any waiting period before accepting a missing child or unidentified person report;
> (2) ensure that no law enforcement agency within the State establishes or maintains any policy that requires the removal of a missing person entry from its State law enforcement system or the National Crime Information Center computer database based solely on the age of the person;
> (3) provide that each such report and all necessary and available information, which, with respect to each missing child report, shall include—
> (A) the name, date of birth, sex, race, height, weight, and eye and hair color of the child; (B) a recent photograph of the child, if available; (C) the date and location of the last known contact with the child; and (D) the category under which the child is reported missing; is entered within 2 hours of receipt into the State law enforcement system and the National Crime Information Center computer networks and made available to the Missing Children Information Clearinghouse within the State or other agency designated within the State to receive such reports ….

42 U.S.C. § 5780.

If the sanctuary laws at issue here are protected by the Tenth Amendment, so too would be state laws mandating the withholding of federally-required information about missing children, or any other state or local refusal to adhere to federal information-sharing requirements.

In short, by mandating non-cooperation in immigration enforcement, the laws stand as an obstacle to the congressional purpose of fostering such cooperation, and thus violate the Supremacy Clause.

B. *Plaintiffs' sanctuary policies impede federal officers in the performance of their duties.*

10

Under the TRUST Act, if a federal immigration officer asks when an alien in custody will be released, officials may not tell him. If a federal immigration officer seeks other information about potential illegal immigrants, officials may not provide it. If an immigration officer seeks to place a detention notice on an illegal immigrant, Illinois will not honor it. By thus shutting off its law enforcement personnel from communicating with immigration officials and by refusing to provide information very germane to the federal enforcement mission, the law patently interferes with federal officers in their enforcement of federal immigration law and were designed to do just that.

Such interference violates the Supremacy Clause at a very basic level; the supremacy of federal law would be meaningless if states could block its enforcement within their territories. Especially egregious is the denial of information about an individual's release date from state or county custody, as if the federal government were a hostile foreign power. One wonders if state officials would attempt to prevent federal entry into its jails by force, or to arrest federal officers who attempted entry if provided the opportunity. Such a shocking course would, of course, violate the Supremacy Clause, as the Supreme Court decided well over a century ago in a case in which state marshals arrested a federal officer in the performance of his federal duties:

> "If, when thus acting, and within the scope of their authority, [federal] officers can be arrested and brought to trial in a state court, for an alleged offence against the law of the State, yet warranted by the federal authority they possess, and if the general government is powerless to interfere at once for their protection—if their protection must be left to the action of the state court—the operations of the general government may at any time be arrested at the will of one of its members. The legislation of a State may be unfriendly. It may affix penalties to acts done under the immediate direction of the national government, and in obedience to its laws. It may deny the authority conferred by those laws. The state court may administer not only the laws of the State, but equally federal law, in such a manner as to paralyze the operations of the government. And even if, after trial and final judgment in the state court, the case can be brought into the United States court for review, the officer is withdrawn from the discharge of his duty during the pendency of the prosecution, and the exercise of acknowledged federal

11

> power arrested. We do not think such an element of weakness is to be found in the Constitution. The United States is a government with authority extending over the whole territory of the Union, acting upon the States and the people of the States. While it is limited in the number of its powers, so far as its sovereignty extends it is supreme. No state government can exclude it from the exercise of any authority conferred upon it by the Constitution; obstruct its authorized officers against its will; or withhold from it, for a moment, the cognizance of any subject which that instrument has committed to it."

*In re Neagle*, 135 U.S. 1, 61-62 (1890) (quoting *Tennessee v. Davis*, 100 U.S. 257, 263 (1879)) (emphases added). See generally Seth P. Waxman and Trevor W. Morrison, WHAT KIND OF IMMUNITY? FEDERAL OFFICERS, STATE CRIMINAL LAW, AND THE SUPREMACY CLAUSE, 112 Yale L.J. 2195, 2236-37 (2003) (discussing Neagle).

But if, under the Supremacy Clause, States may not use force or legal process to block federal officers performing their federal law enforcement duties, they have no legitimate authority, under that clause, to "deny" federal officers access to information in their possession. In this very basic way, Plaintiffs' sanctuary laws violate the Supremacy Clause.

## II.    BECAUSE OF THEIR POLICIES, PLAINTIFF STATES ARE INCAPABLE OF MEETING THE REQUIREMENTS FOR EITHER STANDING OR INJUNCTIVE RELIEF.

Plaintiff States claim several "harms" for which they seek relief, including their respective sovereignty, risking public safety, or – the crux of the suit and motion for preliminary injunction – the alleged potential loss of various types of DHS, FEMA, and Coast Guard grants. Illinois cites no authority supporting its claims of harm, instead stating in conclusory fashion that the Government's policy threatens "irreparable harm" no matter which decision Plaintiff States make. They aver that they must either "comply with conditions that they believe are unlawful, unconstitutional, and imprudent" and "interfere with their control over their law-enforcement officers, disrupt the relationships built between immigrant communities and local law

enforcement" or "forfeit millions of dollars of [federal] funds." Motion for Preliminary Injunction, ECF 20 at pp. 15-16.

The elements for standing in the federal courts are first, injury in fact, second, a causal connection between the injury and the conduct complained of, and third, a likelihood that the conduct complained of be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

An injury in fact is "an invasion of a legally protected interest." *Id*. at 560. The Plaintiff States have no legally protected interest in federal funding they may, or may not, receive sometime in the future where that funding may be impeded only because of their unlawful policies. Indeed, it is well established that litigants lack standing to seek prospective relief if they will only be injured if they engage in illegal conduct. See, e.g., *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (finding that a victim of an illegal police chokehold lacked standing where his likelihood of further injury was premised on a repetition of his unlawful traffic violation); *O'Shea v. Littleton*, 414 U.S. 488, 497 (1974) (finding that plaintiffs lacked standing because they planned to induce future injury by unlawful civil disobedience); *Spencer v. Kemna*, 523 U.S. 1, 13 (1998) (finding that plaintiff lacked standing where his injury would only arise if he were punished for future unlawful conduct).

For the same reason the States cannot show injury requisite for standing, it cannot show irreparable harm requisite for injunctive relief: the alleged harm will only occur because of their own unlawful policies. See *Lyons*, 461 U.S. at 111 (holding that irreparable harm was not shown for the same reasons injury for standing purposes was not shown). Indeed, it is a maxim of equity, especially important in cases such as this one involving the public interest, that "he who comes into equity must come with clean hands." *Precision Inst. Mfg. Co. v. Automotive*

13

*Maintenance Mach. Co.*, 324 U.S. 806, 814 (1945), *Texaco P.R., Inc. v. Dep't of Consumer Affairs*, 60F.3d 867, 880 (1st Cir. 1995). Here, Plaintiff States' hands are decidedly unclean, for they maintain, and seek an injunction by this Court to protect, policies that are unlawful and unconstitutional.

## CONCLUSION

For the foregoing reasons, the Plaintiff States' motion for Preliminary Injunction should be denied.

s/ Joseph S. Larisa, Jr.
Joseph S. Larisa, Jr.
LARISA LAW
50 South Main Street
Suite 311
Providence, RI, 02903
401-743-4700
Fax: 401-633-6296
Emai: joe@larisalaw.com


Jonathon P. Hauenschild*
IMMIGRATION REFORM LAW INSTITUTE
25 Massachusetts Ave., NW, Suite 335
Washington, DC 20001
(202) 232-5590
jhauenschild@irli.org

*Counsel for Amicus Curiae*
* Not admitted in this jurisdiction