## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF ILLINOIS; STATE OF
CALIFORNIA; STATE OF NEW JERSEY;
STATE OF RHODE ISLAND; STATE OF
COLORADO; STATE OF CONNECTICUT;
STATE OF DELAWARE; DISTRICT OF
COLUMBIA; STATE OF HAWAIʻI; STATE
OF MAINE; STATE OF MARYLAND;
COMMONWEALTH OF
MASSACHUSETTS; PEOPLE OF THE
STATE OF MICHIGAN; STATE OF
MINNESOTA; STATE OF NEVADA;
STATE OF NEW MEXICO; STATE OF
NEW YORK; STATE OF OREGON;
STATE OF VERMONT; STATE OF
WASHINGTON; STATE OF WISCONSIN,

*Plaintiffs*,

v.

FEDERAL EMERGENCY
MANAGEMENT AGENCY; UNITED
STATES DEPARTMENT OF HOMELAND
SECURITY; UNITED STATES COAST
GUARD; DAVID RICHARDSON, in his
official capacity as Senior Official
Performing the Duties of the Administrator
of the Federal Emergency Management
Agency; KRISTI NOEM, in her official
capacity as Secretary of the Department of
Homeland Security; and KEVIN E.
LUNDAY, in his official capacity as Acting
Commandant of the U.S. Coast Guard,

*Defendants*.

No. 1:25-cv-00206-WES-PAS

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      For decades, state and local governments have relied on federal funding—totaling

billions of dollars annually—to prepare for, protect against, respond to, and recover from

catastrophic disasters. These grants fund first responders' salaries and pay for the training they receive. They fund building improvements to ensure houses of worship and schools are not vulnerable to malicious attacks. They fund computer network testing to identify cyberattack vulnerabilities. They fund projects to mitigate earthquake and flood risks, and to manage active large-scale wildfires. They fund search and rescue efforts and food aid after natural disasters. They pay case managers who work directly with disaster survivors to develop recovery plans.

2.      Congress created these federal grant programs and appropriates billions of dollars each year to ensure they are fully funded to meet the Nation's needs. Many were authorized by legislation passed in the wake of national emergencies, such as the September 11 terrorist attacks and Hurricane Katrina, in an effort to strengthen the nation's preparedness for and response to emergencies and major disasters.

3.      Now, the U.S. Department of Homeland Security ("DHS") and its sub-agencies—particularly the Federal Emergency Management Agency ("FEMA"), which Congress has tasked with overseeing the disbursement of federal emergency funds to the States—seek to upend this emergency management system, holding critical emergency preparedness and response funding hostage unless States promise to devote their scarce criminal enforcement resources, and other state agency resources, to the federal government's own task of civil immigration enforcement beyond what state law allows (in some States) or requires (in others). Defendants assert a sweeping entitlement to use state law enforcement officers for federal immigration enforcement, contravening the basic principle that States "remain independent and autonomous within their proper sphere of authority." *Printz v. United States*, 521 U.S. 898, 928 (1997). And they seek to require many States to abandon well-considered policies that advance public safety by promoting trust between law enforcement and immigrant communities as a condition on continued funding

of emergency management programs unrelated to immigration enforcement. By hanging a halt in this critical funding over States like a sword of Damocles, Defendants impose immense harm on States, forcing them to choose between readiness for disasters and emergencies, on the one hand, and their judgment about how best to investigate and prosecute crimes, on the other.

4.      Defendants' grant funding hostage scheme violates two key principles that underlie the American system of checks and balances: agencies in the Executive Branch cannot act contrary to the authority conferred on them by Congress, and the federal government cannot use the spending power to coerce States into adopting its preferred policies. Defendants have ignored both principles, claiming undelegated power to place their own conditions on dozens of grant programs that Congress created and bulldozing through the Constitution's boundary between state and federal authority.

5.      In furtherance of this funding hostage scheme, on March 27, 2025 and April 18, 2025, DHS issued new sets of "Standard Terms and Conditions" applicable to all federal awards. The 2025 Terms and Conditions include, for the first time, new requirements compelling States to divert their law enforcement resources away from core public safety missions to federal civil immigration enforcement and to stop operating any program that "benefits illegal immigrants or incentivizes illegal immigration."

6.      DHS cites no statutory authority for these new requirements. Nor could it. The grant statutes that Congress has passed do not permit DHS to condition all agency funds on an agreement to cooperate with civil immigration enforcement.

7.      DHS's decision to impose this new set of conditions (collectively, the "Civil Immigration Conditions") across its grant programs is arbitrary and capricious, exceeds its legal authority, and violates the Spending Clause. The Civil Immigration Conditions impose

requirements that go well beyond the statutory purposes of the grant programs—which were not designed to further civil immigration enforcement—and exceed the limited bases on which DHS is permitted to withhold funding. Furthermore, the ambiguity of the conditions frustrates the States' ability to know what they are being asked to agree to. DHS seeks to force the States into an untenable position: Either (1) accept unlawful conditions, allowing the federal government to conscript state and local officials to enforce federal immigration law and destroying trust between law enforcement and immigrant communities critical to public safety, or (2) forfeit lifesaving federal emergency preparedness and response funds, endangering the States and their residents.

8.      Plaintiffs Illinois, California, New Jersey, Rhode Island, Colorado, Connecticut, Delaware, District of Columbia, Hawaiʻi, Maine, Maryland, Massachusetts, the People of the State of Michigan, Minnesota, Nevada, New Mexico, New York, Oregon, Vermont, Washington, and Wisconsin (collectively, "Plaintiff States") bring this action to challenge the adoption of the illegal and unconstitutional Civil Immigration Conditions. Plaintiff States receive over $3 billion annually from FEMA to prepare for and respond to emergencies and major disasters—*all* of which is placed in jeopardy by DHS's sweeping new conditions.

9.      Plaintiff States seek a declaratory judgment that Defendants' adoption of the Civil Immigration Conditions was unlawful, as well as prospective relief stopping Defendants from taking any actions to implement or enforce the Civil Immigration Conditions in connection with any grant program administered by DHS or a DHS sub-agency. And Plaintiff States are entitled to that relief notwithstanding DHS's last-minute attempt to disclaim the broad applicability of the Conditions in the face of litigation. Although DHS has added language to its website that attempts to hedge as to the Conditions' applicability, the Standard Terms and Conditions document itself still states that the terms "apply to *all* new federal awards of federal financial assistance" that

postdate the terms' adoption, and DHS has not removed the Conditions from the FY 2025 Standard Terms and Conditions that they have provided to Plaintiff States' grant recipients. DHS's public position therefore remains that the Civil Immigration Conditions remain applicable to "all" DHS managed grant programs. Because the Civil Immigration Conditions remain in the Standard Terms and Conditions, and these Conditions are categorically unlawful on multiple grounds, Plaintiffs are entitled to injunctive and declaratory relief against the Conditions in their entirety.

## JURISDICTION AND VENUE

10.     The Court has jurisdiction pursuant to 28 U.S.C. § 1331. The Court has authority to grant declaratory, injunctive, and other relief pursuant 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 702, 705, and 706.

11.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants include a United States officer sued in her official capacity. Plaintiff the State of Rhode Island is a resident of this judicial district and a substantial part of the events or omissions giving rise to this Complaint occurred within the District of Rhode Island.

## PARTIES

**A.      Plaintiffs**

12.     Plaintiff the State of Illinois, represented by and through its Attorney General Kwame Raoul, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on its behalf of the State in this matter.

13.     Plaintiff the State of California, represented by and through its Attorney General Rob Bonta, is a sovereign state in the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on its behalf of the State in this matter

14.     Plaintiff the State of New Jersey, represented by and through its Attorney General, Matthew J. Platkin, is a sovereign State of the United States of America. As the State's chief legal

officer, the Attorney General is authorized to act on its behalf of the State in this matter. The Attorney General is also head of the New Jersey Department of Law and Public Safety, which is the agency responsible for applying for, obtaining, and disbursing several of the federal grant awards that are the subject of this litigation. See N.J. Stat. Ann. § 52:17B-2.

15. Plaintiff the State of Rhode Island, represented by and through its Attorney General Peter Neronha, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on its behalf of the State in this matter.

16. Plaintiff the State of Colorado is a sovereign state in the United States of America. Colorado is represented by Phil Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the state and is authorized by Colo. Rev. Stat. § 24-31-101 to pursue this action.

17. Plaintiff the State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

18. Plaintiff the State of Delaware is a sovereign state in the United States of America. Delaware is represented by Attorney General Kathy Jennings, who is the chief law enforcement officer of Delaware.

19. Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits

initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

20.    Plaintiff the State of Hawai'i is a sovereign State of the United States of America. Hawai'i is represented by Attorney General Anne Lopez, who is the chief law enforcement officer of Hawai'i.

21.    Plaintiff the State of Maine is a sovereign State of the United States of America. Maine is represented by Attorney General Aaron Frey who is the chief law enforcement officer of Maine.

22.    Plaintiff the State of Maryland is a sovereign state of the United States of America. Maryland is represented by Attorney General Anthony G. Brown who is the chief legal officer of Maryland.

23.    Plaintiff the Commonwealth of Massachusetts is a sovereign state of the United States of America. Massachusetts is represented by Attorney General Andrea Joy Campbell, who is the chief law enforcement officer of Massachusetts.

24.    The People of the State of Michigan are represented by Attorney General Dana Nessel. The Attorney General is Michigan's chief law enforcement officer and is authorized to bring this action on behalf of the People of the State of Michigan pursuant to Mich. Comp. Laws § 14.28.

25.    Plaintiff the State of Minnesota is a sovereign state in the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01.

26.    Plaintiff the State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States of America. The Attorney General is the chief law enforcement of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. 228.110 and Nev. Rev. Stat. 228.170.

27.    Plaintiff the State of New Mexico is a sovereign state in the United States of America. New Mexico is represented by Attorney General Raúl Torrez, who is the chief law enforcement officer of New Mexico authorized by N.M. Stat. Ann. § 8-5-2 to pursue this action.

28.    Plaintiff the State of New York, represented by and through its Attorney General Letitia James, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on its behalf of the State in this matter

29.    Plaintiff the State of Oregon, represented by and through its Attorney General Dan Rayfield, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

30.    Plaintiff the State of Vermont is a sovereign State of the United States of America. Vermont is represented by Attorney General Charity Clark, who is the chief law enforcement officer and is authorized by law to initiate litigation on behalf of the State.

31.    Plaintiff the State of Washington, represented by and through its Attorney General, Nicholas W. Brown, is a sovereign state of the United States of America. The Attorney General of Washington is the chief legal advisor to the State and is authorized to act in federal court on behalf of the State on matters of public concern. Chapter 43.10 RCW.

32.    Plaintiff the State of Wisconsin is a sovereign state in the United States of America. Wisconsin is represented by Josh Kaul, the Attorney General of Wisconsin. Attorney General Kaul is the chief law enforcement officer of Wisconsin and is authorized to sue on behalf of the State.

33. Plaintiff States have standing to bring this action because Defendants' imposition of the Civil Immigration Conditions that are the subject of this action harms the States' sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of this policy is permanently enjoined.

**B.    Defendants**

34. Defendant Federal Emergency Management Agency ("FEMA") is a federal agency within DHS that coordinates operational and logistical disaster response and oversees the administration of many of the federal grant programs at issue in this action.

35. Defendant DHS is an agency and executive department of the United States government and has responsibility for implementing the federal grant programs at issue in this action, including through FEMA, the United States Coast Guard ("USCG"), and other subagencies.

36. Defendant USCG is a military service and branch of the armed forces of the United States that operates as a service in DHS unless Congress or the President directs it to operate as a service in the United States Navy.

37. Defendant David Richardson is the Senior Official Performing the Duties of the Administrator of FEMA (the "Interim FEMA Head"). The Interim FEMA Head is sued in his official capacity.

38. Defendant Kristi Noem (the "DHS Secretary") is the United States Secretary of Homeland Security and the federal official in charge of DHS. The DHS Secretary is sued in her official capacity.

39. Defendant Admiral Kevin E. Lunday is the Acting Commandant of the United States Coast Guard (the "Acting Commandant"). The Acting Commandant is sued in his official capacity.

## ALLEGATIONS

**A.    Congress Has For Decades Supported State Emergency Preparedness, Response, and Recovery, and States and Their Residents Rely Heavily on That Support.**

40.    The federal government has provided disaster relief funding to States since at least the enactment of the Federal Disaster Relief Act of 1950, which Congress passed to "provide an orderly and continuing means of assistance by the Federal Government to States and local governments in carrying out their responsibilities to alleviate suffering and damage resulting from major disasters, to repair essential public facilities in major disasters and to foster the development of such State and local organization and plans to cope with major disasters as may be necessary." Pub. L. No. 81-875, § 1, 64 Stat. 1109, 1109. The 1950 law authorized the President to coordinate efforts among federal agencies generally rather than creating a specific federal disaster relief agency. *See* 42 U.S.C. § 1855d (1952).

41.    Since 1950, Congress has steadily expanded the federal government's role in assisting with state and local emergency management. In a series of successive enactments in the 1960s and 1970s, Congress authorized additional assistance to state and local governments for this purpose. *See, e.g.*, Disaster Relief Act of 1966, Pub. L. 89-769, 80 Stat. 1316; Disaster Relief Act of 1969, Pub. L. 91-79, 83 Stat. 125; Disaster Relief Act of 1970, Pub. L. 91-606, 84 Stat. 1744; Disaster Relief Act of 1974, Pub. L. 93-288, 88 Stat. 143. In 1988, Congress formally renamed the federal law establishing the structure for federal and State cooperation in emergency management the Robert T. Stafford Disaster Relief and Emergency Assistance Act, or the Stafford Act. Disaster Relief and Emergency Assistance Amendments of 1988, Pub. L. 100-707, 102 Stat. 4689.

42.    In 1979, FEMA was established to consolidate all federal support for emergency preparedness, mitigation, and response activities under one agency's purview. Today, FEMA is a distinct entity within DHS. *See* 6 U.S.C. §§ 313(a); 316(a). By law, the DHS Secretary "may not

substantially or significantly reduce . . . the authorities, responsibilities, or functions of [FEMA] or the capability of [FEMA] to perform those missions, authorities, responsibilities, except as otherwise specifically provided in an Act enacted after October 4, 2006." *Id*. § 316(c)(1); *see also id.* § 591h(c) ("Nothing in this title or any other provision of law may be construed to affect or reduce the responsibilities of the Federal Emergency Management Agency or the Administrator of the Agency, including the diversion of any asset, function, or mission of the Agency or the Administrator of the Agency.").

43. Consistent with the structure created by Congress over the course of many decades, Plaintiff States today rely on federal grants as a critical tool to support their efforts to mitigate, prepare for, respond to, and recover from catastrophic events like natural disasters and malicious attacks.

44. State emergency management budgets are largely committed to preexisting priorities—including, for example, emergency management staff. Indeed, many federal grants may be used only to support activities that are not already directly funded by the State. Federal grants therefore typically support disaster management initiatives that would not exist but for the federal grant funds and would disappear without them.

45. These federal grant programs, which are administered by FEMA, fall into three categories: (1) "preparedness" grants, which enable States and local governments to put systems in place to prepare for and respond to security threats and emergencies, (2) "disaster relief" grants, which are tied to a presidential declaration of a major disaster and enable States and other recipients to respond to and recover from such disasters, and (3) "mitigation" grants, which enable States and others to prepare for natural disasters (including floods and fires) and other threats.

