# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF ILLINOIS, *et al.*,

                *Plaintiffs*,

    v.

FEDERAL EMERGENCY
MANAGEMENT AGENCY, *et al.*,

                *Defendants*.

No. 1:25-cv-206-WES-PAS

## PLAINTIFF STATES' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................. 3

    A.    Congress's Longstanding Support for State Emergency Preparation and Response. ........................................................................................................ 3

    B.    Plaintiff States and Their Efforts to Secure and Protect Their Residents. .............. 7

    C.    The Department's Attempt to Conscript States in Immigration Enforcement Using the Funds Congress Has Appropriated for Emergencies and Threats. ........11

ARGUMENT AS TO LIABILITY .................................................................................... 17

I.    Plaintiff States' Claims Are Not Moot. ..................................................................... 18

II.    The Promulgation of the Civil Immigration Conditions Was Unlawful. .......................... 23

    A.    The Promulgation of the Civil Immigration Conditions Was Contrary to Law and Ultra Vires. .................................................................................... 23

        1.    DHS lacks freestanding authority to impose a categorical rule requiring grantees to assist in enforcing federal immigration law. ........... 23

        2.    The relevant grant statutes likewise do not authorize the Department to require grantees to assist in enforcing federal immigration law. .......... 25

    B.    The Promulgation of the Civil Immigration Conditions Was Arbitrary and Capricious. ....................................................................................... 29

        1.    The Department failed to consider whether grant-authorizing statutes permit it to impose the Conditions and instead considered a factor irrelevant to the statutory schemes. ................................................ 30

        2.    The Department failed to consider the States' reliance interests in billions of dollars in federal funding. ....................................................... 34

        3.    The Department failed to consider the Conditions' effects on public safety. .................................................................................................. 36

        4.    The Department failed to consider alternatives to its sweeping policy. ................................................................................................. 37

C.     The Promulgation of the Civil Immigration Conditions Was Unconstitutional. .................................................................................. 38

     1.     The Conditions are not reasonably related to the funding programs to which they apply. ................................................................ 38

     2.     The Conditions are coercive because they leave the States with "no real option" but to comply. .......................................................... 40

     3.     The Conditions are unlawfully ambiguous. .............................................. 43

ARGUMENT AS TO REMEDY ............................................................................. 46

     A.     The Court Should Vacate the Promulgation of the Civil Immigration Conditions. ............................................................................................ 46

     B.     The Court Should Permanently Enjoin Defendants Against Implementing or Enforcing the Civil Immigration Conditions Against Plaintiff States. ............. 47

     C.     The Court Should Declare that the Promulgation of the Civil Immigration Conditions Was Unlawful. ................................................................... 52

CONCLUSION ..................................................................................................... 52

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
   570 U.S. 205 (2013)..................................................................................................39

*Am. Petroleum Inst. v. U.S. Envtl. Prot. Agency*,
   52 F.3d 1113 (D.C. Cir. 1995)..................................................................................27

*Ameen v. Amphenol Printed Cirs., Inc.*,
   777 F.3d 63 (1st Cir. 2015) ......................................................................................17

*Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla*,
   490 F.3d 1 (1st Cir. 2007) ........................................................................................47

*Becker v. FEC*,
   230 F.3d 381 (1st Cir. 2000) ....................................................................................19

*Bowen v. Massachusetts*,
   487 U.S. 879 (1988)..................................................................................................35

*Bredesen v. Rumsfeld*,
   No. 05-cv-0640, 2005 WL 2175175 (M.D. Tenn. Sept. 7, 2005) ............................50

*BST Holdings, L.L.C. v. OSHA*,
   17 F.4th 604 (5th Cir. 2021).....................................................................................32

*Carson v. Makin*,
   668 F. Supp. 3d 26 (D. Me. 2023) ............................................................................51

*City of Arlington v. FCC*,
   569 U.S. 290 (2013)............................................................................................23, 29

*City & Cnty. of San Francisco v. Barr*,
   965 F.3d 753 (9th Cir. 2020).....................................................................................45

*City & Cnty. of San Francisco v. Sessions*,
   349 F. Supp. 3d 924 (N.D. Cal. 2018) ................................................................45, 49

*City & Cnty. of San Francisco v. Trump*,
   897 F.3d 1225 (9th Cir. 2018)...................................................................................49

*City & Cnty. of San Francisco v. Trump*,
   No. 3:25-cv-1350, 2025 WL 1738675 (N.D. Cal. June 23, 2025)...............12, 20, 34

*City of Chicago v. Barr*,
   961 F.3d 882 (7th Cir. 2020).............................................................................33, 51

*City of Chicago v. Sessions,*
    321 F. Supp. 3d 855 (N.D. Ill. 2018) ............................................................18, 48

*City of Chicago v. Sessions,*
    888 F.3d 272 (7th Cir. 2018) ...................................................................................51

*City of Evanston v. Barr,*
    412 F. Supp. 3d 873 (N.D. Ill. 2019) ....................................................................49

*City of Philadelphia v. Att'y Gen. of United States,*
    916 F.3d 276 (3d Cir. 2019) ..............................................................................5, 49

*City of Philadelphia v. Sessions,*
    280 F. Supp. 3d 579 (E.D. Pa. 2017) ...............................................................48, 50

*City of Philadelphia v. Sessions,*
    309 F. Supp. 3d 289 (E.D. Pa. 2018) .....................................................................49

*City of Providence v. Barr,*
    954 F.3d 23 (1st Cir. 2020) ...................................................5, 24–26, 28, 31, 36

*Cnty. of Santa Clara v. Trump,*
    250 F. Supp. 3d 497 (N.D. Cal. 2017) ...................................................................49

*Colorado v. U.S. Dep't of Just.,*
    455 F. Supp. 3d 1034 (D. Colo. 2020).................................................................48

*Commodity Futures Trading Comm'n v. Brit. Am. Commodity Options Corp.,*
    434 U.S. 1316 (1977).............................................................................................49

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
    603 U.S. 799 (2024)..............................................................................................46

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,*
    67 F.4th 1027 (9th Cir. 2023) ..........................................................30–31, 33

*Cummings v. Premier Rehab Keller, PLLC,*
    596 U.S. 212 (2022)..............................................................................................24

*Detroit Int'l Bridge Co. v. Canada,*
    192 F. Supp. 3d 54 (D.D.C. 2016) .................................................................30–31

*DHS v. Regents of the Univ. of Cal.,*
    591 U.S. 1 (2020)......................................................................................30, 34–37

*eBay Inc. v. MercExchange, LLC,*
    547 U.S. 388 (2006)..............................................................................................47

*EEOC v. Steamship Clerks Union, Loc. 1066*,
   48 F.3d 594 (1st Cir. 1995) ...........................................................................17

*Fed. Bureau of Investigation v. Fikre*,
   601 U.S. 234 (2024)..............................................................................20, 22

*Fed. Mar. Comm'n v. Seatrain Lines, Inc.*,
   411 U.S. 726 (1973) .....................................................................................27

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
   528 U.S. 167 (2000)......................................................................................20

*Garcia-Garcia v. Costco Wholesale Corp.*,
   878 F.3d 411 (1st Cir. 2017)........................................................................17

*Geertson Seed Farms v. Johanns*,
   570 F.3d 1130 (9th Cir. 2009) .....................................................................46

*Gonzales v. Oregon*,
   546 U.S. 243 (2006)......................................................................................27

*Gregory v. Ashcroft*,
   501 U.S. 452 (1991)......................................................................................24

*Haight v. Thompson*,
   763 F.3d 554 (6th Cir. 2014) ..................................................................40–41

*Harmon v. Thornburgh*,
   878 F.2d 484 (D.C. Cir. 1989)................................................................46–47

*Healey v. Spencer*,
   765 F.3d 65 (1st Cir. 2014) ..........................................................................47

*Hikvision USA, Inc. v. FCC*,
   97 F.4th 938 (D.C. Cir. 2024) ......................................................................32

*Int'l Org. of Masters, Mates & Pilots v. NLRB*,
   61 F.4th 169 (D.C. Cir. 2023)..................................................................35–36

*K–Mart Corp. v. Oriental Plaza, Inc.*,
   875 F.2d 907 (1st Cir. 1989) ........................................................................47

*Kansas v. United States*,
   249 F.3d 1213 (10th Cir. 2001) ...................................................................49

*Kentucky v. Yellen*,
   54 F.4th 325 (6th Cir. 2020).................................................................24, 40

*La. Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986)............................................................................2, 23–24

*Lawless v. Steward Health Care Sys., LLC*,
    894 F.3d 9 (1st Cir. 2018) ....................................................................17

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
    591 U.S. 657 (2020)............................................................................31, 33

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024)............................................................................24

*Lowe v. Gagné-Holmes*,
    126 F.4th 747 (1st Cir. 2025) .............................................................20

*Lunn v. Commonwealth*,
    78 N.E.3d 1143 (Mass. 2017) .............................................................11

*Massachusetts v. United States*,
    435 U.S. 444 (1978)............................................................................38–39

*McHenry Cnty. v. Raoul*,
    44 F.4th 581 (7th Cir. 2022) ..............................................................10

*Melone v. Coit*,
    100 F.4th 21 (1st Cir. 2024) ...............................................................37

*Michigan v. E.P.A.*,
    576 U.S. 743 (2015)............................................................................30

*Miranda-Olivares v. Clackamas County*,
    No. 12-cv-2317, 2014 WL 1414305 (D. Or. Apr. 11, 2014) ...............44

*Morales v. Chadbourne*,
    793 F.3d 208 (1st Cir. 2015) ..............................................................44

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992)............................................................................48

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)............................................................29–33, 36–37

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
    No. 25-cv-239, _ F. Supp. 3d _, 2025 WL 597959 (D.D.C. Feb. 25, 2025) ...........38

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012)............................................................................41–43

*Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs,*
  145 F.3d 1399 (D.C. Cir. 1998)................................................................48

*News-Press v. U.S. Dep't of Homeland Sec.,*
  489 F.3d 1173 (11th Cir. 2007) ...............................................................51

*New York v. Trump,*
  769 F. Supp. 3d 119 (D.R.I. Mar. 6, 2025)..............................................31

*Ocean Cnty. Bd. Of Commissioners v. Att'y Gen. of State of New Jersey,*
  8 F.4th 176 (3d Cir. 2021).......................................................................10

*Ohio v. EPA,*
  603 U.S. 279 (2024).................................................................................49

*Oklahoma v. Castro-Huerta,*
  597 U.S. 629 (2022).................................................................................37

*Or. Nat. Res. Council v. Thomas,*
  92 F.3d 792 (9th Cir. 1996) .....................................................................30

*Pennhurst State Sch. & Hosp. v. Halderman,*
  451 U.S. 1 (1981)........................................................................31, 43, 46

*Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Hum. Servs.,*
  946 F.3d 1100 (9th Cir. 2020) .................................................................27

*Printz v. United States,*
  521 U.S. 898 (1997).................................................................................11

*Ramirez v. U.S. Immigr. & Customs Enf't,*
  568 F. Supp. 3d 10 (D.D.C. 2021) ..........................................................47

*Rhode Island Latino Arts v. Nat'l Endowment for the Arts,*
  No. 25-cv-79, _ F. Supp. 3d _, 2025 WL 1009026 (D.R.I. Apr. 3, 2025)...................18–19, 21

*Robbins v. Reagan,*
  780 F.2d 37 (D.C. Cir. 1985)....................................................................27

*S.E.C. v. Locke Cap. Mgmt., Inc.,*
  794 F. Supp. 2d 355 (D.R.I. 2011) ..........................................................46

*South Dakota v. Dole,*
  483 U.S. 203 (1987)........................................................39, 41, 43, 45–46

*State Highway Comm'n of Mo. v. Volpe,*
  479 F.2d 1099 (8th Cir. 1973) .................................................................31

*Steward Mach. Co v. Davis,*
    301 U.S. 548 (1937).............................................................................41

*Steffel v. Thompson,*
    415 U.S. 452 (1974).............................................................................52

*Taylor v. Am. Chemistry Council,*
    576 F.3d 16 (1st Cir. 2009) .................................................................17

*Tennessee v. Dep't of Educ.,*
    104 F.4th 577 (6th Cir. 2024) .......................................................48–49

*Trump v. CASA, Inc.,*
    No. 24A884, _ S. Ct. _, 2025 WL 1773631 (U.S. June 27, 2025)....................47, 52

*Ulstein Mar., Ltd. v. United States,*
    833 F.2d 1052 (1st Cir. 1987) .............................................................52

*U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO,*
    481 U.S. 1301 (1987)...........................................................................51

*United States v. California,*
    921 F.3d 865 (9th Cir. 2019).........................................................10, 44

*United States v. Microsoft Corp.,*
    253 F.3d 34 (D.C. Cir. 2001)...............................................................46

*United States v. Morrison,*
    529 U.S. 598 (2000)...............................................................................9

*United States v. Oregon State Med. Soc.,*
    343 U.S. 326 (1952).............................................................................52

*United States v. W. T. Grant Co.,*
    345 U.S. 629 (1953).............................................................................20

*United Steel v. Mine Safety & Health Admin.,*
    925 F.3d 1279 (D.C. Cir. 2019)..........................................................47

*Va. Dep't of Educ. v. Riley,*
    106 F.3d 559 (4th Cir. 1997) ..............................................................24

*West Virginia v. Env't Prot. Agency,*
    597 U.S. 697 (2022).............................................................................20

*Will v. Mich. Dep't of State Police,*
    491 U.S. 58 (1989)...............................................................................24

*Winter v. Nat. Res. Def. Council, Inc.*,
 555 U.S. 7 (2008) ........................................................................................50

*Worman v. Healey*,
 922 F.3d 26 (1st Cir. 2019) .........................................................................42

**Statutes**

Pub. L. No. 81-875, 64 Stat. 1109...........................................................................3

Pub. L. No. 100-707, 102 Stat. 4689 ......................................................................3

Pub. L. No. 106-386, 114 Stat. 1464.....................................................................36

Pub. L. No. 107-56, 115 Stat. 272............................................................................4

Pub. L. No. 107-295, 116 Stat. 2064.......................................................................4

Pub. L. No. 107-296, 116 Stat. 2135.......................................................................4

Pub. L. No. 109-295, 120 Stat. 1355 .......................................................................4

5 U.S.C.
 § 703.................................................................................................................47
 § 706............................................................................................23–24, 29, 46

6 U.S.C.
 § 316...................................................................................................................4
 § 605.......................................................................................................5, 25–26
 § 608...........................................................................................................25–26
 § 665g..............................................................................................5–6, 26, 33
 § 762.....................................................................................................5, 25–26, 33

33 U.S.C.
 § 467f...............................................................................................................26
 § 467j...............................................................................................................26

28 U.S.C. § 2201 ...................................................................................................52

42 U.S.C.
 § 4102.........................................................................................................6, 28
 § 4104c.......................................................................................................6, 28
 § 5121....................................................................................................3, 29, 39
 § 5154a.............................................................................................................28
 § 5155...............................................................................................................28
 § 5170...............................................................................................................28
 § 5170a.......................................................................................................28–29

§ 5170b..........................................................................................28
§ 5170c..........................................................................................35
§ 5191............................................................................................28
§ 7704.......................................................................................6, 28

