STATE OF ILLINOIS, et al.,

                *Plaintiffs*,

   v.

FEDERAL EMERGENCY
MANAGEMENT AGENCY, et al.,

                *Defendants.*

No. 1:25-cv-206-WES-PAS

# EXHIBIT 26

## Declaration of Adnan G. Khayyat

# DECLARATION OF ADNAN G. KHAYYAT

I, Adnan G. Khayyat, pursuant to 28 U.S.C. § 1746, hereby declare:

1.     I am over the age of eighteen and understand the obligations of an oath.

2.     I am currently the Chief Nuclear Officer of the Illinois Emergency Management Agency and Office of Homeland Security ("IEMA-OHS"). From April 1 to May 14, 2025, I served as Interim Director, and before that time I was the Acting Chief of Staff of IEMA-OHS. In total, I have served in senior leadership positions with IEMA-OHS for over 13 years. I make this declaration based on personal knowledge and on my review of information and records gathered by IEMA-OHS staff.

3.     IEMA-OHS is an Illinois executive-branch state agency. IEMA-OHS coordinates the State's disaster mitigation, preparedness, response, and recovery programs. As the primary grantee of the Federal Emergency Management Agency ("FEMA") in Illinois, IEMA-OHS administers a wide range of federal programs meant to assist states and localities in preventing and responding to catastrophic events like terrorist attacks and natural disasters.

4.     FEMA administers many grant programs where States are the primary grant recipients. IEMA-OHS administers FEMA's annually funded preparedness grants (discussed in Section I of this Declaration), additional annual prevention grants (discussed in Section II), and post-disaster assistance grants tied to presidentially declared major disasters (discussed in Section III).

5.     As to all programs, under the structure of FEMA grant programs, IEMA-OHS does not disburse payments to vendors and sub-grantees until FEMA has processed and remitted the reimbursement request submitted by IEMA-OHS. When FEMA reimbursements do not process, IEMA-OHS cannot in turn provide any funds to sub-grantees.

6.     In total, accounting for all program funds, IEMA-OHS has relied on the following amounts of DHS funding in recent state fiscal years:

    a.     State Fiscal Year ("SFY") 2021: $789,819,642.55;

    b.     SFY 2022: $634,473,207.35;

    c.     SFY 2023: $316,222,768.38; and

    d.     SFY 2024: $853,427,127.63.

7.      If these funds were withheld, Illinois efforts to build local and state resiliency would be severely impeded, and IEMA-OHS would have to significantly curtail mission-critical capabilities that protect Illinois residents from terrorist attacks and other disasters, as discussed in more detail below.

**I.     <u>Preparedness Grants</u>**

8.     FEMA categorizes as "preparedness grants" the grant programs discussed in Section I of this Declaration, all of which are administered by IEMA-OHS in Illinois.

9.     FEMA typically releases notices of funding opportunities for preparedness grants around April or May of the federal fiscal year for the grant in question. Once FEMA provides notice of a notice of funding opportunity, IEMA-OHS can apply for an award by submitting a timely application.

10.     IEMA-OHS then typically receives an award within four months of its application, so that IEMA-OHS can begin drawing funds on the award by the end of the calendar year.

11.     The term of FEMA preparedness awards is generally three years, meaning that the award remains open for a three-year period for completing reimbursable activities. Any program activities supported by the awarded funds must be completed within the time the award remains open.

12. In FFY 2023, IEMA-OHS received at least $111,987,020.00 in preparedness grant funding from FEMA under the grant programs discussed in this Section.

13. In FFY 2024, IEMA-OHS received at least $115,399,908.00 in preparedness grant funding from FEMA under the grant programs discussed in this Section.

*Homeland Security Grant Program – State Homeland Security Program*

14. I am familiar with the Homeland Security Grant Program, and in particular its sub-component the State Homeland Security Grant Program ("SHSP"). The SHSP provides federal funding to States to build, sustain, and deliver the capabilities necessary to prevent, prepare for, protect against, and respond to acts of terrorism.

15. SHSP funding is administered in Illinois by IEMA-OHS.

16. Because SHSP grants are formula grants and not competitive grants, each State is entitled to a specific allocation whenever a notice of funding opportunity is posted.

17. In addition to using SHSP funds themselves, States may pass SHSP funds through to subgrantees for the same purposes. IEMA-OHS passes approximately 75% of SHSP funds on to county or local fire departments, law enforcement, and other first responders or emergency preparedness offices.

18. Illinois has applied for and received funds from the SHSP since its creation in the USA PATRIOT ACT in 2001.

19. IEMA-OHS has four open SHSP awards from FFYs 2021 to 2024:

   a. FFY 2021: Award of $14,427,260;

   b. FFY 2022: Award of $13,894,910;

   c. FFY 2023: Award of $13,894,910; and

   d. FFY 2024: Award of $12,505,419.

