**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

STATE OF ILLINOIS, et al.,

*Plaintiffs*,

v.

FEDERAL EMERGENCY MANAGEMENT AGENCY, et al.,

*Defendants*.

No. 1:25-cv-206-WES-PAS

# EXHIBIT 37

Declaration of Michael A. Gaimari, Sr.

**DECLARATION OF MICHAEL A. GAIMARI, SR.**

I, MICHAEL A. GAIMARI, SR., pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1. I am over the age of eighteen and understand the obligations of an oath.
2. I am the Chief of Police for the City of Bridgeton, New Jersey.
3. I have been a police officer in Bridgeton for 37 years. For 20 of those years, I worked as a Detective, Detective-Sergeant, and Detective-Lieutenant, and carried out criminal investigations. On two occasions, the Department dispatched me to serve in a supervisory capacity on the Cumberland County Narcotics Task Force and Organized Crime Bureau. I have served as Chief of Police since 2015.
4. I am familiar with the matters set forth herein, either from personal knowledge or on the basis of documents and information that I have reviewed.
5. As Chief of Police, I oversee a Department of 82 employees. My Department is committed to providing the highest quality of law enforcement services in order to protect the safety and welfare of over 26,000 residents. Bridgeton is an ethnically diverse community and includes a substantial population of first-, second-, and third-generation immigrants from Mexico and Central America.
6. Our main priority as law enforcement officers is to deter and solve crime, bring criminals to justice, and interact with the community through community-based programs. Based on my training and experience, it is my opinion that access to information, including information from members of the public, is a fundamental component in preventing and solving crime. I also believe this to be a proposition with which any law enforcement professional would agree. Both quantity and quality of information matters. To solve and prevent criminal activity, we aim to obtain the most information, and the most accurate information, possible.

7. Based on my training and experience, it is my opinion that a critical tool for obtaining access to more information, and more accurate information, is building and maintaining trust among our community members, who would be a primary source of that information.

8. Over my 37-year career with the Bridgeton Police Department, I have seen the problems that arise when members of the public are afraid to cooperate with police either due to fear of retaliation from the offenders or fear of deportation.

9. On many occasions, we received calls from people who either were alleged victims of crime or had information pertaining to a criminal investigation. However, out of fear of being contacted again by police—and potentially bringing attention from immigration authorities to themselves, family members, or neighbors—they many times would offer aliases and/or inaccurate address information, preventing officers and detectives from following up with them and hindering a number of investigations. Sometimes those people eventually are identified, and sometimes they are not. When we cannot verify or follow up on the information provided by a member of the public, it often is of little use to a criminal investigation, causing a substantial number of these investigations to be left unsolved and empowering those who are committing these crimes to continue conducting criminal activity.

10. Additionally, the criminal element committing these crimes, in most cases both armed and strong-armed street robberies, frequently have the awareness that the victims they prey on may not cooperate with authorities, increasing the chances of them not being brought to justice. Unfortunately, information received from those that are arrested and informants on the street indicates these victims are commonly referred to as "walking ATMs" by those committing these crimes.

11. We have also observed that immigrant victims have failed to report crimes due to their fear of entering into any process that would bring attention to their immigration status. In such cases, law enforcement often only becomes aware of such crimes due to notifications from hospitals. This delayed notification impedes investigations by inhibiting law enforcement's ability to investigate the crime scene.

12. Over the past several years, and as a result of this concern, Bridgeton has carried out a number of initiatives designed to build community trust, and ultimately to help make our community safer. It therefore welcomed the Attorney General's issuance of Directive 2018-6, also known as the Immigrant Trust Directive, which helps us build that trust.

13. After the Directive was issued, we held a community outreach meeting in Bridgeton to explain its purpose and content. The meetings allowed us to explain that our primary concerns are crime-solving and public safety, not turning our residents over to immigration authorities.

14. We held a second such meeting with the community in December 2019. We were pleasantly surprised by the highly positive feedback we received from leaders from churches and other local community groups. It was apparent that the highly positive feedback from the December 2019 meeting was in part the result of the Directive having been in effect for several months preceding the meeting. The meeting was a strong sign that we were having success in developing a more cooperative relationship between Bridgeton police and Bridgeton residents.

15. Since then, there have been several other meetings held in the community related to public welfare issues such as gang activity and juvenile safety that continued to highlight the underlying principles of the Directive to encourage reporting from the immigrant community. The Bridgeton police emphasized their goal was to solve crimes in the community rather than concern themselves with immigration status.

16. The Directive helps my officers to solve crimes. In order to arrest, charge, and ultimately convict criminals, we need the assistance of witnesses and victims. As stated above, it has been my experience that undocumented immigrants, or their family or friends, avoid talking to law enforcement out of fear of deportation, even when they are the victims of crime. The Directive provides us with the authority we need to calm those fears and allow witnesses and victims to participate in criminal proceedings.

17. The Bridgeton population is majority Hispanic or Latino. Bridgeton also has a significant immigrant population, which includes undocumented immigrants. Almost every major case therefore requires Bridgeton police to interact with the immigrant community because solving major cases requires cooperation through the community tip line, receiving residential video footage from home security systems, video footage from businesses, cell phone camera footage from community members, and statements from community members—often compiled by Bridgeton police knocking on the doors of residential homes and commercial businesses.

18. Homicides have unfortunately occurred every year in the recent past in Bridgeton—including seven in 2024, six in 2023, two in 2022, and five in 2021. As recent as in late 2024, two homicides that occurred in Bridgeton were solved because Bridgeton police were able to obtain video footage and witness statements from immigrant residents which was key to solving both cases.

19. In the years following issuance of the Directive, we turned a corner in community trust-building—which I attribute in large part to the Directive. I observed victims and witnesses become more forthcoming with information, provide more accurate descriptions of suspects, and make themselves more available to participate in photo spreads, line-ups, and investigations. The Directive has been a key tool in our crime-fighting arsenal.

20. The Directive is particularly important in light of the federal government's recent public statements concerning its mass deportation efforts. In the wake of those statements, we received reports of a significant drop-off in cooperation from individuals in the immigrant community in Bridgeton, as well as reports of community members confusing police officers with federal immigration officers. The Directive is crucial in helping to rebuild this trust. Weakening the Directive would exacerbate the recent challenges we have faced in maintaining community trust.

21. Based on my training and experience, it is also my opinion that any claim that the Directive undermines public safety is inaccurate. I have not seen any indication that my community has been made less safe since the Directive went into effect.

22. Based on my training and experience, it is my opinion that undermining the Directive at this stage would undo several years' worth of efforts my Department invested into building and maintaining trust within the community. If, as a consequence of this, my Department begins to receive less information, or less accurate information, concerning current or future criminal investigations, that would make the community less safe.

I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct to the best of my personal knowledge.

Executed this 14th day of May, 2025, in Bridgeton, New Jersey.

Michael A. Gaimari, Sr.
Chief of Police
City of Bridgeton