46.     Plaintiff States challenge the application of the Civil Immigration Conditions to any grant program administered by FEMA, including but not limited to the following programs:

- Community Disaster Loans (CDL)
- Disaster Unemployment Assistance (DUA)
- Individuals and Households Program (IHP)
- Fire Management Assistance Grants (FMAG)
- Hazard Mitigation Grant Program (HMGP)
- Hazard Mitigation Grant Program Post Fire (HMGP Post Fire)
- Public Assistance – Grants to State & Local
- Public Assistance - NGOs
- Urban Search and Rescue (US&R)
- Assistance to Firefighter Grants (AFG)
- Building Resilient Infrastructure and Communities (BRIC)
- Chemical Stockpile Emergency Preparedness Program (CSEPP)
- Community Assistance Program State Support Services Element (CAP-SSEE)
- Cooperating Technical Partners (CTP)
- Emergency Management Baseline Assessments Grant (EMBAG)
- Emergency Operations Center (EOC)
- Fire Prevention and Safety (FP&S)
- Flood Mitigation Assistance (FMA)
- Flood Mitigation Assistance Swift Current (FMA Swift)
- Homeland Security Preparedness Technical Assistance Program (HSPTAP)
- Homeland Security National Training Program (HSNTP) – National Domestic Preparedness Consortium (NDPC)
- HSNTP – National Cybersecurity Preparedness Consortium
- National Dam Safety Program (NDSP)
- Rehabilitation of High Hazard Potential Dams Grant Program (HHPD)
- National Earthquake Hazards Reduction Program (NEHRP) and Multi-state and National Earthquake Assistance (MSNEA) Grant Program
- National Earthquake Hazards Reduction Program – Individual State Earthquake Assistance (NEHRP-ISEA)
- National Fire Academy Training Assistance (NFATA)
- National Incident Management Systems (NIMS) / Emergency Management Assistance Compact Program (EMAC)
- National Urban Search and Rescue (US&R)
- Pre-Disaster Mitigation (PDM)
- Pre-Disaster Mitigation (PDM) Congressionally Directed Spending (CDS) / Legislative Pre-Disaster Mitigation (LPDM)

- Safeguarding Tomorrow Revolving Loan Fund / Safeguarding Tomorrow through Ongoing Risk Mitigation Act (STORM)
- Staffing for Adequate Fire and Emergency Response (SAFER)
- State and Local Cybersecurity Grant Program (SLCGP)
- State Fire Training System Grants (SFT)
- Crisis Counseling Program (CCP)
- Disaster Case Management (DCM)
- Public Assistance – Non-Congregate Sheltering
- Emergency Food and Shelter Program (EFSP)
- Nonprofit Security Grant Program (NSGP)
- Nonprofit Security Grant Programs – National Security Supplemental (NSGP-NSS)
- Emergency Management Performance Grant (EMPG)
- Homeland Security Grant Program – Operation Stonegarden (OPSG)
- Homeland Security Grant Program – State Homeland Security Program (SHSP)
- Homeland Security Grant Program – Urban Area Security Initiative (UASI)
- Homeland Security National Training Program (HSNTP) – Continuing Training Grants Program- Competitive (CTG)
- Port Security Grant Program (PSGP)
- Presidential Residence Protection Assistance (PRPA)
- Regional Catastrophic Preparedness Grant Program (RCPGP)
- Targeted Violence and Terrorism Prevention Grant Program (TVTP)
- Transit Security Grant Program (TSGP) / Intercity Passenger Rail (IPR)

47.     Other sub-agencies of DHS, including the USCG, also administer several grant programs on which Plaintiff States rely, including grants to assist States in waterway safety management.

48.     Plaintiff States also challenge the application of the Civil Immigration Conditions to any other grant program administered by DHS or its sub-agencies, including the USCG. This includes but is not limited to the following programs:

- State Recreational Boating Safety (RBS)
- BioWatch Program
- Securing the Cities Program (STC)

49.     The following sections discuss some of the above programs, the purposes they serve, and Plaintiff States' crucial reliance on the assistance they provide for emergency preparedness and response. But this discussion is not exhaustive. Plaintiff States seek an injunction against enforcement of the challenged conditions as to **all** grants and programs that Defendants administer, not merely those discussed here—grants that Defendants, not Plaintiff States, are best positioned to identify. At bottom, Plaintiffs challenge Defendants' decision to incorporate the Civil Immigration Conditions into DHS' Standard Terms and Conditions—which presumptively apply to all "federal awards of federal financial assistance" administered by DHS or any of its sub-agencies.

### 1.     Preparedness Grants

50.     FEMA's "preparedness grant programs" annually provide "more than two billion dollars in funding to state, local, tribal Nations, and territorial governments, as well as transportation authorities, nonprofit organizations, and other eligible entities." *Simplifying FEMA Preparedness Grants*, 88 Fed. Reg. 62098, 62099 (2023). "For decades, FEMA has provided federal assistance to aid states in building and sustaining capabilities to measurably improve the nation's readiness in preventing, preparing for, protecting against, and responding to terrorist attacks and other hazards." *Id.* at 62098-99. Over a dozen different preparedness programs help States reduce the risk of terrorism and extremist violence, maintain general emergency management capabilities, and address emerging threats like cyber-attacks. *Id.* at 62099.

51.     Congress created many of the preparedness grant programs in direct response to the horrific events of September 11, 2001. The USA PATRIOT Act, enacted on October 26, 2001, established a grant program to allow States "to prepare for and respond to terrorist acts," Pub. L. 107-56, § 1014, 115 Stat. 272, 399, which was the precursor to the Homeland Security Grant Program, *infra* ¶¶ 55-85. The Maritime Transportation Security Act of 2002 created the Port

Security Grant Program, *infra* ¶¶ 127-139, to prevent security incidents at the nation's ports. *See* Pub. L. 107-295, § 102, 116 Stat. 2064, 2075 (codified as amended at 46 U.S.C. § 70107). In 2006, as part of a comprehensive reorganization of FEMA in the wake of Hurricane Katrina, Congress permanently lodged all preparedness programs within FEMA. *See* Homeland Security Act of 2002, Pub. L. 107-296, § 430, 116 Stat. 2135, 2191 (creating the Office for Domestic Preparedness); Post-Katrina Emergency Management Reform Act of 2006, Pub. L. 109-295, tit. VI, § 611, 120 Stat. 1355, 1400 (codified at 6 U.S.C. § 315(a)(2)) (transferring these functions to FEMA).

52.    Congress expanded the preparedness programs in 2007 with comprehensive legislation "[t]o provide for the implementation of the recommendations of the National Commission on Terrorist Attacks Upon the United States," informally known as the 9/11 Commission. *See* Pub. L. 110-53, 121 Stat. 266. This law, once again passed in direct response to the September 11 attacks, brought together and made permanent the Homeland Security Grant Program and the Emergency Management Performance Grants. *See* Pub. L. 110-53, §§ 101, 201, 121 Stat. 266, 271, 294; *infra* ¶¶ 55-98.  Through appropriations laws since 2004, Congress has also funded a program to assist nonprofit organizations, including religious organizations, "at high risk of international terrorist attack," Pub. L. 108-334, 118 Stat. 1298, 1309; *infra* ¶¶ 114-126. The Securing American Nonprofit Organizations Against Terrorism Act of 2019 expanded and made permanent this Nonprofit Security Grant Program. Pub. L. 116-108, 133 Stat. 3294.

53.    As a result of these congressional actions, today Plaintiff States critically rely on federal preparedness grant programs, including the Homeland Security Grant Program – State Homeland Security Program, the Homeland Security Grant Program – Urban Area Security Initiative, the Emergency Management Performance Grant Program, the State and Local Cybersecurity Grant Program, the Nonprofit Security Grant Program, and the Port Security Grant

Program. Plaintiff States receive over $1 billion annually in funding from FEMA preparedness grants.

54.    FEMA typically releases notices of funding opportunities for preparedness grants around April or May of the federal fiscal year for the grant in question, and States then apply for funding by submitting applications.  The federal government's fiscal year runs from October 1 to September 30 of the following year.

### a.    The Homeland Security Grant Program – State Homeland Security Program ("SHSP")

55.    Homeland Security Grant Program – State Homeland Security Program ("SHSP") grants exist to provide federal funding to States to build the necessary capacity to prevent, prepare for, protect against, and respond to acts of terrorism.

56.    SHSP funds have been available to States since the first version of the program was created by the USA PATRIOT Act in 2001. The program is codified at 6 U.S.C. §§ 603, 605-09.

57.    FEMA is required to allocate SHSP funds pursuant to a risk assessment, which determines each State's relative threat, vulnerability, and consequences from acts of terrorism, considering factors such as population density and history of threats. *Id*. § 608(a)(1). Recipients may then use SHSP funds for uses permitted by statute, such as enhancing homeland security, conducting training exercises, upgrading equipment, or paying salaries. *Id*. § 609(a).

58.    Because SHSP grants are formula grants based on a statutory risk formula, not competitive grants, each State is entitled to a minimum and specific allocation based on the risk assessment whenever a notice of funding opportunity is posted.

59.    The FEMA Administrator "shall ensure" that each State receives no less than an amount equal to 0.35 percent of the total funds Congress appropriated for SHSP grants. *Id*. § 605(e)(1)(A)(v).

60.    The SHSP statutes do not authorize DHS to impose any of the Civil Immigration Conditions on SHSP funding.

61.    States collectively receive hundreds of millions of dollars per year in SHSP grants. They use these funds for myriad counterterrorism and emergency preparedness purposes, including, but not limited to, funding State special operations command teams (including SWAT teams and bomb squads) and funding mutual aid networks of police departments, fire departments, emergency services, and public works departments to mobilize first responders from outside an immediate jurisdiction in the event of a disaster.

62.    SHSP funds allow States to advance counterterrorism and emergency preparedness purposes in ways they otherwise could not. The multijurisdictional emergency response organizations funded by SHSP would be forced to shut down absent federal funding.

63.    Because each SHSP grant typically remains open for three years, an award in one fiscal year usually allows States to continue to support program activities in at least the two years thereafter, many Plaintiff States are currently relying on funding from the SHSP awards for Federal Fiscal Years ("FY") 2021-2024.

64.    As an example of how States use SHSP funding, Rhode Island uses SHSP funding for several specialized teams that are the only personnel in Rhode Island with the expertise and training to respond to incidents such as a wilderness search and rescue, attacks involving a weapon of mass destruction or an explosive device, or a terrorist attack at a port.

65.    Similarly, Illinois has used its SHSP funding for a wide range of initiatives that prevent, prepare for, protect against, and respond to acts of terrorism. Those efforts include first responder mutual aid networks, which coordinate terrorism responses from outside an immediate jurisdiction. SHSP funds also support the Illinois Statewide Terrorism and Intelligence Center,

17

which facilitates communication across jurisdictions between public safety officials regarding national terrorism trends. SHSP funds also pay for the Illinois State Police's SWAT and Statewide Weapons of Mass Destruction Team.

66.     New Jersey has used its SHSP funding to fund the salaries of state agency staff who provide cybersecurity training, plan risk mitigation efforts, and combat domestic violent extremism. SHSP funds have also enabled the development and maintenance of several technological systems, including automated license plate recognition, unmanned aircraft detection, and the New Jersey Interoperability Communications System, which is a statewide radio system designed to strengthen communication among local, county, state, and federal first responders.

67.     Furthermore, New York has used SHSP funds to administer and manage terrorism and targeted violence prevention grants and 12 local FBI-certified bomb squads to detect and respond to explosive incidents throughout the State.  SHSP funding has also been critical in New York's establishment of local specialty teams, including explosive detection canine teams, tactical teams, and HazMat teams.  SHSP funding supports the operations of the State's only fusion center, the New York State Intelligence Center (NYSIC).  This funding is critical to supporting incident command operations, radiation interdiction efforts, cybersecurity activities, and weapons of mass destruction programs and staffing for intelligence analysts. In addition, SHSP funding supports citizen preparedness initiatives across the State, and New York has used SHSP funds to reduce vulnerabilities in crowded open spaces.

68.     Plaintiff States were allocated the following in SHSP funds since FY2021 as shown in Table 1 below:

**Table 1: SHSP Allocations to Plaintiff States in FY2021-2024[1]**

| Plaintiff State | FY2021 | FY2022 | FY2023 | FY2024 |
|---|---|---|---|---|
| California | $59,220,807 | $57,035,623 | $57,035,623 | $51,332,060 |
| Colorado | $4,602,500 | $4,847,500 | $4,847,500 | $4,362,750 |
| Connecticut | $4,602,500 | $4,847,500 | $4,847,500 | $4,362,750 |
| Delaware | $4,602,500 | $4,847,500 | $4,847,500 | $4,362,750 |
| District of Columbia | $5,280,222 | $5,085,387 | $5,085,387 | $4,576,849 |
| Hawai'i | $4,602,500 | $4,847,500 | $4,847,500 | $4,362,750 |
| Illinois | $14,427,260 | $13,894,910 | $13,894,910 | $12,505,419 |
| Maine | $4,602,500 | $4,847,500 | $4,847,500 | $4,362,750 |
| Maryland | $7,345,897 | $7,074,841 | $7,074,841 | $6,367,357 |
| Massachusetts | $6,428,138 | $6,190,947 | $6,190,947 | $5,571,852 |
| Michigan | $5,280,222 | $5,085,387 | $5,085,387 | $4,576,849 |
| Minnesota | $4,602,500 | $4,847,500 | $4,847,500 | $4,362,750 |
| Nevada | $4,602,500 | $4,847,500 | $4,847,500 | $4,362,750 |
| New Jersey | $7,345,897 | $7,074,841 | $7,074,841 | $6,367,357 |
| New Mexico | $4,602,500 | $4,847,500 | $4,847,500 | $4,362,750 |
| New York | $70,639,800 | $68,033,267 | $68,033,267 | $61,229,940 |
| Oregon | $4,602,500 | $4,847,500 | $4,847,500 | $4,362,750 |
| Rhode Island | $4,602,500 | $4,847,500 | $4,847,500 | $4,362,750 |
| Vermont | $4,602,500 | $4,847,500 | $4,847,500 | $4,362,750 |

---

[1] This chart is prepared based on allocations set out by FEMA in its annual Notices of Funding Opportunity. Actual awarded amounts may vary slightly.

| Washington | $6,428,138 | $6,190,947 | $6,190,947 | $5,571,852 |
| Wisconsin | $4,602,500 | $4,847,500 | $4,847,500 | $4,362,750 |
| TOTAL | $237,626,381 | $233,836,150 | $233,836,150 | $210,452,535 |

69.     Plaintiff States have been applying for and obtaining SHSP funds every year since the program was established during the Bush Administration.

70.     Plaintiff States intend to apply for SHSP funds in FY2025.

**b.     Homeland Security Grant Program – Urban Area Security Initiative ("UASI")**

71.     Homeland Security Grant Program – Urban Area Security Initiative ("UASI") grants serve the same overall purposes as SHSP grants. These funds are used to build necessary capacity to prevent, prepare for, protect against, and respond to acts of terrorism but with a focus on high-threat, high-density urban areas.

72.     UASI funds have been available to States since the first version of the program was created by appropriations statute in 2003. *See* Pub. L. 108-90, 117 Stat. 1137, 1146. The program is codified at 6 U.S.C. §§ 603-04, 606-09.

73.     FEMA is required to follow considerations set in statute to determine the relative threat, vulnerability, and consequences from acts of terrorism faced by metropolitan areas to designate high-risk urban areas that may submit applications for UASI grants. *Id.* §§ 604(b)(3). FEMA is required to allocate UASI funds pursuant to a risk assessment, which determines each high-risk urban area's relative threat, vulnerability, and consequences from acts of terrorism, considering factors such as population density and history of threats. *Id.* § 608(a)(1).

74.     Because UASI grants are formula grants based on a statutory risk formula, not competitive grants, each eligible State is entitled to a specific allocation based on the risk

assessment whenever a notice of funding opportunity is posted, tied to the FEMA-designated eligible urban area or areas in that State.

75.    Recipients must use UASI funds for permitted uses, such as enhancing homeland security, conducting training exercises, upgrading equipment, or paying salaries. *Id*. § 609(a). None of the permitted uses include civil immigration enforcement.

76.    States that receive UASI funds must provide the high-risk urban area with at least 80% of the grant funds. *Id*. § 604(d)(2)(A). Any funds retained by the State shall be expended on items, services, or activities that benefit the high-risk urban area. *Id*.

77.    The UASI statutes do not authorize DHS to impose any of the Civil Immigration Conditions on UASI funding.

78.    States collectively receive hundreds of millions of dollars per year in UASI grants, passing most of these funds along to the high-risk urban areas. States and the local government entities they pass these funds to use UASI funds for myriad counterterrorism and emergency preparedness purposes, including support for urban fusion centers, SWAT teams, canine units, and bomb squads.

79.    UASI funds allow States and local government entities to advance counterterrorism and emergency preparedness purposes in ways they otherwise could not.

80.    Because each UASI grant typically remains open for three years, an award in one fiscal year usually allows States to continue to support program activities in at least the two years thereafter.

81.    As an example of how States use UASI funding, Illinois has one eligible high-threat, high-density urban area, the Chicago metropolitan statistical area. Illinois passes approximately 90% of UASI funds on to fire departments, law enforcement, other first responders,

and emergency preparedness offices in the greater Chicago area. These funds provide critical funding for the Chicago Office of Emergency Management, the Chicago Crime Prevention and Intelligence Center, and the Cook County Department of Emergency Management and Regional Security. Chicago uses UASI funds for preparedness purposes including, but not limited to, replacing and sustaining its stock of respirators necessary for mass casualty incidents, maintaining training for fire department special operations teams, and developing policy and training regarding active shooters and coordinated terrorist attack scenarios.

82.    Similarly, New Jersey passes UASI funds through to seven contiguous counties in the New York City metropolitan area, including the major cities of Newark and Jersey City, eight medical centers in urban areas throughout the state, and six State-level agencies that perform preparedness work in service of those geographic areas. New Jersey has used UASI funds to enhance urban search and rescue, including training and equipment and gear upgrades and replacements.