46 U.S.C.
§ 13102...................................................................................26, 39
§ 13104........................................................................................26
§ 70103.........................................................................................28
§ 70107.....................................................................................6, 28

5 Ill. Comp. Stat.
805/1...............................................................................................9
805/15...........................................................................................10

Cal. Gov. Code
§ 7282.............................................................................................9
§ 7282.5......................................................................................9–10
§ 7283.............................................................................................9
§ 7283.1.........................................................................................44
§ 7284.............................................................................................9
§ 7284.6.........................................................................................10

Colo. Rev. Stat. § 24-76.6-101............................................................9

N.J. Att'y Gen. Directive 2018-6.........................................................9

Wash. Rev. Code Ann.
§ 10.93.160.....................................................................................9
§ 43.10.315.....................................................................................9

## Executive & Administrative Materials

88 Fed. Reg. 62098 (2023) ................................................................50

Exec. Order No. 14159,
90 Fed. Reg. 8443 (Jan. 20, 2025) ...............................11, 21, 37, 39–40

Exec. Order No. 14218,
90 Fed. Reg. 10581 (Feb. 19, 2025) ......................................21, 37

Exec. Order No. 14287,
90 Fed. Reg. 18761 (Apr. 28, 2025) .........................15, 21, 37, 40

Fed. Emergency Mgmt. Agency, *DHS Announces Funding Allocations for Fiscal Year 2024 Preparedness Grants* (Aug. 23, 2024) ......................................................7

Office of Inspector Gen., U.S. Dep't of Homeland Sec., *FEMA Followed Applicable Laws and Reporting Requirements for Transferring Disaster Relief Funds* (Jan. 23, 2025)....................7

U.S. Dep't of Just., *General Policy Regarding Charging, Plea Negotiations, and Sentencing* (Feb. 5, 2025)..................................................................................................................45

## Other Authorities

11A Fed. Prac. & Proc. § 2944 (1995).................................................................................48

Cong. Budget Office, *FEMA's Disaster Relief Fund: Budgetary History and Projections* (Nov. 2022), https://www.cbo.gov/publication/58840.............................................7

Doc. 50, *United States v. Illinois*, No. 1:25-cv-1285 (N.D. Ill. Apr. 1, 2025) ..............................................................44

Doc. 93, *City & Cnty. of San Francisco v. Trump*, No. 3:25-cv-1350 (N.D. Cal. Mar. 31, 2025).......................................................32

Greg Norman, *Homeland Security removes 'sanctuary jurisdictions' list from its website*, Fox News (June 2, 2025) ...........................................................................15, 21, 40

U.S. Government Accountability Office, *Disaster Relief Fund: Lessons Learned from COVID-19 Could Improve FEMA's Estimates* (July 9, 2024), https://www.gao.gov/assets/gao-24-106676.pdf.......................................................7

# INTRODUCTION

In late March, the Department of Homeland Security ("DHS" or "the Department") revised the standard terms and conditions that govern all federal funds it oversees, adding a new set of conditions that require state and local grantees to certify—for the first time—that they will assist it in enforcing federal civil immigration law, or else lose all federal funds overseen by DHS. The Department's new terms and conditions plainly state that they apply to "*all* new federal awards of federal financial assistance (federal awards) for which the federal award date occurs in [fiscal year ("FY")] 2025." Ex. 1 at 1 (emphasis added). The promulgation of these terms threatened to deprive Plaintiff States of billions of dollars annually that fund state emergency-management efforts to prepare for floods, wildfires, terrorist attacks, and more, and to respond to such emergencies when they arise. Plaintiff States thus filed this action on May 13, contending that the new terms (the "Civil Immigration Conditions") are unlawful and unconstitutional and seeking declaratory and injunctive relief against their imposition and enforcement.

On Friday, June 6, defendants purported to make an about-face. Although the DHS standard terms and conditions—both at the time of suit and to this day—state that they apply to "all new federal awards of federal financial assistance," defendants on June 6 stated that the Civil Immigration Conditions *would not* apply to twelve specific grant programs named in the complaint, and *may not* apply to other grant programs (both those identified in the complaint and others), depending on "further consideration and analysis." *See* ECF 52 at 7–11; ECF 52-1 ("Richardson Decl.") ¶¶ 12–16. Defendants did not state that they had communicated any decisions about the scope of the terms and conditions to agency program staff. Nor did defendants specify the nature of the "analysis" they were undertaking or the likely timeframe for any decision. These halfhearted and incomplete gestures at revocation—gestures that cannot be squared with the plain text of the operative legal document—are no more than attempts to evade accountability for, and

review of, defendants' decision to promulgate across-the-board conditions that apply to all DHS-operated programs. The Court should accordingly disregard them and consider the legality of the Civil Immigration Conditions as promulgated.

On the merits, the final agency action that defendants took in promulgating the Civil Immigration Conditions, across all DHS grants, is unlawful in multiple respects. First, and most fundamentally, DHS lacks the authority to impose the conditions. An administrative agency "has no power to act . . . unless and until Congress confers power upon it," *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986), and DHS has never cited any statute authorizing it to condition the receipt of *all* federal funds on States' assisting it in enforcing federal civil immigration law. Indeed, the various grant statutes that Congress has enacted and charged DHS and its sub-agency FEMA with overseeing—supporting state efforts to respond to and mitigate the effects of catastrophic events ranging from floods to wildfires to terrorist attacks—plainly preclude imposition of the Civil Immigration Conditions. Second, and separately, DHS violated the Administrative Procedure Act ("APA") by acting arbitrarily and capriciously in promulgating the Conditions. DHS's decision was unreasoned in multiple respects: It failed to consider whether any of the statutes authorizing its grant programs permitted imposition of the conditions; it ignored the States' reliance interests on federal funds and neglected the conditions' impact on public safety; and it overlooked obvious alternatives to imposing the conditions. Finally, DHS violated the Spending Clause by imposing the Conditions: The federal government cannot lawfully coerce the States into enacting its preferred policy goals, but that is just what defendants are attempting to do here, threatening to withhold billions annually in necessary federal emergency and disaster funds to extract policy changes from the States that defendants could not lawfully command.

For these reasons, the Court should declare the promulgation of the Civil Immigration Conditions unlawful, set it aside, and permanently enjoin the Civil Immigration Conditions' enforcement and application as to Plaintiff States and their instrumentalities and subdivisions.

## BACKGROUND

### A.    Congress's Longstanding Support for State Emergency Preparation and Response.

1.    For over 70 years, Congress has addressed the threat of unpredictable disasters and emergencies by providing robust and unflagging financial support—today totaling tens of billions of dollars annually—for a complex infrastructure of emergency preparedness and response, anchored by FEMA but administered in the first instance by the States. Congress first created a general emergency funding infrastructure in 1950, enacting the Disaster Relief Act to "provide an orderly and continuing means of assistance by the Federal Government to States and local governments in carrying out their responsibilities to alleviate suffering and damage resulting from major disasters." Pub. L. No. 81-875, § 1, 64 Stat. 1109, 1109. Over the following decades, Congress has steadily expanded its support for state emergency disaster management, establishing additional programs and providing ever greater support for the States and their residents. In 1988, Congress enacted the Disaster Relief and Emergency Assistance Amendments, which formally renamed the federal government's disaster authority the Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act"). Pub. L. No. 100-707, 102 Stat. 4689. The Stafford Act sets out a framework for responding to natural disasters that still governs today, directing federal funds to flow to States and their residents following a presidential disaster declaration. *See* 42 U.S.C. § 5121 *et seq.*

Congress once again overhauled the federal emergency-management infrastructure during the Bush Administration, in the wake of multiple significant disasters on American soil. First, after

the September 11, 2001 terrorist attacks, Congress added funding programs to support States and localities in counterterrorism measures, with the goal of ensuring that a disaster of that sort never happens again. In October 2001, Congress passed the USA PATRIOT Act, establishing grant programs to States "to prepare for and respond to terrorist acts." Pub. L. No. 107-56, § 1014, 115 Stat. 272, 399. Congress went on to pass the Homeland Security Act of 2002, Pub. L. No. 107-296, § 430, 116 Stat. 2135, 2191, and the Maritime Transportation Security Act of 2002, Pub. L. No. 107-295, § 102, 116 Stat. 2064, 2075, which likewise increased support for state preparedness measures in areas of vulnerability. Finally, in the wake of Hurricane Katrina, Congress passed— and President Bush signed into law—the Post-Katrina Emergency Management Reform Act of 2006, Pub. L. No. 109-295, tit. VI, § 611, 120 Stat. 1355, 1400, which comprehensively overhauled all federal emergency assistance grant programs and granted FEMA the authority to administer them. That statute expressly prohibits the DHS Secretary from "substantially or significantly reduc[ing] . . . the authorities, responsibilities, or functions of [FEMA] or the capability of [FEMA] to perform [its] missions, authorities, [or] responsibilities, except as otherwise specifically provided" by law. 6 U.S.C. § 316(c)(1).

2.      The federal grant programs that Congress has authorized and that FEMA and other DHS sub-agencies administer vary in scope and purpose, but they are united by a common theme: They provide support to States and localities based on objective criteria that center on States' actual need to prepare for and respond to emergencies and similar threats to their residents' safety and security. Congress did not, in authorizing these programs and appropriating funds to support them, confer on FEMA or other DHS sub-agencies any freestanding authority to pick and choose among funding recipients according to the political priorities of the administration in office. Nor did Congress authorize DHS or its sub-agencies to attach conditions to funds unrelated to the primary

purpose of the funding programs: supporting States in preparing for and responding to emergencies and similar hazards.

*First*, many of the grant programs that Congress has authorized and that FEMA and other DHS sub-agencies administer are so-called "formula" grant programs—grants that are disbursed to States based on specific factors, such as a State's population. *See, e.g.*, *City of Philadelphia v. Att'y Gen. of United States*, 916 F.3d 276, 280 (3d Cir. 2019) (setting out the statutory factors determining eligibility for one specific formula grant); *see also City of Providence v. Barr*, 954 F.3d 23, 27 (1st Cir. 2020) (similar).

For instance, the Emergency Management Performance Grant Program—which Congress created during the Bush Administration to provide direct support to the state agencies that oversee emergency management functions—provides over $300 million annually to States, allocated on a fixed basis: 0.75% of the total appropriated amount to each State, with the remainder apportioned strictly by population. *See* 6 U.S.C. § 762(b), (d) (FEMA Administrator "***shall*** . . . make grants to States" based on this formula (emphasis added)). Likewise, after the September 11, 2001, terrorist attacks, Congress established a program to support state and local counterterrorism measures—the State Homeland Security Grant Program—through which it annually distributes over $350 million to States, again guaranteeing each State a minimum amount of funding. *See id.* § 605(e)(1) (FEMA Administrator "***shall*** ensure that . . . each State receives . . . not less than an amount equal to" a portion of total appropriated funds (emphasis added)). More recently, as part of the Infrastructure Investment and Jobs Act of 2021, Congress established (and appropriated $1 billion to support) the State and Local Cybersecurity Grant Program, which supports state cybersecurity measures, and again specified exactly how the funds it made available should be distributed: 1% of the appropriated funds per State, with the remainder apportioned by population. *See id.* § 665g(*l*) (DHS

"*shall* apportion" funds in this manner (emphasis added)). These programs direct how emergency funds are to be apportioned to States and afford DHS and its sub-agencies no discretion to impose their own funding conditions that deviate from Congress's instructions.

*Second*, even those grant programs that permit FEMA and other DHS sub-agencies some degree of discretion over the disbursement of federal funds nonetheless set out objective criteria—criteria centered on States' need to prepare for and respond to emergencies and other threats—that the sub-agencies are required to use in allocating the funds that Congress has appropriated. To take one example, Congress established the Flood Mitigation Assistance Program "to provide financial assistance to States and communities . . . for planning and carrying out activities designed to reduce the risk of flood damage to structures" insured by the National Flood Insurance Program. 42 U.S.C. § 4104c(a). Although States must prepare a "flood risk mitigation plan" in order to seek and obtain funds pursuant to this program, *id.* § 4104c(b), Congress provided specific factors for FEMA to use in evaluating those plans: The plans must propose to "(1) constrict the development of land which is exposed to flood damage where appropriate, (2) guide the development of proposed construction away from locations which are threatened by flood hazards, (3) assist in reducing damage caused by floods, and (4) otherwise improve the long-range land management and use of flood-prone areas." *Id.* § 4102(c); *see id.* § 4104c(c)(3) (describing specific eligible activities). The same is true for other grant programs that Congress has created and that FEMA administers: Such programs are established for specific purposes, *see, e.g.*, *id.* § 7704(a)(2)(B)(i) (to "promote the adoption of earthquake hazards reduction measures by Federal, State, and local governments"); 46 U.S.C. § 70107(b) (to correct "vulnerabilities in port security"), and do not confer unfettered authority on FEMA (or any other DHS sub-agency) to award funds based on the political priorities of a particular presidential administration.

6

Today, the robust support system that Congress created for state emergency preparation and response is critical to States and their residents. FEMA provides nearly $2 billion annually in funds to States to support "preparedness" activities—i.e., efforts States undertake to prepare for emergencies and other threats (ranging from floods to fires to terrorist attacks) *before* they occur. *See* Fed. Emergency Mgmt. Agency, *DHS Announces Funding Allocations for Fiscal Year 2024 Preparedness Grants* (Aug. 23, 2024) (Ex. 9). And, under the Stafford Act, *supra* p. 3, FEMA likewise provides **tens of billions** of dollars annually to States and other recipients to help recover from and mitigate the effects of major disasters, an amount that has only increased in recent years. *See* Cong. Budget Office, *FEMA's Disaster Relief Fund: Budgetary History and Projections* (Nov. 2022), https://www.cbo.gov/publication/58840; Office of Inspector Gen., U.S. Dep't of Homeland Sec., *FEMA Followed Applicable Laws and Reporting Requirements for Transferring Disaster Relief Funds* 3 (Jan. 23, 2025) (Ex. 10). Since 2017, excluding COVID-19 disaster declarations, and according to its own public data, FEMA has obligated over $23.2 billion from the Disaster Relief Fund to Plaintiff States. *See* Ex. 25 (Joseph Decl.), ¶ 12.[1]

### B.    Plaintiff States and Their Efforts to Secure and Protect Their Residents.

1.    Plaintiffs are the States of Illinois, California, New Jersey, Rhode Island, Colorado, Connecticut, Delaware, Hawai'i, Maine, Maryland, Massachusetts, the People of the State of Michigan, Minnesota, Nevada, New Mexico, New York, Oregon, Vermont, Washington, and Wisconsin, and the District of Columbia ("Plaintiff States"). For decades, Plaintiffs have relied on grant programs established by Congress and administered by FEMA and other sub-agencies to protect their residents from emergencies and other catastrophic threats to their safety.

---

[1] The COVID-19 disaster declarations accounted for an additional $125 billion in disaster relief obligations to all States between 2020 and 2023. *See* U.S. Gov't Accountability Office, *Disaster Relief Fund: Lessons Learned from COVID-19 Could Improve FEMA's Estimates* 1 (July 9, 2024), https://www.gao.gov/assets/gao-24-106676.pdf.