20. IEMA-OHS intends to apply again for SHSP funds in FFY 2025.

21.     Each year, the Department of Homeland Security ("DHS") and FEMA set funding priorities to which States must direct at least 30% of their SHSP funding. The FFY 2024 priority areas highlight key purposes of the SHSP program: enhancing cybersecurity, enhancing the protection of soft targets and crowded places, enhancing information and intelligence sharing, combating domestic violent extremism, enhancing community preparedness and resilience, and enhancing election security.

22.     SHSP funds support IEMA-OHS staff salaries focused on terrorism and targeted violence prevention. Statewide efforts include the Illinois School and Campus Safety Program, which provides preparedness trainings in Illinois schools to raise awareness about how to prevent and respond to emergencies and disasters.

23.     SHSP funds provide the near-exclusive source of money for the "mutual aid" networks of police departments, fire departments, emergency services, and public works departments across the country. In Illinois, these organizations are, respectively, the Illinois Law Enforcement Alarm System, the Mutual Aid Box Alarm System, the Illinois Emergency Management Mutual Aid System, and the Illinois Public Works Mutual Aid Network. In a major emergency, these networks mobilize first responders from outside the immediate jurisdiction where the disaster took place. Without them, local first responder capabilities would quickly be overwhelmed.

24.     SHGP funds components of the Illinois State Police devoted to preventing and responding to terrorist attacks and other extreme criminal acts. First, the Statewide Terrorism and Intelligence Center (STIC) improves information sharing with and between public safety officials, especially as to national trends and critical incidents where local officials have no other immediate source of information. STIC analysts perform a thorough search of all available databases and

resources, thus reducing the need for local officials to make numerous contacts with various organizations. Second, the Special Operations Command includes the State Police's Special Weapons and Tactics ("SWAT") team, which is funded with SHSP dollars.

25.     Both state and local bomb squads, including the State Police's Statewide Weapons of Mass Destruction Team, are funded using SHSP dollars.

*Homeland Security Grant Program – Urban Area Security Initiative*

26.     I am familiar with the Homeland Security Grant Program, and in particular its sub-component the Urban Area Security Initiative ("UASI"). UASI serves many of the same overall purposes as the SHSP, but it focuses its resources on high-threat, high-density urban areas. FEMA determines the eligible urban areas through an analysis of relative risk of terrorism faced by the 100 most populous metropolitan statistical areas in the United States.

27.     UASI funding is administered in Illinois by IEMA-OHS.

28.     Because UASI grants are formula grants and not competitive grants, eligible States are entitled to a specific allocation whenever a notice of funding opportunity is posted, tied to the FEMA-designated eligible urban area or areas in that State.

29.     Illinois has one eligible high-threat, high-density urban area, the Chicago metropolitan statistical area. IEMA-OHS passes approximately 90% of UASI funds on to fire departments, law enforcement, other first responders, and emergency preparedness offices in the greater Chicago area.

30.     Illinois has applied for and received funds from UASI since it was created by appropriations statute in 2003.

31.     IEMA-OHS has four open UASI awards from FFYs 2021 to 2024:

     a.     FFY 2021: Award of $68,000,000;

     b.     FFY 2022: Award of $67,182,000;

c.      FFY 2023: Award of $66,174,270; and

d.      FFY 2024: Award of $59,395,378.

32.     IEMA-OHS intends to apply again for UASI funds in FFY 2025.

33.     UASI provides funding for the same services discussed above with regard the SHSP, with a particular focus on sub-grantee agencies in the Chicago area. *See supra* ¶ 21. For instance, DHS and FEMA set the same funding priorities for FFY 2024 UASI funds as it set for FFY 2024 SHSP funds.

34.     UASI monies provide critical funding for Chicago Office of Emergency Management, the Chicago Crime Prevention and Intelligence Center, and the Cook County Department of Emergency Management and Regional Security.

35.     In addition, IEMA-OHS retains about 10% of UASI funds to provide similar support to the Chicago metropolitan statistical directly, including support targeted to areas not within the boundaries of Cook County. USAI funds provide critical support for salaries at the state level in addition to the local level.

*Emergency Management Performance Grant Program*

36.     I am familiar with the Emergency Management Performance Grant Program ("EMPG"). EMPG provides federal funding to States to assist state, local, tribal, and territorial emergency management agencies to implement FEMA's National Preparedness System, including by building continuity-of-government capabilities to ensure essential functions in a catastrophic disaster.