83.    Plaintiff States eligible for UASI funding were allocated the following in UASI funds since FY2021 as shown in Table 2 below:

### Table 2: UASI Allocations to Plaintiff States in FY2021-2024[2]

| Plaintiff State | FY2021 | FY2022 | FY2023 | FY2024 |
|---|---|---|---|---|
| California | $135,350,000 | $133,877,000 | $132,063,095 | $118,534,552 |
| Colorado | $3,900,000 | $3,900,000 | $3,900,000 | $3,500,484 |
| District of Columbia | $51,750,000 | $51,127,000 | $50,360,095 | $45,201,207 |
| Hawai'i | $3,800,000 | - | $1,500,000 | $1,346,340 |

---

[2] This chart is based on amounts allocated by FEMA in its annual Notices of Funding Opportunity. Actual awarded amounts may vary slightly.

| | | | | |
|---|---|---|---|---|
| **Illinois** | $68,000,000 | $67,182,000 | $66,174,270 | $59,395,378 |
| **Maryland** | $4,250,000 | $3,800,000 | $3,800,000 | $3,410,728 |
| **Massachusetts** | $16,900,000 | $16,900,000 | $16,646,500 | $14,941,233 |
| **Michigan** | $5,250,000 | $5,250,000 | $5,250,000 | $4,712,190 |
| **Minnesota** | $5,250,000 | $5,250,000 | $5,250,000 | $4,712,190 |
| **Nevada** | $5,250,000 | $4,847,500 | $5,250,000 | $4,712,190 |
| **New Jersey** | $19,050,000 | $18,915,000 | $18,631,275 | $16,722,687 |
| **New York** | $178,750,000 | $176,599,000 | $173,950,017 | $156,131,176 |
| **Oregon** | $3,800,000 | $3,800,000 | $3,800,000 | $3,410,728 |
| **Washington** | $6,250,000 | $6,250,000 | $6,250,000 | $5,609,750 |
| **TOTAL** | $507,550,000 | $497,697,500 | $492,825,252 | $442,340,833 |

84.     Eligible Plaintiff States have been applying for and obtaining UASI funds every year since the program was established during the Bush Administration.

85.     Eligible Plaintiff States intend to apply for UASI funds in FY2025.

     **c.     Emergency Management Performance Grant Program ("EMPG")**

86.     The Emergency Management Performance Grant Program ("EMPG") provides federal funding to States to assist state, local, tribal, and territorial emergency management agencies in implementing FEMA's National Preparedness System, including by building continuity-of-government capabilities to ensure essential functions in a catastrophic disaster.

87.     EMPG funds have been available to States since an initial appropriation for the program in 2003. *See* Pub. L. 108-7, 117 Stat. 11, 516. The program is now codified at 6 U.S.C. § 762 after being made permanent by the Post-Katrina Emergency Management Reform Act of 2006.

88.     FEMA's allocation of EMPG funds is set by statutory formula. For each year's apportioned amount of EMPG, FEMA must allocate to certain territories a baseline amount of 0.25 percent of the appropriated funds and to the States a baseline amount of 0.75 percent of the appropriated funds. *Id*. § 762(d)(1). FEMA must apportion the remaining amount among the States on a population-share basis. *Id*. § 762(d)(2).

89.     Because EMPG grants are formula grants and not competitive grants, each State is entitled to a specific allocation whenever a notice of funding opportunity is posted.

90.     The EMPG statute does not authorize DHS to impose any of the Civil Immigration Conditions on EMPG funding.

91.     States collectively receive hundreds of millions of dollars per year in EMPG grants. They use these funds for emergency preparedness purposes, including funding the salaries of operations personnel who coordinate disaster response efforts and funding communications, facilities, and vehicles used for disaster response.

92.     EMPG funds allow States to advance emergency preparedness purposes in ways they otherwise could not. States would otherwise not be able to employ the emergency management staff funded by EMPG funds, severely diminishing States' ability to coordinate a disaster response.

93.     Because each EMPG grant typically remains open for three years, an award in one fiscal year usually allows States to continue to support program activities in at least the two years thereafter.

94.     States use EMPG funding for a wide range of emergency response programming. For instance, EMPG dollars fund the salaries of state agency personnel who lead statewide coordination efforts in response to a natural disaster or mass casualty event, such as state

emergency operations plans, hurricane response plans, severe weather plans and procedures. The EMPG program also funds communications, facilities, and vehicles for disaster response in State-level agencies. EMPG monies also fund the ongoing costs of the software program used at the state emergency operations centers, which are the physical location where a state emergency manager directs all strategic and operational activities in the event of a disaster or public health emergency.  For example, Rhode Island uses EMPG funds to lead statewide coordination efforts in response to disasters or mass casualty events.  EMPG funds pay for communications, facilities, vehicles and equipment for disaster response.

95.    States also pass through EMPG funds to localities who likewise fund the salaries of local emergency managers and local support staff statewide as well as software and communications to support local emergency response. For instance, California distributes EMPG funding to 59 local government entities and tribes to improve and fill critical gaps for existing emergency management systems.

96.    Plaintiff States were allocated the following in EMPG funds since FY2021 as shown in Table 3 below:

**Table 3: EMPG Allocations to Plaintiff States in FY2021-2024[3]**

| Plaintiff State | FY2021 | FY2022 | FY2023 | FY2024 |
|---|---|---|---|---|
| **California** | $27,840,216 | $31,711,205 | $27,342,079 | $24,465,792 |
| **Colorado** | $6,376,806 | $7,224,682 | $6,355,283 | $5,725,277 |
| **Connecticut** | $4,937,370 | $5,652,584 | $4,955,472 | $4,444,987 |
| **Delaware** | $3,293,610 | $3,755,425 | $3,306,466 | $2,980,703 |

---

[3] This chart is based on amounts allocated by FEMA in its annual Notices of Funding Opportunity. Actual awarded amounts may vary slightly.

| | | | |
|---|---|---|---|
| **District of Columbia** | $3,118,379 | $3,537,568 | $3,087,304 | $2,780,814 |
| **Hawai'i** | $3,562,346 | $4,092,884 | $3,573,185 | $3,209,100 |
| **Illinois** | $10,712,809 | $12,329,319 | $10,618,545 | $9,504,284 |
| **Maine** | $3,525,978 | $4,025,503 | $3,538,497 | $3,186,775 |
| **Maryland** | $6,535,466 | $7,517,313 | $6,560,623 | $5,896,691 |
| **Massachusetts** | $7,071,260 | $8,135,699 | $7,077,439 | $6,361,781 |
| **Michigan** | $9,036,574 | $10,345,728 | $9,007,410 | $8,081,267 |
| **Minnesota** | $6,280,633 | $7,175,934 | $6,277,669 | $5,646,155 |
| **Nevada** | $4,669,562 | $5,289,011 | $4,671,913 | $4,205,403 |
| **New Jersey** | $8,343,188 | $9,774,016 | $8,518,986 | $7,658,501 |
| **New Mexico** | $4,009,589 | $4,573,158 | $3,998,839 | $3,593,811 |
| **New York** | $15,029,265 | $17,687,743 | $15,105,029 | $13,481,216 |
| **Oregon** | $5,375,140 | $6,110,421 | $5,343,682 | $4,793,987 |
| **Rhode Island** | $3,338,580 | $3,833,335 | $3,354,105 | $3,016,993 |
| **Vermont** | $3,061,159 | $3,503,868 | $3,071,660 | $2,762,968 |
| **Washington** | $7,582,922 | $8,625,483 | $7,585,716 | $6,821,397 |
| **Wisconsin** | $6,392,753 | $7,311,711 | $6,388,552 | $5,744,163 |
| **TOTAL** | $150,093,605 | $172,212,590 | $149,738,454 | $134,362,065 |

97.    Plaintiff States have applied for and obtained EMPG funds every year since the program was established.

98.    Plaintiff States intend to apply for EMPG funds in FY2025.

### d.    State and Local Cybersecurity Grant Program ("SLCGP")

99.    The State and Local Cybersecurity Grant Program ("SLCGP") provides federal funding to States to manage and reduce cyber risk.

100.    SLCGP funds have been available to States since the program was created by 2021 Infrastructure Investment and Jobs Act. The program is codified at 6 U.S.C § 665g.

101.    FEMA is required to allocate SLCGP funds on a population-share basis. *Id.* § 665g(l).

102.    Because SLCGP grants are formula grants and not competitive grants, each State is entitled to a specific allocation whenever a notice of funding opportunity is posted.

103.    The SLCGP statute does not authorize DHS to impose any of the Civil Immigration Conditions on SLCGP funding.

104.    States collectively receive hundreds of millions of dollars per year in SLCGP grants. They use these funds for cybersecurity purposes, including funding critical infrastructure necessary to detect cyber threats.

105.    SLCGP funds allow States to provide cybersecurity defenses in ways they otherwise could not. States do not have a substitute source of cyber defense funding if SLCGP dollars are cut off.

106.    Because each SLCGP grant typically remains open for three years, an award in one fiscal year usually allows States to continue to support program activities in at least the two years thereafter.

107.    As an example of how States use SLCGP funds, Illinois has used its SLCGP funding for a wide range of cybersecurity programming. Illinois passes all its SLCGP dollars to the Illinois Department of Information Technology, which in turn passes the funds entirely on to local governments in Illinois. These local governments use the funds to strengthen their cyber

defenses, improve incident response capabilities, and protect critical infrastructure from evolving cyber threats. For example, the funds are used to develop endpoint detection software, which continuously monitors the activities on all physical devices connected to a network to detect threats as early as possible. In Illinois, SLCGP funds also support penetration testing, which involves hiring cybersecurity experts to attempt to break into a computer network to identify vulnerabilities before an attack happens.

108.     Similarly, New Jersey has used its SLCGP funding to establish a unified cybersecurity strategy statewide, guided by the Cybersecurity and Communications Integration Cell of the New Jersey Office of Homeland Security and Preparedness. Under this unified approach, the State-level agency provides equipment and services for state and local entities to enhance the State's cyber response.

109.     Washington also passes on most of its SLCGP funds to local governments, and the City of Everett has used SLCGP funds to install advanced network monitoring systems and next-generation firewalls to protect the City's water and wastewater plants. These upgrades have made it more difficult for hackers to infiltrate some of the City's most critical infrastructure.

110.     California's Cybersecurity Integration Center formed a subcommittee to develop a state cybersecurity plan to guide its SLCGP funding allocations. California's plan includes expanding cybersecurity protections to small and rural local governments, where cybersecurity programs are often nonexistent and basic IT functions are limited.

111.     Plaintiff States were allocated the following in SLCGP funds since FY2022 as shown in Table 4 below:

**Table 4: SLCGP Allocations to Plaintiff States in FY2021-2024[4]**

| Plaintiff State | FY2022 | FY2023 | FY2024 |
|---|---|---|---|
| California | $7,981,997 | $15,879,497 | $11,845,702 |
| Colorado | $3,234,143 | $6,553,216 | $4,791,605 |
| Connecticut | $2,681,116 | $5,465,875 | $4,122,302 |
| Delaware | $2,224,803 | $4,546,985 | $3,377,360 |
| District of Columbia | $2,081,394 | $4,240,457 | $3,166,373 |
| Hawaiʻi | $2,243,739 | $4,567,336 | $3,469,262 |
| Illinois | $4,404,622 | $8,834,866 | $6,724,174 |
| Maine | $2,666,932 | $5,439,273 | $4,038,646 |
| Maryland | $3,214,008 | $6,514,533 | $4,924,161 |
| Massachusetts | $3,173,589 | $6,419,112 | $4,816,189 |
| Michigan | $4,777,219 | $9,609,530 | $7,178,365 |
| Minnesota | $3,606,482 | $7,270,657 | $5,474,363 |
| Nevada | $2,488,375 | $5,072,822 | $4,205,403 |
| New Jersey | $3,380,963 | $6,858,348 | $5,184,599 |
| New Mexico | $2,540,767 | $5,178,907 | $3,893,800 |
| New York | $5,813,554 | $11,588,894 | $8,723,252 |
| Oregon | $2,988,975 | $6,047,316 | $4,515,523 |
| Rhode Island | $2,190,484 | $4,467,229 | $3,326,808 |
| Vermont | $2,310,302 | $4,717,850 | $3,530,689 |

---

[4] This chart is based on amounts allocated by FEMA in its annual Notices of Funding Opportunity. Actual awarded amounts may vary slightly.

| Washington | $3,667,735 | $7,403,503 | $5,546,984 |
| Wisconsin | $3,795,634 | $7,666,939 | $5,806,564 |
| **TOTAL** | $71,466,833 | $144,343,145 | $108,662,124 |

112.    Plaintiff States have applied for and obtained SLGCP funds every year since the program was established.

113.    Plaintiff States intend to apply for SLCGP funds in FY2025.

   **e.    Nonprofit Security Grant Program ("NSGP")**

114.    The Nonprofit Security Grant Program ("NSGP") provides federal funding to States to help nonprofits in those States increase the physical security of their facilities at risk of a terrorist or other extremist attack. The program was created in response to concerns that nonprofit organizations, particularly religious institutions, have faced increasing threats from extremists and other violent organizations.

115.    NSGP funds have been available to States since the program was created by legislative appropriation in 2004. Pub. L. 108-334, 118 Stat. 1298, 1309. The program is now codified at 6 U.S.C. § 609a.

116.    Nonprofit organizations eligible to participate in the NSGP are generally organizations exempt from tax under section 501(c)(3) of the Internal Revenue Code, such as houses of worship, museums, educational facilities, senior centers, community centers, and day camps.

117.    Eligible nonprofit organizations submit an application to their State, describing the nature of the threats they face, and then States apply to FEMA for NSGP funds on behalf of the eligible nonprofit organizations.

118.    Each State is entitled to a target allocation of statewide NSGP funds each fiscal year, with the States submitting enough projects to exhaust this target allocation. The available funds are distributed among eligible nonprofits based on a competitive scoring process. Additional high-risk urban area funding is available on a competitive basis. Multiple Plaintiff States apply for both their baseline allocation and additional competitive funds each year.

119.    NSGP fund recipients may use the funds for uses permitted by statute, including target hardening activities, fees for security training, and security personnel costs. *Id*. § 609a(c)(1).

120.    The NSGP statutes do not authorize DHS to impose any of the Civil Immigration Conditions on NSGP funding.

121.    States collectively receive hundreds of millions of dollars per year in NSGP grants. They use these funds for myriad nonprofit security purposes, including, but not limited to, funding security systems and physical building improvements. NSGP funds allow States to advance nonprofit security purposes in ways they otherwise could not. Nonprofit organizations generally lack other sources of funds to implement such improvements, and a funding cut-off would significantly hinder efforts to safeguard vulnerable faith-based and civic organizations during a period of heightened risk of violence motivated by developing domestic and global events.

122.    Because each NSGP grant typically remains open for three years, an award in one fiscal year usually allows States to continue to support nonprofit security programming in at least the two years thereafter.

123.    The States have used their NSGP funding for a wide range of initiatives that bolster nonprofit security. Those efforts include support for thousands of nonprofit organization sites, including religious institutions and private schools, at risk of being targeted by violent extremists. Recipients of NSGP funds include synagogues and Jewish Day Schools facing the risk of

antisemitic violence. The grant program has also supported security measures for churches, mosques, and secular organizations that face violent threats. NSGP funds have gone to security measures such as public address systems to be used in an emergency, security systems, physical building improvements to mitigate damage from explosions and impacts, bulletproof glass, bollards and other physical barriers, and screening equipment for packages and people such as metal detectors. As one example, recent NSGP awards have been used to help synagogues in the New York City-area to purchase security cameras, hire security guards, and install fencing.

124.    Multiple Plaintiff States rely on funding from NSGP awards to protect non-profit institutions.  For example, in FY 2024, Plaintiff States collectively relied on over $100 million in NSGP funds, including in excess of $43 million for California, $8 million for Colorado, $4 million for Connecticut, $24 million for Illinois, $8 million for Maryland, $8 million for Massachusetts, $14 million for Michigan, $8 million for Minnesota, $7 million for New Jersey, $2 million for New Mexico, $44 million for New York, $3 million for Oregon, $2 million for Rhode Island, and $7 million for Wisconsin.

125.    Many Plaintiff States have applied for and obtained NSGP funds every year since the program was established during the Bush Administration.

126.    Many Plaintiff States intend to apply for NSGP funds in FY2025.

### f.    Port Security Grant Program ("PSGP")

127.    The Port Security Grant Program ("PSGP") provides federal funding to States to support increased port-wide risk management and protect critical marine transportation system infrastructure from acts of terrorism, major disasters, and other emergencies.

128.    PSGP funds have been available to States since the program was created by the Maritime Transportation Security Act of 2002. The program is codified at 46 U.S.C. § 70107.