Plaintiff States use funds appropriated by Congress for a range of purposes. Federal funds for state emergency management include dozens of grant programs, addressing everything from homeland security (the State Homeland Security Program and the Urban Area Security Initiative) to port security (Port Security Grant Program) to cybersecurity (State and Local Cybersecurity Grant Program) to dam safety (National Dam Safety Program). Federal dollars help States secure schools and houses of worship at risk for extremist attacks (Nonprofit Security Grant Program) and pay the salaries of emergency coordination personnel (Emergency Management Performance Grant). When disaster does strike, the federal government awards money to States for food aid, debris removal, and permanent infrastructure repairs, paid out from a federal Disaster Relief Fund.

States rely heavily on the programs that Congress has authorized—and the funds Congress has appropriated to support those programs—to lead their communities through disasters and other emergencies. For example, Plaintiff States rely on DHS grant money to, among other things: (1) fund state and local SWAT teams and bombs squads, Ex. 26 (Khayyat Decl.), ¶¶ 24–25; Ex. 28 (Maulawin Decl.), ¶ 9; Ex. 23 (Higgins Decl.), ¶ 22; (2) pay local emergency managers, Ex. 33 (Sweeney Decl.), ¶¶ 33, 77; Ex. 49 (Pappas Decl.), ¶ 18; Ex. 52 (Ezelle Decl.), ¶¶ 53–54; (3) deploy cybersecurity software to protect local governments from cyberattacks, Ex. 28 (Maulawin Decl.), ¶ 15; Ex. 41 (Bray Decl.), ¶¶ 45, 64; Ex. 35 (Cunningham Decl.), ¶ 29; (4) install security systems at religious institutions, Ex. 21 (Haney Decl.), ¶¶ 48–49; Ex. 36 (Doran Decl.), ¶ 33; Ex. 41 (Bray Decl.), ¶ 72; (5) reduce flood risks through flood control infrastructure and paid relocation, Ex. 23 (Higgins Decl.), ¶ 56; Ex. 30 (Strickland Decl.), ¶¶ 121–123; Ex. 45 (McMahon Decl.), ¶ 63; (6) restore and protect electrical infrastructure after powerful storms, Ex. 21 (Haney Decl.), ¶¶ 79, 86; Ex. 26 (Khayyat Decl.), ¶ 104; Ex. 54 (Engle Decl.), ¶ 80; and

(7) cover the sudden and uncontrollable outlays needed to fight major wildfires, Ex. 19 (Owen Decl.), ¶¶ 10–12; Ex. 22 (Kitchell Decl.) ¶¶ 22–23; Ex. 52 (Ezelle Decl.), ¶¶ 79–80.

2.    Plaintiff States are likewise responsible for maintaining the day-to-day safety of all residents of their communities. Plaintiff States enact statutes and establish policies about the best use of law-enforcement time and energy to ensure that their residents are protected from crime and violence. *See United States v. Morrison*, 529 U.S. 598, 618 (2000) ("Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims."). One critical choice that Plaintiff States must make in doing so is whether, when, and how to task their law-enforcement officers with assisting the federal government in enforcing federal civil immigration law.

Many Plaintiff States have chosen to use state and local law-enforcement resources on state and local matters, not federal matters—and so limit the circumstances under which state and local law enforcement may participate in federal civil immigration enforcement. *See, e.g.*, 5 Ill. Comp. Stat. 805/1 *et seq.*; Cal. Gov. Code §§ 7282–7282.5, 7283–7283.2, 7284–7284.12; N.J. Att'y Gen. Directive 2018-6 ("N.J. Directive"); Wash. Rev. Code Ann. §§ 10.93.160, 43.10.315; Colo. Rev. Stat. § 24-76.6-101 to -103. These States have concluded that such policies best promote public safety, both because they ensure that state and local law enforcement spend their time addressing crime, rather than civil immigration enforcement, and because undocumented immigrants and their families are less willing to engage with law enforcement (for instance, if they have been victims or witnesses to a crime) if doing so could risk deportation. *See* N.J. Directive at 1 (recognizing the fear of engaging with state and local law enforcement "makes it more difficult for officers to solve crimes and bring suspects to justice").

Many of these state policies seek to promote law-enforcement cooperation by ensuring a clear distinction between the roles of state and local officers who enforce state criminal law and the federal immigration officers who enforce federal civil immigration law. Illinois's TRUST Act, for instance, restricts state and local law-enforcement officers from voluntarily assisting in the civil enforcement of federal immigration law, including by arresting or detaining individuals on the basis of their immigration status; by providing federal civil immigration officials with access to state or local law-enforcement facilities; or by notifying civil immigration officials of detainees' upcoming release dates from state custody. 5 Ill. Comp. Stat. 805/15; *see also, e.g.*, Cal. Gov't Code § 7284.6(a); N.J. Directive at 3–4. But most of these statutes and directives contain important exceptions to ensure compliance with federal law and protect the public from violent criminals. Many authorize state and local law enforcement to work with federal civil immigration officials to facilitate the removal of certain criminals, *e.g.*, 5 Ill. Comp. Stat. 805/15(h), (i); Cal. Gov't Code §§ 7282.5(a), 7284.6(a)(1)(C), 7284.6(a)(4); N.J. Directive at §§ II.B.5–.6, and expressly allow officers to cooperate with immigration enforcement as required by federal law, 5 Ill. Comp. Stat. 805/15(h); Cal. Gov't Code § 7284.6(e); N.J. Directive at 1–2. Many of these policies have been in place for years, and many were passed with bipartisan support: Illinois's, for instance, was signed into law in 2017 by Republican Governor Bruce Rauner. And those policies that have been challenged in court have uniformly been upheld. *See, e.g.*, *McHenry Cnty. v. Raoul*, 44 F.4th 581 (7th Cir. 2022); *Ocean Cnty.*, 8 F.4th 176; *United States v. California*, 921 F.3d 865 (9th Cir. 2019).

Other Plaintiff States have not codified directives regarding the use of law-enforcement resources to assist in federal immigration law. Although these States have not imposed categorical *limitations* on the use of law-enforcement resources to assist in the enforcement of federal immigration law, they nonetheless do not impose categorical *requirements* of this kind on state and

local law-enforcement officers, either. Many of these States have concluded that they can best protect their residents by maintaining control over state and local law-enforcement resources, and/or by empowering law-enforcement officials to exercise discretion in determining when it would best promote public safety to assist federal immigration-enforcement efforts, rather than requiring those officers to devote resources to federal immigration enforcement on the federal government's command. Others are subject to different rules in this context. For instance, some Plaintiff States must comply with state court rulings that prevent them from cooperating with civil immigration detainer requests. *See, e.g.*, *Lunn v. Commonwealth*, 78 N.E.3d 1143, 1146 (Mass. 2017). Still other Plaintiff States have concluded that participating in federal immigration-enforcement efforts imposes substantial costs on local jurisdictions, not only in the form of personnel and resources but also in the form of potential civil liability. While Plaintiff States' decisions in this area have differed, *all* are consistent with the basic rule that the States "remain independent and autonomous within their proper sphere of authority," *Printz v. United States*, 521 U.S. 898, 928 (1997)—a principle that has no greater force than in the context of States' exercise of their police powers for the protection of their residents.

### C. The Department's Attempt to Conscript States in Immigration Enforcement Using the Funds Congress Has Appropriated for Emergencies and Threats.

1.    In the seven decades in which the federal government has supported the States in protecting their residents against catastrophic disasters, to Plaintiffs' knowledge, no presidential administration has threatened to withhold emergency and disaster funds to conscript the States into adhering to its policy preferences. But the current administration has now taken that step. On January 20, 2025, his first day in office, President Trump expressly directed DHS to "ensure that so-called 'sanctuary' jurisdictions do not receive access to Federal funds." Exec. Order No. 14159, § 17, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025). Less than a month later, on February 19, the DHS

Secretary issued a memorandum to all DHS agencies and offices titled "Restricting Grant Funding for Sanctuary Jurisdictions," directing DHS agencies to review all federal financial assistance and cut off funding to sanctuary jurisdictions. *See* Ex. 6. The then-Senior Official Performing the Duties of the FEMA Administrator, Cameron Hamilton, later sent a memorandum to the Secretary that reviewed FEMA's grant programs and identified twelve specific programs that, in Hamilton's view, might be lawfully limited to non-"sanctuary" jurisdictions. *See* Ex. 7 at 2. But he expressly recommended *against* attempting to apply conditions of this sort to "disaster grants, non-disaster mitigation grants, and grants to fire departments" and other similar organizations. *Id.*

But instead of following Hamilton's recommendations, on March 27, 2025, DHS revised the terms and conditions that govern ***all*** funding programs overseen by the agency to incorporate a sweeping new set of conditions that require all States to assist in enforcing federal immigration law in order to receive ***any*** federal funds from the agency. *See* Ex. 1. The agency subsequently issued a revised version of the terms and conditions on April 18, 2025. *See* Ex. 1 (Mar. 27, 2025 version); Ex. 2 (Apr. 18, 2025 version); *see also* U.S. Dep't of Homeland Sec., *DHS Standard Terms and Conditions* (captured May 17, 2025) (Ex. 3) (identifying the date ranges where different versions of the standard terms and conditions apply). Both the March 27 and April 18 standard terms purport to govern "***all*** new federal awards of federal financial assistance (federal awards) for which the federal award date occurs in FY 2025." Exs. 1–2 (emphasis added). As another district court has already observed, "the clear and specific language of the DHS Standard Terms communicates DHS's intent to apply those terms to all new federal awards." *City & Cnty. of San Francisco v. Trump*, No. 3:25-cv-1350, 2025 WL 1738675, at *2 (N.D. Cal. June 23, 2025) (quotation omitted).

The new terms and conditions require States to "comply with" a set of conditions "related

to coordination and cooperation" with federal immigration officials. Ex. 2 at 4. Specifically, they require States to certify compliance with the following conditions:

1. *The Information Sharing Condition* (C.IX.1.a): Grant recipients must comply with the requirements of 8 U.S.C. §§ 1373 and 1644, which prohibit state restrictions on sharing information with DHS concerning the citizenship or immigration status, lawful or unlawful, of any individual.

2. *The Compliance Condition* (C.IX.1.b): Grant recipients must comply with various criminal laws, including 8 U.S.C. § 1324, that prohibit, among other things, "encouraging or inducing" noncitizens to unlawfully enter the United States.

3. *The Cooperation Condition* (C.IX.1.c): Grant recipients must "honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer."

4. *The Access Condition* (C.IX.1.d): Grant recipients must provide federal immigration agents "access to detainees" in correctional facilities to inquire as to such individuals' right to be or remain in the United States.

5. *The Publicization Condition* (C.IX.1.e): Grant recipients must not "leak or otherwise publicize the existence of" any federal immigration enforcement operations.

6. *The Certification and Monitoring Condition* (C.IX.2): Grant recipients must certify compliance with the above conditions and require subgrant recipients to do the same.

*Id.* at 4–5. A separate term requires grantees to certify that "[t]hey do not, and will not during the term of this award, operate any program that benefits illegal immigrants or incentives illegal immigration." *Id.* at 6 (term C.XVII.2.a.iii, or the Benefits Condition). Plaintiff States refer to these terms together as the "Civil Immigration Conditions" (or the "Conditions").

2.    Plaintiff States filed this lawsuit on May 14, 2025. ECF 1. At the time of filing, and to this day, no provision in the April 18 standard terms identified any exception to DHS's stated intent to apply the Standard Terms and Conditions to all new federal awards. Again, the standard terms and conditions state that they apply to "***all*** new federal awards of federal financial assistance (federal awards) for which the federal award date occurs in FY 2025." Ex. 2 at 1 (emphasis added). And they provide that "[t]he United States has the right to seek judicial enforcement of these terms

13

and conditions," *id.*, without any tailoring to specific grant programs. At the time this suit was filed, the website where the standard terms and conditions are posted identified no exception to DHS's stated intent to apply all terms and conditions to all new federal awards. *See* U.S. Dep't of Homeland Sec., *DHS Standard Terms and Conditions* (captured May 17, 2025) (Ex. 3). Thus, when this suit commenced, defendants had made and announced a final decision to impose the Civil Immigration Conditions on all grant programs administered by DHS or its components.

At the time of filing, Plaintiffs also faced multiple pending requests from defendants to certify compliance to the Civil Immigration Conditions to receive grant funds. For instance, Washington relies heavily on FEMA for Fire Management Assistance Grants ("FMAG")—funds authorized by Congress to assist States and localities in protecting against, managing, and controlling fires. Ex. 52 (Ezelle Decl.), ¶¶ 78–82. But it cannot obtain FMAG funds for this year's fire season without a signed disaster-management agreement with FEMA, and the agreement FEMA sent to Washington on April 18, 2025 requires the State to accept the FY 2025 terms and conditions. *Id*. ¶¶ 84–85. New Jersey also faced a demand to certify in connection with the FMAG program. *See* Ex. 38 (Ottobre Decl.), ¶¶ 72–73. Moreover, almost all Plaintiff States have been awarded formula funds for FY 2025 through the Coast Guard's State Recreational Boating Safety Program, but can obtain them only if they sign the terms and conditions. *See* Ex. 27 (King Decl.), ¶¶ 51–52 & Ex. A (describing and attaching the email that went to all States); *see also* Ex. 18 (Fernandez Decl.), ¶¶ 15–19; Ex. 32 (Bowen Decl.), ¶¶ 19–24; Ex. 34 (Block Decl.), ¶ 24; Ex. 43 (Seward Decl.), ¶ 19; Ex. 46 (Warren Decl.), ¶¶ 7–9; Ex. 47 (Hoxsie Decl.), ¶¶ 13, 15.

Plaintiff States filed a motion for a preliminary injunction on May 19, 2025, ECF 20–21, and the Court ordered defendants to respond by June 6. While the response was pending, on May 29, 2025, defendants published a list of so-called "sanctuary jurisdictions," which included all

Plaintiff States. The list was posted pursuant to an April 28 executive order that, among other things, required "the Attorney General, in coordination with [DHS]" to publish a "list" of "sanctuary jurisdictions" and to "notify each sanctuary jurisdiction regarding its defiance of Federal immigration law enforcement and any potential violations of Federal criminal law." Exec. Order No. 14287, § 2(a), 90 Fed. Reg. 18761, 18761 (2025). The list was taken offline two days later after 9:19 PM on Saturday, May 31. *See* Dep't of Homeland Sec., *Sanctuary Jurisdictions Defying Federal Immigration Law* (captured May 29, 2025 9:59 PM GMT) (Ex. 12); Dep't of Homeland Sec., *Sanctuary Jurisdictions Defying Federal Immigration Law* (captured June 1, 2025 1:19 AM GMT) (Ex. 13); Dep't of Homeland Sec., *Page Not Found* (same URL captured June 1, 2025 2:48 AM GMT) (Ex. 14). Asked the next day, June 1, about the removal of the list in a televised interview, defendant Noem stated that the sanctuary list "is absolutely continuing to be used and it is going to be identifying those cities and those jurisdictions that aren't honoring law and justice." Greg Norman, *Homeland Security removes 'sanctuary jurisdictions' list from its website*, Fox News (June 2, 2025) (Ex. 15); *see also* Ex. 8 (memorandum dated June 11, 2025 providing for Secretary-level control over all DHS spending in excess of $100,000).