37.     EMPG funding is administered in Illinois by IEMA-OHS.

38.     Because EMPG grants are formula grants and not competitive grants, each State is entitled to a specific allocation whenever a notice of funding opportunity is posted.

39.     In addition to using EMPG funds themselves, States may pass EMPG funds through to subgrantees for the same purposes. IEMA-OHS passes approximately 40% of EMPG funds on to county or local fire departments, law enforcement, and other first responders or emergency preparedness offices.

40.     Illinois has applied for and received funds from EMPG since it was codified in the Post-Katrina Emergency Management Reform Act of 2006.

41.     IEMA-OHS has two open EMPG awards from FFYs 2023 and 2024:

a.      FFY 2023: Award of $10,618,545; and

b.      FFY 2024: Award of $9,504,284.

42.     IEMA-OHS intends to apply again for EMPG funds in FFY 2025.

43.     EMPG funding is the primary enabler to develop both state and local resilience programs for emergency management.

44.     EMPG dollars fund the salaries of IEMA-OHS Operations personnel. Operations personnel lead statewide coordination efforts in response to a disaster or mass casualty event. The EMPG program also funds IEMA-OHS communications, facilities, and vehicles for disaster response.

45.     The amounts passed through to localities under the EMPG program likewise fund the salaries of local emergency managers and local support staff across Illinois as well as software and communications to support local emergency response. Without these funds, local jurisdictions will not have sufficient funding support to build emergency management programs, operations plans, and exercise plans which contribute to resiliency and preparedness.

46.     EMPG monies fund the ongoing costs of the software program used at the State Emergency Operations Center, which is the physical location where a state emergency manager

would direct all strategic and operational activities in the event of a disaster or public health emergency.

*State and Local Cybersecurity Grant Program*

47.    I am familiar with the State and Local Cybersecurity Grant Program ("SLCGP"). SLCGP provides federal funding to States to manage and reduce systemic cyber risk.

48.    SLCGP funding is administered in Illinois by IEMA-OHS.

49.    Because SLCGP grants are formula grants and not competitive grants, each State is entitled to a specific allocation whenever a notice of funding opportunity is posted.

50.    In addition to using SLCGP funds themselves, States may pass SLCGP funds through to subgrantees for the same purposes. IEMA-OHS passes all of its SLCGP funds on to a sub-grantee, the Illinois Department of Information Technology, which in turn passes the funds entirely on to units of local government in Illinois.

51.    Illinois has applied for and received funds from SLCGP since it was created as part of the 2021 Infrastructure Investment and Jobs Act. At this time, IEMA-OHS has one open SLCGP award from FFY 2023 of $8,834,866.

52.    IEMA-OHS also applied for FFY 2024 SLCGP grant funding. In January 2025, IEMA-OHS received a communication from FEMA that the FFY 2024 application had been approved at a funding level of $6,833,696. On May 6, 2025, a FEMA official stated that there was final approval to move forward with the FFY 2024 SLCGP grant, meaning that IEMA-OHS will imminently receive an award document for ratification.

53.    IEMA-OHS intends to apply again for SLCGP funds in FFY 2025.

54.    SLCGP funds help local governments strengthen their cyber defenses, improve incident response capabilities, and protect critical infrastructure from evolving cyber threats. The

overall goal of the program is to enable state and local governments to take decisive steps to modernize their approach to cybersecurity.

55.     For example, SLCGP funds are meant to develop (1) endpoint detection and response capabilities and (2) ongoing penetration testing programs. Endpoint detection refers to software that can continuously monitor the activities on all physical devices connected to a network and detect threats as early as possible. Penetration testing refers to hiring cyber-security experts to attempt to break into a computer network to identify vulnerabilities before an attack happens. Many local governments currently lack these core capabilities essential to maintain cybersecurity in an increasingly dangerous environment.

*Nonprofit Security Grant Program*

56.     I am familiar with the Nonprofit Security Grant Program ("NSGP"). NSGP provides federal funding to States to help nonprofits in those States increase the physical security of their facilities at risk of a terrorist of other extremist attack.

57.     NSGP funding is administered in Illinois by IEMA-OHS.

58.     Because NSGP grants are formula grants and not competitive grants, each State is entitled to a specific allocation whenever a notice of funding opportunity is posted.

59.     States pass all NSGP funds through to the subgrantee nonprofits. Eligible subgrantees are generally organizations exempt from tax under section 501(c)(3) of the Internal Revenue Code, such as houses of worship, museums, educational facilities, senior centers, community centers, and day camps. These subgrantees apply to IEMA-OHS under the application criteria set by FEMA.