129.    PSGP grants are awarded on a competitive basis as outlined in the pertinent notice of funding opportunity. Eligible funding must support an Area Maritime Security Program at one of the port areas designated for special security protections by the Secretary of Homeland Security.

130.    Multiple Plaintiff States apply for this competitive grant on an annual basis.

131.    The PSGP statute does not authorize DHS to impose any of the Civil Immigration Conditions on PSGP funding.

132.    States collectively receive millions of dollars per year in PSGP grants. They use these funds to purchase and upgrade port security systems, including threat detection technology.

133.    Because each PSGP grant typically remains open for three years, an award in one fiscal year usually allows States to continue to support port security in at least the two years thereafter.

134.    Illinois has used its PSGP funding to equip Lake Michigan patrol boats with tracking and navigation systems capable of detecting improvised explosive devices and unmanned aerial systems deployed over water. It has also used PSGP funds to purchase new patrol boats in the Port of St. Louis.

135.    Illinois currently relies on funding from the PSGP awards for FY2023 and FY2024. For FY2023, Illinois received an award of $75,000 for electronics upgrades to the four current Lake Michigan patrol boats. For FY 2024, Illinois received an award of $600,000 to purchase a new Lake Michigan patrol boat and an award of $45,000 to upgrade equipment on a Port St. Louis patrol boat.

136.    New Jersey relies on two PSGP awards each year, for its designated North and South port security areas. New Jersey has open awards for FYs 2022 to 2024. In FY 2023, New Jersey received a $2,139,749 award for the North area and a $372,842 award for the South area.

In FY2024, New Jersey received a $348,750 award for the North area and a $464,250 award for the South area.

137.    Washington relies on PSGP funds to patrol the Puget Sound region and respond quickly to emergencies occurring on the water, such as distressed boaters or an active shooter aboard a Washington State Ferry. For instance, Washington received a $398,454 award in FY 2021 and a $450,000 award in FY 2023, which it used to purchase critical marine assets, including a boat equipped with the ability to detect nuclear devices in Puget Sound. Washington intends to apply for a FY 2025 PSGP grant and to use those funds to train and equip its maritime police officers, who frequently support federal partners during high profile events in Seattle, such as the upcoming 2026 FIFA World Cup.

138.    Many Plaintiff States have applied for and obtained PSGP funds every year since the program was established during the Bush Administration.

139.    Many Plaintiff States intend to apply for PSGP funds in FY2025.

g.    **Presidential Residence Protection Security Grant Program ("PRP")**

140.    The Presidential Residence Protection Security Grant Program ("PRP") program provides federal funding to reimburse States for extraordinary law enforcement or other emergency personnel costs for protection activities directly and demonstrably associated with any residence of the President of the United States that is designated or identified to be secured by the United States Secret Service.

141.    Because President Donald Trump has a residence in New Jersey, the State of New Jersey has applied for and received PRP funds for FY2017, FY2018, FY2019, FY2020, and FY 2021, corresponding to each of President Trump's first four years in office. In FY2017, New Jersey received $281,821. In FY2018, New Jersey received $186,683. In FY2019, New Jersey received $234,693. In FY2020, New Jersey received $295,080. In FY2021, New Jersey received $6,646.

142.    The statutes and regulations governing PRP do not authorize DHS to impose any of the Civil Immigration Conditions on PRP funding.

143.    States collectively receive hundreds of thousands or millions of dollars per year in PRP grants. They use these funds to reimburse expended money spent on protection services at a non-governmental residence of the President as designated by the United States Secret Service.

144.    Plaintiff New Jersey intends to apply for PRP funds in FY2025 to reimburse the State for funds expended for extraordinary protection activities directly associated with the President's New Jersey residence.

**h.    Transit Security Grant Program ("TSGP")**

145.    The Transit Security Grant Program ("TSGP") provides funds to transit agencies to protect critical surface transportation infrastructure and the traveling public from acts of terrorism.

146.    Eligible public transportation agencies may apply for TSGP funds, 6 U.S.C. § 1135(a)(2), and DHS must "select the recipients of grants based solely on risk," *id.* § 1135(c)(2).

147.    The TSGP statute does not authorize DHS to impose any of the Civil Immigration Conditions on TSGP funding.

148.    State subdivisions collectively receive millions of dollars per year in TSGP funds. They use these funds to protect critical transportation infrastructure and the traveling public from acts of terrorism and increasing the resilience of the transportation infrastructure itself.

**2.    Disaster Relief Grants**

149.    In addition to preparedness grants, FEMA administers grant programs tied to a presidential declaration of a major disaster or an emergency under the Stafford Disaster Relief and Emergency Assistance Act (the "Stafford Act").

150.    Congress passed the Stafford Act in 1988 to "provide an orderly and continuing means of assistance by the Federal Government to State and local governments in carrying out

their responsibilities to alleviate the suffering and damage which result from such disasters." 42 U.S.C. § 5121(b).

151.    Typically, a State's governor will request a major disaster declaration, and the President can either grant or deny the request. The governor's request "shall be based on a finding that the disaster is of such severity and magnitude that effective response is beyond the capabilities of the State and the affected local governments and that Federal assistance is necessary." *Id*. § 5170; *see also id.* § 5191 (process for declaring an emergency).

152.    FEMA has promulgated regulations to govern the disaster declaration process. *See* 44 C.F.R. § 206.31 *et seq.* The regulations include more detailed criteria for when FEMA recommends that the President declare a major disaster. *See id.* §§ 206.36(b)-(c), 206.37(c)(1), 206.48; *see also id.* § 206.35 (criteria for emergencies). These criteria relate exclusively to the severity of the disaster (in terms of monetary and non-monetary damages), the available resources to address it, and the history of pre-disaster mitigation efforts.

153.    Congress specifically lists the actions a President may take in any major disaster, including directing any federal agency to utilize its resources for support, coordinating disaster relief, providing technical and advisory assistance, assisting in the distribution of supplies, assisting in inspections for building damage compliance, and providing accelerated federal assistance and support where necessary to save lives, prevent human suffering, and mitigate severe damage. *Id*. § 5170a. The Stafford Act does not authorize DHS to impose any of the Civil Immigration Conditions on post-disaster grant programs.

154.    The FEMA regulations do not authorize DHS to impose any of the Civil Immigration Conditions on post-disaster grant programs.

155.    FEMA issues grants under the Stafford Act pursuant to a range of different programs including the Public Assistance Program, the Disaster Case Management Program, the Hazard Mitigation Grant Program, and the Fire Management Assistance Grant Program.

156.    FEMA grants issued under the Stafford Act are paid out from the Disaster Relief Fund, an appropriation against which FEMA can direct, coordinate, manage, and fund eligible resources and recovery efforts associated with domestic major disasters and emergencies pursuant to the Stafford Act. Congress appropriated $29 billion to the Disaster Relief Fund in the American Relief Act of 2025.

157.    FEMA reports the amounts shown in Table 5 below that have been obligated to the Plaintiff States from the Disaster Relief Fund for non-COVID disasters declared since 2017:

**Table 5: Funds Obligated from FEMA Disaster Relief Fund to Plaintiff States for All Non-COVID Disasters Declared since 2017[5]**

| Plaintiff State | Disaster Relief Fund Obligated |
|---|---|
| California | $11,428,661,663 |
| Colorado | $145,484,901 |
| Connecticut | $140,816,858 |
| Delaware | $12,587,235 |
| Hawai'i | $3,141,366,233 |
| Illinois | $909,651,965 |
| Maine | $210,579,535 |
| Maryland | $47,598,393 |

---

[5]    As reported on FEMA, *State Profiles on Disaster Funding*, available at https://www.fema.gov/emergency-managers/national-preparedness/frameworks/national-disaster-recovery/support-functions/rsflg/state-profiles (accessed on July 1, 2025).

| | |
|---|---|
| **Massachusetts** | $139,585,137 |
| **Michigan** | $1,040,805,220 |
| **Minnesota** | $368,094,536 |
| **Nevada** | $51,086,321 |
| **New Jersey** | $860,507,957 |
| **New Mexico** | $650,865,450 |
| **New York** | $1,909,767,947 |
| **Oregon** | $1,068,350,533 |
| **Rhode Island** | $62,453,267 |
| **Vermont** | $551,480,210 |
| **Washington** | $389,808,183 |
| **Wisconsin** | $157,383,628 |

158.    As shown in Table 5, FEMA has obligated over $23.2 billion in disaster relief funding since 2017 to the Plaintiff States, amounting to an average of over $2.9 billion per year.

### a.    Public Assistance Program

159.    After the President makes a major disaster declaration pursuant to the Stafford Act, the Public Assistance Program provides federal funding to States and other eligible recipients to help communities pay for emergency response measures in a disaster's immediate aftermath. FEMA and States work to develop detailed preliminary damage estimates, which ultimately become the basis on which FEMA determines the amount of funding that will be made available. *See* 44 C.F.R. §§ 206.201(d); 206.202.

160.    Neither the Stafford Act nor the FEMA regulations applicable to the Public Assistance Program authorize DHS to impose any of the Civil Immigration Conditions on Public Assistance Program funds.

161.    Public Assistance funds are critical for States as they recover from major disasters, funding activities ranging from debris removal, search and rescue, construction of temporary facilities for medical care and shelter, and infrastructure repair, all of which are authorized by the Stafford Act. *See* 42 U.S.C. §§ 5170a, 5170b, 5172-5173, 5185-5186. States can also apply for a narrower set of assistance after the declaration of an emergency, short of a major disaster. *See id.* § 5192(a). The federal share of Public Assistance funding "shall be not less than 75 percent of the eligible cost." *Id.* §§ 5170b(b), 5172(b)(1), 5173(d), 5193(a).

162.    Plaintiff States rely on Public Assistance for a wide range of essential recovery expenses. For example, Illinois has used its Public Assistance funding to conduct search and rescue operations in the immediate aftermath of a disaster, provide food aid, debris removal, and permanent work including the repair of roads, bridges, water control facilities, buildings and equipment, utilities, ports, recreational areas, and other physical infrastructure.

163.    Delaware currently relies on Public Assistance funding arising out of a Tropical Storm ISAIAS which caused widespread flooding and wind damage. Public Assistance funds were used to restore electrical infrastructure and roads damages by the storm.

164.    Hawaiʻi has thirteen open Public Assistance awards, providing emergency relief after landslides, wildfires, hurricanes, and the Kilauea Volcanic eruption and earthquakes.

165.    In New York, Public Assistance funds ensured that vital public services were stabilized and rebuilt in the wake of Superstorm Sandy, and the funds ensured that a pump station and sewer treatment plant were repaired after Tropical Storm Debby.

166.    Washington has relied on Public Assistance to rebuild key buildings after fire destroyed 80% of buildings in the town of Malden, including the fire station, the city hall, library, post office, and at least 84 homes. Washington also relied on Public Assistance funding after severe storms to repair the Diablo Dam, a key hydroelectric asset that generates electricity and plays a role in managing the State's water supply.

167.    Finally, Wisconsin used Public Assistance funds to repair critical infrastructure after 17 tornadoes hit northern Wisconsin, causing extended power outages.

168.    Plaintiff States have routinely applied for, and intend to continue to apply for, Public Assistance funds whenever they suffer from an eligible major disaster, which could happen at any time.

**b.    Disaster Case Management ("DCM") Program**

169.    The Stafford Act also provides that the federal government "may provide case management services, including financial assistance, to State or local government agencies or qualified private organizations to provide such services, to victims of major disasters to identify and address unmet needs." 42 U.S.C. 5189d(a).

170.    The Disaster Case Management ("DCM") Program provides supplemental funding to the Public Assistance funding for a State to assist disaster-impacted individual and families through the recovery process. For example, the program funds case managers who work directly with disaster survivors to develop and carry out the survivor's long-term recovery plan.

171.    The Stafford Act does not authorize DHS to impose any of the Civil Immigration Conditions on DCM funds or impose immigration status requirements on survivors or individual DCM service beneficiaries.

172.    For example, Illinois has three open DCM awards, relating to disasters involving severe storms and flooding. The original amounts of these awards totaled over $9 million. Illinois

is in the process of finalizing an additional DCM award under a disaster involving severe storms, tornadoes, straight-line winds, and flooding that took place in seven Illinois counties during the period July 13, 2024 to July 16, 2024. Illinois intends to apply again for DCM funds whenever there is an eligible major disaster affecting Illinois.

173.     Multiple Plaintiff States have routinely applied for, and intend to continue to apply for, DCM funds whenever they suffer from an eligible major disaster, which could happen at any time.

          **c.**      **Hazard Mitigation Grant Program ("HMGP")**

174.     The Stafford Act also provides that the federal government may contribute "up to 75 percent of the cost of hazard mitigation measures" which "substantially reduce the risk of, or increase resilience to, future damage, hardship, loss, or suffering in any area affected by a major disaster." 42 U.S.C. § 5170c(a).

175.     After a major disaster declaration, the Hazard Mitigation Grant Program ("HMGP") provides federal funding to States to develop hazard mitigation plans and rebuild in a way that reduces future disaster losses in the communities affected by the declared disaster. Projects eligible for HMGP funds include, but are not limited to, structural hazards control or protection projects, construction activities, retrofitting of facilities, or development or improvement of warning systems. 44 C.F.R. §§ 206.434(d).

176.     For example, Colorado is using an HMPG award following the Cameron Peak Fire to prevent further losses in the area due to wildfire. This project will reduce hazardous fuels along 47 miles of critical road infrastructure and adjacent private properties to provide a safer environment for thousands of residents and businesses. It will also protect critical community infrastructure, including: 41 dams, 35 schools, 15 fire and EMS stations, 4 hospitals, 4 power plants, 3 wastewater treatment plants, and a water treatment plant. This project has a total cost of

$1.5 million ($1.14 million federal, $190,000 state, and $190,000 local) and provides over $7 million of benefits, a return on investment of $4.57 in savings for every $1.00 invested.

177.    Similarly, Wisconsin has relied on HMGP funds to address erosion caused by high water levels Lake Michigan, putting a sewer interceptor line at severe risk of failure.  An HMPG grant of over $7 million will protect the sanitary system in the City of Sheboygan from failure.

178.    Washington and Oregon are both using HMPG funds to retrofit or replace water storage facilities in the Cascadia Subduction Zone to avert severe damage in the event of an earthquake. Absent this work, the current facilities are expected to suffer catastrophic failure during the next significant earthquake, which would not only render water systems inoperable but also endanger lives.

179.    Neither the Stafford Act nor the FEMA regulations applicable to the HMGP authorize DHS to impose any of the Civil Immigration Conditions on HMGP funds.

180.    Multiple Plaintiff States have routinely applied for, and intend to continue to apply for, HMPG funds whenever they suffer from an eligible major disaster, which could happen at any time.

### d.    Fire Management Assistance Grant ("FMAG") Program

181.    The Stafford Act also provides that the federal government may "provide assistance, including grants, equipment, supplies, and personnel, to any State or local government for the mitigation, management, and control of any fire on public or private forest land or grassland that threatens such destruction as would constitute a major disaster." 42 U.S.C. § 5187. One of the purposes of these grants is to save the federal government money. Stopping a fire before it turns into a major disaster saves lives, protects property, and reduces the funding necessary for recovery efforts.

182.    Funding is available under the Fire Management Assistance Grant ("FMAG") Program after a State's Governor or the Governor's Authorized Representative requests an FMAG declaration, and FEMA grants the request.

183.    FEMA regulations describe the criteria to be considered when evaluating a request for an FMAG evaluation. 44 C.F.R. § 204.21. None of these criteria relate to civil immigration policy.

184.    As an example of how States rely on FMAG funding, Washington has 60 open FMAG grants and has received 32 FMAG grants over the past five years. These federal funds are critical for ensuring state and local governments have the resources necessary to evacuate affected areas and control fires, including by renting aircraft, bulldozers, and other equipment, funding firefighter overtime, and providing food and lodging for firefighters that travel from outside the area to help. Washington experiences wildfires every summer, and its highest risk fire season is between June and October.

185.    Multiple Plaintiff States intend to apply for FMAG funds whenever they suffer from an eligible major fire, which could happen at any time.

### 3.    FEMA Mitigation Grants

186.    In addition to preparedness grants and disaster relief grants, FEMA administers grants programs authorized by other statutes intended to reduce risks posed by earthquakes, floods, and other natural disasters before those disasters occur.

### a.    National Earthquake Hazards Reduction Program – Individual State Earthquake Assistance ("NEHRP-ISEA")

187.    The National Earthquake Hazards Reduction Program – Individual State Earthquake Assistance ("NEHRP-ISEA") provides federal funding to States to reduce the risks to

life and property from future earthquakes in the United States through the establishment and maintenance of an effective earthquake risk reduction program.