On June 6, 2025, defendants filed their response to Plaintiff States' preliminary-injunction motion (and filed a corrected response on June 9). ECF 50, 52. In their response, defendants stated that DHS and FEMA had made a "final determination" that the Civil Immigration Conditions would not apply to twelve listed grant programs administered by FEMA, attaching a declaration from defendant Richardson, the Senior Official Performing the Duties of the FEMA Administrator. ECF 52 at 3–4; Richardson Decl. ¶ 14. Richardson did not specify in his declaration the form that the final determination took nor the date when it was made, nor did he assert that that the determination had been communicated to FEMA staff or implemented by the agency.

The Court held a status hearing on June 9, 2025, where Plaintiff States expressed their concerns that defendants' change in position regarding these twelve programs had not been communicated to FEMA staff and had not been formalized in the terms and conditions themselves, concerns that Plaintiff States had also expressed in a status report the day before. *See* ECF 51 ¶¶ 4–5. On June 11, DHS added language to its website, stating for the first time: "Not all of DHS's Standard Terms and Conditions apply to every DHS grant program[]. DHS directs individuals to review the program's NOFO and/or FEMA-State Agreement to determine which Terms and Conditions apply to a particular grant." U.S. Dep't of Homeland Sec., *DHS Standard Terms and Conditions* (captured June 12, 2025 3:45 PM EDT) (Ex. 4). To this day, however, the DHS standard terms and conditions still state that they "apply to all new federal awards of federal financial assistance (federal awards) for which the federal award date occurs in FY 2025." Ex. 2 at 1.

Since June 9, Plaintiff States have seen few changes in defendants' implementation of Civil Immigration Conditions. As noted, Richardson's declaration does not state that, as of its execution, he or any other FEMA official had communicated the agency's change in position to its program staff. And multiple FEMA employees have since indicated that they are unaware of any change in position. For instance, Richardson attested the Conditions would not apply to the Fire Management Assistance Grants (FMAG) program, which assists States and localities in protecting against, managing, and controlling fires. Richardson Decl. ¶ 14. On June 12, 2025, an employee of the Oregon Department of Forestry, which manages the FMAG grant in Oregon, reached out to their FEMA contact to solicit an amended FEMA-State agreement without the Conditions. Ex. 44 (Graham Decl.), ¶ 6. The FEMA official appeared to be unaware of the position taken in the Richardson declaration, and to this day Oregon has not received a revised agreement. *Id.* ¶¶ 6–8. The State of Washington had a similar experience: Regional FEMA officials were initially unaware

of the Richardson declaration's statement that the Civil Immigration Conditions did not apply to FMAG. Ex. 53 (Supp. Ezelle Decl.), ¶ 9. On June 24, a FEMA employee stated that an amendment to the FEMA-State agreement was in process, but that the employee did not know when it would arrive or what it would contain. *Id.* ¶ 10. To date, no State has received a revised FEMA-State agreement that excludes the Civil Immigration Conditions. *See* Ex. 39 (Supp. Ottobre Decl.), ¶ 7; Ex. 44 (Graham Decl.), ¶ 8; Ex. 53 (Supp. Ezelle Decl.), ¶ 11.

## ARGUMENT AS TO LIABILITY

"A grant of summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411, 417 (1st Cir. 2017) (quoting *Ameen v. Amphenol Printed Cirs., Inc.*, 777 F.3d 63, 68 (1st Cir. 2015)). "A genuine issue of fact exists where the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Taylor v. Am. Chemistry Council*, 576 F.3d 16, 24 (1st Cir. 2009) (quotation omitted). "The court must examine 'the record in the light most favorable to the nonmovant' and must make 'all reasonable inferences in that party's favor.'" *Garcia-Garcia*, 878 F.3d at 417 (quoting *Ameen*, 777 F.3d at 68). "Where, as here, the parties cross-move for summary judgment, the court must assay each motion 'separately, drawing inferences against each movant in turn.'" *Lawless v. Steward Health Care Sys., LLC*, 894 F.3d 9, 21 (1st Cir. 2018) (quoting *EEOC v. Steamship Clerks Union, Loc. 1066*, 48 F.3d 594, 603 n.8 (1st Cir. 1995)).

Here, Plaintiff States are entitled to summary judgment on each of their claims challenging the imposition and application of the Civil Immigration Conditions. The Court has jurisdiction to consider those claims, notwithstanding defendants' attempts to disclaim the scope and reach of the Civil Immigration Conditions, and the Conditions are unlawful in multiple independent respects.

17

## I.     Plaintiff States' Claims Are Not Moot.

DHS's attempt to disclaim the scope and reach of the Civil Immigration Conditions in the face of litigation has no effect on the nature of Plaintiff States' claims or the justiciability of the case before the Court. On March 27, 2025 and April 18, 2025, defendants imposed the Civil Immigration Conditions on "***all*** new federal awards . . . for which the federal award date occurs in FY 2025." Exs. 1–2 (emphasis added). Plaintiff States filed this action seeking declaratory and injunctive relief against enforcement of the Civil Immigration Conditions on May 13, 2025. ECF 1. Defendants have now taken the position that the Conditions may not apply to "all" grant awards, notwithstanding the plain text of the document, Richardson Decl. ¶ 8, and that FEMA, at least, has decided that they will *not* apply to twelve specific grant programs administered by that agency, *id.* ¶¶ 6, 14.[2] But the agency's change in position does not moot Plaintiff States' challenge to the Conditions as originally promulgated—i.e., as across-the-board conditions that apply to "all" grant programs that defendants oversee—for two reasons. First, it is unclear whether defendants have effected *any* legally binding change in their position on the scope of the Civil Immigration Conditions. And even if they had done so, that post-litigation shift would fall squarely within the voluntary-cessation exception to mootness. The Court should thus consider Plaintiff States' claims to the Conditions as pleaded, and reject any mootness argument defendants may advance.

To start, the events post-dating the filing of Plaintiff States' original complaint relate, at most, to mootness. "[U]nder circumstances where, as here, the plaintiffs had standing at the outset

---

[2] FEMA has also stated that, as of June 6, it was "completing [an] additional analysis" of whether to apply the Conditions to twelve other grant programs, Richardson Decl. ¶ 6, and defendants argued in opposing the preliminary-injunction motion that Plaintiff States' claims were not yet ripe with respect to those programs, ECF 52 at 8–11. Plaintiff States disagree with that argument, *see City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 865–66 (N.D. Ill. 2018), but for present purposes assume that defendants will make a final decision as to the conditions' applicability to all programs they operate by the time the Court resolves this dispute. *Cf.* Richardson Decl. ¶ 6 (explaining that the federal government's fiscal year ends on September 30).

(and their claims were ripe), but the defendants' intervening conduct raises the question whether a case or controversy remains, mootness is the relevant inquiry." *Rhode Island Latino Arts v. Nat'l Endowment for the Arts*, No. 25-cv-00079, _ F. Supp. 3d _, 2025 WL 1009026, at *6 (D.R.I. Apr. 3, 2025) (citing *Becker v. FEC*, 230 F.3d 381, 386 n.3 (1st Cir. 2000)). Here, Plaintiff States clearly had (and, indeed, still have today) standing to challenge the promulgation of the Civil Immigration Conditions, as the Conditions—if not vacated or enjoined—would deprive them of billions of dollars in funds that Congress has authorized and appropriated for emergency preparation and response. *See supra* pp. 7–9. So defendants' change in position goes, at most, to mootness. And Plaintiff States' claims are not moot.

At the outset, the Richardson declaration does not clearly accomplish any binding recission of the Civil Immigration Conditions even as to the grant programs that it lists. The declaration states that FEMA has "made a final determination that Immigration Conditions do ___**not**___ apply to" twelve grant programs administered by FEMA. Richardson Decl. ¶ 14. But it does not specify the form that this final determination took. The DHS website to this day reflects that the April 18 standard terms and conditions remain the operative version, and the April 18 terms still apply to "all new federal awards." Ex. 2 at 1; *see* U.S. Dep't of Homeland Sec., *DHS Standard Terms and Conditions* (captured July 2, 2025) (Ex. 5). On June 11, 2025, defendants added language to the website—though not the actual standard terms document—that "[n]ot all of DHS's Standard Terms and Conditions apply to every DHS grant program[]." U.S. Dep't of Homeland Sec., *DHS Standard Terms and Conditions* (captured June 12, 2025 3:45 PM EDT) (Ex. 4). But this tentative statement is expressly contradicted by the provisions of the terms-and-conditions document itself, which provides that "[t]he United States has the right to seek judicial enforcement of these terms and conditions," Ex. 2 at 1, full stop. Plaintiff States of course intend to hold defendant Richardson

to his word that FEMA's recent determination "supersedes any language in the April Terms suggesting that the Immigration Conditions apply to these grant programs," ECF 52-1 ¶ 15, but that avowal runs contrary to the terms of the operative legal document, *see San Francisco*, 2025 WL 1738675, at *2. Indeed, since the Richardson declaration was filed, to Plaintiffs' knowledge, *no* State has received an updated federal-State FMAG agreement excluding the Civil Immigration Conditions, and FEMA program staff have expressed uncertainty to multiple States about the agency's implementation of any decision as to the conditions' scope and reach. *See* Ex. 39 (Supp. Ottobre Decl.), ¶ 7; Ex. 44 (Graham Decl.), ¶¶ 6–8; Ex. 53 (Supp. Ezelle Decl.), ¶¶ 9–11.

In any event, even if defendants *have* effectuated some change in position, their last-minute litigation pivot falls squarely within the voluntary-cessation exception to mootness. Under that doctrine, defendants bear the "formidable burden" to "prove 'no reasonable expectation' remains that [they] will 'return to [their] old ways.'" *Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 241 (2024) (quoting *United States v. W. T. Grant Co.*, 345 U.S. 629, 632–33 (1953)). Defendants may not resort to "the simple expedient of suspending [their] challenged conduct after [they are] sued" to deprive this Court of jurisdiction. *Id.* at 241. They must instead "show[] that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000); *see also West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 720 (2022) (same). "[T]he voluntary cessation doctrine does not apply if the party seeking mootness can show either that the challenged conduct cannot reasonably be expected to recur *or* that it was ceased for a non-litigation reason." *Lowe v. Gagné-Holmes*, 126 F.4th 747, 758 (1st Cir. 2025). Defendants cannot meet their burden as to either factor.

First, all defendants' past actions suggest that defendants will press forward with imposing the Civil Immigration Conditions whenever and however they can. On January 20, 2025, his first day in office, President Trump directed DHS to "ensure that so-called 'sanctuary' jurisdictions do not receive access to Federal funds." Exec. Order No. 14159, § 17, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025). Another order on February 19, 2025, directed not only DHS but all executive departments to "ensure, consistent with applicable law, that Federal payments to States and localities do not . . . abet so-called 'sanctuary' policies." Exec. Order No. 14218, § 2(a)(ii), 90 Fed. Reg. 10581, 10581 (Feb. 19, 2025). The same day, defendant Noem proclaimed that "[i]f any government entity chooses to thumb its nose at" DHS's mission, then "it should not receive a single dollar of the Department's money unless Congress has specifically required it." Ex. 6 at 2. Most recently, the President issued yet another executive order denouncing "State and local officials" who "use their authority to violate, obstruct, and defy the enforcement of Federal immigration laws," calling States' sovereign choice about how to employ their own law enforcement "a lawless insurrection." Exec. Order No. 14287, § 1, 90 Fed. Reg. 18761, 18761 (Apr. 28, 2025). This executive order also directed DHS to "publish a list of" so-called "sanctuary jurisdictions" by May 28, 2025. *Id.* § 2(a). DHS did so, though the list was later taken down. *See* Exs. 12–14. Defendant Noem has publicly stated in a television interview that the sanctuary list "is absolutely continuing to be used and it is going to be identifying those cities and those jurisdictions that aren't honoring law and justice." Ex. 15.

In short, "unless the [defendants] forego[] implementation of the EO, the practice will likely resume in some form. The only question is how much that practice will resemble the challenged one." *Rhode Island Latino Arts*, 2025 WL 1009026, at *8. Moreover, the Richardson Declaration appears limited to fiscal year 2025 funds, leaving open the possibility that DHS will

attempt to reimpose these or materially similar terms in the future absent a judgment that holds them unlawful. Defendants have thus not met their "formidable burden" to establish there is no "reasonable expectation" that they will attempt to impose similar conditions in the future. *Fikre*, 601 U.S. at 241.

Second, defendants have never identified any non-litigation reason for defendants' retreat regarding the scope of the challenged conditions, and any such argument would be implausible given defendants' actions both before and after Plaintiff States filed suit. To take the most obvious example, although defendants now take the position that the Civil Immigration Conditions will not apply to certain Stafford Act disaster grants, including the Fire Management Assistance Grant ("FMAG"), *see* Richardson Decl. ¶¶ 14–16, multiple States were told before they filed suit that the FEMA-State agreements they were required to sign in order to obtain funds pursuant to that grant program would contain the new terms and conditions—*all* of the terms and conditions. *See* ECF 20 at 14–15; Ex. 52 (Ezelle Decl.), ¶¶ 84–85; Ex. 38 (Ottobre Decl.), ¶ 73. To the extent FEMA has changed its position since that time, the only possible prompt for that change is Plaintiff States' lawsuit. Indeed, even *after* Plaintiff States filed suit—and as late as June 4, 2025, two days before defendants' partial rollback of the Civil Immigration Conditions—a DHS official told a large group of States that receive BioWatch Program funds that the forthcoming FY 2025 BioWatch cooperative agreement "will be updated to the current FY 2025 DHS Standard Terms and Conditions (T&Cs), April 18, 2025." Ex. 29 (Poeschel Decl.), ¶ 10 & Ex. A. And it was days more (and prompted by a status conference with this Court) before FEMA posted any limiting language on its website. *See* Ex. 4. Indeed, as late as June 12, lower-level FEMA officials were not aware of any change as to the FMAG program. *See* Ex. 44 (Graham Decl.), ¶ 6.

These basic facts demonstrate that any change in the scope of application of the Civil Immigration Conditions took place precisely because Plaintiff States filed suit against defendants' decision to promulgate the Conditions and apply them across-the-board to "all" grants. Defendants cannot escape that decision now by retroactively disclaiming their intent to do any such thing. Plaintiff States' challenge to the Civil Immigration Conditions—as promulgated—is not moot, either in whole or in part, and the Court should proceed to the merits.

## II.     The Promulgation of the Civil Immigration Conditions Was Unlawful.

On the merits, DHS's promulgation of the Civil Immigration Conditions was unlawful in at least three separate respects: The agency lacked statutory authority to impose the Conditions; its decision to adopt the Conditions was arbitrary and capricious, violating the APA, 5 U.S.C. § 706(2)(A); and its attempt to use funding conditions to coerce Plaintiff States' law-enforcement officers into federal civil immigration enforcement violated the Constitution's Spending Clause.