60.     Illinois has applied for and received funds from NSGP since its creation in the Homeland Security Act of 2002.

61.     IEMA-OHS has four open NSGP awards from FFYs 2021 to 2024:

a.  FFY 2021: Award of $8,636,669.00;

b.  FFY 2022: Award of $12,079,802.11;

c.  FFY 2023: Award of $11,401,933.00; and

d.  FFY 2024: Award of $24,740,040.00.

62.  IEMA-OHS intends to apply again for NSGP funds in FFY 2025.

63.  NSGP funds currently support about 400 nonprofit organization sites in Illinois, including religious institutions and private schools, at risk of being targeted by violent extremists.

64.  For instance, as part of the FFY 2023 grant, FEMA approved funds for distribution to 14 churches, 21 synagogues, 8 mosques, 20 religiously affiliated schools, and 16 other religiously affiliated institutions such as retirement communities and service organizations.

65.  Typical security measures that the NSGP makes possible for vulnerable nonprofits include public address systems to be used in an emergency, security systems, physical building improvements to mitigate damage from explosions and impacts, bulletproof glass, bollards and other physical barriers, and screening equipment for packages and people such as metal detectors. NSGP funds also pay for armed security personnel to protect both students and staff of eligible nonprofits.

66.  IEMA-OHS can also retain a limited portion of NSGP funds in order to administer the NSGP program.

*Emergency Operations Center Grant Program*

67.  I am familiar with Emergency Operations Center ("EOC") Grant Program. The EOC program provides federal funding to States to improve emergency management and preparedness capabilities by supporting flexible, sustainable, secure, strategically located, and fully interoperable EOCs. Local EOCs coordinate emergency response and recovery efforts during a disaster.

68.     EOC program funding is administered in Illinois by IEMA-OHS.

69.     Congress directly names the recipients and amounts of EOC program funding in annual appropriations laws. FEMA then lists specific EOC projects to be funded in an appendix to the annual notice of funding opportunity ("NOFO"). Thus, States are usually directed to pass EOC funds through to subgrantees to establish or upgrade their EOCs. In recent years, Congress has directed IEMA-OHS to pass all EOC funds on to local governments, state universities, and other sub-grantees.

70.     Illinois has applied for and received funds from EOC in every year that funds have been made available to Illinois-based entities.

71.     IEMA-OHS has three open EOC awards from FFYs 2022 to 2024:

   a.     FFY 2022: Award of $3,036,000;

   b.     FFY 2023: Award of $1,000,000; and

   c.     FFY 2024: Award of $2,358,595.

72.     Congress did not appropriate any EOC funding for FFY 2025.

## II.     Other Annual Grants

73.     IEMA-OHS also serves as the state recipient for two additional FEMA programs that, like the preparedness grants, operate on an annual funding model.

*National Earthquake Hazards Reduction Program – Individual State Earthquake Assistance*

74.     I am familiar with National Earthquake Hazards Reduction Program (NEHRP) Individual State Earthquake Assistance (ISEA). NEHRP-ISEA provides federal funding to States to reduce the risks of life and property from future earthquakes in the United States through the establishment and maintenance of an effective earthquake risk reduction program.

75.     NEHRP-ISEA funding is administered in Illinois by IEMA-OHS.

76.     Because NEHRP-ISEA grants are formula grants and not competitive grants, each State is entitled to a specific allocation whenever a notice of funding opportunity is posted.

77.     IEMA-OHS passes all its NEHRP-ISEA funds on to the Central United States Earthquake Consortium (CUSEC), which is a partnership among the eight States affected by earthquakes in the central United States, including in the vicinity of the New Madrid fault system.

78.     Illinois has applied for and received funds from NEHRP-ISEA since its establishment by the Earthquake Hazards Reduction Act of 1977.

79.     IEMA-OHS has two open NEHRP-ISEA awards from FFYs 2023 and 2024:

    a.      FFY 2023: Award of $62,496; and

    b.      FFY 2024: Award of $62,496.

80.     IEMA-OHS intends to apply again for NEHRP-ISEA funds in FFY 2025.

*Flood Mitigation Assistance*

81.     I am familiar with Flood Mitigation Assistance ("FMA"). FMA provides financial assistance in the form of grants for planning and carrying out activities designed to reduce the risk of flood damage to structures covered under contracts for flood insurance with the National Flood Insurance Program, with a focus on eliminating the risk of repetitive flood damage.

82.     FMA funding is administered in Illinois by IEMA-OHS.

83.     FMA grants are awarded on a competitive basis to specific sub-applicants, which are generally units of local government. Units of local government present flood mitigation plans to IEMA-OHS, which IEMA-OHS reviews and presents in one combined application to FEMA. FEMA then makes awards based on based on IEMA-OHS's ranking of the projects, project eligibility, and cost-effectiveness of the projects.