188.    NEHRP-ISEA funds have been available to States since the program was created by the Earthquake Hazards Reduction Act of 1977. The program is codified at 42 U.S.C. § 7704.

189.    NEHRP-ISEA are available to eligible applicants, as determined by a risk formula. Each State is entitled to a specific allocation whenever a notice of funding opportunity is posted.

190.    The NEHRP-ISEA statute does not authorize DHS to impose any of the Civil Immigration Conditions on NEHRP-ISEA funding.

191.    States collectively receive millions of dollars per year in NEHRP-ISEA grants. Many States use these funds for earthquake risk reduction programming.  For instance, they use these funds to support seismic mitigation planning, conduct seismic safety inspections of critical structures, update building codes, zoning codes, and ordinances to enhance seismic safety, increase earthquake awareness and education, participate in emergency management exercises, and promote earthquake insurance.

192.    Because each NEHRP-ISEA grant typically remains open for three years, an award in one fiscal year usually allows States to continue to support earthquake risk reduction in at least the two years thereafter.

193.    As an example of how States use NEHRP-ISEA funding, Illinois passes all its funds on to the Central United States Earthquake Consortium (CUSEC), which is a partnership among the eight States affected by earthquakes in the central United States, including in the vicinity of the New Madrid fault system.

194.    Illinois currently relies on funding from the NEHRP-ISEA awards for FY2023 and FY2024. For FY2023, Illinois received an NEHRP-ISEA award of $62,496. For FY2024, Illinois received an NEHRP-ISEA award of $62,496.

195.    Washington has applied for and received NEHRP-ISEA grants on many occasions since the program began, and Washington intends to apply for an NEHRP-ISEA grant for fiscal year 2025. Washington faces one of the highest earthquake risks in the nation. In addition to fault lines throughout the state, including in Seattle, the Cascadia Subduction Zone off the Washington coast is one of the most dangerous fault lines on Earth. These funds support coordination between state and local agencies and the private sector regarding efforts to retrofit unreinforced masonry buildings (such as brick buildings) that face the highest risk of collapse during an earthquake. In addition, these funds support the annual Great Washington ShakeOut Campaign, which is a statewide earthquake and tsunami drill that encourages individuals, families, schools, businesses, and other organizations to update their emergency plans, restock their emergency supplies, secure their spaces, and practice evacuation routes so that they can minimize harm from an earthquake or tsunami.

196.    Multiple Plaintiff States intend to apply for NEHRP-ISEA funds in FY2025.

**b.    Flood Mitigation Assistance ("FMA")**

197.    Flood Mitigation Assistance ("FMA") grants provide federal funding to States for planning and carrying out activities designed to reduce the risk of flood damage to structures covered under contracts for flood insurance with the National Flood Insurance Program, with a focus on eliminating the risk of repetitive flood damage.

198.    FMA funds have been available to States since the program was created by the National Flood Insurance Reform Act of 1994. The program is codified at 42 U.S.C. § 4104c.

199.    FMA grants are awarded on a competitive basis to specific sub-applicants, which are generally units of local government. Units of local government present flood mitigation plans to States, which review and present one combined application to FEMA. FEMA then makes awards based on based on each State's ranking of the projects, project eligibility, and cost-effectiveness of the projects.

200.    The FMA statute does not authorize DHS to impose any of the Civil Immigration Conditions on FMA funding.

201.    States collectively receive millions of dollars per year in FMA grants. They use these funds to undertake both localized and individual flood mitigation projects. Localized projects include drainage pipes, pump stations, grading, and seawalls to reduce flood risk in a localized area. Individual flood mitigation operates at the property level, for instance by allowing local governments to acquire flood-prone properties so that the owners can relocate.

202.    Because each FMA grant typically remains open for three years, an award in one fiscal year usually allows States to continue to support earthquake risk reduction in at least the two years thereafter.

203.    Multiple Plaintiff States rely on FMA funding. For example, Illinois currently relies on funding from the FMA awards for FY2019, FY2021, and FY2022. For FY2019, Illinois received an FMA award of $1,929,926.90. For FY2021, Illinois received an FMA award of $2,158,695. For FY2022, Illinois received an FMA award of $373,210.50.

204.    New Jersey currently relies on funding from the FMA awards for FYs 2018 through 2023. For FY2018, New Jersey received an FMA award of $10,925,478. For FY2019, New Jersey received an FMA award of $21,193,033. For FY2020, New Jersey received an FMA award of $14,101,546. For FY2021, New Jersey received an FMA award of $22,344,965. For FY2022, New

Jersey received an award of $29,266,503. For FY2023, New Jersey received an award of $20,006,501.

205.    Multiple Plaintiff States applied for FMA funds in FY2024, with the application window closing on April 18, 2025. Those applications are currently under review by FEMA.

206.    Multiple Plaintiff States intend to apply for FMA funds in FY2025.

        **c.    National Dam Safety Program ("NDSP")**

207.    National Dam Safety Program ("NDSP") grants provide federal funding to States to support state programs intended to ensure dam safety and thereby protect human life and property.

208.    NDSP funds have been available to States since the program was created by the National Dam Safety Program Act in 1996. The program is codified at 33 U.S.C § 467f.

209.    FEMA "shall provide assistance" under the NDSP to "assist States in establishing, maintaining, and improving dam safety programs" in accordance with statutory criteria. 33 U.S.C § 467f(e)(1).

210.    The NDSP statute does not authorize DHS to impose any of the Civil Immigration Conditions on NDSP funding.

211.    Plaintiff States collectively receive millions of dollars per year in NDSP grants. Projects funded by NDSP funds include the daily work for processing permit applications for the construction, operation, and maintenance of new dams and the modification, operation, and maintenance of existing dams. States also use NDSP funds to support dam inspection programs.

212.    Multiple Plaintiff States currently rely on NDPS awards. For example, Illinois currently relies on funding from NDSP awards from FY2024. In the Spring of FY2024, Illinois received an NDSP award of $100,078.  In the Fall of FY2024, Illinois received an NDSP award of $174,843.

213.    New Jersey currently relies on funding from NDSP awards from FY 2024 in the amount of $511,366 and FY2023 in the amount of $94,816.

214.    Massachusetts received funding from NDSP awards from FY2022, FY2023, and FY 2024.  In FY2022, Massachusetts received an NDSP award of $209,257.41.  In FY2023, Massachusetts received a NDSP award of $119,563.  In FY2024, Massachusetts received an NDSP award of $645,551.

215.    Multiple Plaintiff States intend to apply for NDPS funds in FY2025.

### d.    Community Assistance Program – State Support Services Element ("CAP-SSSE")

216.    Community Assistance Program – State Support Services Element ("CAP-SSSE") grants provide federal funding to States for state-level technical assistance for the National Flood Insurance Program ("NFIP").  The funding helps States to proactively identify, prevent, and resolve floodplain management issues in participating communities before a flood event occurs.

217.    CAP-SSSE funds have been available to States since the program was created by the Flood Insurance Act of 1968.

218.    Through CAP-SSSE, each State is entitled to a base allocation whenever a notice of funding opportunity is posted, but the States can also apply for additional discretionary and competitive funding.

219.    The statutes and regulations governing CAP-SSSE do not authorize DHS to impose any of the Civil Immigration Conditions on CAP-SSSE funding.

220.    States collectively receive millions of dollars per year in CAP-SSSE grants. Uses of CAP-SSEE funds include support for the salaries of NFIP employees, who educate and train local officials on how to build floodplain management efforts to assure continued eligibility to participate in NFIP.

221.    Each CAP-SSSE grant typically remains open for one year.

222.    Multiple Plaintiff States currently rely on CAP-SSSE funding. For example, Illinois currently relies on funding from a CAP-SSSE award for FY2024. In FY2024, Illinois received a CAP-SSSE award of $293,318.

223.    New Jersey currently relies on funding from a CAP-SSSE award for FY2024. In FY2024, Illinois received a CAP-SSSE award of $504,104.

224.    Multiple Plaintiff States intend to apply for CAP-SSSE funds in FY2025.

   **e. National Urban Search & Rescue Response System ("US&R")**

225.    National Urban Search & Rescue Response System ("US&R") grants provide federal funding to States to ensure adequate management, training, exercise, procurement, storage, and maintenance for joint national-state task forces staffed and equipped to conduct around-the-clock search and rescue operations following a major disaster or emergency declared under the Stafford Act.  When deployed, these task forces support other state and local emergency responders in conducting mass search and rescue operations in the immediate aftermath of a natural or man-made disaster.

226.    For example, since its formation in 2016, New Jersey's urban search and rescue team has provided advanced technical search and rescue capabilities in response to several catastrophic disasters across the county including Hurricane Harvey in 2017, Hurricane Dorian in 2019, Hurricane Ida in 2021, Hurricane Ian in 2022, and Hurricanes Helene and Milton in 2024 among numerous others.

227.    US&R funds have been available to States since the program was created by FEMA in 2005. 44 C.F.R. § 208.1 et. seq.

228.    Because US&R grants are formula grants and not competitive grants, each State is entitled to a specific allocation whenever a notice of funding opportunity is posted.

229.    The statutes and regulations governing US&R grants do not authorize DHS to impose any of the Civil Immigration Conditions on US&R funding.

230.    States collectively receive millions of dollars per year in US&R grants.

231.    Because each US&R grant typically remains open for three years, an award in one fiscal year usually allows States to continue to support urban search and rescue efforts in at least the two years thereafter.

232.    In FY2023, New Jersey received a US&R award of $1,409,884.

233.    Multiple Plaintiff States intend to apply for US&R funds in FY2025.

   **f.  Cooperating Technical Partners Program ("CTP")**

234.    Cooperating Technical Partners Program ("CTP") grants provide federal funding to States to participate in the FEMA flood mapping program. The funding helps States to proactively identify flood hazards, make risk assessments, and support local communities to take action to reduce the risk of flooding.

235.    CTP funds have been available to States since the program was created by FEMA in 2001 through 66 Fed. Reg. 30925 (2001).

236.    The statutes and regulations governing CTP grants do not authorize DHS to impose any of the Civil Immigration Conditions on CTP funding.

237.    States collectively receive millions of dollars per year in CTP grants. They use these funds to support the salaries of agency employees who work on flood risk mapping projects.

238.    New Jersey currently relies on funding from CTP awards for FY2018, FY2021, FY2022, FY2023, and FY2024. In FY2018, New Jersey received a CTP award of $2,988,193. In FY2021, New Jersey received a CTP award of $105,000. In FY2022, New Jersey received a CTP award of $240,000. In FY2023, New Jersey received a CTP award of $291,000. In FY2024, New Jersey received a CTP award of $40,000.

239.    Multiple Plaintiff States intend to apply for CTP funds in FY2025.

**4.    Non-FEMA DHS Grants**

240.    Finally, DHS sub-agencies other than FEMA also administer grant programs on which the States rely.

**a.    State Recreational Boating Safety ("RBS")**

241.    The State Recreational Boating Safety ("RBS") grant program, operated by Defendant USCG, provides federal funding to States to assist States carrying out their own state recreational boating safety programs that meet certain federal requirements, thereby promoting uniform standards for boating safety across the country.

242.    RBG grant funds have been available to States since the program was created by the Federal Boat Safety Act of 1971, Pub. L. 92-75, 85 Stat. 213 (codified as amended at 46 U.S.C. § 13101 *et seq.*).

243.    Because RBS grants are formula grants and not competitive grants, each State is entitled to a specific allocation whenever a notice of funding opportunity is posted. *See* 46 U.S.C. § 13104 (detailing funding formula).

244.    The RBS statutes do not authorize DHS to impose any of the Civil Immigration Conditions on RBS funding.

245.    States collectively receive millions of dollars per year in RBS grants. States use these funds for recreational boating safety programming.  For instance, they use these funds to support the salaries of law enforcement who work on boat safety enforcement, to fund on-water safety training, to purchase aids in navigation on navigable waterways, and to help maintain state-level boat registration and titling databases.

246.    Each RBS grant typically remains open for one year.

247.    On April 4, 2025, the USCG provided formal notification to Plaintiff States of their FY2025 allocations under the RBS program. Those allocations are set out in Table 6 below:

**Table 6: Funds Allocated to Plaintiff States for RBS Program for FY2025**

| Plaintiff State | FY2025 Allocation |
|---|---|
| California | $5,443,096 |
| Colorado | $1,143,289 |
| Connecticut | $1,513,650 |
| Delaware | $1,111,080 |
| District of Columbia | $947,767 |
| Hawaiʻi | $927,355 |
| Illinois | $1,710,304 |
| Maine | $1,466,596 |
| Maryland | $3,964.905 |
| Massachusetts | $2,390,327 |
| Michigan | $7,368,925 |
| Minnesota | $3,962,181 |
| Nevada | $1,018,081 |
| New Jersey | $2,703,231 |
| New Mexico | $936,451 |
| New York | $2,901,786 |
| Oregon | $2,235,584 |
| Rhode Island | $1,077,219 |
| Vermont | $963,614 |

| Washington | $2,573,759 |
|------------|-----------|
| Wisconsin | $3,902,902 |
| TOTAL | $46,301,162 |

### b.    Securing the Cities ("STC")

248.    The Securing the Cities ("STC") program was established to "enhance the ability of the United States to detect and prevent terrorist attacks and other high-consequence events utilizing nuclear or other radiological materials that pose a high risk to homeland security in high-risk urban areas." 6 U.S.C § 596b(a).

249.    Through the STC program, DHS assists "State, local, Tribal, and territorial governments in designing and implementing, or enhancing existing, architectures for coordinated and integrated detection and interdiction of nuclear or other radiological materials that are out of regulatory control." *Id*. § 596b(b)(1).

250.    The STC program started as a pilot in 2007 and was codified by Congress in the Countering Weapons of Mass Destruction Act of 2018. *See generally* 6 U.S.C. § 596b.

251.    The STC statute does not authorize DHS to impose any of the Civil Immigration Conditions on STC funding.

252.    State subdivisions collectively receive millions of dollars per year in STC funds, and they use those funds counterterrorism purposes such as purchasing equipment to detect nuclear and radiological materials, creating training programs for employees to use such equipment, paying salaries, and developing plans for preparing for and responding to nuclear and/or radiological threats.

### c. BioWatch Program

253.    The BioWatch program provides federal funding to States to deploy a nationwide surveillance system for aerosolized exposure caused by the intentional release of biological agents. BioWatch provides support to States to maintain the constant ability to detect and respond to bioterrorist events in metropolitan areas across the county.

254.    DHS created the BioWatch program in 2003 in response to a perceived urgency to deploy useful technologies in the face of potentially catastrophic consequences. Congress codified DHS's authority to operate BioWatch in 2006, giving DHS authority to "operate extramural and intramural programs and distribute funds through grants, cooperative agreements, and other transactions and contracts" that carry out the responsibilities of the Countering Weapons of Mass Destruction Office. 6 U.S.C. §§ 592, 596(1).

255.    The statutes authorizing BioWatch do not authorize DHS to impose any of the Civil Immigration Conditions on BioWatch funding.

256.    States collectively receive millions of dollars per year in BioWatch funds. States use these funds for biological agent detection and response. For instance, they use these funds deploy a network of air monitors to detect potential biological agents and identify the agent used. BioWatch funds can also be used to fund salaries, equipment, travel, subcontractors, and supporting costs required to deploy and maintain the network of air monitors.

### B.    States Have Exercised Their Sovereign Prerogative To Choose How To Deploy Law Enforcement Resources Within Their Jurisdictions.

257.    Plaintiff States are responsible for maintaining the day-to-day safety of all residents of their communities. Plaintiff States enact statutes and establish policies to effectively enforce state and local laws, keep public order, and provide public safety services. *See United States v. Morrison*, 529 U.S. 598, 618 (2000) ("Indeed, we can think of no better example of the police

power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.").

258.    One critical choice that Plaintiff States can make in doing so is whether to devote their scarce law enforcement and other agency resources to assisting the federal government in enforcing federal civil immigration law.

259.    Many Plaintiff States and their political subdivisions, for decades, have chosen to limit their entanglement in the enforcement of federal immigration law. *See, e.g.*, 5 Ill. Comp. Stat. 805/1 to /20; 5 Cal. Gov. Code §§ 7282, 7282.5, 7283-7283.2, 7284-7284.12; N.J. Att'y Gen. Directive 2018-6; Wash. Rev. Code Ann. §§ 10.93.160, 43.10.315; Colo. Rev. Stat. § 24-76.6-102 to -103; Conn. Gen. Stat. Ann. § 54-192h; Or. Rev. Stat. § 181A.820; Vt. Stat. Ann. tit. 20, § 4651; N.Y. Exec. Orders 170 and 170.1. Many of these States have determined that public safety and law enforcement benefit from a relationship of trust between immigrant communities and state and local law enforcement. Their laws and policies uniformly authorize state and local authorities to comply with all applicable federal laws, but impose limitations on the circumstances under which state and local officers can devote their own resources to assisting the federal government in enforcing federal immigration law.