### A.     The Promulgation of the Civil Immigration Conditions Was Contrary to Law and Ultra Vires.

The Department's adoption of the Civil Immigration Conditions was legally infirm for the basic reason that the agency lacks the statutory authority to impose a categorical rule requiring the recipients of all DHS funding to assist it in enforcing federal immigration law. The Department thus acted "in excess of statutory . . . authority," 5 U.S.C. § 706(2)(C), and ultra vires in promulgating the conditions.

#### 1.     DHS lacks freestanding authority to impose a categorical rule requiring grantees to assist in enforcing federal immigration law.

As relevant here, DHS and its sub-agencies are "charged with administering congressional statutes," which means that "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). Indeed, "an agency literally has no power to act . . . unless and until Congress confers power upon it," *La. Pub. Serv.*

*Comm'n*, 476 U.S. at 374, especially in the area of federal funding, *see Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022) (emphasizing that it is Congress that "has broad power" to "set the terms on which it disburses federal funds"). "Any action that an agency takes outside the bounds of its statutory authority is ultra vires and violates the [APA]." *Providence*, 954 F.3d at 31 (citations omitted); 5 U.S.C. § 706(2)(C). "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).

Here, no federal statute authorizes the Department to establish the kind of categorical rule that it has promulgated here. Through the Civil Immigration Conditions, defendants assert a power to require States to change their policies on participating in civil immigration enforcement as a condition of accessing **all** federal funding that it administers—a power that would dramatically upset the federal-state balance. To justify that assertion of authority, DHS would need to identify a statute with a "clear statement" that Congress "in fact . . . intended to" alter the balance of federal-state power in this manner. *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989)); *see Kentucky v. Yellen*, 54 F.4th 325, 347 (6th Cir. 2022) (explaining courts "must employ a federalism-based clear-statement rule when construing spending legislation as a matter of statutory interpretation" (emphasis omitted)). But no federal law contains an "unambiguous statutory expression of congressional intent to condition the States' receipt of federal funds" on the States' participation in civil immigration enforcement. *Va. Dep't of Educ. v. Riley*, 106 F.3d 559, 566 (4th Cir. 1997) (en banc). Indeed, DHS has *still* never attempted to justify its categorical rule by reference to such a categorical grant of statutory authority. *See* ECF 52 at 15 (arguing instead that "specific Congressional authority" is not needed).

These basic principles suffice to show that promulgating the Civil Immigration Conditions as to all DHS grants was unlawful, in excess of statutory authority, and ultra vires. DHS "took an impermissible shortcut when it attempted to impose the challenged conditions . . . conditions that Congress had not vested [it] with authority to impose." *Providence*, 954 F.3d at 45. The Court "need go no further." *Id.*

> **2.     The relevant grant statutes likewise do not authorize the Department to require grantees to assist in enforcing federal immigration law.**

Not only is there no freestanding statute that could authorize the Department to impose the categorical rule set out in the Civil Immigration Conditions, but the statutes that Congress passed to govern the use of specific federal funds likewise grant FEMA and other DHS sub-agencies no power to condition funds on adherence to the President's immigration priorities. Indeed, as explained, *supra* pp. 5–6, these statutes provide support to States and localities based on objective criteria that center on States' actual need to prepare for and respond to emergencies and similar threats to their residents' safety and security. They do not confer on DHS or FEMA the discretion to fund only those States that share the current administration's political priorities.

Congress has generally authorized FEMA and other DHS sub-agencies to provide funding to States through either (1) "formula" grant programs (i.e., grants disbursed to States on the basis of certain fixed factors, like state population) or (2) discretionary grant programs focused on specific threats, including floods, earthquakes, or other hazards. Under neither framework has Congress given the Department the power to limit funding to only those States that agree to cooperate in federal immigration-enforcement efforts.

That conclusion is straightforward for the many formula grants that provide Plaintiff States with a substantial portion of their preparedness funds. *See, e.g.*, 6 U.S.C. § 762(b), (d) (Emergency Management Performance Grant Program); *id.* §§ 605(e)(1), 608 (State Homeland Security Grant

Program); *id.* § 665g(*l*) (State and Local Cybersecurity Grant Program); 33 U.S.C. §§ 467f(e)(2), 467j(a)(2)(A) (National Dam Safety Program); 46 U.S.C. §§ 13102(a), 13104(a) (State Recreational Boating Safety Program). Although these statutes work in different ways, many of them direct DHS or its sub-agencies to provide States an annual allocation based on population, risk, or some other objective indicia, in some instances specifying the exact proportion—by statute—that each State is to receive. *See, e.g.*, *id.* § 665g(*l*) (agency "**shall** apportion" State and Local Cybersecurity Grant Program funds according to population (emphasis added)); § 762(b), (d) (FEMA Administrator "**shall** . . . make grants to States" under Emergency Management Performance Grant Program based on statutory formula (emphasis added)); 46 U.S.C. § 13104(a) (similar for State Recreational Boating Safety Program); 33 U.S.C. § 467j(a)(2)(A) (similar for National Dam Safety Program). Other FEMA programs operate differently—for instance, establishing a minimum amount of funds to which all States are entitled, while directing FEMA to establish an objective, risk-based allocation of the remaining funds, which are then made available to States annually. *See* 6 U.S.C. § 605(e)(1) (FEMA Administrator "shall ensure" that States receive minimum funding amounts under State Homeland Security Grant Program); *id.* § 608(a)(1) (enumerating factors that Administrator shall consider in allocating remaining funds). With respect to these programs, it is plain that the Department has no authority to impose unrelated substantive conditions on the receipt of funds. As the First Circuit explained in rejecting a similar attempt to conscript States and localities into federal immigration enforcement, "the statutory formula[s]" at issue in programs of this sort "simply do[] not allow [federal agencies] to impose by brute force conditions on [federal funds] to further [those agencies'] unrelated law enforcement priorities." *Providence*, 954 F.3d at 34–35. Indeed, the specificity of the statutory schemes at issue here "strongly implies that Congress did not intend to give [DHS] the power to advance its own

priorities by means of grant conditions." *Id.* at 35. DHS accordingly lacks authority to impose the Civil Immigration Conditions on these programs.

The same is true for the discretionary grants that FEMA and other sub-agencies administer. *Supra* p. 6. Although these agencies retain some discretion in disbursing funds, they must exercise that authority within the parameters set by Congress. "When Congress limits the purpose for which a grant can be made, it can be presumed that it intends that the dispersing agency make its allocations based on factors solely related to the goal of implementing the stated statutory purposes in a reasonable fashion, rather than taking irrelevant or impermissible factors into account." *Robbins v. Reagan*, 780 F.2d 37, 48 (D.C. Cir. 1985); *see also Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Hum. Servs.,* 946 F.3d 1100, 1113 (9th Cir. 2020) (holding that an agency's grant criterion was contrary to law because it deviated from the purposes of the authorizing statute). This principle flows from a broader rule of administrative law: Where Congress sets out specific grants of authority, the courts are "unwilling to construe the ambiguous provisions" as conferring authority for some other purpose. *Gonzales v. Oregon*, 546 U.S. 243, 258 (2006) (quoting *Fed. Mar. Comm'n v. Seatrain Lines, Inc.*, 411 U.S. 726, 744 (1973)); *Am. Petroleum Inst. v. U.S. Envtl. Prot. Agency*, 52 F.3d 1113, 1119 (D.C. Cir. 1995) (holding that a federal agency "cannot rely on its general authority to make rules . . . when a specific statutory directive defines the relevant functions of [the agency] in a particular area").

The discretionary grant programs to which FEMA and other DHS sub-agencies have added the Civil Immigration Conditions have nothing to do with federal civil immigration enforcement. Each of these statutes identifies the specific hazards or other threats that Congress intended FEMA to support—ranging from floods to earthquakes to port security—and directs the agency to provide funds for *that* purpose, and no other. The Port Security Grant Program, for instance, provides tens

of millions of dollars annually to States and their subdivisions to implement Area Maritime Transportation Security Plans at one of the port areas designated for special security measures by DHS, 46 U.S.C. §§ 70103(a)(2)(G)(i), 70107(a); the Flood Mitigation Assistance Program is designed to help States mitigate the damaging effects of floods and more broadly "improve the long-range land management and use of flood-prone areas," 42 U.S.C. § 4102(c)(4); *see id.* § 4104c(b); and the National Earthquake Hazards Reduction Program was enacted to support state plans to "develop effective measures for earthquake hazards reduction," *id.* § 7704(a)(2). None of these statutes have anything to do with civil immigration enforcement, and DHS's authority to allocate these funds consistent with *Congress's* purposes does not give DHS the power to use the money that Congress has provided the States for *DHS's* preferred purposes—especially when those purposes have nothing to do with port security, floods, earthquakes, and the like.

The same reasoning applies with even greater force to disaster- and emergency-relief funds. The Stafford Act specifies a procedure through which the President can declare a major disaster or emergency and authorize federal assistance, *see* 42 U.S.C. §§ 5170(a), 5191(a) (requiring that governor of affected State request presidential declaration based on specific factual findings), and includes a detailed list of permissible uses of federal funds—for example, distributing food and medicine, clearing debris, and performing search and rescue, *see, e.g.*, *id.* §§ 5170a, 5170b. The Act and related statutes also impose targeted restrictions on the availability of federal assistance. *See, e.g.*, *id.* § 5154a (prohibiting assistance for certain uninsured properties damaged by floods); *id.* § 5155 (barring provision of duplicative benefits for insured losses). Nothing in this intricate statutory scheme gives the agency authority to leverage relief funds to facilitate civil immigration enforcement. *See Providence*, 954 F.3d at 35 (a detailed scheme "strongly implies that Congress did not intend to give the [agency] the power to advance its own priorities by means of grant

28

conditions"). On the contrary, both the Act's statement of purpose and its operative provisions make clear Congress's purpose to "expedit[e] the rendering of aid, assistance, and emergency services, and the reconstruction and rehabilitation of devastated areas." 42 U.S.C. § 5121(a); *see, e.g., id.* § 5170a(6)(B) (allowing the President to forego certain procedural requirements where compliance would "delay or impede the rapid deployment, use, and distribution of critical resources to victims of a major disaster"). The Civil Immigration Conditions fit nowhere in the reticulated system Congress designed.

In the end, although each of the DHS-operated funding programs Congress created operates in its own way, the material point remains the same: Congress instructed DHS on how to provide money to the States for emergency preparedness and response, and it gave the agency no authority to ignore or thwart the purposes for which those funds were appropriated. DHS cannot now assert the power to withhold those funds until States comply with the administration's political priorities. To permit an administrative agency to claim that power would be at odds with the basic rule of administrative law: that an agency's "power to act and how [it is] to act" are both "authoritatively prescribed by Congress." *Arlington*, 569 U.S. at 297.

### B.    The Promulgation of the Civil Immigration Conditions Was Arbitrary and Capricious.

Defendants' adoption of the Civil Immigration Conditions was also arbitrary and capricious in violation of the APA. *See* 5 U.S.C. § 706(2)(A). An agency's action is arbitrary and capricious when it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency, or [that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). When changing positions, an

agency must also consider both the "alternatives that are within the ambit of the existing policy" and the "serious reliance interests" engendered by the status quo. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (brackets and internal quotation marks omitted).

DHS's promulgation of across-the-board Civil Immigration Conditions bears all those hallmarks of unreasoned decisionmaking. As a preliminary matter, the Court must consider the explanation (or lack thereof) that DHS gave in March and April 2025 when it promulgated the Conditions, not statements made in litigation. *Id.* at 20 ("It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'") (quoting *Michigan v. E.P.A.*, 576 U.S. 743, 758 (2015)). Measured by this standard, the Conditions are arbitrary and capricious in at least four independent respects: DHS (1) failed to consider whether any of the statutes authorizing its grant programs permits the imposition of the Conditions and instead considered factors that are irrelevant to the statutory schemes; (2) ignored the States' profound reliance interests on federal funding; (3) neglected the Conditions' impact on criminal law enforcement and public safety; and (4) overlooked obvious alternatives.

        **1.**      **The Department failed to consider whether grant-authorizing statutes permit it to impose the Conditions and instead considered a factor irrelevant to the statutory schemes.**

As a general matter, whether the agency "entirely failed to consider an important aspect of the problem" or "relied on factors which Congress has not intended it to consider," *State Farm*, 463 U.S. at 43, necessarily "turns on what the relevant substantive statute makes important," *Or. Nat. Res. Council v. Thomas*, 92 F.3d 792, 799 (9th Cir. 1996) (internal quotation marks omitted); *see Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 67 F.4th 1027, 1039 (9th Cir. 2023). Put differently, the universe of information an agency must (and must not) consider depends on "the scope of the duty imposed on the agency by Congress in the relevant substantive statute."

*Detroit Int'l Bridge Co. v. Gov't of Canada*, 192 F. Supp. 3d 54, 78 (D.D.C. 2016), *aff'd*, 883 F.3d 895 (D.C. Cir. 2018). It is thus arbitrary and capricious for the agency to neither "look to" nor "discuss" statutory "requirements," *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 682 (2020), or to "rel[y] on factors which Congress has not intended it to consider" in making its decision, *State Farm*, 463 U.S. at 43; *see Ctr. for Biological Diversity*, 67 F.4th at 1039.

These principles are even more pressing in the grant context. "*Congress* may fix the terms on which it shall disburse federal money to the States," meaning that any "federally imposed conditions" on States must square with the relevant "legislation enacted pursuant to the spending power." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (emphasis added). The statutory authorization for a grant program, by definition, sets forth the factors that Congress requires—and permits—an agency to consider in issuing funds. As the First Circuit has explained, the agency cannot "create qualification requirements unrelated to the [statutory] grant program simply to advance its own policy priorities." *Providence*, 954 F.3d at 39; *see also, e.g.*, *State Highway Comm'n of Mo. v. Volpe*, 479 F.2d 1099, 1114 (8th Cir. 1973) (agency cannot set spending requirements "remote and unrelated" to the underlying statute). So an agency cannot impose any grant conditions without first ensuring that the relevant statute supports them. *See New York v. Trump*, 769 F. Supp. 3d 119, 142 (D.R.I. Mar. 6, 2025) (agencies acted arbitrarily and capriciously by failing to consider whether action "fell within the bounds of their statutory authority"), *appeal docketed*, No. 25-1236 (1st Cir. Mar. 10, 2025).

But defendants made no effort to ascertain whether each of the many applicable funding statutes permits imposition of the Civil Immigration Conditions before promulgating them. Indeed, in promulgating the across-the-board Civil Immigration Conditions on March 27 and April 18,

DHS sidestepped the March 20 proposal by Cameron Hamilton to impose restrictions and conditions on open and future awards under twelve specific FEMA grant programs—programs, in his view, whose authorizing statutes would have permitted the imposition of immigration-related terms that would "vary based on the structure or authority of each respective program." Ex. 7 at 2.[3] That list expressly excluded "disaster grants, non-disaster mitigation grants, and grants to fire departments" and other similar organizations. *Id.* Seven days later, the Department imposed the Conditions on **all** DHS funds, including disaster funds. *See* Ex. 1. Elsewhere, the United States has correctly conceded that "the degree of agency discretion in implementing grant programs varies depending on the type of grant program and the terms of the authorizing legislation." Doc. 93 at 20, *City & Cnty. of San Francisco v. Trump*, No. 3:25-cv-1350 (N.D. Cal. Mar. 31, 2025). But that is exactly what DHS ignored here. Its decision to impose a one-size-fits-all funding condition without regard for the underlying authorizing statutes was "arbitrarily broad." *E.g.*, *Hikvision USA, Inc. v. FCC*, 97 F.4th 938, 949–50 (D.C. Cir. 2024); *see also BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 612 (5th Cir. 2021) (rejecting agency's "one-size-fits-all sledgehammer").