84.     Illinois has applied for and received FMA funds on many occasions since its creation in the National Flood Insurance Reform Act of 1994.

85. IEMA-OHS has three open FMA awards:

    a. FFY 2019: Award of $1,929,926.90;

    b. FFY 2021: Award of $2,158,695.00; and

    c. FFY 2022: Award of $373,210.50.

86. On April 18, 2025, IEMA-OHS submitted its application for FFY 2024 FMA funds.

87. IEMA-OHS intends to apply again for FMA funds in FFY 2025.

88. Investments in flood mitigation help to significantly minimize the risk of flooding and the severity of the impacts from flood events, which can reduce the need for state or federal disaster declarations and recovery costs.

89. FMA funds help units of local government to build planning and management capacity and to undertake both localized and individual flood mitigation projects. Localized projects include drainage pipes, pump stations, grading, and seawalls to reduce flood risk in a localized area. Individual flood mitigation operates at the property level, for instance by allowing local governments to acquire flood-prone properties so that the owners can relocate.

90. As an example, Machesney Park, Illinois, is using FMA funding to acquire and demolish 17 flood prone properties. These properties will be returned to open space to both improve resilience and relive the current owners from great financial strain. This project's total cost is $2,078,356 and has been made possible only through federal assistance.

### III. Post-Disaster Public Assistance Programs

91. A number of FEMA grant programs are tied not to an annual application process but rather to the presidential declaration of a major disaster under the Stafford Disaster Relief and Emergency Assistance Act. Typically, a State's governor sends a request for a disaster declaration to FEMA, and the President then either grants or denies the request. The President can also declare a major disaster without a governor's request.

92.     Seven major disasters declared by the President in Illinois have active or pending FEMA awards at this time, listed according to the major disaster declaration number ("DR"):

     a.    DR-4116: Severe storms, straight-line winds, and flooding that took place across northern and central Illinois between April 16, 2013 and May 5, 2013;

     b.    DR-4461: Severe storms and extended-duration flooding that took place in many western Illinois counties along the Mississippi and Illinois Rivers during the period February 24, 2019 to July 3, 2019;

     c.    DR-4489: The disaster declaration for the COVID-19 pandemic, which lasted for the period January 20, 2020 to May 11, 2023;

     d.    DR-4676: Severe storms and flooding that took place in St. Clair County during the period July 25, 2022 to July 28, 2022;

     e.    DR-4728: A derecho event causing severe storms and flooding that took place in many central Illinois counties during the period June 29, 2023 to July 2, 2023;

     f.    DR-4749: Severe storms and flooding that took place in Cook County during the period September 17, 2023 to September 18, 2023; and

     g.    DR-4819: Severe storms, tornadoes, straight-line winds, and flooding that took place in seven Illinois counties during the period July 13, 2024 to July 16, 2024.

93.     FEMA provides critical funding for Illinois communities to recover after a major disaster through a number of programs, including those discussed below. As shown by the above

list, many major disasters arise from storm activity that typically intensifies during the upcoming summer months.

94.     In total, as to the seven major disasters above, FEMA has obligated over $2.4 billion in federal funds to help Illinois communities recover from these devastating events.

*Public Assistance Program*

95.     I am familiar with the Public Assistance Program. After the President makes a major disaster declaration, Public Assistance provides federal funding to States and other eligible recipients to help communities pay for emergency work in the immediate aftermath of a disaster and also to complete more long-term recovery work.

96.     After a major disaster, IEMA-OHS, as the state recipient for Public Assistance funds, develops a list of impacts that the disaster has had on Illinois. FEMA and IEMA-OHS work to develop detailed damage descriptions, which ultimately become the basis on which FEMA determines the amount of funding that will be made available.

97.     FEMA awards funds based on the validated cost of the scope of work developed by IEMA-OHS and approved by FEMA. Typically, FEMA will then cover 75% of the eligible costs, with the state recipient responsible for the remaining 25%.

98.     In addition to using Public Assistance funds themselves, States may pass Public Assistance funds through to subgrantees as part of the approved scope of work.

99.     By following the above process, Illinois has obtained an allocation of Public Assistance funds each time the President has approved a major disaster declaration in Illinois.

100.    IEMA-OHS has four open Public Assistance awards:

    a.     DR-4116: Award of $32,677,038.53;

    b.     DR-4461: Award of $67,208,327.48;

    c.     DR-4489: Award of $2,370,646,115.87; and

      d.     DR-4728: Award of $22,847,706.96.

101.    IEMA-OHS intends to apply again for Public Assistance funds whenever there is an eligible major disaster affecting Illinois, which could happen at any time.