260.    These laws and policies are based on the considered experience of law enforcement agencies, which demonstrates that persons who lack lawful immigration status or have family members or friends who lack lawful immigration status are less likely to report a crime as victims or witnesses if they fear that the responding officer will turn them over to civil immigration authorities. This reluctance makes it increasingly difficult for officers to solve crimes and bring suspects to justice, putting all residents at risk. *See, e.g.*, Directive 2018-6, at 1; Cal. Gov. Code § 7284.2.

261.    These States' determination is also well-supported by analyses of empirical data. Numerous studies have confirmed that immigration-related fears prevent witnesses, victims, and others from reporting crimes. Surveys of law enforcement officers and analyses of victim reporting data conclude that fear of immigration enforcement decreased immigrant victims' likelihood of making police reports and reporting domestic violence, participating in investigations, and working with prosecutors. *See* Rafaela Rodrigues et al., *Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforcement: Initial Report from a 2017 National Survey* at 72-73, National Immigrant Women's Advocacy Project (May 3, 2018).[6] One study estimated that policies designed to foster greater trust between immigrant communities and police could cause an additional 90,000 violent incidents per year to be reported to law enforcement nationwide. *See* Ricardo D. Martínez-Schuldt & Daniel E. Martínez, *Immigrant Sanctuary Policies and Crime-Reporting Behavior: A Multilevel Analysis of Reports of Crime Victimization to Law Enforcement, 1980 to 2004*, 86 Am. Sociological Rev. 154, 170 (2021).

262.    Illinois, for instance, has codified its commitment to building trust between immigrant communities and state and local law enforcement officers in the TRUST Act, which was enacted in 2017 by the Illinois General Assembly and signed into law by Bruce Rauner, then the Republican Governor of Illinois. The TRUST Act provides that law enforcement agencies and officers in Illinois may not detain a person solely on the basis of an "immigration detainer" or a civil immigration warrant, 5 ILCS 805/15(a), and generally prohibits them from detaining people solely on the basis of citizenship or immigration status, *id.* § 805/15(b). The statute also prohibits

---

[6] *Available at* http://library.niwap.org/wp-content/uploads/Immigrant-Access-to-Justice-National-Report.pdf.

state and local law enforcement officials from assisting federal immigration agents in any enforcement operations, *id.* § 805/15(h)(1); providing access to detained individuals to immigration agents, *id.* § 805/15(h)(2); and giving immigration agents non-public information about the release dates of detained individuals, *id.* § 805/15(h)(7). But the TRUST Act expressly allows state and local law enforcement officers to cooperate with federal immigration enforcement actions when "presented with a federal criminal warrant" or "otherwise required by federal law," *id.* § 805/15(h), and also expressly states that it should not be read to "restrict" information-sharing regarding "citizenship or immigration status" in accordance with two federal statutes, 8 U.S.C. § 1373 and § 1644, *id.* § 805/5.

263.    New Jersey's Immigrant Trust Directive ("ITD"), Directive 2018-6, for instance, likewise is meant to build a cooperative relationship between immigrant communities and law enforcement. Issued by the New Jersey Attorney General, the State's chief law enforcement officer, the ITD carries the force of law and is binding on all New Jersey state and local law enforcement agencies. It is designed to help communities draw a clear distinction between state and local officers who enforce state criminal law, and federal immigration officers who enforce federal civil immigration law. For instance, it limits federal immigration officers' access to state and local law enforcement facilities, and to individuals detained within them, and it prevents state and local law enforcement from providing notice of most detainees' upcoming release from custody, or for holding most detainees solely pursuant to a civil detainer request. *See* Directive 2018-6, at 3-4.

264.    At the same time, the ITD also contains provisions to ensure that New Jersey's law enforcement agencies and officers comply with federal law and that violent criminals are held accountable. The ITD allows state and local law enforcement officers to assist federal immigration

authorities where state and federal law require. State and local officers can provide assistance to comply with federal court orders and judicial arrest warrants. They can participate in joint law enforcement efforts with federal authorities in efforts unrelated to civil immigration enforcement and can help federal immigration authorities in exigent circumstances. The ITD also permits state and local law enforcement to notify immigration authorities about the release of certain detainees with particularly serious criminal histories, and to continue to hold those detainees pursuant to immigration detainers. And the ITD is also clear that it should not be construed to restrict or prohibit a state or local law enforcement agency or officer from maintaining information about the citizenship or immigration status of any individual, or providing that information to or receiving it from the federal government.

265.    Likewise, in 2017, California enacted Senate Bill 54 (SB 54), known as the California Values Act, Cal. Gov't Code §§ 7284-7284.12, to "foster trust between California's immigrant community and state and local agencies," to "ensure effective policing, to protect the safety, well-being, and constitutional rights of the people of California," and "to direct the state's limited resources to matters of greatest concern to state and local governments." *Id.* § 7284.2. In furtherance of those objectives, the Values Act sets the parameters under which California law enforcement agencies may assist in immigration enforcement. For example, the Values Act: (a) prohibits compliance with detainer hold requests, *id.* § 7284.6(a)(1)(B); (b) defines when California law enforcement agencies may comply with requests by immigration authorities seeking the release date and time of a person in advance of the person's release, i.e., notification requests, *id.* §§ 7282.5(a), 7284.6(a)(1)(C); (c) defines when California law enforcement agencies may transfer an individual to immigration authorities—including when authorized by a judicial warrant or judicial probable cause determination, *id.* §§ 7282.5(a), 7284.6(a)(4); and (d) restricts California

law enforcement agencies from "[p]roviding personal information . . . about an individual" for "immigration enforcement purposes," unless that information is publicly available, *id.* § 7284.6(a)(1)(D).

266.    The Values Act, however, does not prohibit California law enforcement agencies from asserting its own jurisdiction over criminal law enforcement matters, *id.* § 7284.6(f), and permits other forms of cooperation with immigration authorities. It does not restrict law enforcement agencies from responding to requests from immigration authorities for a specific person's criminal history. *Id.* § 7284.6(b)(2). The Values Act permits law enforcement agencies to participate in task forces with immigration authorities or share confidential information if the "primary purpose" of the task force is not immigration enforcement. *Id.* § 7284.6(b)(3). And it expressly authorizes compliance with all aspects of 8 U.S.C. §§ 1373 and 1644. *Id.* § 7284.6(e).

267.    Maryland law enables law enforcement to investigate crime regardless of immigration status while also encouraging immigrant communities to cooperate with law enforcement. Maryland law generally prohibits law enforcement agents from inquiring about an individual's "citizenship, immigration status, or place of birth during a stop, a search, or an arrest," while engaging in the performance of "regular police functions" and prohibits law enforcement agents from detaining, or extending the detention of, an individual for the purposes of "investigating the individual's citizenship or immigration status, or based on the suspicion that the individual has committed a civil immigration violation." Md. Code Ann., Crim. Proc. § 5-104. It also prohibits law enforcement agents from intimidating, threatening, or coercing any individual on the basis of the actual or perceived immigration status of the individual or their family member, legal guardian, or someone whom they serve as a guardian, and from transferring an individual to federal immigration authorities unless specifically required to do so by federal law. *Id.* specifically

states, "Nothing in this subsection shall prevent a law enforcement agent from inquiring about any information that is material to a criminal investigation." *Id.*

268.    Maryland law also restricts State and local officials from sharing an individual's photograph or "personal information," such as their address, with a federal agency seeking to enforce the immigration laws. Md. Code Ann., Gen Prov. § 4-320.1(b). However, it will share such information with a federal agency seeking to enforce immigration laws when a judicial warrant is presented. *Id.*

269.    Some States have likewise determined that it will interfere with important public welfare functions if state employees divert non-law enforcement resources to engage in unnecessary inquiries into individuals' immigration status, fulfill information requests by federal immigration officials not required by law, or facilitate civil immigration arrests in state buildings. *E.g.*, New York Exec. Order 170 (Sept. 15, 2017); New York Exec. Order 170.1 (Apr. 25, 2018).

270.    Other Plaintiff States have made different decisions or are subject to different rules in this context. For instance, some Plaintiff States must comply with state court rulings that prevent them from cooperating with civil immigration detainer requests. *See Lunn v. Commonwealth*, 477 Mass. 517, 518-19 (2017).

271.    Still other Plaintiff States without codified directives of the kind described above have not imposed categorical limitations on the use of law-enforcement or state agency resources to assist in the enforcement of federal immigration law. However, they nonetheless do not impose categorical *requirements* of this kind on their law enforcement officers and state agency employees.

272.    Some of these States have concluded that participating in federal immigration enforcement efforts imposes substantial costs on local jurisdictions, not only in the form of

personnel and resources but also in the form of potential civil liability. And some such States have reasoned that even where law-enforcement resources are dedicated to assisting with enforcement of federal immigration law, it is preferable to retain critical decision-making authority regarding when to offer those resources and how many resources to offer.

273.    Thus, although Plaintiff States have made different decisions regarding the use of their law enforcement and agency resources, all Plaintiff States' decisions in this area are consistent with the basic rule that the States "remain independent and autonomous within their proper sphere of authority," *Printz*, 521 U.S. at 928—a principle that has no greater force than in the context of States' exercise of their police powers for the protection of their residents.

**C.    Defendants Impose the Civil Immigration Conditions.**

274.    Since January 2025, Defendants have engaged in a concerted campaign to pressure States to serve as enforcers of federal immigration law, subverting the design of each DHS grant program.

275.    On January 20, 2025, his first day in office, President Trump issued an executive order directing the Secretary of Homeland Security to "ensure that so-called 'sanctuary' jurisdictions do not receive access to Federal funds," and to take "any other lawful actions, criminal or civil" that the Secretary of Homeland Security deem warranted. Exec. Order No. 14159, 90 Fed. Reg. 8443 (2025).

276.    This was not President Trump's first time announcing an intent to use conditions on federal funding to coerce states into adopting his preferred set of policies. The first Trump Administration imposed immigration-enforcement conditions on funding Plaintiff States received from the Byrne Justice Access Grants Program. These immigration-enforcement conditions prompted extensive litigation, in which courts repeatedly held the immigration-enforcement conditions to exceed the Department's statutory authority. *City of Providence v. Barr*, 954 F.3d

23, 42 (1st Cir. 2020); *City of Philadelphia v. Att'y Gen. of United States*, 916 F.3d 276, 290 (3d Cir. 2019); *City of Chicago v. Barr*, 961 F.3d 882, 894 (7th Cir. 2020); *City & Cnty. of San Francisco v. Barr*, 965 F.3d 753, 761 (9th Cir. 2020); *City of Los Angeles v. Barr*, 941 F.3d 931, 944 (9th Cir. 2019); *Colorado v. U.S. Dep't of Justice*, 455 F. Supp. 1034 (D. Colo. 2020); *City of Evanston v. Sessions*, 2018 WL 10228461 (N.D. Ill. 2018); *see also City of Albuquerque v. Barr*, 515 F. Supp. 3d 1163 (D. N.M. 2021) (granting preliminary injunction); *but see New York v. Dep't of Justice*, 951 F.3d 84 (2d Cir. 2020).

277. On February 19, 2025, the DHS Secretary issued a memorandum to all USDHS agencies and offices titled "Restricting Grant Funding for Sanctuary Jurisdictions" (the "Directives Memorandum"), attached as Exhibit A. The Directives Memorandum directed all DHS agencies and offices to review all federal financial assistance and, consistent with DHS' immigration initiatives, cease federal funding to what DHS deems "sanctuary" jurisdictions. The DHS Secretary also directed components to make criminal referrals to the Department of Justice for any resistance or non-compliance with lawful immigration-related commands.

278. On March 20, 2025, then-interim FEMA Administrator Cameron Hamilton sent a memorandum to the DHS Secretary titled "Approval of FEMA-Administered Grant Disbursements," attached as Exhibit B. Hamilton's memorandum listed FEMA's grant programs and identified twelve specific grant programs that, in his view, might lawfully be limited to non-"sanctuary" jurisdictions. Hamilton recommended applying targeted terms that would limit funding under these twelve programs to States that helped assist in enforcing federal immigration law—but only those twelve programs. Hamilton's recommendation regarding these twelve programs was not supported by any statutory authority or any analysis of the basis for DHS's authority to impose conditions on grant programs.

279.    DHS did not adopt Hamilton's recommendations. Instead, on March 27, 2025, DHS posted on its website the FY 2025 DHS Standard Terms and Conditions, Version 2, and on April 18, 2025, DHS posted on its website the FY 2025 DHS Terms and Conditions, Version 3 (the "Terms and Conditions," attached as Exhibit C). These Terms and Conditions govern "all new federal awards of federal financial assistance (federal awards) for which the federal award date occurs in FY 2025," including those that Hamilton had previously recommended against attaching any immigration-related terms or conditions.

280.    Section C.IX of the Terms and Conditions includes conditions titled "Communication and Cooperation with the Department of Homeland Security and Immigration Officials." These conditions require recipients and subrecipients of any DHS federal awards to "comply with the following requirements related to coordination and cooperation with" federal immigration authorities, including, as summarized below:

- *The Information Sharing Condition* (C.IX.1.a): Grant recipients "must comply with the requirements of 8 U.S.C. §§ 1373 and 1644," which prohibit restrictions on government entities or officials exchanging information with DHS concerning the citizenship or immigration status, lawful or unlawful, of any individual.

- *The Compliance Condition* (C.IX.1.b): Grant recipients must comply with various criminal laws that prohibit, among other things, "encouraging or inducing" noncitizens to unlawfully enter the United States.

- *The Cooperation Condition* (C.IX.1.c): Grant recipients must "honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer."

- *The Access Condition* (C.IX.1.d): Grant recipients must provide federal immigration agents "access to detainees" in correctional facilities to inquire as to such individuals' right to be or remain in the United States.

- *The Publicization Condition* (C.IX.1.e): Grant recipients must not "leak or otherwise publicize the existence of" any federal immigration enforcement operations.

- *The Certification Condition* (C.IX.2): Grant recipients must certify compliance with the above conditions and require subgrant recipients to do the same.

281.    Finally, Section C.XVII of the Terms and Conditions, titled "Anti-Discrimination," imposes an additional immigration condition on all DHS awards (the *Benefits Condition*). The Benefits Condition requires recipients of grant awards to certify that "[t]hey do not, and will not during the term of this award, operate any program that benefits illegal immigrants or incentivizes illegal immigration." But the condition does not define "benefits" or "incentivizes."

282.    The Civil Immigration Conditions that Plaintiff States challenge include both the conditions listed in Section C.IX of the Terms and Conditions and the Benefits Condition. Plaintiff States challenge the Civil Immigration Conditions and also reserve the right to challenge additional requirements imposed by the Terms and Conditions.

283.    DHS announced that the Standard Terms and Conditions are applicable to all new federal awards made by DHS, including its sub-agencies, for which the federal award date occurs in FY 2025.

284.    On April 28, 2025, President Trump issued another Executive Order relating to jurisdictions with policies designed to improve relations between law enforcement and communities. *See* Exec. Order No. 14287, 90 Fed. Reg. 18761 (2025). The EO requires "the Attorney General, in coordination with [DHS]" to publish a "list" of "sanctuary jurisdictions" and to "notify each sanctuary jurisdiction regarding its defiance of Federal immigration law enforcement and any potential violations of Federal criminal law." *Id.* § 2(a). The Attorney General and DHS were to publish this list within 30 days, meaning May 28, 2025. *Id.*

285.    Section 3(a) of the April 28 Executive Order then directs agencies to "identify appropriate Federal funds to sanctuary jurisdictions, including grants and contracts, for suspension or termination, as appropriate," *id.* § 3(a), 90 Fed. Reg. at 18761-62, expanding to all federal

agencies a similar directive in the January 20 Executive Order that applied only to the Attorney General and DHS, 90 Fed. Reg. at 8446, § 17.

286.    Since adopting the FY 2025 Standard Terms and Conditions, Defendants have taken multiple steps to secure Plaintiff States' agreement to them.

287.    All Plaintiff States receive annual funding through the Recreational Boat Safety grant program, operated by Defendant USCG. This program provides federal funding to States to assist States carrying out their own state recreational boating safety programs that meet certain federal requirements, thereby promoting uniform standards for boating safety across the country

288.    On April 4, 2025, the USCG emailed all state agencies receiving funding through the RBS program to provide notification of the final FY2025 awards under the program. Some Plaintiff States have received award packages, requesting that Plaintiff States execute their acceptance of the final FY25 awards and all applicable conditions, including the Civil Immigration Conditions.

289.    Many Plaintiff States have been unable to accept their FY2025 RBS award because they cannot, or are not willing to, comply with the Civil Immigration Conditions. DHS has thus required them to choose between obtaining federal funds under the RBS program—funds supporting safety measures on which they have relied for years—and adhering to the manner in which they have chosen to deploy law enforcement resources.