The agency's failure to examine its own statutory authority was compounded by its reliance on a factor that "Congress ha[d] not intended it to consider," *State Farm*, 463 U.S. at 43—namely, whether state and local grant recipients assist the federal government in enforcing immigration law or instead choose to exercise control over the use of their law-enforcement resources. As discussed, *supra* pp. 23–29, the relevant statutes do not permit DHS to condition funding on States' willingness to assist in immigration enforcement; indeed, they do not even contemplate that factor

---

[3] The memorandum did not explain or support this recommendation, and Plaintiff States do not agree that the statutes authorizing even these twelve programs would permit the kind of limitations that the memorandum appears to propose. *See supra* pp. 25–29. And these statutes plainly do not permit the kind of *across-the-board* condition that DHS ultimately imposed.

as one the agency is permitted to consider. Many of the funding programs administered by FEMA and other DHS sub-agencies are formula programs, meaning that funds must be disbursed according to a "structured, precise calculation." *City of Chicago v. Barr*, 961 F.3d 882, 921 (7th Cir. 2020); *see supra* pp. 5, 25–27; 6 U.S.C. § 762(b), (d) (Emergency Management Performance Grant Program); *id.* § 665g(*l*) (State and Local Cybersecurity Grant Program). Even those that afford some discretion to the agency have nothing to do with immigration but instead are designed to support state efforts to prepare for and mitigate the effects of wildfires, floods, and other disasters. *See supra* pp. 6, 27–28. By engaging in no effort to consider its statutory authority and instead basing its *entire* funding decision on States' willingness to cooperate with immigration-enforcement efforts, DHS transparently "relied on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43; *see Ctr. for Biological Diversity*, 67 F.4th at 1039 (explaining that, where a detailed statutory scheme required an agency to examine certain factors, agency could not base its decision on other considerations). DHS thus acted arbitrarily and capriciously both by "failing to consider an important aspect of the problem," *Little Sisters*, 591 U.S. at 682—namely, whether it actually had authority to impose the Conditions in the first place— and by considering States' willingness to cooperate in immigration-enforcement efforts even when the statutory schemes made that factor irrelevant, *see State Farm*, 463 U.S. at 43.

To be sure, defendants have now taken the position that DHS adopted Hamilton's proposal and concluded that some programs should be "*exempt* from immigration enforcement conditions." Richardson Decl. ¶ 6. As discussed, however, *supra* pp. 19–23, that litigation position should not shape the Court's assessment of the dispute. Defendants promulgated the Civil Immigration Conditions and provided that the conditions would apply to "all" grants—a statement that remains in the legal document itself, and that defendants have taken only halting and incomplete steps to

33

disavow. *See San Francisco*, 2025 WL 1738675, at *2 ("the clear and specific language of the DHS Standard Terms communicates DHS's intent to apply those terms to all new federal awards"). Regardless, Plaintiff States challenged the Civil Immigration Conditions as originally promulgated—i.e., as conditions that applied across the board to all DHS grants—and defendants' litigation conduct does not moot that decision. The Court should thus decide whether defendants acted arbitrarily and capriciously by promulgating the Civil Immigration Conditions as across-the-board requirements for access to all DHS funds, including federal emergency and disaster funds, without considering their authority to do so. Plainly, they did.

### 2. The Department failed to consider the States' reliance interests in billions of dollars in federal funding.

The promulgation of the Civil Immigration Conditions was also arbitrary and capricious because DHS "failed to address whether there was legitimate reliance on" the existing funding landscape—which there was. *Regents*, 591 U.S. at 30 (internal quotation marks omitted). As the Supreme Court has explained, "[w]hen an agency changes course," it is "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* at 30, 33. To "ignore" the "serious reliance interests" that "longstanding policies may have engendered" is arbitrary and capricious. *Id.* at 30 (internal quotation marks omitted).

Again, that is exactly what DHS did here. The States rely heavily on the annual receipt of funds that the Civil Immigration Conditions now endanger. For one, Plaintiff States rely on billions of dollars in federal funding annually to support critical preparedness programs—programs that help prepare for the possibility of catastrophic events that range from floods to tornadoes to acts of extremist violence. As DHS itself has explained, the National Network of Fusion Centers— which FEMA supports through the Homeland Security Grant Program, Ex. 28 (Maulawin Decl.),

¶ 9; Ex. 41 (Bray Decl.), ¶ 30; Ex. 49 (Pappas Decl.), ¶ 25; Ex. 54 (Engle Decl.), ¶ 23—helps share threat-related information among different levels of government. U.S. Dep't of Homeland Sec., *Fusion Centers* (captured July 2, 2025) (Ex. 16). DHS admits "that no other federal or local organization can replicate" that "unique perspective on threats to" states and localities. *Id.* The States likewise rely on billions of dollars of federal support in the wake of catastrophic disasters under programs established pursuant to the Stafford Act. In the aftermath of a major disaster, States rely on the Public Assistance Program for "crucial immediate support," including both "extraordinary life-saving measures like search and rescue and distribution of food aid" and longer-term repair of physical infrastructure. Ex. 26 (Khayyat Decl.), ¶ 102; *accord* Ex. 21 (Haney Decl.), ¶ 79; Ex. 24 (Mark Decl.), ¶¶ 40, 51; Ex. 41 (Bray Decl.), ¶ 102. Also tied to presidential disaster declarations are Hazard Mitigation Grant Program funds, which aim to reduce loss of life and property in future disasters. *See* 42 U.S.C. § 5170c; Ex. 52 (Ezelle Decl.), ¶ 71. For instance, Washington and Oregon are using Hazard Mitigation funds to retrofit or replace water storage facilities in the Cascadia Subduction Zone to prevent catastrophic failures in the next significant earthquake. *Id.* ¶ 73(a); Ex. 45 (McMahon Decl.), ¶ 96.

The States have structured their budgets and operations based on the reasonable expectation of continued funding via annual preparedness grants, which they cannot make up from other sources. Ex. 23 (Higgins Decl.), ¶¶ 20, 30, 84, 88; Ex. 31 (Brantley Decl.), ¶ 78; Ex. 51 (Chapman-See Decl.), ¶ 9. Plaintiff States' "interest in planning future programs" is an "important" one, *Bowen v. Massachusetts*, 487 U.S. 879, 906–07 (1988), but DHS did not heed it. In imposing the Civil Immigration Conditions, DHS not only failed to "weigh" these longstanding reliance interests "against competing policy concerns"; it "ignore[d]" them altogether. *Regents*, 591 U.S. at 30, 33 (internal quotation marks omitted). Because the Conditions were adopted "with no regard

for the [States'] reliance interests," and DHS "did not acknowledge—much less justify—its adoption" of the new requirements, they must be vacated "for want of reasoned decision making." *Int'l Org. of Masters, Mates & Pilots v. NLRB*, 61 F.4th 169, 179–80 (D.C. Cir. 2023).

### 3. The Department failed to consider the Conditions' effects on public safety.

Another "important aspect of the problem" that DHS "entirely failed to consider" is the adverse impact adhering to the Civil Immigration Conditions would have on States' enforcement of criminal law and efforts to maintain public safety. *State Farm*, 463 U.S. at 43.

Under the Conditions, States "must agree that they will comply" with requirements "related to coordination and cooperation with [DHS] and immigration officials." Ex. 2 at 4. But many Plaintiff States limit their participation in federal civil immigration enforcement to preserve their resources for core public-safety missions and to "build trust between their law enforcement agencies and immigrant communities and ensure that noncitizens feel comfortable reporting crimes, cooperating with investigators, and serving as witnesses." *Providence*, 954 F.3d at 30; *see supra* pp. 9–11. Senior law-enforcement officials in Plaintiff States corroborate this view. *See* Ex. 20 (Rosen Decl.) (District Attorney of Santa Clara County, California); Ex. 37 (Gaimari Decl.) (Chief of Police of Bridgeton, New Jersey); Ex. 50 (Perez Decl.) (Chief of Police of Providence, Rhode Island). Congress recognized the legitimacy of this interest in creating the U-visa program for immigrant crime victims. *See* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, § 1513(a)(2), 114 Stat. 1464, 1533–34 (visa program for crime victims "will encourage law enforcement officials to better serve immigrant crime victims and to prosecute crimes committed against aliens" and "will facilitate the reporting of crimes to law enforcement"). Even in Plaintiff States without categorical policies, DHS's requirement that state agencies devote scarce resources to federal civil immigration enforcement prevents States from exercising

discretion on how best to allocate resources to protect the public. The Civil Immigration Conditions run up against the States' "strong sovereign interest in ensuring public safety and criminal justice." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 651 (2022).

To be sure, defendants have stated that they do not agree with Plaintiff States' judgments about how to promote public safety or respect Plaintiff States' sovereign autonomy in this area. *See* Exec. Order No. 14159, § 17, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025); Exec. Order No. 14218, § 2(a)(ii), 90 Fed. Reg. 10581, 10581 (Feb. 19, 2025); Exec. Order No. 14287, § 1, 90 Fed. Reg. 18761, 18761 (Apr. 28, 2025). The Court does not need to decide here who has the better of that dispute. But DHS was required to at least consider the States' interest in maintaining public safety and "weigh" that interest "against competing policy concerns." *Regents*, 591 U.S. at 33. Its failure to do so was arbitrary and capricious. *Id.*

### 4.    The Department failed to consider alternatives to its sweeping policy.

Finally, in promulgating the Civil Immigration Conditions and requiring States to certify compliance with them in order to receive *any* agency funding, DHS overlooked the "alternatives" that were "within the ambit of the existing" landscape. *Id.* at 30 (brackets omitted) (quoting *State Farm*, 463 U.S. at 51). As *Regents* explained, it is arbitrary and capricious for an agency to change a federal program wholesale without first assessing whether it should instead alter specific aspects of the program. *See id.* at 26–30. DHS did not consider less drastic alternatives to its sweeping Civil Immigration Conditions before promulgating them. Once again, "[i]t is a bedrock principle of administrative law that a court reviewing agency action may consider only the agency's explanation given at the time the relevant decision was made, as opposed to its post hoc rationale." *Melone v. Coit*, 100 F.4th 21, 31 (1st Cir. 2024).

Namely, if the agency had statutory and constitutional authority to do so, it could have limited the condition to certain grants—as then-Senior Official Performing the Duties of the FEMA

Administrator Hamilton proposed—rather than announcing a sweeping policy spanning multiple grant programs and billions in annual funds to the States. *Cf., e.g.*, *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-cv-239, _ F. Supp. 3d _, 2025 WL 597959, at *14 & n.10 (D.D.C. Feb. 25, 2025) (distinguishing "targeted pauses of funding for specific projects" from a "nationwide suspension of *all* federal financial assistance"), *appeal docketed*, No. 25-5148 (D.C. Cir. Apr. 25, 2025). (Again, although defendants now state that they have tailored the Conditions to some extent, *see* Richardson Decl. ¶¶ 6–15, that argument should be disregarded, given the tentative and incomplete nature of their efforts to disavow the conditions and that those efforts do not moot Plaintiff States' challenge to the conditions as originally promulgated. *Supra* pp. 19–23.) Alternatively, the agency could have sought permission from Congress to establish a new grant program that *was* meant for the purpose of enforcing immigration law, rather than repurposing programs Congress established for different purposes. Instead, DHS sought to "cut the fuel supply . . . without any consideration for the consequences of that decision," an approach that is "not— and could never be—rational." *Nat'l Council of Nonprofits*, 2025 WL 597959, at *14.

### C.    The Promulgation of the Civil Immigration Conditions Was Unconstitutional.

Finally, the Civil Immigration Conditions also violate the Constitution's Spending Clause in several respects. The Conditions impose requirements that are not reasonably related to the purposes of the grants themselves, are unconstitutionally coercive, and are unlawfully ambiguous. Each of these defects is independently fatal.

#### 1.    The Conditions are not reasonably related to the funding programs to which they apply.

First, the Civil Immigration Conditions are unconstitutional because they are too unrelated to the purposes of DHS's grants. The Spending Clause requires any conditions imposed on federal grants to be "reasonably related to the federal interest in particular national projects or programs."

*Massachusetts v. United States*, 435 U.S. 444, 461 (1978); *accord South Dakota v. Dole*, 483 U.S. 203, 207 (1987). But the Civil Immigration Conditions bear no relationship to the grants Congress has tasked FEMA and other DHS sub-agencies with administering. Take the State Recreational Boating Safety Program, which Congress created to "encourage greater State participation and uniformity in boating safety efforts" and enable "States to assume the greater share of boating safety education, assistance, and enforcement activities." 46 U.S.C. § 13102(a). There is no rational connection between promoting boating safety and co-opting local law enforcement for immigration-enforcement purposes. The same is true of countless other DHS grant programs. For example, Congress created an elaborate statutory scheme to "expedit[e] the rendering of aid, assistance, and emergency services, and the reconstruction and rehabilitation of devastated areas," 42 U.S.C. § 5121(a), and it has appropriated billions in funding to support that goal. Pressing States into service in federal civil immigration enforcement does nothing to advance that purpose, and defendants have never argued that it does. Instead, the Civil Immigration Conditions impermissibly "seek to leverage funding to regulate [States' activities] outside the contours of the [grant] program[s]," *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013) (applying similar principle in First Amendment context), contrary to hornbook federalism principles.

Indeed, defendants' have admitted publicly that they view the Civil Immigration Conditions not as a lawful exercise of authority granted them by Congress but as a way of coercing the States into exercising their police power "outside the contours of the [grant] program[s]" at issue. *Id.* at 215. The President, for instance, issued an executive order directing the Attorney General and the DHS Secretary to "ensure that so-called 'sanctuary' jurisdictions . . . do not receive

access to Federal funds." Exec. Order No. 14159, § 17, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025).[4]

Secretary Noem, in turn, issued a memorandum directing that "[s]tate and local governments that refuse to cooperate with, refuse to share information with, or even actively obstruct federal immigration enforcement" not receive "a single dollar of the Department's money unless Congress has specifically required it." Ex. 6 at 1. And, on June 1, she publicly reiterated DHS's intent to continue to use a list of "sanctuary" jurisdictions targeted for punishment. *See* Ex. 15. Defendants' public statements, in other words, reflect not an exercise of any statutory discretion to impose reasonable conditions on the use of public funds; they reflect an attempt to impermissibly leverage preexisting funds to obtain outcomes not contemplated by Congress and that the executive branch could not otherwise achieve.