102.    Public Assistance funding provides crucial immediate support for Illinois communities after presidentially declared major disasters. The allowable emergency work immediately after a disaster includes extraordinary life-saving measures like search and rescue and distribution of food aid, as well as debris removal. In the longer term, Public Assistance funds "permanent work," which refers to efforts to repair eligible roads, bridges, water control facilities, buildings and equipment, utilities, ports, recreational areas, and other physical infrastructure.

103.    In Illinois, the Public Assistance Program has proven indispensable, helping communities save lives, recover faster, and rebuild stronger and more resilient systems in the face of devastation. From restoring electrical infrastructure damaged by powerful derechos to deploying medical surge staffing during a historic pandemic, the program ensures that vital public services can be quickly stabilized and rebuilt. Disaster relief and recovery would proceed more slowly without federal Public Assistance funding.

104.    Disaster DR-4728 was declared after the June 29, 2023, derecho that swept across Illinois causing significant damage to critical infrastructure, particularly to the City of Springfield's power transmission and distribution system. The storm damaged dozens of utility poles—ranging from 30-ft wood poles to 100-ft steel poles—and over 60 electrical transformers of varying capacities. Wind and rain also tore through vital sub-assemblies and nearly 3,500 linear feet of conductor wire, severely disrupting power services. The City of Springfield promptly undertook full restoration efforts. The total cost of this recovery effort amounted to $7,378,332.41. Through the Public Assistance Program, 75% of the eligible costs—totaling $5,533,749.31—was

federally funded, significantly aiding local recovery and reinforcing the resilience of Illinois' electrical infrastructure following this severe weather event.

105.    Under Disaster DR-4489, the State of Illinois undertook a massive expansion of inpatient capacity to provide critical care during the peak of the public health emergency, incurring a total eligible cost of $386,596,484.65. Managed by the Illinois Department of Healthcare and Family Services as a sub-grantee of IEMA-OHS, this project involved the deployment of over 178,000 hours of contracted medical and support staff to 171 healthcare facilities across the state from January 2021 to June 2022. Staffing included a wide range of medical professionals and support roles, forming strike teams to meet urgent regional needs. This project, fully funded at 100% federal share, highlights FEMA's role in supporting Illinois' pandemic surge staffing program through the Public Assistance Program.

106.    During the 2019 DR-4461 flooding, the Illinois Department of Natural Resources (IDNR) sustained significant impacts across its managed sites, leading to 119 documented damages with a total signed cost of $5,269,762.50. Through Public Assistance funds, IDNR as a sub-grantee of IEMA-OHS received a federal share of $3,991,228.97 to address these damages. This funding addressed issues ranging from emergency protective measures and debris removal to the repair of critical infrastructure like levees, roads, and utilities within state parks and natural areas affected by the severe flooding.

*Disaster Case Management*

107.    I am familiar with the Disaster Case Management (DCM) Program. DCM provides supplemental funding, in addition to the Public Assistance funding, for a State to assist disaster-impacted individuals and families through the recovery process.

108.    IEMA-OHS has three open DCM awards:

    a.    DR-4676: Award of $2,324,593;

      b.      DR-4728: Award of $19,000,924; and

      c.      DR-4749: Award of $5,234,865.

109.    IEMA-OHS is in the process of applying for an additional DCM award under disaster DR-4819, with a request for $12,667,702.24, which remains under FEMA review.

110.    The typical timeline for FEMA to review a DCM application and issue a decision is between 90 and 120 days.

111.    In addition to the present application, IEMA-OHS intends to apply again for DCM funds whenever there is an eligible major disaster affecting Illinois, which could happen at any time.

112.    Whereas Public Assistance funding focuses on immediate life-saving efforts and physical infrastructure recovery, the DCM program funds case managers who work directly with disaster survivors to develop and carry out the survivor's long-term recovery plan. DCM funding allows IEMA-OHS to hire case managers who give survivors a single point of contact to identify available resources based on their unmet needs caused by a disaster.

*Hazard Mitigation Grant Program*

113.    I am familiar with the Hazard Mitigation Grant Program (HMGP). After the President makes a major disaster declaration, HMGP provides federal funding to States to develop hazard mitigation plans and rebuild in a way that reduces future disaster losses in the communities affected by the declared disaster.

114.    HMGP funding is administered in Illinois by IEMA-OHS.

115.    Because HMGP grants are formula grants and not competitive grants, a State is entitled to a specific allocation determined by regulation following a major disaster declaration.

116.    In addition to using HMGP funds themselves, States may pass HMGP funds through to subgrantees for the same purposes. Local governments as well as eligible private,

nonprofit organizations apply to IEMA-OHS, which in turn sends applications on to FEMA for approval.