290.    Defendant FEMA has also recently taken steps to require Plaintiff States to certify compliance with the Civil Immigration Conditions.

291.    For instance, FEMA's regulations provide that a "State must have a signed and up-to-date FEMA-State Agreement before receiving Federal funding for fire management assistance

grants" and that "FEMA will provide no funding absent a signed and up-to-date Agreement." 44 C.F.R. § 204.25.

292.    FEMA sent Washington a FEMA-State Agreement for 2025 on April 18, 2025. Section II(F)(3) of that Agreement incorporates DHS's Standard Terms and Conditions, and thus the Civil Immigration Conditions, which Washington cannot agree to.

293.    By conditioning Washington's access to critical federal disaster funds—including funds that enable the State to fight wildfires of the kind that burned over 300,000 acres of land in 2024—on its agreement to the Civil Immigration Conditions, FEMA put Washington in an untenable position: accept unlawful conditions that allow the federal government to conscript state law enforcement officers into enforcing federal immigration laws or risk out-of-control wildfires that could damage thousands of acres of state land, destroy state-owned and private property, and take lives.

294.    Similarly, New Jersey relies on FMAG funding to construct field camps, to purchase equipment, materials, supplies, and to mobilize personnel in response to major fires. A major fire that is estimated to have burned over 15,000 acres occurred in Ocean County, New Jersey in May 2025, during which the Acting Governor of New Jersey, on behalf the New Jersey Office of Emergency Management, requested FEMA assistance in the form of grant under FMAG. The Acting Governor subsequently submitted a written request for FMAG funds to assist the state with paying costs associated with fighting the fire. FEMA advised that to secure the FMAG funding that has been requested, the New Jersey Department of Law and Public Safety would have to agree to comply with the terms of a new Fire Management Assistance FEMA-State agreement. That agreement states that it is "subject to" the "DHS Standard Terms and Conditions for grants in effect at the date of this Agreement."

295. As discussed below, DHS has now taken the position in this litigation that the Civil Immigration Conditions do not apply to the FMAG grant program. But neither Washington nor New Jersey—nor, to Plaintiff States' knowledge, any other State that receives FMAG funding— has received an updated draft FEMA-State agreement that omits the Civil Immigration Conditions.

296. On May 29, 2025, DHS published a list of so-called "sanctuary jurisdictions," which included all Plaintiff States. The list was taken down two days later after 9:19 PM on Saturday, May 31.

297. In an interview with Fox News on June 1, 2025, however, Defendant Noem stated that the "list is absolutely continuing to be used and it is going to be identifying those cities and those jurisdictions that aren't honoring law and justice."

**D.    The Instant Litigation**

298. Plaintiff States filed their complaint for declaratory and injunctive relief, initiating this lawsuit, on May 14, 2025.

299. At the time the lawsuit was filed, neither DHS's Standard Terms and Conditions nor any statement on DHS's website identified any exception to DHS's stated intent to apply the Standard Terms and Conditions to all new federal awards. *See* ECF 21-7 and Ex. C.

300. Thus, at the time the lawsuit was filed, Defendants had announced a final decision to impose the Civil Immigration Conditions on all grant programs administered by defendants in which Plaintiff States intend to participate.

301. Plaintiff States filed a motion for preliminary injunction on May 19, 2025.

302. On June 6, 2025, Defendants filed their response in opposition to Plaintiffs' motion, and on June 9, 2025, filed a corrected response in opposition to the motion.

303. In their response, Defendants stated that DHS and FEMA had decided not to apply the Civil Immigration Conditions to the following twelve grant programs:

- Public Assistance Programs
- Disaster Case Management (DCM)
- Hazard Mitigation Grant Program (HMGP)
- Fire Management Assistance Grant (FMAG)
- National Earthquake Hazards Reduction Program – Individual State Earthquake Assistance (NEHRP-ISEA)
- Flood Mitigation Assistance (FMA)
- National Dam Safety Program (NDSP)
- Community Assistance Program – State Support Services Element (CAP-SSSE)
- National Urban Search & Rescue Response System (US&R)
- Cooperating Technical Partners Program (CTP)
- State and Local Cybersecurity Grant Program (SLCGP)
- Nonprofit Security Grant Program (NSGP)

304.    Defendants also filed a declaration from Defendant David Richardson, the senior official performing the duties of the administrator of FEMA. Richardson states in that declaration that the agency has made a final determination as to the twelve grant programs on which DHS and FEMA would not apply the Civil Immigration Conditions.

305.    Richardson did not describe in his declaration any communications he or any other FEMA official had made to FEMA employees regarding the agency's change in position.

306.    At the time the response was filed, the Standard Terms and Conditions themselves remained unchanged on the DHS website and did not reflect any suggestion that the terms might not be applied to all DHS grant programs.

307.    The Court held a status hearing on June 9, 2025, where the Plaintiff States expressed their concerns that Defendants' change in position regarding these twelve programs had not been communicated to FEMA agency staff and had not been publicly announced on the FEMA website.

308.    On June 11, 2025, DHS added language to its website, stating for the first time that "[n]ot all of DHS's Standard Terms and Conditions apply to every DHS grant program[]. DHS

directs individuals to review the program's NOFO and/or FEMA-State Agreement to determine which Terms and Conditions apply to a particular grant."

309.    To this day, however, the DHS Standard Terms and Conditions *themselves* still provide that they "apply to all new federal awards of federal financial assistance (federal awards) for which the federal award date occurs in FY 2025." And as of this date, Plaintiff States have not received a single FEMA-State Agreement that excludes the Civil Immigration Conditions, and FEMA program staff have expressed uncertainty about whether and when any such agreements will be issued.

310.    Likewise, although Defendant Richardson asserts that FEMA, at least, is continuing to conduct "additional analysis" to "determine whether it should apply restrictions related to federal immigration enforcement to each [FEMA grant] program and, if so, the scope of those restrictions," the Civil Immigration Conditions themselves apply to these programs by their plain text, and Defendants have offered no additional information about the nature of their "analysis" or when it might conclude.

311.    Defendants' equivocal statements about the range of grants to which the Civil Immigration Conditions apply are calculated attempts to evade responsibility for their decision to promulgate the conditions and apply them to "all" DHS-operated programs—intentional attempts to moot some of Plaintiff States' claims while rendering others unripe. These statements were not made for any non-litigation reason.

312.    Defendants have not proffered any independent reason, other than the litigation, for their change in position, if any.

313.    And given Defendant Noem's statement that the DHS list of sanctuary jurisdictions "is absolutely continuing to be used," there is a reasonable expectation that the promulgation of

the Civil Immigration Conditions, and their application to DHS grant programs, can reasonably be expected to recur if any part of Plaintiff States' challenge were dismissed.

**E.      The Civil Immigration Conditions Are Unlawful.**

314.     The Civil Immigration Conditions overstep the Executive Branch's authority in numerous respects by attempting to use funds authorized and appropriated by Congress to ***support*** the States to instead ***coerce*** the States and their subdivisions into adhering to the policy priorities of the current administration.

315.     "The Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz*, 521 U.S. at 925. "That is true whether [it] directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own." *Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 580 (2012) (opinion of Roberts, C.J.). The Civil Immigration Conditions attempt to do exactly that—and they do so by trying to use funds that Congress has appropriated to support the States and their residents in unrelated aims.

316.     In doing so, the Civil Immigration Conditions upset the constitutional balance of power between the Executive Branch and Congress. An "agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). And if Congress wishes to upset the federal-state balance of power, as the Civil Immigration Conditions do, "it must make its intention to do so unmistakably clear in the language of the statute." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Here, no statute confers upon DHS the power to impose an across-the-board condition requiring States to engage in federal immigration enforcement efforts to obtain federal funds, and the legislation authorizing the grant programs at issue in this litigation does not permit such an approach. The Civil Immigration Conditions are therefore ultra vires action by DHS.

317.    Indeed, many of the authorizing statutes expressly forbid DHS from withholding grant money from the States. *See, e.g.*, 6 U.S.C. § 605(e)(1)(A)(v) (the FEMA administrator "shall ensure" that each State receive a minimum allocation of SHSP funds); *id.* § 665g(l) (the DHS Security "shall first apportion" a baseline percentage of each year's apportionment of SLCGP funds to each State and "shall apportion" the remaining to States on a population-share basis); *id.* § 762(d) (the FEMA administrator "shall first apportion" a baseline amount of each year's apportionment of EMPG funds to States and "shall apportion" the remainder of such amounts on a population-share basis). The Civil Immigration Conditions thus overturn Congress's carefully designed statutory schemes for each grant program.

318.    The Supreme Court has held that statutes should not be read to alter the "usual constitutional balance between the States and the Federal Government" unless that intention is "unmistakably clear in the language of the statute." *Gregory*, 501 U.S. at 460. But the Civil Immigration Conditions also purport to remake the federal-state balance of power without any clear statement from Congress authorizing abridgement of Plaintiff States' "substantial sovereign powers." *Id*. at 461; *see also Gonzales v. Oregon*, 546 U.S. 243, 275-76 (2006) (concluding that "the background principles of our federal system" foreclosed reading a statute to confer authority on agency to regulate areas traditionally supervised by the States). DHS identifies no statute that could plausibly be read to permit it to use federal funds as a cudgel to force the States to devote their law enforcement resources in this way, much less a statute that says so clearly.

319.    The Civil Immigration Conditions are also arbitrary and capricious under the Administrative Procedure Act ("APA"). The APA requires that agencies' decisions be supported by a rational connection between the choice made and the facts underlying that choice. It also requires that a deviation from agency policy be acknowledged and supported by a reasoned

explanation or justification. *See* 5 U.S.C. § 706(2)(C). DHS's imposition of the Civil Immigration Conditions is supported by neither.

320.    DHS imposed sweeping new substantive conditions on the receipt of federal funds, imperiling billions of dollars in annual funding to the States. The funds that DHS is holding hostage are meant to fund emergency preparedness, flood mitigation, recovery from hurricanes and fires, and more. Plaintiff States have received grants administered by DHS for decades—in many cases, year over year—and rely on such funding for critical disaster preparedness, mitigation, and relief efforts. DHS now insists that the States are not entitled to these funds unless they help enforce federal immigration law. But it identifies no legal basis for imposing such a sweeping new condition for the first time across the entire span of the agency's multi-billion-dollar funding portfolio. And its decision to impose these conditions on all DHS grant programs, across the board, with no regard for the purpose of the individual grant program or the statutory scheme that undergirds it, is the antithesis of the kind of reasoned decision making that the APA requires. Agencies cannot execute an about-face of this sort without a reasoned justification that considers all relevant factors—including, at bare minimum, the statutory scheme, the States' substantial reliance interests, and the detrimental effects of imposing the condition on state and local law enforcement. DHS's failure to offer any reasoned explanation for its imposition of the conditions transparently violates the APA.

321.    Finally, the Civil Immigration Conditions are also unconstitutional as an unlawful encroachment on the constitutional province of the States under the Spending Clause and the Tenth Amendment. Although the Spending Clause allows Congress to decide how to spend funds, the Civil Immigration Conditions exceed Congress's authority under the Spending Power in multiple respects.

322.    *First*, federal grant conditions are illegitimate if they are unrelated to the purposes of project to which they are attached. *South Dakota v. Dole*, 483 U.S. 203, 207-08 (1987). The Civil Immigration Conditions fail this test, as none relate to the programmatic goals of the grant programs that Congress created: supporting state emergency preparedness and response efforts.

323.    *Second*, States must be able to reject Civil Immigration Conditions in both theory and fact. Where, as here, the size of the financial inducement at stake goes much further than "mild encouragement," the coercive act amounts to an unconstitutional "gun to the head." *NFIB*, 567 U.S. at 580 (opinion of Roberts, C.J.). Here, DHS threatens to deprive Plaintiff States of all DHS funding—"not merely a 'relatively small percentage,' . . . but *all* of it," *id.* at 581 (quoting *Dole*, 483 U.S. at 211)—if they do not comply with the Civil Immigration Conditions. The sums implicated by such a funding cut are significant and constitute a substantial portion of each of Plaintiff States' emergency preparedness budget. That portion increases when accounting for how much of each of Plaintiff States' budget is already committed to staff salaries and other items that cannot be reallocated. Losing those grants would abruptly terminate ongoing emergency management programming. Plaintiff States and millions of their residents would be placed at risk of disasters similar to those that prompted Congress to create federal grant programs after September 11 and Hurricane Katrina. The financial scale of the affected grant programs and the substantial human cost of forgoing them each render the Civil Immigration Conditions sufficiently coercive as to be unconstitutional.

324.    *Finally*, when the federal government wishes to condition the States' receipt of federal funds, it "must do so unambiguously," *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981), such that States can "exercise their choice knowingly, cognizant of the

consequences of their participation." *Dole*, 483 U.S. at 207. The Civil Immigration Conditions are hopelessly unclear, and so flunk this test too.

325.    The Cooperation Condition (C.IX.1.c) requires grant recipients to "honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer." But the condition offers no explanation of what "cooperation" might entail, what "joint operations" might be required, or what "information" grant recipients are being asked to share, or whether "short term detention" extends beyond normally scheduled release dates and times.

326.    Likewise, the Access Condition (C.IX.1.d) requires grant recipients to "provide access to detainees, such as when an immigration officer seeks to interview a person who might be a removable alien." But the condition does not explain what "access" means, nor whether there are any limitations on this obligation. Some States permit access to immigrant detainees only upon informing those detainees of their rights, *see, e.g.*, Cal. Gov. Code § 7283.1, but it is ambiguous whether States would violate this condition by enforcing those statutes.

327.    The Information Sharing (C.IX.1.a) and Compliance (C.IX.1.b) Conditions ask grantees to certify compliance with various federal statutes, but do not explain DHS's interpretation of those statutes, leaving Plaintiff States in the dark on the nature and scope of the obligations they would be undertaking in certifying. *See, e.g., City & Cnty. San Francisco v. Sessions*, 349 F. Supp. 3d 924, 958 (N.D. Cal. 2018) (finding § 1373 compliance condition violated the Spending Clause where "DOJ's evolving interpretations of the [§ 1373] certification condition further demonstrate ambiguities that prevent applicants from deciding whether to accept the funds 'cognizant of the consequences of their participation.'"), *vacated in part on other grounds sub nom. City & Cnty. of San Francisco v. Barr*, 965 F.3d 753 (9th Cir. 2020).

328.    The Benefits Condition—which requires States to certify that "[t]hey do not, and will not during the term of this award, operate any program that benefits illegal immigrants or incentivizes illegal immigration"—is likewise hopelessly ambiguous. Plaintiff States' agencies cannot possibly identify the many individuals (and their citizenship status) who might "benefit" from one of the many programs they administer, let alone understand what DHS believes might "incentivize[] illegal immigration."

329.    For reasons including but not limited to those summarized above, Plaintiff States cannot accept the vague and unbounded Civil Immigration Conditions "knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207.

**F.    The Civil Immigration Conditions Irreparably Harm the States.**

330.    The imposition of Defendants' proposed Civil Immigration Conditions will irreparably harm the Plaintiff States.

331.    Plaintiff States have received and relied on funding from the preparedness grants, the post-disaster public assistance grants, and other DHS grant programs for decades. With individual grants open for years at a time, the Plaintiff States have closely integrated grant-funded activities with their broader emergency preparedness and response budgets. The grant money pays for police special operation teams, emergency operations personnel, disaster response vehicles, cybersecurity software, and nonprofit security equipment. The Civil Immigration Conditions would force Plaintiff States to choose between immediately shutting down those efforts and leaving themselves more exposed to threats, disasters, and emergencies or allowing their law enforcement to be conscripted by federal immigration authorities, sometimes in violation of state law. These are irreparable harms that cannot be remedied through relief after the fact.

332.    Should the Civil Immigration Conditions go into effect, Plaintiff States will lose access to the funds that support these vital programs or otherwise cede control of state and local

law enforcement to federal immigration authorities. And many Plaintiff States will be unable to successfully apply for or receive funding under the preparedness grants, the post-disaster public assistance grants, and other DHS grant programs as long as the Conditions remain because the grant terms conflict with state law.

333.     Plaintiff States are, in other words, presented with an impossible choice: forego the hundreds of millions of dollars in federal funds that Congress has appropriated and on which they depend for critical emergency preparedness and response efforts, or face compulsory diversion of limited law enforcement resources to enforce federal immigration law beyond what state law allows or requires. And even if States agree, as noted above, they could unwittingly violate vague terms. *See supra* ¶¶ 324-329. For example, the conditions purport to allow DHS to determine *post hoc* whether recipients operate any program that "benefits illegal immigrants or incentivizes illegal immigration."