### 2.    The Conditions are coercive because they leave the States with "no real option" but to comply.

Second, and independently, the Civil Immigration Conditions attempt to coerce the States by withholding a staggering sum of money—billions of dollars in federal emergency funding that the States cannot realistically turn down. The Spending Clause affords Congress some power to "cajole the states to enact policies indirectly (through a spending inducement) that it could never directly order them to perform with its other enumerated powers." *Yellen*, 54 F.4th at 347 (emphasis omitted). But that comes with a unique danger—"allow[ing] Congress to exceed its otherwise limited and enumerated powers by regulating in areas that the vertical structural protections of the Constitution would not otherwise permit." *Haight v. Thompson*, 763 F.3d 554,

---

[4] The President later issued another executive order directed to all executive agencies, not just the Attorney General and DHS, directing them to "identify appropriate Federal funds to sanctuary jurisdictions, including grants and contracts, for suspension or termination." Exec. Order No. 14287, § 3(a), 90 Fed. Reg. 18761, 18762 (Apr. 28, 2025). This order also directed DHS to "publish a list of" so-called "sanctuary jurisdictions" by May 28, 2025. *Id.* § 2(a).

568 (6th Cir. 2014). In particular, the Supreme Court has cautioned against enabling the federal government to impose conditions that place so much "pressure" on the States that it "turns into compulsion," allowing Congress to effectively command a nationwide policy via funding measures alone. *Steward Mach. Co v. Davis*, 301 U.S. 548, 590 (1937). The Court has explained that, for a spending condition to remain permissible, a State must remain free from "coercion" and must be able to reject the condition and decline the funds "not merely in theory but in fact." *Dole*, 483 U.S. at 211–12.

To determine "where persuasion gives way to coercion," courts must examine all relevant facts and circumstances, including both "the programs at issue" and "the nature of the threat" posed by the condition. *Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 580, 585 (2012) (opinion of Roberts, C.J.). A condition that merely provides "mild encouragement" is permissible—as in *Dole*, where the funding condition deprived the States of only "5% of the funds otherwise obtainable under specified highway grant programs" if they did not adopt a minimum drinking age of 21. 483 U.S. at 211. That condition left States free to reject the condition and to spend the remaining 95% of their federal highway funds to ensure that roads within their states were safe. *See id.* (observing that the "argument as to coercion is shown to be more rhetoric than fact"). The *NFIB* Court, by contrast, held that the federal government had crossed the line when it imposed as its condition for a State refusing to expand Medicaid the loss of not "merely 'a relatively small percentage' of its existing Medicaid funding, but *all* of it." 567 U.S. at 580 (opinion of Roberts, C.J.) (quoting *Dole*, 483 U.S. at 211); *accord id.* at 689 (opinion of Scalia, J.).

The Civil Immigration Conditions cross that line. DHS has candidly admitted that the Conditions are designed to ensure that so-called "sanctuary" States "not receive a single dollar of the Department's money." Ex. 6 at 1. The Conditions are thus undoubtedly intended "as a means

of pressuring the States to accept policy changes." *NFIB*, 567 U.S. at 580 (opinion of Roberts, C.J.). And the imposition of the Civil Immigration Conditions on literally every dollar of federal emergency and disaster funding is not merely "mild encouragement," but "a gun to the head." *Id.* at 581 (internal quotation marks omitted). Put simply, Plaintiff States lack "a realistic option," *id.* at 681 (opinion of Scalia, J.), to turn down access to the federal funding that Congress has provided for emergency preparedness and disaster relief. As the First Circuit has recognized, "few interests are more central to a state government than protecting the safety and well-being of its citizens." *Worman v. Healey*, 922 F.3d 26, 39 (1st Cir. 2019). And over the past five years, Plaintiff States have received billions of dollars in funding through the grant programs at issue—easily surpassing $3 billion annually, even excluding COVID-19 disaster funds, *supra* p. 7 (citing DHS data)— amounting to a substantial—and irreplaceable—part of their disaster and terrorism preparedness and response budgets. *See supra* pp. 7–9; Ex. 31 (Brantley Decl.), ¶ 73; Ex. 40 (Shabazz Decl.), ¶ 5; Ex. 42 (Clayton Decl.), ¶ 7; Ex. 55 (Thomas Decl.), ¶ 7. And, as in *NFIB*, but unlike in *Dole*, Plaintiff States stand to lose not just some portion of their DHS funding, "but *all* of it," *NFIB*, 567 U.S. at 581 (opinion of Roberts, C.J.). That is "economic dragooning" that, as in *NFIB*, "leaves the States with no real option" to turn down the funds. *Id.* at 582.[5]

And "the nature of the threat and the programs at issue," *NFIB*, 567 U.S. at 580 (opinion of Roberts, C.J.), makes the threat more coercive: Foregoing billions of dollars in DHS funding would force Plaintiff States to abruptly terminate ongoing public safety and disaster preparedness and response initiatives, putting them and millions of their residents at risk. *See* Ex. 26 (Khayyat

---

[5] Again, although defendants have now taken the position that the Civil Immigration Conditions do not apply to *all* DHS-operated grant programs, but only to *some* grant programs, that litigation position does not affect Plaintiff States' challenges to the conditions as originally promulgated— i.e., as across-the-board requirements for accessing all DHS funding. *Supra* pp. 19–23.

Decl.), ¶¶ 142–147; Ex. 33 (Sweeney Decl.), ¶ 8; Ex. 48 (Longolucco Decl.), ¶¶ 34–37; Ex. 52 (Ezelle Decl.), ¶ 96. Moreover, due to the preexisting commitment of state resources, Plaintiff States cannot simply pay for these programs and continue operating them in the absence of federal funds without cutting other important state programs. Ex. 26 (Khayyat Decl.), ¶ 139; Ex. 36 (Doran Decl.), ¶ 66; Ex. 51 (Chapman-See Decl.), ¶ 9. And DHS's decision to apply the Civil Immigration Conditions not only to preparedness funds, but also to *disaster* funds, means that Plaintiff States face the real risk of confronting the next natural disaster—whether a wildfire, a hurricane, or some other threat—without any federal support whatsoever, absent a promise to devote state and local law-enforcement resources to federal civil immigration enforcement. That result is untenable. The Spending Clause does not permit the executive branch to wield billions of dollars of federal emergency money as a cudgel to threaten the States in such a manner.

### 3.    The Conditions are unlawfully ambiguous.

Finally, the Civil Immigration Conditions violate the Spending Clause for the separate reason that they are hopelessly unclear and leave Plaintiff States and their agencies guessing at what is required to comply. The Spending Clause requires that, when the federal government imposes conditions on federal funds, those conditions must be unambiguous, such that States can "exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207; *see also NFIB*, 567 U.S. at 577 (opinion of Roberts, C.J.); *Pennhurst*, 451 U.S. at 17, 24–25. Here, the Civil Immigration Conditions fail to pass muster.

For instance, the Cooperation Condition (C.IX.1.c) requires grant recipients to "honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer." Ex. 2 at 4. But the condition offers no explanation of what "cooperation" might entail, what "joint operations" might be required, or what "information" grant recipients must share. Nor does it make clear whether

"requests for short term detention of an alien pursuant to a valid detainer" would require States to hold individuals beyond their scheduled release dates—potentially asking them to violate the Fourth Amendment or similar state constitutional guarantees. *See Morales v. Chadbourne*, 793 F.3d 208, 218 (1st Cir. 2015); *Miranda-Olivares v. Clackamas Cnty.*, No. 12-cv-2317, 2014 WL 1414305, at *11 (D. Or. Apr. 11, 2014). Similarly, the Access Condition (C.IX.1.d) does not offer any explanation of what "provid[ing] access to detainees" entails. For example, defendants do not explain whether the condition requires States to provide unlimited access to immigration officers, and whether State laws that allow immigration officers with access after informing detainees of their rights would violate the condition. *See, e.g.*, Cal. Gov. Code § 7283.1. Read literally, the Cooperation and Access Conditions would allow DHS to commandeer whatever state or local resources it desires, so long as it invokes enforcing federal immigration law when it does so.

The Information Sharing (C.IX.1.a) and Compliance (C.IX.1.b) Conditions are likewise ambiguous. Each condition asks grantees to certify compliance with various federal statutes, *see* Ex. 2 at 4, but the current administration has in other contexts taken extreme positions about the interpretation of these statutes, many of which have been rejected by courts. For instance, the current administration has taken the position that 8 U.S.C. § 1373 prohibits States from limiting state and local officials' authority to share not only "information regarding the *citizenship or immigration status*, lawful or unlawful, of any individual" with the federal government, but also officials' authority to share *any* information about noncitizens. *See, e.g.*, Doc. 50 at 35, *United States v. Illinois*, No. 1:25-cv-1285 (N.D. Ill. Apr. 1, 2025) (arguing that "'information regarding citizenship or immigration status' also covers aliens' contact information and release dates"). That interpretation has been rejected by federal courts, *see, e.g.*, *California*, 921 F.3d at 891–93, but Plaintiff States do not know whether defendants are asking them to certify compliance with that

understanding of this provision or not, *see, e.g., City & Cnty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 958 (N.D. Cal. 2018) (finding § 1373 compliance condition violated the Spending Clause where "DOJ's evolving interpretations of the [§ 1373] certification condition further demonstrate ambiguities that prevent applicants from deciding whether to accept the funds 'cognizant of the consequences of their participation'" (quoting *Dole*, 483 U.S. at 207)), *aff'd in part, vacated in part on other grounds sub nom. City & Cnty. of San Francisco v. Barr*, 965 F.3d 753 (9th Cir. 2020). Likewise, although the Compliance Condition asks States to certify that they do not violate 8 U.S.C. § 1324 and other unnamed "laws related to immigration," it neither identifies what laws Plaintiff States would be obligated to certify compliance with nor states whether DHS is requiring Plaintiff States to certify compliance with a faulty interpretation of § 1324 under which their laws somehow have the effect of violating that statute. *Cf.* U.S. Dep't of Just., *General Policy Regarding Charging, Plea Negotiations, and Sentencing* 2 (Feb. 5, 2025) (instructing Justice Department to investigate state actors for prosecution under § 1324 for "failing to comply with lawful immigration-related commands and requests") (Ex. 11).

The Benefits Condition (C.XVII.2.a.iii)—which requires States to certify that "[t]hey do not, and will not during the term of this award, operate any program that benefits illegal immigrants or incentivizes illegal immigration," Ex. 2 at 6—is likewise hopelessly ambiguous. Plaintiff States' agencies cannot possibly identify the many individuals (and their citizenship statuses) who might "benefit" from any of the many programs they administer, Ex. 17 (Buccieri-Harrington Decl.), ¶ 35; Ex. 27 (King Decl.), ¶ 70; Ex. 47 (Hoxsie Decl.), ¶ 20; Ex. 52 (Ezelle Decl.), ¶ 11; let alone understand what DHS believes might "incentivize[] illegal immigration." For instance, does putting out a wildfire that threatens the homes of both American citizens and undocumented noncitizens confer a disqualifying "benefit"? What about rebuilding a road after a hurricane?

45

Plaintiff States cannot accept such vague and unbounded conditions "knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207 (quoting *Pennhurst*, 451 U.S. at 17).

The Civil Immigration Conditions would subject the States' control over their own public safety operations to unbounded intrusions by the federal government. They thus run afoul of the constraints imposed by the Spending Clause and are unlawful on that basis as well.

## ARGUMENT AS TO REMEDY

Plaintiff States are entitled to declaratory relief, vacatur of the promulgation of the Civil Immigration Conditions, and a permanent injunction against any future implementation or enforcement of the Civil Immigration Conditions against Plaintiff States and their subdivisions and instrumentalities. The Court may decide appropriate relief based on undisputed facts without a separate hearing. *See S.E.C. v. Locke Cap. Mgmt., Inc.*, 794 F. Supp. 2d 355, 368–71 (D.R.I. 2011) (determining appropriate remedies based on undisputed facts at summary judgment); *see also Geertson Seed Farms v. Johanns*, 570 F.3d 1130, 1139 (9th Cir. 2009) (no evidentiary hearing on remedy required where "the facts are undisputed"); *United States v. Microsoft Corp.*, 253 F.3d 34, 101 (D.C. Cir. 2001) (same).

### A.    The Court Should Vacate the Promulgation of the Civil Immigration Conditions.

The APA directs that a "reviewing court shall . . . hold unlawful and set aside agency action" found to be unlawful. 5 U.S.C. § 706(2). "The Federal Government and the federal courts have long understood § 706(2) to authorize vacatur" of the challenged agency action. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring). "When a federal court sets aside an agency action, the federal court vacates that order—in much the same way that an appellate court vacates the judgment of a trial court." *Id.* at 830. "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the

rules are vacated—not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *see United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action."); *see also Trump v. CASA, Inc.*, No. 24A884, _ S. Ct. _, 2025 WL 1773631, at *8 n.10 (U.S. June 27, 2025) (acknowledging continuing vitality of this rule). Because the promulgation of the across-the-board Civil Immigration conditions was in excess of statutory authority, arbitrary and capricious, and contrary to constitutional right, that agency action should be vacated.

### B. The Court Should Permanently Enjoin Defendants Against Implementing or Enforcing the Civil Immigration Conditions Against Plaintiff States.

Plaintiff States are also entitled to a permanent injunction against future implementation or enforcement of the Civil Immigration Conditions. In general, courts issue permanent injunctive relief where "(1) plaintiffs prevail on the merits; (2) plaintiffs would suffer irreparable injury in the absence of injunctive relief; (3) the harm to plaintiffs would outweigh the harm the defendant would suffer from the imposition of an injunction; and (4) the public interest would not be adversely affected by an injunction." *Healey v. Spencer*, 765 F.3d 65, 74 (1st Cir. 2014) (quoting *Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007)); *see also eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). "District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *K–Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989).

As an initial matter, the APA expressly authorizes "actions for . . . prohibitory or mandatory injunction" in addition to vacatur. 5 U.S.C. § 703. "[C]ourts use this broad remedial power to issue permanent injunctive relief for APA violations." *Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 22 (D.D.C. 2021). The D.C. Circuit has held that, in the APA context, "once the

court reache[s] the conclusion that the rule was indeed illegal (i.e., not merely that the plaintiffs had a reasonable probability of success on the merits, as would be necessary for a preliminary injunction), there [is] no separate need to show irreparable injury, as that is merely one possible 'basis for showing the inadequacy of the legal remedy.'" *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting 11A Fed. Prac. & Proc. § 2944 (1995)). This principle alone suffices to support the issuance of permanent injunctive relief against future enforcement of the Civil Immigration Conditions against Plaintiff States.

Examining the equitable factors in greater detail leads to the same result. Plaintiff States face a choice between two stark alternatives: foregoing billions in federal funding to prepare for and respond to disasters or relinquishing their sovereign right to decide how to use their own law-enforcement officers and other public resources. This impossible choice inflicts irreparable harm. *See, e.g.*, *Colorado v. U.S. Dep't of Just.*, 455 F. Supp. 3d 1034, 1061 (D. Colo. 2020) (finding "irreparable harm" to support permanent injunction where "Colorado must either suffer constitutional injury or forgo Byrne JAG funds entirely"); *Chicago*, 321 F. Supp. 3d at 878 ("[T]he Hobson's choice that now confronts the City—whether to suffer this injury or else decline much-needed grant funds—is not a choice at all and is itself sufficient to establish irreparable harm.") (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992)); *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 657 (E.D. Pa. 2017) (a choice "between, on the one hand, complying with a law [one] credibly believes is unconstitutional, and on the other hand, foregoing funds [one] plans to use for life-saving projects" establishes irreparable harm).