117.   IEMA-OHS has four open HMGP awards:

    a.   DR-4461: Award of $11,558,331.78;

    b.   DR-4489: Award of $64,354,320.00;

    c.   DR-4676: Award of $4,110,099.00; and

    d.   DR-4728: Award of $51,969,376.53.

118.   IEMA-OHS is in the process of applying for an additional HMGP award under disaster DR-4749, with a HMGP request of $9,503,931, which remains under FEMA review.

119.   FEMA's typical timeline to sign a grant agreement after all reviews is 120 to 180 days. A decision is expected in 2025.

120.   IEMA-OHS is in the process of applying for an additional HMGP award under disaster DR-4819, with a HMGP request of $20,583,599, which remains under FEMA review.

121.   The typical timeline to sign a grant agreement after all reviews is 120 to 180 days. A decision is expected in late 2025 or early 2026 for this grant.

122.   IEMA-OHS intends to apply again for HMGP funds whenever there is an eligible major disaster affecting Illinois, which could happen at any time.

123.   HMGP funds are invaluable to local mitigation preparedness and planning efforts. In St. Clair County, which has been hit with three presidentially declared major disasters in recent years, IEMA-OHS has multiple active grants to address the needs of the repetitively flooded areas by identifying needed projects that would mitigate the flooding going forward and help prevent the need for future public assistance funds.

124.     As another example funded by HMGP funds, the Addison Creek Reservoir and the Addison Creek Channel improvements are two connected flood control projects that will work together to significantly benefit communities in western Cook County along Addison Creek, including Bellwood, Northlake, Stone Park, Melrose Park, Westchester and Broadview. The 600-acre-foot Addison Creek Reservoir will hold 195 million gallons of storage capacity and connect with the Addison Creek Channel to project the communities from overbank flooding. This project's total cost is $60,967,301. IEMA-OHS estimates, however, that it will have $93,125,730 in benefits, paying for itself. This project is ongoing.

### IV.     Harms to Preparedness, Mitigation, and Recovery Efforts Caused by DHS's Funding Conditions

125.     On March 27, 2025, DHS posted a new version of its Standard Terms and Conditions applicable to new federal awards ratified in FFY 2025. Because FEMA is a component of DHS, these new Standard Terms would apply to any grant agreement executed under the programs described above.

126.     The 2025 Standard Terms and Conditions include a new Section IX titled "Communication and Cooperation with the Department of Homeland Security and Immigration Officials." The new Section IX seeks certain commitments not only from all "recipients" but also from "other recipients of funds under this award," which would include all the units of local government and nonprofit organizations who might be sub-grantees of IEMA-OHS.

127.     Among other things, the new Section IX purports to require grantees and sub-grantees to "honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer" and not to "leak or otherwise publicize the existence of an immigration enforcement operation."

128. On April 18, 2025, DHS posted another new version of its Standard Terms and Conditions applicable to new federal awards ratified in FFY 2025. The new terms preserved Section IX, as described above. They also added a clause in the "Anti-Discrimination" section requiring recipients to certify that "[t]hey do not, and will not during the term of this award, operate any program that benefits illegal immigrants or incentivizes illegal immigration."

129. I understand that IEMA-OHS is unable to comply with the federal government's new funding conditions. IEMA-OHS has no direct knowledge or control over its many sub-recipients and their actions or inactions that might be relevant to the Section IX terms. In order to comply, IEMA-OHS would be required to monitor compliance with DHS's new conditions as to all its many sub-grantees, which it cannot do.

130. IEMA-OHS further does not understand what DHS means to include within the broad phrase "any program that benefits illegal immigrants," which is not explained. IEMA-OHS cannot identify the innumerable individual people who might "benefit" from one of the programs IEMA-OHS administers, like security measures for nonprofits or flood mitigation efforts. Even if these individuals could somehow be identified before grant funds are obligated, which is impossible, IEMA-OHS further lacks any capacity to verify individuals' immigration status.

131. Even if IEMA-OHS attempted to monitor compliance with the new terms and conditions, it would need to expend considerable additional administrative resources to do so.

132. In the event IEMA-OHS is unable to comply with the federal government's new funding conditions, Illinois would be unable to receive FY2025 FEMA funds, depriving the State of over $255 million through preparedness and post-disaster programs and frustrating the ability of IEMA-OHS to fulfill all of the crucial functions detailed above.

133. The Homeland Security Grant Program funds police, fire, emergency services, and public works mutual aid organizations. *See supra* ¶ 23. These organizations rely on Homeland Security Grant Program funding for 100% of their operating budgets and would be forced to shut down if FEMA cuts off funding.