334.     Accepting the Civil Immigration Conditions would also create unique additional forms of irreparable harm for those Plaintiff States that have chosen to enact laws and policies that seek to further trust that those States have cultivated between law enforcement and immigrant communities. That loss of goodwill and trust cannot easily be restored once this litigation has concluded. If those Plaintiff States accept the Civil Immigration Conditions, thousands more crimes will go unreported each year, with those Plaintiff States unable to bring the perpetrators to justice. Members of immigrant communities will be less likely to help police officers, detectives, and prosecutors investigate crimes and press charges. The result will be—among other ills—more violent crime, trafficking in illegal guns and drugs, and ongoing, irreparable harm to public safety.

## FIRST CAUSE OF ACTION

### Violation of the Administrative Procedure Act
### Arbitrary and Capricious Agency Action

335.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

336.    Under the APA, a court must set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A); *see Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 52 (1983) (agency action must be supported by a "rational connection between the facts found and the choice made"); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agency must provide "reasoned explanation" for departing from prior policy and must provide "a more detailed justification than what would suffice for a new policy" when "its prior policy has engendered serious reliance interests that must be taken into account"); *accord FDA v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898, 917 (2025).

337.    DHS failed to comply with these bedrock requirements in multiple respects. First, DHS failed to consider "an important aspect of the problem," *State Farm*, 463 U.S. at 4: whether the federal grant statutes that Congress created and charged it with administering actually allowed it to condition access to grant funds on Plaintiff States' agreeing to lend state resources to federal immigration enforcement. DHS here made no effort whatsoever to ascertain whether these grant statutes permitted it to impose the Civil Immigration Conditions, instead simply imposing an across-the-board set of terms and conditions that fundamentally alter the nature of the grant programs at issue. Its failure to even consider the legality of its actions violates the APA.

338.    Second, DHS "failed to address whether there was 'legitimate reliance' on" the existing funding landscape—which there was. *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30

(2020). Plaintiff States rely on the annual receipt of funds that the Civil Immigration Conditions now endanger, relying on billions of dollars in federal funding annually to support critical programs like terrorism prevention, emergency management, disaster relief, and infrastructure protection. DHS not only failed to "weigh" these longstanding and substantial reliance interests "against competing policy concerns," it simply "ignore[d]" them. *Regents*, 591 U.S. at 30-33.

339.    Third, DHS likewise "entirely failed to consider" the adverse impact on criminal enforcement and public safety if States were to adhere to the Civil Immigration Conditions. *State Farm*, 463 U.S. at 43. Under those conditions, States "must agree that they will comply" with requirements "related to coordination and cooperation with [DHS] and immigration officials." But some States limit their participation in federal civil immigration enforcement to "build trust between their law enforcement agencies and immigrant communities and ensure that noncitizens feel comfortable reporting crimes, cooperating with investigators, and serving as witnesses." *Providence*, 954 F.3d at 30. DHS altogether failed to weigh that interest against its own policy preferences. It violated the APA in doing so.

340.    The Civil Immigration Conditions will cause harm to Plaintiffs and their residents.

## SECOND CAUSE OF ACTION

### *Ultra Vires* Agency Action Not Authorized by Congress

341.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

342.    An executive agency "has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n*, 476 U.S. at 374.

343.    Defendants may exercise only that authority which is conferred by statute. *See City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (federal agencies' "power to act and how they are

to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires").

344.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

345.    Defendants lack the statutory authority to impose the Civil Immigration Conditions. No provision of DHS's authorizing statutes authorizes the agency to impose these terms, and the statutes authorizing Defendants to administer specific grant programs also preclude their imposition.

346.    In imposing the Civil Immigration Conditions, Defendants exceeded the statutory authority granted to DHS by Congress. The Civil Immigration Conditions are therefore ultra vires executive agency actions.

347.    The Civil Immigration Conditions will cause harm to Plaintiffs and their residents.

### THIRD CAUSE OF ACTION

**Violation of Administrative Procedure Act
Agency Action in Excess of Statutory Authority**

348.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

349.    The APA requires that a court set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

350.    Defendants lack the statutory authority to impose the Civil Immigration Conditions. No provision of DHS's authorizing statutes authorizes the agency to impose these terms, and the

statutes authorizing Defendants to administer specific grant programs also preclude their imposition.

351.    In imposing the Civil Immigration Conditions, Defendants exceeded the statutory authority granted to DHS by Congress. The Civil Immigration Conditions therefore must be set aside under the APA.

352.    The Civil Immigration Conditions will cause harm to Plaintiffs and their residents.

353.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that Defendants lack authority to impose the Civil Immigration Conditions, and a permanent injunction preventing the Defendants from putting those conditions into effect.

**FOURTH CAUSE OF ACTION**

**Violation of the U.S. Constitution
Spending Clause**

354.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

355.    The Constitution vests the spending power in Congress, not the President or any executive agency. U.S. Const. art. I § 8, cl. 1.

356.    Even if Congress had delegated the authority to Defendants to impose the Civil Immigration Conditions, the U.S. Constitution prohibits grant conditions that are "so coercive as to pass the point at which pressure turns into compulsion." *South Dakota v. Dole*, 483 U.S. 203, 211 (1987). Furthermore, the U.S. Constitution prohibits imposing condition on federal grant programs that are wholly unrelated to the purpose of the programs. *Id.* at 207-08. Finally, the U.S. Constitution permits only unambiguous federal funding conditions. *Id.* at 207. These limits "ensur[e] that Spending Clause legislation does not undermine the status of the States as

independent sovereigns in our federal system," *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577 (2012), as embodied in the Tenth Amendment.

357.    DHS's attempt to impose the Civil Immigration Conditions violates all these constitutional limits. First, DHS's threat to restrict all agency funding to Plaintiff States "is much more than 'relatively mild encouragement'—it is a gun to the head" for Plaintiff States. *NFIB*, 567 U.S. at 581 (opinion of Roberts, C.J.); *see also id.* (holding threats to funding as coercive in violation of the Spending Clause because a State "stands to lose not merely 'a relatively small percentage'" of funding from the agency, "but *all* of it"). Plaintiff States receive over $1 billion annually in funding from FEMA preparedness grants, based on the sums they were allocated in FY2024 from the SHSP, UASI, EMPG, SLCGP, and NSGP programs. And FEMA has obligated over $22 billion to the Plaintiff States in disaster relief funding since 2017, amounting to an annual average of over $2 billion per year.

358.    Second, the Civil Immigration Conditions are not related to the federal interest in the projects to which they are attached—namely, Congress's long commitment to furthering state emergency preparedness and relief purposes. *See Dole*, 483 U.S. at 207-08.

359.    Finally, the Civil Immigration Conditions are impermissibly vague. *See Pennhurst*, 451 U.S. at 17.

360.    Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 327. "[T]he President's actions may . . . be reviewed for constitutionality." *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992). Plaintiff States are "entitled to invoke the equitable jurisdiction to restrain enforcement" of unconstitutional acts by federal officials, including "executive orders." *Panama Ref. Co. v. Ryan*, 293 U.S. 388, 414 (1935).

361.    As a direct and proximate result of DHS's action, Plaintiffs will be required either to accept the unlawful and unconstitutional Civil Immigration Conditions or forego receiving grant funds that are necessary to support critical emergency preparedness and emergency response programs and initiatives in Plaintiff States.

362.    The Civil Immigration Conditions will cause harm to Plaintiffs and their residents.

## FIFTH CAUSE OF ACTION

### Violation of Administrative Procedure Act
### Agency Action Contrary to Constitutional Right

363.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

364.    The APA requires that a court set aside agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

365.    The Civil Immigration Conditions violate the Spending Clause, for the reasons set out above. *Supra* ¶¶ 355-359.

366.    The Civil Immigration Conditions will cause harm to Plaintiffs and their residents.

367.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that Defendants lack authority to impose the Civil Immigration Conditions, and a permanent injunction preventing the Defendants from putting those conditions into effect

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that the Court:

a.   Declare that the Defendants' promulgation of the Civil Immigration Conditions on receipt of funds under the grant programs they administer are contrary to the Constitution and laws of the United States;

82

b.  Declare that the adoption of the Civil Immigration Conditions and any actions taken by Defendants agencies to implement or enforce them violate the Administrative Procedure Act;

c.  Preliminarily and permanently enjoin Defendants from implementing or enforcing the Civil Immigration Conditions against Plaintiff States, including their subdivisions and instrumentalities, as to any grant program administered by Defendants;

d.  Vacate the Defendants' adoption of the Civil Immigration Conditions, and any actions taken by Defendants to implement or enforce them;

e.  Issue a writ of mandamus or, in the alternative, preliminary and permanent mandatory injunctive relief compelling Defendants to immediately send notices of funding opportunity and award letters that do not include the Civil Immigration Conditions to Plaintiff States, their subdivisions, and their instrumentalities, as appropriate;

f.  Retain jurisdiction to monitor Defendants' compliance with this Court's judgment;

g.  Award the States their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

h.  Award such additional relief as this Court may deem just and proper.

July 2, 2025

**ROB BONTA**
  ATTORNEY GENERAL OF CALIFORNIA

Michael L. Newman
  *Senior Assistant Attorney General*
Joel Marrero
James E. Stanley
  *Supervising Deputy Attorneys General*
Luke Freedman
Newton Knowles
Christopher Medeiros
Alexis Piazza
Deylin Thrift-Viveros
Delbert Tran
  *Deputy Attorneys General*

/s/ Lee I. Sherman
Lee I. Sherman
  *Deputy Attorney General*
California Department of Justice
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6000
lee.sherman@doj.ca.gov

*Attorneys for the State of California*

Respectfully submitted,

**KWAME RAOUL**
  ATTORNEY GENERAL OF ILLINOIS

/s/ Alex Hemmer
Alex Hemmer
  *Deputy Solicitor General*
Christopher G. Wells
  *Chief of the Public Interest Division*
Darren Kinkead
  *Public Interest Counsel*
R. Sam Horan
Michael M. Tresnowski
R. Henry Weaver
  *Assistant Attorneys General*
Office of the Illinois Attorney General
115 LaSalle Street
Chicago, IL 60603
(773) 590-7932
alex.hemmer@ilag.gov

*Attorneys for the State of Illinois*

**MATTHEW J. PLATKIN**
  ATTORNEY GENERAL OF NEW JERSEY

/s/ Shankar Duraiswamy
Shankar Duraiswamy
  *Deputy Solicitor General*
Mayur P. Saxena
  *Assistant Attorney General*
Surinder K. Aggarwal
Anaiis Gonzalez
Christopher J. Ioannou
Olivia C. Mendes
Phoenix N. Meyers
Sarah Nealon
Daniel Resler
  *Deputy Attorneys General*
New Jersey Office of Attorney General
25 Market Street, PO Box 093
Trenton, NJ 08625-0093
(609) 376-2745
shankar.duraiswamy@law.njoag.gov

*Attorneys for the State of New Jersey*


**PETER F. NERONHA**
  ATTORNEY GENERAL OF RHODE ISLAND

/s/ Keith D. Hoffmann
Keith D. Hoffmann (RI Bar No. 9874)
  *Chief of Policy*
  *Assistant Attorney General*
Kathryn M. Sabatini (R.I. Bar No. 8486)
  *Chief, Civil Division*
  *Special Assistant Attorney General*
Paul Meosky (RI Bar No. 10742)
  *Special Assistant Attorney General*
Rhode Island Attorney General's Office
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 1882
khoffmann@riag.ri.gov

*Attorneys for the State of Rhode Island*


**PHILIP J. WEISER**
  ATTORNEY GENERAL OF COLORADO

/s/ David Moskowitz
David Moskowitz
  *Deputy Solicitor General*
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov

*Attorneys for the State of Colorado*


**WILLIAM TONG**
  ATTORNEY GENERAL OF CONNECTICUT

/s/ Ashley Meskill
Ashley Meskill
  *Assistant Attorney General*
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5270
ashley.meskill@ct.gov

*Attorneys for the State of Connecticut*

**KATHLEEN JENNINGS**
  ATTORNEY GENERAL OF DELAWARE

/s/ Ian R. Liston
Ian R. Liston
  *Director of Impact Litigation*
Vanessa L. Kassab
  *Deputy Attorney General*
Delaware Department of Justice
820 North French Street
Wilmington, DE 19801
(302) 683-8899
ian.liston@delaware.gov

*Attorneys for the State of Delaware*


**ANNE E. LOPEZ**
  ATTORNEY GENERAL OF HAWAIʻI

/s/ Kalikoʻonālani D. Fernandes
David D. Day
  *Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes
  *Solicitor General*
Department of the Hawaiʻi Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Attorneys for the State of Hawaiʻi*


**BRIAN L. SCHWALB**
  ATTORNEY GENERAL FOR THE DISTRICT OF
  COLUMBIA

/s/ Mitchell P. Reich
Mitchell P. Reich
  *Senior Counsel to the Attorney General*
Office of the Attorney General for the District
  of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 279-1261
mitchell.reich@dc.gov

*Attorneys for the District of Columbia*


**AARON M. FREY**
  ATTORNEY GENERAL OF MAINE

/s/ Vivian A. Mikhail
Vivian A. Mikhail
  *Deputy Attorney General*
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800
vivian.mikhail@maine.gov

*Attorneys for the State of Maine*

**ANTHONY G. BROWN**
  ATTORNEY GENERAL OF MARYLAND

/s/ James C. Luh
James C. Luh
  *Senior Assistant Attorney General*
Office of the Maryland Attorney General
200 Saint Paul Place
20th Floor
Baltimore, MD 21202
(410) 576-6411
jluh@oag.state.md.us

*Attorneys for the State of Maryland*


**ANDREA JOY CAMPBELL**
  ATTORNEY GENERAL OF MASSACHUSETTS

/s/ Hannah C. Vail
Katherine Dirks
  *Chief State Trial Counsel*
Hannah C. Vail
  *Assistant Attorney General*
Office of the Massachusetts Attorney General
1 Ashburton Place
Boston, MA 02108
(617) 963-2512
hannah.vail@mass.gov

*Attorneys for the Commonwealth of Massachusetts*


**DANA NESSEL**
  ATTORNEY GENERAL OF MICHIGAN

/s/ Neil Giovanatti
Neil Giovanatti
Adam de Bear
  *Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa Street
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov

*Attorneys for the People of the State of Michigan*


**KEITH ELLISON**
  ATTORNEY GENERAL OF MINNESOTA

/s/ Brian S. Carter
Brian S. Carter
  *Special Counsel*
Minnesota Attorney General's Office
445 Minnesota Street
Suite 1400
St. Paul, MN 55101
(651) 757-1010
brian.carter@ag.state.mn.us

*Attorneys for the State of Minnesota*


**AARON D. FORD**
  ATTORNEY GENERAL OF NEVADA

/s/ Heidi Parry Stern
Heidi Parry Stern
  *Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
hstern@ag.nv.gov

*Attorneys for the State of Nevada*


**RAÚL TORREZ**
  ATTORNEY GENERAL OF NEW MEXICO

/s/ Steven Perfrement
Steven Perfrement
  *Senior Litigation Counsel*
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
sperfrement@nmdoj.gov

*Attorneys for the State of New Mexico*

**LETITIA JAMES**
  ATTORNEY GENERAL OF NEW YORK

/s/ Julie Dona
Julie Dona
  *Special Counsel*
Zoe Levine
  *Special Counsel for Immigrant Justice*
Rabia Muqaddam
  *Special Counsel for Federal Initiatives*
28 Liberty Street
New York, NY 10005
(212) 416-8494
julie.dona@ag.ny.gov

*Attorneys for the State of New York*

**DAN RAYFIELD**
  ATTORNEY GENERAL OF OREGON

/s/ Thomas H. Castelli
Thomas H. Castelli
  *Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
thomas.castelli@doj.oregon.gov

*Attorneys for the State of Oregon*

**CHARITY R. CLARK**
  ATTORNEY GENERAL OF VERMONT

/s/ Julio A. Thompson
Jonathan T. Rose
  *Solicitor General*
Julio A. Thompson
  *Co-Director, Civil Rights Unit*
Officer of the Vermont Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-5519
julio.thompson@vermont.gov

*Attorneys for the State of Vermont*

**NICHOLAS W. BROWN**
  ATTORNEY GENERAL OF WASHINGTON

/s/ Tyler Roberts
Tyler Roberts
Benjamin Seel
Cristina Sepe
Marsha Chien
  *Assistant Attorneys General*
Washington State Office of the Attorney
  General
800 Fifth Avenue
Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Tyler.Roberts@atg.wa.gov

*Attorneys for the State of Washington*

**JOSHUA L. KAUL**
  ATTORNEY GENERAL OF WISCONSIN

/s/ Frances Reynolds Colbert
Frances Reynolds Colbert
  *Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-9226
frances.colbert@wisdoj.gov

*Attorneys for the State of Wisconsin*