So too would each option standing alone. Acceding to the Civil Immigration Conditions to preserve access to critical grant funds would intrude on Plaintiff States' sovereignty. The impact of an invasion of state sovereignty "cannot be economically quantified" and thus constitutes

irreparable harm. *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024) (alterations omitted) (quoting *Kentucky v. Biden*, 23 F.4th 585, 611 n.19 (6th Cir. 2022)). States suffer an "irreparable" injury when forced to abandon their "sovereign interests and public policies." *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001); *see also Ohio v. EPA*, 603 U.S. 279, 291 (2024) (impairment of States' "sovereign interests in regulating their own industries and citizens" is irreparable harm). Forcing Plaintiff States to abandon specific public policies governing their limited law-enforcement resources is exactly what the Civil Immigration Conditions require.

Courts uniformly viewed this same type of demand as a source of irreparable harm during the first Trump administration. When presented with similar immigration-related grant conditions from the Department of Justice, multiple courts held that States and localities would "suffer an affront to their sovereignty" if the United States were "permitted to direct their behavior in an unauthorized way." *City of Evanston v. Barr*, 412 F. Supp. 3d 873, 888 (N.D. Ill. 2019). These "Tenth Amendment violations constitute[d] irreparable harm." *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 340 (E.D. Pa. 2018), *aff'd in part, vacated in part on other grounds*, 916 F.3d 276; *see also San Francisco*, 349 F. Supp. 3d at 970; *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537–38 (N.D. Cal. 2017).

The other path left open by the Civil Immigration Conditions—foregoing billions in federal funds—also leads to irreparable harm. The scale of the potential funding loss to Plaintiff States— billions of dollars annually, *see supra* p. 7—makes the harm irreparable. Just as the risk of being "driven out of business" constitutes "irreparable harm" in the commercial context, a significant loss of funding for a government can also be catastrophic such that money damages are inadequate. *Commodity Futures Trading Comm'n v. Brit. Am. Commodity Options Corp.*, 434 U.S. 1316, 1320 (1977); *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018).

The functions for which Plaintiff States use these grant funds are, in many circumstances, matters of life and death. *See Philadelphia*, 280 F. Supp. 3d at 579 (likely "loss of human life" constitutes irreparable harm). Defendants' own words confirm as much: "For decades, FEMA has provided federal assistance to aid states in building and sustaining capabilities to measurably improve the nation's readiness in preventing, preparing for, protecting against, and responding to terrorist attacks and other hazards." 88 Fed. Reg. 62098, 62098–99 (2023). If deprived of funds under programs administered by DHS, Plaintiff States would have to scale back or shut down efforts meant to protect and preserve human life. For example, Congress established the terrorism-prevention assistance programs at issue in this suit through legislation passed in direct response to the horrific events of September 11, 2001. *See supra* pp. 3–4. Plaintiff States and their political subdivisions rely heavily on the anti-terrorism funding that DHS provides under that congressional mandate. In fiscal year 2024, to prevent and respond to terrorist attacks, DHS obligated over $26 million to Colorado, $115 million to Illinois, $60 million to New Jersey, $288 million to New York, and over $24 million to Wisconsin. Ex. 21 (Haney Decl.), ¶ 6; Ex. 26 (Khayyat Decl.), ¶ 13; Ex. 36 (Doran Decl.), ¶ 64; Ex. 41 (Bray Decl.), ¶ 17; Ex. 54 (Engle Decl.), ¶ 13.

For these same reasons, "the balance of equities tips in [Plaintiff States'] favor," and "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiff States "have an overarching public interest in retaining the resources already allotted to them" to provide "critical resources to provide immediate relief efforts" after a disaster. *Bredesen v. Rumsfeld*, No. 05-cv-0640, 2005 WL 2175175, at *11 (M.D. Tenn. Sept. 7, 2005). And "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).

On the other side of the ledger, defendants would suffer no harm by simply returning to the status quo, in which they allocate these congressionally mandated funds without the Civil Immigration Conditions attached. *See City of Chicago v. Sessions*, 888 F.3d 272, 291 (7th Cir. 2018) (no harm to the government where it can "distribute the funds without mandating the conditions—as has been done for over a decade"). "Continuation of [that] status quo will not work an irreparable harm" on defendants. *U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 481 U.S. 1301, 1303 (1987) (Rehnquist, C.J., in chambers). Defendants have the "awesome statutory responsibility to prepare the nation for, and respond to, all national incidents, including natural disasters and terrorist attacks." *News-Press v. U.S. Dep't of Homeland Sec.*, 489 F.3d 1173, 1178 (11th Cir. 2007). They cannot complain of an injunction that merely obliges them to perform that duty without attaching sweeping funding conditions never contemplated by Congress.

Defendants' late-breaking attempt to walk back their Civil Immigration Conditions, in contravention of the plain text of the standard terms document, does nothing to diminish the need for a permanent injunction. For all the reasons discussed above, this matter is not moot. *See supra* pp. 19–23. Because the case is not moot, injunctive relief remains warranted. *See Carson v. Makin*, 668 F. Supp. 3d 26, 39 (D. Me. 2023) (rejecting argument that irreparable harm for purposes of permanent injunction no longer existed after voluntary cessation of the challenged conduct). Indeed, during the previous Trump administration, the Department of Justice, though enjoined from applying immigration-cooperation conditions in fiscal year 2017, attempted to roll out new grant terms enacting the same policy in fiscal year 2018. *See Chicago*, 961 F.3d at 909–10 (summarizing this history). "Injunctive relief is forward-looking, and a plaintiff injured by an unconstitutional or unlawful action in one year does not need to suffer injuries repeatedly in each ensuing year—and separately sue after each injury—to obtain relief from the unlawful actions."

*Id.* at 910. "It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption." *United States v. Oregon State Med. Soc.*, 343 U.S. 326, 333 (1952). Here, an injunction against implementation or enforcement of the Civil Immigration Conditions as to Plaintiff States (including their subdivisions and instrumentalities) is necessary and proper to provide the States with "complete relief." *CASA*, 2025 WL 1773631, at *11. Defendants should be permanently enjoined from implementing or enforcing the Civil Immigration Conditions as to Plaintiff States in any form.

### C.    The Court Should Declare that the Promulgation of the Civil Immigration Conditions Was Unlawful.

In addition and in the alternative, the Court should declare that the promulgation of the Civil Immigration Conditions was without statutory authority, arbitrary and capricious, and in violation of the Constitution. "In a case of actual controversy within its jurisdiction . . . any court of the United States, . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "[T]he propriety of granting federal declaratory relief may properly be considered independently of a request for injunctive relief." *Steffel v. Thompson*, 415 U.S. 452, 462 (1974); *see also Ulstein Mar., Ltd. v. United States*, 833 F.2d 1052, 1055 (1st Cir. 1987).

### CONCLUSION

The Court should enter judgment in Plaintiff States' favor, declare that the defendants' promulgation of the Civil Immigration Conditions was contrary to the Constitution and laws of the United States, vacate the promulgation of the Civil Immigration Conditions, and permanently enjoin defendants from implementing or enforcing the Civil Immigration Conditions against Plaintiff States, including their subdivisions and instrumentalities.

July 2, 2025

**ROB BONTA**
  ATTORNEY GENERAL OF CALIFORNIA

Michael L. Newman
  *Senior Assistant Attorney General*
Joel Marrero
James E. Stanley
  *Supervising Deputy Attorneys General*
Luke Freedman
Newton Knowles
Christopher Medeiros
Alexis Piazza
Deylin Thrift-Viveros
Delbert Tran
  *Deputy Attorneys General*

/s/ Lee I. Sherman
Lee I. Sherman
  *Deputy Attorney General*
California Department of Justice
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6000
lee.sherman@doj.ca.gov

*Attorneys for the State of California*

Respectfully submitted,

**KWAME RAOUL**
  ATTORNEY GENERAL OF ILLINOIS

/s/ Alex Hemmer
Alex Hemmer
  *Deputy Solicitor General*
Christopher G. Wells
  *Chief of the Public Interest Division*
Darren Kinkead
  *Public Interest Counsel*
R. Sam Horan
Michael M. Tresnowski
R. Henry Weaver
  *Assistant Attorneys General*
Office of the Illinois Attorney General
115 LaSalle Street
Chicago, IL 60603
(773) 590-7932
alex.hemmer@ilag.gov

*Attorneys for the State of Illinois*

**MATTHEW J. PLATKIN**
  ATTORNEY GENERAL OF NEW JERSEY

/s/ Shankar Duraiswamy
Shankar Duraiswamy
  *Deputy Solicitor General*
Mayur P. Saxena
  *Assistant Attorney General*
Surinder K. Aggarwal
Anaiis Gonzalez
Christopher J. Ioannou
Olivia C. Mendes
Phoenix N. Meyers
Sarah Nealon
Daniel Resler
  *Deputy Attorneys General*
New Jersey Office of Attorney General
25 Market Street, PO Box 093
Trenton, NJ 08625-0093
(609) 376-2745
shankar.duraiswamy@law.njoag.gov

*Attorneys for the State of New Jersey*


**PHILIP J. WEISER**
  ATTORNEY GENERAL OF COLORADO

/s/ David Moskowitz
David Moskowitz
  *Deputy Solicitor General*
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov

*Attorneys for the State of Colorado*


**PETER F. NERONHA**
  ATTORNEY GENERAL OF RHODE ISLAND

/s/ Keith D. Hoffmann
Keith D. Hoffmann (RI Bar No. 9874)
  *Chief of Policy*
  *Assistant Attorney General*
Kathryn M. Sabatini (R.I. Bar No. 8486)
  *Chief, Civil Division*
  *Special Assistant Attorney General*
Paul Meosky (RI Bar No. 10742)
  *Special Assistant Attorney General*
Rhode Island Attorney General's Office
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 1882
khoffmann@riag.ri.gov

*Attorneys for the State of Rhode Island*


**WILLIAM TONG**
  ATTORNEY GENERAL OF CONNECTICUT

/s/ Ashley Meskill
Ashley Meskill
  *Assistant Attorney General*
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5270
ashley.meskill@ct.gov

*Attorneys for the State of Connecticut*

**KATHLEEN JENNINGS**
  ATTORNEY GENERAL OF DELAWARE

/s/ Ian R. Liston
Ian R. Liston
  *Director of Impact Litigation*
Vanessa L. Kassab
  *Deputy Attorney General*
Delaware Department of Justice
820 North French Street
Wilmington, DE 19801
(302) 683-8899
ian.liston@delaware.gov

*Attorneys for the State of Delaware*


**ANNE E. LOPEZ**
  ATTORNEY GENERAL OF HAWAIʻI

/s/ Kalikoʻonālani D. Fernandes
David D. Day
  *Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes
  *Solicitor General*
Department of the Hawaiʻi Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Attorneys for the State of Hawaiʻi*


**BRIAN L. SCHWALB**
  ATTORNEY GENERAL FOR THE DISTRICT OF COLUMBIA

/s/ Mitchell P. Reich
Mitchell P. Reich
  *Senior Counsel to the Attorney General*
Office of the Attorney General for the District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 279-1261
mitchell.reich@dc.gov

*Attorneys for the District of Columbia*


**AARON M. FREY**
  ATTORNEY GENERAL OF MAINE

/s/ Vivian A. Mikhail
Vivian A. Mikhail
  *Deputy Attorney General*
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800
vivian.mikhail@maine.gov

*Attorneys for the State of Maine*

**ANTHONY G. BROWN**
  ATTORNEY GENERAL OF MARYLAND

/s/ James C. Luh
James C. Luh
  *Senior Assistant Attorney General*
Office of the Maryland Attorney General
200 Saint Paul Place
20th Floor
Baltimore, MD 21202
(410) 576-6411
jluh@oag.state.md.us

*Attorneys for the State of Maryland*

**ANDREA JOY CAMPBELL**
  ATTORNEY GENERAL OF MASSACHUSETTS

/s/ Hannah C. Vail
Katherine Dirks
  *Chief State Trial Counsel*
Hannah C. Vail
  *Assistant Attorney General*
Office of the Massachusetts Attorney General
1 Ashburton Place
Boston, MA 02108
(617) 963-2512
hannah.vail@mass.gov

*Attorneys for the Commonwealth of
  Massachusetts*

**DANA NESSEL**
  ATTORNEY GENERAL OF MICHIGAN

/s/ Neil Giovanatti
Neil Giovanatti
Adam de Bear
  *Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa Street
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov

*Attorneys for the People of the State of
  Michigan*

**KEITH ELLISON**
  ATTORNEY GENERAL OF MINNESOTA

/s/ Brian S. Carter
Brian S. Carter
  *Special Counsel*
Minnesota Attorney General's Office
445 Minnesota Street
Suite 1400
St. Paul, MN 55101
(651) 757-1010
brian.carter@ag.state.mn.us

*Attorneys for the State of Minnesota*

**AARON D. FORD**
  ATTORNEY GENERAL OF NEVADA

/s/ Heidi Parry Stern
Heidi Parry Stern
  *Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
hstern@ag.nv.gov

*Attorneys for the State of Nevada*


**LETITIA JAMES**
  ATTORNEY GENERAL OF NEW YORK

/s/ Julie Dona
Julie Dona
  *Special Counsel*
Zoe Levine
  *Special Counsel for Immigrant Justice*
Rabia Muqaddam
  *Special Counsel for Federal Initiatives*
28 Liberty Street
New York, NY 10005
(212) 416-8494
julie.dona@ag.ny.gov

*Attorneys for the State of New York*


**RAÚL TORREZ**
  ATTORNEY GENERAL OF NEW MEXICO

/s/ Steven Perfrement
Steven Perfrement
  *Senior Litigation Counsel*
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
sperfrement@nmdoj.gov

*Attorneys for the State of New Mexico*


**DAN RAYFIELD**
  ATTORNEY GENERAL OF OREGON

/s/ Thomas H. Castelli
Thomas H. Castelli
  *Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
thomas.castelli@doj.oregon.gov

*Attorneys for the State of Oregon*

**CHARITY R. CLARK**
  ATTORNEY GENERAL OF VERMONT

/s/ Julio A. Thompson
Jonathan T. Rose
  *Solicitor General*
Julio A. Thompson
  *Co-Director, Civil Rights Unit*
Officer of the Vermont Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-5519
julio.thompson@vermont.gov

*Attorneys for the State of Vermont*

**NICHOLAS W. BROWN**
  ATTORNEY GENERAL OF WASHINGTON

/s/ Tyler Roberts
Tyler Roberts
Benjamin Seel
Cristina Sepe
Marsha Chien
  *Assistant Attorneys General*
Washington State Office of the Attorney
  General
800 Fifth Avenue
Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Tyler.Roberts@atg.wa.gov

*Attorneys for the State of Washington*

**JOSHUA L. KAUL**
  ATTORNEY GENERAL OF WISCONSIN

/s/ Frances Reynolds Colbert
Frances Reynolds Colbert
  *Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-9226
frances.colbert@wisdoj.gov

*Attorneys for the State of Wisconsin*