134. The Homeland Security Grant Program – Urban Areas Security initiative funds the Urban Area Working Group, which coordinates response from Chicago, Cook County, and its municipalities during a disaster, terrorist attack, or other mass-casualty event. This coordinated effort relies entirely on FEMA funds, so their termination could leave one of the most populous areas of the country without a coordinated response to the next disaster.

135. The Emergency Management Performance Grant program funds the salaries of state and local emergency management staff as well as equipment and facilities. *See supra* ¶ 44–45. Local emergency management agencies in Illinois could be shut down if EMPG funding is discontinued. These local emergency management agencies are first line of defense during a disaster. At the state level, IEMA-OHS operations could likewise be decimated, leaving no state agency to coordinate disaster response.

136. The Nonprofit Security Grant Program funds critical security measures for hundreds of nonprofit organizations like houses of worship, private schools, and hospitals. *See supra* ¶¶ 63–64. These organizations generally lack any other source of funds to implement such measures absent FEMA funding, and the work will not be completed. A cut-off of funds would significantly hinder efforts to safeguard these vulnerable faith-based and civic organizations during a period of heightened risk of violent domestic extremism.

137. The State and Local Cybersecurity Grant Program provides funding to help local governments strengthen their cyber defenses. *See supra* ¶ 54. There is no substitute stream of

funding if SLCGP dollars are cut off. The discontinuation of SLCGP funding would immediately hamper efforts to safeguard against cybersecurity attacks from both criminal actors and hostile nation-states such as China, Russia, and Iran.

138.    Public Assistance, Disaster Case Management, and Hazard Mitigation grants provide crucial support to state and local governments and individuals in the wake of a presidentially declared major disaster. *See supra* ¶¶ 91–124. The denial of such funding to Illinois would severely hamper the ability of Illinois communities to recover from the next natural disaster, which could come at any time.

139.    The State does not have the budgetary resources or flexibility to make up for the lost funding without drawing funding away from other important public safety and law enforcement operations.

## V.    **Harms to Preparedness, Mitigation, and Recovery Efforts Caused by FEMA's Categorical Freeze on Reimbursements Earlier this Year**

140.    The categorical freeze on FEMA funds that FEMA imposed from early February 2025 through April 4, 2025 provides direct evidence of the impending effects of the new funding conditions.

141.    Between February 14 and April 4, 2025, IEMA-OHS received almost no disbursements of any FEMA funds on any of its active awards. There were two minor exceptions: On February 24, 2025, FEMA released approximately $18,827.28 on one Hazard Mitigation grant; and on April 2, 2025, FEMA released $12,548.43 related to two Public Assistance grants.

142.    As a result of this freeze, by April 4, 2025, IEMA-OHS had $63,683,672.01 of payment requests pending with FEMA payment systems. The consequences of the recent funding freeze directly illustrate what will come to pass because of the new funding conditions if they are allowed to go into effect.

143.     During the funding freeze, all police, fire, emergency services, and public works mutual aid organizations in Illinois, discussed *supra* ¶ 23, were operating on reserve funding. IEMA-OHS had disbursed a fiscal quarter's worth of payroll funding to the mutual aid organizations on or about January 28, 2025, before the freeze went into effect. The mutual aid organizations advised IEMA-OHS that they could only continue to operate through June 2025, at which point they would have needed to curtail their operations.

144.     During the funding freeze, the Cook County Department of Emergency Management and Regional Security discontinued all discretionary activities including trainings, local emergency management funding, and its own support for the police, fire, emergency services, and public works mutual aid organizations. Even a temporary disruption in funds therefore undermines statewide preparedness for natural disasters and terrorist attacks.

145.     During the funding freeze, the Central United States Earthquake Consortium submitted reimbursement requests for ongoing operational funding, and IEMA-OHS was unable to process those requests. Without funding under the National Earthquake Hazards Reduction Program, Illinois would be unable to effectively plan and coordinate efforts to detect and prepare for earthquakes from the New Madrid fault.

146.     During the funding freeze, dozens of sub-grantees submitted reimbursement requests as to Public Assistance and Hazard Mitigation grants, including numerous hospitals and units of local government. IEMA-OHS was unable to support these requests until FEMA belatedly processed the payments.

147.     These examples of the effects of a temporary funding freeze for approximately two months in February and April only hint at the effects of a permanent cut-off of funds, which would

ultimately require winding down the many important mitigation, preparedness, and response programs discussed in this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16th day of May, 2025, in Springfield, Illinois.

Adnan G. Khayyat
Chief Nuclear Officer
Illinois Emergency Management Agency and Office of
     Homeland Security