# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| ILLINOIS, *et al.*, | |
| Plaintiffs, | |
| *v.* | Civil Action No. 25-cv-206-WES-PAS |
| FEDERAL EMERGENCY MANAGE-MENT AGENCY, *et al.*, | |
| Defendants. | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................3

STANDARD OF REVIEW ................................................................................................8

   I.    Subject Matter Jurisdiction .................................................................... 8

   II.   Summary Judgment ............................................................................... 9

ARGUMENT ...................................................................................................................11

   I.    The Court Should Dismiss Plaintiffs' Claims Concerning Programs to Which Defendants Have Decided Not to Apply the Contested Conditions. ............. 11

   II.   Plaintiffs' Claims Regarding the Remaining FEMA and USCG-Administered Grant Programs Are Not Ripe ........................................................... 13

   III.  Because the Tucker Act Grants Exclusive Jurisdiction Over Plaintiffs' Claims to the Court of Federal Claims, This Court Lacks Subject Matter Jurisdiction. ........................................................................................ 15

   IV.  Defendants Have Not Violated the Law ................................................ 20

       A.   Congress Did Not Preclude the Implementation of Specific Terms and Conditions ..................................................................................20

       B.   The Constitution Permits Agencies to Set Terms and Conditions ......................20

           1.   Congress Has Granted DHS Broad Authority to Set Terms and Conditions for Discretionary Grants .........................................................23

           2.   DHS Has Limited Potential Application of the Challenged Conditions ....................................................................................25

       C.   Defendants Have Not Violated the APA ...........................................................30

           1.   Allocation of Discretionary Grant Funding is Committed to Agency Discretion and Is Unreviewable Under the APA .......................30

           2.   The Agency's Actions Are Neither Contrary to Law Nor Arbitrary or Capricious ..........................................................................33

   V.   The Court Should Limit Any Relief to the Grant Programs Identified in Plaintiffs' Amended Complaint and to the Plaintiff States ....................................... 35

   CONCLUSION ........................................................................................... 36

## INTRODUCTION

Plaintiffs seek an order enjoining the Department of Homeland Security ("DHS" or "Agency"), and primarily the Federal Emergency Management Agency ("FEMA"), from implementing certain new Immigration Conditions, defined below, that DHS added to its standard grant program terms and conditions and is in the process of determining whether to apply on a grant by grant basis to a much smaller number of programs than are the subject of Plaintiffs' pleadings. Plaintiffs ask this Court to invalidate the new conditions and require DHS and its component agencies to provide funding to each Plaintiff state. They ask for this relief regardless of the level of discretion Congress has delegated to the Agency for each program and regardless of whether a state has determined that it will cooperate with, or potentially impede, DHS's efforts to fulfill its national security and immigration enforcement responsibilities. Plaintiffs seek this injunction across *all* of DHS's grant programs without identifying all of the specific grant programs at issue, including where both the purpose of the underlying grants and the Immigration Conditions expressly relate to Congressional objectives delegated to DHS and its subagencies, such as border security.

In its prior briefing in this lawsuit, the Agency clarified through a sworn declaration by a senior official that it had made a final decision not to apply the challenged Immigration Conditions to most of the grant programs that Plaintiffs had identified in their pleading, including all of the disaster relief programs at the core of Plaintiffs' claims. In their Amended Complaint, Plaintiffs expand the list of challenged grant programs from 18 to 53, and include the grant programs where the Agency has already reached a final decision not to apply the Immigration Conditions. As a result, in total, Plaintiffs' challenge is moot concerning 40 of the 53 programs Plaintiffs identify in the Amended Complaint. Consistent with the March 25, 2025 Memo attached to Plaintiffs' filings, *see* ECF 57-2, DHS and FEMA have reached a final determination to exempt these programs from the Immigration Conditions to which Plaintiffs object. Plaintiffs do not need to comply with the challenged Immigration Conditions in order to receive funding under these programs. *See* Declaration of David Richardson, Senior Official Performing the Duties of the FEMA Administrator,

("Richardson Decl. II"), ¶ 8 (July 23, 2025). In addition, as clarified on the DHS website, individual Notices of Funding Opportunities ("NOFOs") for the grant programs at issue will clarify the applicability of the Immigration Conditions to each program. *Id.* ¶¶ 11, 25 & Ex. A. DHS will incorporate clarifying language into the NOFOs to which the Immigration Conditions will not apply as well as into its FEMA-State Agreements that facilitate disaster relief. *Id.* ¶¶ 9, 11. To the extent that any FEMA-State Agreements ("FSAs") required for funding had included the Immigration Conditions when executed earlier this calendar year, FEMA is amending the language in the previously-executed FSAs to clarify that the Immigration Conditions do not apply. *Id.* ¶¶ 9, 10.

For each of the remaining 13 grant programs, the Agency has either decided that the Immigration Conditions will apply or the Agency is still in the process of reaching a final decision. For these remaining programs, this case is, at its essence, a dispute about changes by one party to grant agreement language, and therefore it is a contract dispute that must be heard in the Court of Federal Claims. Even if that were not so, most of these grant programs are discretionary, meaning that Congress has given broad authority to DHS to administer these programs within general statutory purposes, with little restriction. In appropriating money to the Agency, Congress intended the Agency to use those funds to address national homeland security and terrorism concerns that rely on the cooperation that the challenged Immigration Conditions promote. Congress did not preclude the Agency from implementing the Immigration Conditions for the grant programs at issue, and Plaintiffs have not established that they are entitled to judgment as a matter of law with respect to these programs.

As noted in its prior briefing, the government recognizes that Plaintiffs may disagree with the federal government's current immigration policies and decide for the limited number of grant programs at issue that they will forgo federal funding for grants related to national security and immigration enforcement. However, this disagreement and determination by Plaintiffs is not sufficient to enjoin the Agency's requirements as unconstitutional or unlawful. Plaintiffs' view of what the federal government should do differs from what the federal government may lawfully do.

Should the Court disagree and be inclined to enter permanent injunctive relief, the government respectfully submits that any such injunction should not apply to grant programs beyond those identified in Plaintiffs' Amended Complaint or to entities beyond the Plaintiff states.

## BACKGROUND

**February 19, 2025 Memo**. On February 19, 2025, DHS Secretary Kristi Noem issued a memo titled "Restricting Grant Funding for Sanctuary Jurisdictions," which instructed Agency components to "review all federal financial assistance awards" to determine what, if any, funds are going to sanctuary jurisdictions and to report on their compliance with the Noem Memo in 30 days.

**March 25, 2025 Memo.**[1] On March 25, 2025, DHS Secretary Noem signed a memorandum outlining which grant programs might apply immigration enforcement-related conditions. ECF 57-2, Ex. B to Pls.' Am. Compl.; Richardson Decl. II, ¶ 7. The March 25 Memo noted that DHS/FEMA application of any conditions or restrictions on grant program applications or funding would vary based on the structure, purpose, and statutory authority of each respective program. After reviewing each of FEMA's grant programs, the Agency made a determination that certain grant programs are exempt from the Immigration Conditions. Richardson Decl. II, ¶¶ 8. The March 25 Memo included pre-decisional analysis for specific grant programs that required additional review.[2] *Id.* ¶¶ 12-13.

**April 18, 2025 DHS Standard Terms and Conditions**. On April 18, 2025,[3] DHS published updated standard terms and conditions for DHS grants for FY 2025 ("April Terms").

---

[1] Plaintiffs refer to this memorandum as the March 20, 2025 memo, but because it was signed by the Secretary on March 25, 2025, Defendants refer to March 25 as the operative date.

[2] The March 25 Memo identified 12 grant programs for additional review, 10 of which Plaintiffs identify in their Amended Complaint. With respect to the two remaining programs, FEMA terminated the existing Shelter and Services Program awards and announced it had redesigned it as the Detention Support Grant Program, and FEMA has decided not to issue a NOFO for the Case Management Pilot Program for FY 2025. Richardson Decl. II, ¶¶ 13 n.1. Defendants therefore do not specifically address these programs here.

[3] DHS also published updated Standard Terms and Conditions on March 27, 2025, which contained the challenged Immigration Conditions. The government references the April 18, 2025 version herein because they are the current, operative version.

The updated conditions include the following terms ("Immigration Conditions"):

- C.IX.1.a: Grant recipients "must comply with the requirements of 8 U.S.C. §§ 1373 and 1644 . . . [which] prohibit restrictions on information sharing by state and local government entities with DHS regarding the citizenship or immigration status, lawful or unlawful, of any individual . . . ."

- C.IX.1.b: Grant recipients "must comply with other relevant laws related to immigration . . . ." (listing specific examples)

- C.IX.1.c: Grant recipients "will honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer. A jurisdiction does not fail to comply with this requirement merely because it lacks the necessary resources to assist in a particular instance."

- C.IX.1.d: Grant recipients "will provide access to detainees . . . ."

- C.IX.1.e: Grant recipients "will not leak or otherwise publicize the existence of an immigration enforcement operation."

- C.IX.2: Grant recipients "must certify . . . that [they] will comply with the requirements of this term. . . ."

- C.IX.3: Grant recipients "agree[ ] that compliance with this term is material to the Government's decision to make or continue with this award and that the Department of homeland Security may terminate this grant, or take any other allowable enforcement action, if the recipient fails to comply with this term."

- C.XVII(2)(a)(iii): "By accepting the grant award, recipients are certifying that . . . [t]hey do not, and will not during the term of this award, operate any program that benefits illegal immigrants or incentivizes illegal immigration."

ECF 57-3, Ex. C to Pls.' Am. Compl.

On June 11, 2025, the Agency clarified the Standard Terms and Conditions Section on its website, stating: "Not all of DHS's Standard Terms and Conditions apply to every DHS grant program[ ]. DHS directs individuals to review the program's NOFO and/or FEMA-State Agreement to determine which Terms and Conditions apply to a particular grant." *See* DHS Website, DHS Standard Terms and Conditions, *available at* https://www.dhs.gov/publication/dhs-standard-terms-and-conditions; Richardson Decl. II ¶ 25 & Ex. A.

With respect to the grant programs identified in Plaintiffs' Amended Complaint, ECF 57 at ¶¶ 46, 48, DHS and FEMA have made a final determination that the Immigration Conditions do not apply to the following 40 grant programs:

- Community Disaster Loans (CDL)
- Disaster Unemployment Assistance (DUA)
- Individual and Households Program (IHP)
- Fire Management Assistance Grants (FMAG)
- Hazard Mitigation Grant Program (HMGP)
- Hazard Mitigation Grant Program Post Fire (HMGP Post Fire)
- Public Assistance – Grants to State & Local
- Public Assistance – NGOs
- Urban Search and Rescue (US&R)[4]
- Assistance to Firefighter Grants (AFG)
- Building Resilient Infrastructure and Communities (BRIC)
- Chemical Stockpile Emergency Preparedness Program (CSEPP)
- Community Assistance Program – State Support Services Element (CAP-SSSE)
- Cooperating Technical Partners (CTP)
- Emergency Management Baseline Assessments Grant (EMBAG)
- Emergency Operations Center (EOC)
- Fire Prevention and Safety (FP&S)
- Flood Mitigation Assistance (FMA)
- Flood Mitigation Assistance Swift Current (FMA Swift)
- Homeland Security Preparedness Technical Assistance Program (HSPTAP)
- Homeland Security National Training Program (HSNTP) – National Domestic Preparedness Consortium (NDPC)
- HSNTP – National Cybersecurity Preparedness Consortium
- National Dam Safety Program (NDSP)
- Rehabilitation of High Hazard Potential Dams Grant Program (HHPD)
- National Earthquake Hazards Reduction Program (NEHRP) and Multistate and National Earthquake Assistance (MSNEA) Grant Program
- National Earthquake Hazards Reduction Program – Individual State Earthquake Assistance (NEHRP-ISEA)
- National Fire Academy Training Assistance (NFATA)
- National Incident Management Systems (NIMS) / Emergency Management Assistance Compact Program (EMAC)
- Pre-Disaster Mitigation (PDM)
- Pre-Disaster Mitigation (PDM) Congressionally Directed Spending (CDS)/ Legislative Pre-Disaster Mitigation (LPDM)
- Safeguarding Tomorrow Revolving Loan Fund / Safeguarding Tomorrow through Ongoing Risk Mitigation Act (STORM)
- Staffing for Adequate Fire and Emergency Response (SAFER)
- State and Local Cybersecurity Grant Program (SLCGP)
- State Fire Training System Grants (SFT)
- Crisis Counseling Program (CCP)
- Disaster Case Management (DCM)

---

[4] US&R is listed twice in Plaintiffs' Amended Complaint.

- Public Assistance – Non-Congregate Sheltering
- Emergency Food and Shelter Program (EFSP)
- Nonprofit Security Grant Program (NSGP)
- Nonprofit Security Grant Programs – National Security Supplemental (NSGP-NSS)

Richardson Decl. II, ¶ 8.

DHS has revised its language for FY 2025 FSAs to include the following:

> **F.    CONTROLLING AUTHORITIES**. This Agreement is subject to the following governing authorities:
> . . . .
> 3.   The FY 2025 Department of Homeland Security Standard Terms and Conditions, v. 3 (Apr. 18, 2025), which are incorporated by reference into this Agreement with the exception Paragraph C.IX (Communication and Cooperation with the Department of Homeland Security and Immigration Officials) and paragraph C.XVII(2)(a)(iii) (Anti-Discrimination Grant Award Certification regarding immigration). Paragraphs C.IX and C.XVII(2)(a)(iii) do not apply to any federal award covered by this Agreement. The FY 2025 Department of Homeland Security Terms and Conditions, v.3 (Apr. 18, 2025), are available at www.dhs.gov/publication/dhs-standard-terms-and-conditions.

Richardson Decl. II, ¶ 9.

To the extent that any FSAs required for funding had included the Immigration Conditions when executed earlier this calendar year, FEMA is amending the previously-executed FSAs to incorporate this language. Richardson Decl. II, ¶ 10. To the extent any NOFOs were issued for any of the programs listed above earlier this calendar year with reference to the DHS Standard Terms and Conditions that include the Immigration Conditions, FEMA will include the following language in any award packages issued pursuant to those NOFOs:

> A recipient under this funding opportunity must comply with the FY 2025 Department of Homeland Security Standard Terms and Conditions, v. 3 (Apr. 18, 2025), with the exception Paragraph C.IX (Communication and Cooperation with the Department of Homeland Security and Immigration Officials) and paragraph C.XVII(2)(a)(iii) (Anti-Discrimination Grant Award Certification regarding immigration). Paragraphs C.IX and C.XVII(2)(a)(iii) do not apply to any federal award under this funding opportunity. The FY 2025 Department of Homeland Security Standard Terms and Conditions, v. 3 (Apr. 18, 2025) are available at www.dhs.gov/publication/dhs-standard-terms-and-conditions.

Richardson Decl. II, ¶ 11.

DHS is continuing to review the remaining ten FEMA grant programs at issue in this case that the March 25 Memo identified to determine whether to apply Immigration Conditions to each program and, if so, their scope. *Id.* ¶¶ 12-13.; *supra* n.2.

In addition, the application of the Immigration Conditions to U.S. Coast Guard's State Recreational Boating Safety Program ("RBS") is currently under review, and a final decision has not been made regarding the application of the Immigration Conditions to that program. *See* Declaration of P. Oborski, Grants Mgmt. Branch Chief, Div. of Boating Safety, U.S. Coast Guard ¶ 4 (July 23, 2025) ("Oborski Decl."). In light of this review, U.S. Coast Guard will no longer require an agreement to comply with the Immigration Conditions in order to receive funding for RBS for any active NOFOs. *Id*.

DHS has made a final decision to apply of the Immigration Conditions to the BioWatch Program and the Securing the Cities ("STC") Program identified in Plaintiffs' Amended Complaint, based on the purposes of these programs and the Agency's view of their nexus to immigration enforcement. Richardson Decl. II, ¶¶ 19-23.

Thus, after final agency action, DHS either has decided, or might decide, to apply the Immigration Conditions to the following 13 grant programs identified in Plaintiffs' Amended Complaint:

- Emergency Management Performance Grant (EMPG)
- Homeland Security Grant Program – Operation Stonegarden (OPSG)
- Homeland Security Grant Program – State Homeland Security Program (SHSP)
- Homeland Security Grant Program – Urban Area Security Initiative (UASI)
- Homeland Security National Training Program – Continuing Training Grants – Competitive (HSNTP-CTG)
- Port Security Grant Program (PSGP)
- Presidential Residence Protection Assistance (PRPA)
- Regional Catastrophic Preparedness Grant Program (RCPGP)
- Targeted Violence and Terrorism Prevention Grant Program (TVTP)
- Transit Security Grant Program (TSGP)[5]
- State Recreational Boating Safety (RBS)
- BioWatch Program
- Securing the Cities Program (STC)

*Id.* ¶¶ 13, 19; Oborski Decl. ¶ 4.

---

[5] Plaintiffs include the Intercity Passenger Rail program as part of TSGP in their Amended Complaint. The Intercity Passenger Rail program provides funding to Amtrak only, not to the states, and the program is among those that the March 25th Memo exempted from the Immigration Conditions. Thus, it is not properly the subject of this litigation.

Of the 13 grant programs where the Immigration Conditions might be applied, eight are discretionary grant programs, where general parameters for use of funding are set by Congress, but where determinations regarding the contours of the program, the number of awards, the size of awards and the appropriate recipients are left to Agency discretion. The eight discretionary grant programs are:

- Homeland Security National Training Program – Continuing Training Grants – Competitive (authorized through annual appropriations acts; *e.g.*, Pub. L. 118-47, 138 Stat 460, 608 (March 23, 2024))
- Port Security Grant Program (46 U.S.C. §§ 70101, 70103, 70107)
- Presidential Residence Protection Assistance (authorized through annual appropriations acts; *e.g.*, Pub. L. 119-21, 139 Stat 72, 361 (July 4, 2025))
- Regional Catastrophic Preparedness Grant Program (authorized through annual appropriations acts, *e.g.*, Pub. L. 118-47, 138 Stat 460, 608 (Mar. 23, 2024))
- Targeted Violence and Terrorism Prevention Grant Program (authorized through annual appropriations acts, *e.g.*, Pub. L. 118-47, 138 Stat 460, 594 (Mar. 23, 2024))
- Transit Security Grant Program (6 U.S.C. § 1135)
- BioWatch Program (6 U.S.C. §§ 591, 592, 596)
- Securing the Cities Program (6 U.S.C. § 596b)

On May 13, 2025, 20 states filed a complaint in this Court seeking to enjoin the application of the Immigration Conditions by DHS and the U.S. Coast Guard. On May 19, 2025, Plaintiffs moved for a preliminary injunction. On July 2, 2025, Plaintiffs[6] filed an Amended Complaint and Motion for Summary Judgment. For the reasons discussed below, the Court should deny Plaintiffs' Motion and should enter summary judgment in favor of the Defendants. In the alternative, the Court should not enjoin DHS or FEMA from implementing the Immigration Conditions to grant programs beyond those identified in Plaintiffs' Amended Complaint, or to entities beyond the Plaintiff states.

## STANDARD OF REVIEW

### I.    Subject Matter Jurisdiction

To proceed on their claims, the Plaintiff states must first establish subject matter jurisdiction in this Court—specifically, by showing whether Congress has waived sovereign immunity

---

[6] The District of Columbia was added as a plaintiff in the Amended Complaint.

and, if so, whether this Court may hear their claims. *See, e.g.*, *Hanley v. United States*, No. 94-1315, 1994 WL 723678, at *2 (1st Cir. Oct. 5, 1994) (per curiam) (affirming R. 12(b)(1) dismissal) ("A plaintiff has the burden of showing a waiver of sovereign immunity."). "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) (citing cases); *United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."); *Griffith v. Bowen*, 678 F. Supp. 942, 944 (D. Mass. 1988) ("[T]his Court must decide whether it has jurisdiction over the subject matter of the dispute before it may proceed any further.").

Federal courts "presume [they] lack jurisdiction unless the contrary appears affirmatively from the record." *Renne v. Geary*, 501 U.S. 312, 316 (1991) (cleaned up). The test for deciding whether sovereign immunity has been waived is "stringent," the waiver must be "unmistakably clear," and the Court must "indulge every reasonable presumption against" waiver. *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675, 678, 682 (1999) (cleaned up); *FAA v. Cooper*, 566 U.S. 284, 290 (2012) ("A waiver of sovereign immunity must be unequivocally expressed in statutory text.").

Thus, Plaintiff states have the burden of alleging facts sufficient to establish the Court's subject matter jurisdiction. *See Aversa v. United States*, 99 F.3d 1200, 1209 (1st Cir. 1996); *see also Padilla-Mangual v. Pavía Hosp.*, 516 F.3d 29, 31 (1st Cir. 2008) ("Once challenged, the party invoking subject matter jurisdiction . . . has the burden of proving by a preponderance of the evidence the facts supporting jurisdiction.").

## II.    Summary Judgment

Summary judgment is proper when "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence . . . would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d

5, 8 (1st Cir.1990). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby Inc*., 477 U.S. 242, 248 (1986).

"The presence of cross-motions for summary judgment neither dilutes nor distorts this standard of review." *Mandel v. Boston Phoenix, Inc*., 456 F.3d 198, 205 (1st Cir. 2006). In such circumstances, courts "resolve all factual disputes and any competing, rational inferences in the light most favorable to the party against whom summary judgment has entered." *Wightman v. Springfield Terminal Ry*., 100 F.3d 228, 230 (1st Cir.1996).

"[T]he summary judgment rubric has a special twist in the administrative law context." *Boston Redev. Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (cleaned up). There, "summary judgment is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious." *Id*.

The Court may set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Nat'l Lab. Rels. Bd. v. Beverly Enters.-Mass., Inc.*, 174 F.3d 13, 23 (1st Cir. 1999) (quoting 5 U.S.C. § 706(2)(A)). "The burden is on the party challenging the agency decision"—here, Plaintiffs—"to show that the arbitrary and capricious standard has been met." *Bluestone Env't Grp., Inc. v. Zapisek*, No. 3:21-cv-30056-MGM, 2022 WL 16857173, at *4 (D. Mass. Nov. 10, 2022).

The standard of review is "narrow" and "a reviewing court may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions." *Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015) (cleaned up). "[A]gency action is presumptively valid . . . ." *R.I. Hosp. v. Leavitt*, 548 F.3d 29, 33-34 (1st Cir. 2008). An agency decision need only be "rational" to "pass muster under the APA's 'arbitrary and capricious test[.]'" *Beverly Enters.-Mass.*, 174 F.3d at 24; *see Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) ("We will, however, uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.") (cleaned up).

## ARGUMENT

I. **The Court Should Dismiss Plaintiffs' Claims Concerning Programs to Which Defendants Have Decided Not to Apply the Contested Conditions.**

There is no relief for the Court to grant with respect to 40 of the grant programs that the Plaintiffs' Amended Complaint identifies. That is so because DHS and FEMA have made final decisions ***not*** to apply any of the Immigration Conditions that Plaintiffs challenge to those programs, and Plaintiffs do not need to comply with the Immigration Conditions in order to receive funding under them. Richardson Decl. II, ¶ 8. This includes all of the disaster relief grants identified by the Plaintiffs, which comprise the vast majority of FEMA funding to states, and which are at the heart of Plaintiffs' concerns.

When, as here, a "case loses its live-controversy character at any point in the proceedings, the mootness doctrine generally stops [a court] from pumping new life into the dispute (regardless of how fascinating the party's claims are) by 'oust[ing]' the federal courts of 'jurisdiction' and 'requir[ing]' [a court] to 'dismiss[ ]' the case." *Boston Bit Labs, Inc. v. Baker*, 11 F.4th 3, 8 (1st Cir. 2021) (quoting and citing *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 335 (1980)) (affirming dismissal of case as moot given recission of challenged executive action). "The doctrine of mootness enforces the mandate that an actual controversy must be extant at all stages of the review, not merely at the time the complaint is filed." *Lowe v. Gagné-Holmes*, 126 F.4th 747, 755 (1st Cir. 2025) (quoting *Mangual v. Rotger-Sabat*, 317 F.3d 45, 60 (1st Cir. 2003) (cleaned up). "[I]f events have transpired to render a court opinion merely advisory, Article III considerations require dismissal of the case." *Am. Civil Liberties Union of Mass. v. U.S. Conf. of Catholic Bishops*, 705 F.3d 44, 52-53 (1st Cir. 2013) (quoting *Mangual*, 317 F.3d at 60).

Invoking the voluntary cessation doctrine, Plaintiffs contend the Agency changed positions on these 40 programs only for the purposes of litigation and so they are not moot. ECF 58 at 18-23. The voluntary cessation doctrine creates a mootness exception when two tests are both met: (1) the defendant voluntarily ceased the challenged practice in order to moot the plaintiff's case; and (2) there exists a reasonable expectation that the challenged conduct will be repeated. *See Lowe*, 126 F.4th at 756.

With respect to the 40 programs to which the Agency has clarified that it will not apply the Immigration Conditions, the March 25th Memo indicated that the applicability of the Immigration Conditions to each particular grant program was under review by the Agency, and the Memo provided in detail the program-by-program analysis by the Agency with respect to the application of the Immigration Conditions. Even if the timing of the Agency's final decisions was a result of this litigation, which Defendants do not concede, Plaintiffs seem to argue that the simple fact that the Agency could take action in future fiscal years to apply the Immigration Conditions to the 40 programs is sufficient to create a reasonable expectation that the Agency will do so. This speculation, however, is insufficient. The fact that a government agency has the power to change policies or implement change does not defeat mootness; if that were the case "no suit against the government would ever be moot." *Boston Bit Labs, Inc.*, 11 F.4th at 10 (finding that the power to issue executive orders is insufficient to defeat mootness); *see also Lowe*, 126 F.4th at 758 ("Nor does the fact that the defendant state health officials have the authority to promulgate regulations as to future events negate mootness."); *Calvary Chapel of Bangor v. Mills*, 52 F.4th 40, 49 (1st Cir. 2022) (rejecting the argument that a suit cannot be moot where the governor retained the authority to reinstate restrictions and thus the plaintiff faced a "constant threat" that the governor's power would be used to restore allegedly discriminatory restrictions).

Because the very relief that Plaintiffs seek—exempting the Immigration Conditions as part of certain grants—has already been achieved by final agency action concerning these specified programs, there is nothing for the Court to do concerning these programs, and Plaintiffs' claims so far as they concern these programs should be dismissed as moot under Federal Rule of Civil Procedure 12(b)(1).

## II.    Plaintiffs' Claims Regarding the Remaining FEMA and USCG-Administered Grant Programs Are Not Ripe

The Court should deny Plaintiffs' request for summary judgment with respect to the remaining 11 FEMA and U.S. Coast Guard-administered grant programs[7] at issue in this case because the Agency has not determined whether to apply the Immigration Conditions to them, and thus a court-ordered injunction would short-circuit ongoing administrative processes at the Agency and cause separation-of-powers complications. *See, e.g.*, *Downing/Salt Pond Partners, L.P. v. Rhode Island & Providence Plantations*, 643 F.3d 16, 17 (1st Cir.), *cert. denied*, 565 U.S. 977 (2011). "Ripeness is a justiciability doctrine" whose purpose is to prevent "courts from 'entangling themselves in abstract disagreements over administrative policies' and from improperly interfering in the administrative decision-making process." *City of Fall River v. Fed. Energy Regulatory Comm'n*, 507 F.3d 1, 6 (1st Cir. 2007) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)). "The burden to prove ripeness is on the party seeking jurisdiction." *Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318, 326 (1st Cir. 2016) (affirming dismissal of pre-enforcement judicial review on ripeness grounds).

Courts apply a two-part test to determine whether a case is ripe for review, and both favor the Defendants. First, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998); *see also City of Fall River*, 507 F.3d at 6 (declining to review agency's conditional project approval for lack of ripeness). Agency action is not ripe for judicial review until an agency has made a final decision. *Abbott Labs.*, 387 U.S. at 149. And, for an agency review to be final, it must be both (a) "the consummation of the agency's decisionmaking process," and (b) a decision "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177 (1997); *Abbott Labs.*, 387 U.S. at 148-49.

DHS has not issued any NOFOs for the remaining FEMA-administered grant programs at issue in this case for Fiscal Year 2025. Richardson Decl. II, ¶¶ 26. Until a NOFO issues, no funds

---

[7] Defendants do not raise a defense of ripeness regarding BioWatch or Securing the Cities, to which the Agency as made a final decision to apply the Immigration Conditions.

are available to any state for that program for FY 2025. *Id.* For the grant programs at issue, states are not required to acknowledge DHS's Terms until they apply for a NOFO. *Id.* A NOFO establishes DHS's guidance concerning various aspects of a particular grant program for a specific fiscal year. Those aspects include the program's objectives, the amount of money appropriated by Congress for the program, how states can demonstrate their eligibility for funding and how they must apply for it, and the terms and conditions that apply to those programs. *Id.* ¶ 4. With respect to the RBS program, the U.S. Coast Guard will no longer require an agreement to comply with the Immigration Conditions in order to receive funding for the RBS program for any active NOFO, and will clarify through any future NOFOs for FY 2026 whether the Immigration Conditions apply. Oborski Decl. ¶ 4. Most importantly, the Agency's determination regarding whether the Immigration Conditions apply to any of the remaining FEMA and U.S. Coast Guard-administered grant programs is pre-decisional. Richardson Decl. II ¶ 13; Oborski Decl. ¶ 4.

Without the Agency's determination regarding whether the Immigration Conditions apply to the remaining FEMA and U.S. Coast Guard-administered grant programs at issue in this case, there is no final agency action. Without this agency action, it is unclear what the Court would be assessing, how, and on what grounds, as well as what relief it could grant. *See, e.g.*, *Broderick v. di Grazia*, 504 F.2d 643, 645 (1st Cir.1974) (action for declaratory judgment that statement by Police Commissioner would deprive police officers of due process in future administrative proceedings not ripe because "[a] court could only guess at how [the statement] might be translated into practice"); *Carman v. Yellen*, 112 F.4th 386, 402 (6th Cir. 2024) (explaining that a pre-enforcement facial vagueness challenge is not ripe for review) ("We cannot invalidate [a law] based on scenarios that may never come to pass."); *City of Fall River*, 507 F.3d at 6 ("[A] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."); *Cont'l Air Lines, Inc. v. Civil Aeronautics Bd.*, 522 F.2d 107, 125 (D.C. Cir.1975) ("If the [agency's] position is likely to be abandoned or modified before it is actually put into effect, then its review wastes the court's time and interferes with the process by which the agency is attempting to reach a final decision."); *cf. Portela-Gonzalez v. Sec'y of the*

*Navy*, 109 F.3d 74, 79 (1st Cir. 1997) ("[D]isregarding available administrative processes thrusts parties prematurely into overcrowded courts and weakens an agency's effectiveness by encouraging end-runs around it."). In addition, without final agency action, there can be no review under the APA. *See* 5 U.S.C. § 704; *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024).

Second, a court must consider the hardship to both parties, but there is no hardship to the Plaintiffs. Should DHS decide to apply terms that Plaintiffs would contest for the same reasons as set forth in their Amended Complaint, they may challenge the Agency's decisionmaking before this Court if and when that contingency actually occurs. *See City of Fall River*, 507 F.3d at 7; *see also Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 734 (1998) ("The [plaintiff] thus will have ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain."). If, instead, the Agency decides not to apply the Immigration Conditions, as it did with its final decision not to apply any of the challenged conditions to the vast majority of the grant programs raised in this case, Plaintiffs' claims will be moot and there will be nothing for the Court to decide. Therefore, until there is a final agency action for the Court to evaluate, Plaintiffs' motion should be denied as to the FEMA and U.S. Coast Guard-administered grant programs.

## III.    Because the Tucker Act Grants Exclusive Jurisdiction Over Plaintiffs' Claims to the Court of Federal Claims, This Court Lacks Subject Matter Jurisdiction.

The core of Plaintiffs' claims is that the government has unfairly and unilaterally changed the standard terms of its grant agreements, and they seek an order that the government must provide grant funding regardless of each state's compliance with DHS's grant conditions. These claims are based on the Plaintiffs' contractual relationships with the federal government, including the government's ability to alter the terms of those contractual relationships, and thus this Court lacks jurisdiction to provide the relief that Plaintiffs seek.

The Tucker Act grants exclusive jurisdiction to the Court of Federal Claims over "any claim against the United States founded" on "any express or implied contract with the United States" for amounts over ten thousand dollars. 28 U.S.C. § 1491(a). That court may hear "claim[s] against the United States founded either upon the Constitution, or any Act of Congress or any

regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." *Id.* § 1491(a)(1). Thus, where a party seeks funding that it believes the government is obligated to pay under a contract, the proper remedy is suit under the Tucker Act, not the APA, and that suit must proceed only in the Court of Federal Claims. *See, e.g.*, *Burgos v. Milton*, 709 F.2d 1, 3 (1st Cir. 1987) (vacating district court judgment; concluding district court lacked jurisdiction under 5 U.S.C. § 702 to award money judgment); *id.* ("[E]ven if we agreed with [claimant] that the award was equitable and did not constitute 'money damages,' we would still find that section 702 did not remove the defense of sovereign immunity."); *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 62 (1st Cir. 1978) (no district court jurisdiction under APA even where plaintiff alleged violations of the agency's regulations and due process of law because the Court of Claims provided "an adequate remedy" for the claims, which were grounded in contract).

In determining whether "a particular action" is "at its essence a contract action" that is subject to the Tucker Act or, instead, is a challenge properly brought under the APA, courts have looked at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982); *see also, e.g.*, *Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 403 (2d Cir. 2017) (applying *Megapulse* test); *Califano*, 571 F.2d at 63 (evaluating whether "the essence of the action is in contract").

In April, the Supreme Court stayed a district court order to make payments based on grant agreements because the government was "likely to succeed in showing that the District Court lacked jurisdiction" to bar termination of various education-related grants. *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025). The Court held the injunction was effectively an order "to enforce a contractual obligation to pay money" and thus was not covered by the limited waiver of sovereign immunity in Section 702 of the APA. Instead, the Court held, the Tucker Act grants the Court of Federal Claims exclusive jurisdiction over such suits. *Id.*

Here, Plaintiffs argue that DHS has unilaterally changed its standard grant terms in a way that risks ending Plaintiffs' longstanding receipt of funding from DHS and its component subagencies, which includes FEMA and the U.S. Coast Guard. Under the first prong of the *Megapulse* test, any right that Plaintiffs would have to this funding is not in the various statutes that create the grant programs, but in the language of the grant agreements themselves. Those grant agreements provide the detailed criteria that determines whether Plaintiffs are in fact eligible for funding, based on whether they meet the specified conditions.

For example, if a state did not submit an application for a grant by the deadline instituted by DHS, the state would not be entitled to that grant funding. Similarly, if a grant applicant were delinquent in its repayment of any federal debt, it would not be eligible for grant funding. *See* April Terms, at XIX (ECF 57-3). Under the applicable regulations for federal grants, if a state "fails to comply with the U.S. Constitution, Federal statutes, regulations, *or terms and conditions of the Federal award*," DHS has the authority to "implement specific conditions," including "suspend[ing] or terminat[ing] the Federal award in part or in its entirety." 2 C.F.R. § 200.339 (emphasis added). This is because Congress has given DHS broad authority to implement grant programs, and no statute provides any rights to an individual state to obtain those funds regardless of whether they meet DHS's terms and conditions for the grant.

A review of the statutory language with respect to the grants at issue in this case also shows that Congress did not entitle states to funding notwithstanding any Agency-imposed conditions. Instead, many of the grant programs at issue come from annual appropriation statutes through which Congress provided few restrictions on how DHS could spend or allocate the money and necessarily delegated to the Agency the policy objectives those funds may promote.

For example, the Homeland Security National Training Program – Continuing Training Grants – Competitive Program is authorized by language approving funding "to sustain current operations for training, exercises, technical assistance, and other programs." *See* 2024 DHS Appropriations Act, Pub. L. 118-47, 138 Stat 608 (Mar. 23, 2024). The Congressional Joint Explan-

17

atory Statement for this program simply states: "Continuing Training Grants . . . to be competitively awarded for FEMA-certified rural and tribal training" Joint Explanatory Statement—Division C, Department of Homeland Security Appropriations Act, 2024, at 42, *available at* https://appropriations.house.gov/further-consolidated-appropriations-act-2024. Similarly, the specific language from DHS's 2024 annual appropriations for the Targeted Violence and Terrorism Prevention Grant Program was: "[f]or necessary expenses of the Office of the Secretary and for executive management for Federal assistance through grants . . . of which $18,000,000 shall be for targeted violence and terrorism prevention grants . . . ." 2024 DHS Appropriations Act, Pub. L. 118-47, 138 Stat 460, 594 (Mar. 23, 2024). This language does not give any state the right to funding—that could only come, if at all, once DHS has actually awarded grant funds to a recipient, in its discretion.

By arguing that their right to funding comes from statutes, Plaintiffs contend they are entitled to funding even if they don't meet the qualifications that the Agency sets. But that cannot be the case. Congress intended for the Agency to set terms and conditions, *see generally* 2 C.F.R. §§ 200 *et seq.* (providing uniform requirements for federal awards, authorized by 31 U.S.C. §§ 503, 6101-6106, 6307, and 7501-7507), and this dispute is about a change in those terms. That means the source of Plaintiffs' claims is contractual in nature, and this Court lacks subject-matter jurisdiction. *See Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (court lacks subject-matter jurisdiction because asserted right to payment "in no sense . . . exist[ed] independently of [its] contract").

Whether labeled as APA claims or constitutional claims, in determining whether a plaintiff's suit is to be heard in district court or the Court of Federal Claims, a court "must look beyond the form of the pleadings to the substance of the claim. We have cautioned litigants that dressing up a claim for money as one for equitable relief will not remove the claim from Tucker Act jurisdiction to make it an APA case." *Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 480 F.3d 1116, 1124 (Fed. Cir. 2007); *see also Christopher Vill., L.P. v. United States*, 360 F.3d 1319, 1328 (Fed. Cir. 2004) ("[A] party may not circumvent the Claims Court's exclusive

jurisdiction by framing a complaint in the district court as one seeking injunctive, declaratory or mandatory relief where the thrust of the suit is to obtain money from the United States.") (citation omitted); *Consol. Edison Co. of New York, Inc. v. U.S. Dep't of Energy*, 247 F.3d 1378 (Fed. Cir. 2001) ("This court and its sister circuits will not tolerate a litigant's attempt to artfully recast its complaint to circumvent the jurisdiction of the Court of Federal Claims."); *Vill. West Assocs. v. R.I. Hous. & Mortg. Fin. Corp.*, 618 F. Supp. 2d 134, 139-40 (D.R.I. 2009) (rejecting as "without merit" the "familiar argument" that by seeking a prospective declaration regarding future agency actions, the Court of Federal Claims could not provide adequate relief in cases where the Tucker Act applies).

A request for an order that the government "must perform" under an agreement is one that "must be resolved by the Claims Court." *U.S. Conf. of Catholic Bishops v. Dep't of State*, No. 25-cv-00465, 2025 WL 763738, at *5 (D.D.C. Mar. 11, 2025) (quoting *Ingersoll-Rand* Co. *v. United States*, 780 F.2d 74, 80 (D.C. Cir. 1985)); *see California*, 145 S. Ct. at 968. It makes no difference that Plaintiffs frame the relief they seek as an injunction barring Defendants from implementing a term of the grants, rather than a specified amount of damages. The heart of this dispute is about the unilateral change of grant terms used year after year by the parties and that could prevent Plaintiffs from recovering federal funds if implemented. That is a dispute for the Court of Federal Claims.

The government acknowledges that courts are divided on whether the Tucker Act precludes claims in district court regarding changes to grant funding. *Compare, e.g.*, *Colorado v. U.S. Dep't of Health & Human Servs.*, No. 25-cv-00121-MSM-LDA; 2025 WL 1426226, at *6-*7 (D.R.I. May 16, 2025) (holding that the Tucker Act did not apply to certain grant terminations); *Rhode Island v. Trump*, No. 25-cv-00128-JJM-LDA; 2025 WL1303868, at *5-*6 (D.R.I. May 6, 2026), *appeal pending*, No. 25-1477 (docketed May 20, 2025); *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 25-cv-00097-MSM-PAS, 2025 WL 1116157, at *12 (D.R.I. Apr. 15, 2025), *appeal pending*, No. 25-1428 (docketed May 1, 2025), *with Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, No. 25-cv-30041-RGS, 2025 WL 1225481 (D. Mass. Apr. 14,

2025) (granting a motion to dissolve TRO in a case involving grant terminations based on *California*). The government respectfully submits that in this case, because Plaintiffs' rights to funding are dependent on whether they are qualified to receive funding under the terms and conditions of the grants, and because the relief they seek is for the government to be compelled to remove certain contract conditions and provide funding to the Plaintiffs, their claims are only within the jurisdiction of the Court of Federal Claims.

### IV.    Defendants Have Not Violated the Law

#### A.    Congress Did Not Preclude the Implementation of Specific Terms and Conditions

Should the Court conclude that it has jurisdiction over any of Plaintiffs' claims, it should still enter summary judgment in favor of the Defendants. Plaintiffs focus much of their argument on the absence of specific statutory language from Congress listing the exact Immigration Conditions at issue here within the broader authority given by Congress to the Agency to provide grant funding. However, Congress has given DHS "the authority to make contracts, grants, and cooperative agreements . . . as may be necessary and proper to carry out the Secretary's responsibilities under this chapter or otherwise provided by law…." 6 U.S.C. § 112(b)(2). Specific Congressional authority for each individual grant condition is not required by either the Constitution or the APA. Instead, the statutes at issue provide discretion to the Agency to set grant terms and conditions, without specifying or limiting all the contours of those conditions. Thus, Congress has given DHS the discretion to implement appropriate standard terms and conditions to its grant programs that follow from the Agency's core purpose and goals, which include the promotion of national security through immigration enforcement. Should Congress wish to limit this discretion by setting specific terms and conditions, it has the power to do so.

#### B.    The Constitution Permits Agencies to Set Terms and Conditions

To succeed in their facial challenge, Plaintiffs must show that the Immigration Conditions would be unconstitutional in all their applications. *See United States v. Salerno*, 481 U.S. 739, 745

(1987) (facial challenge must establish that "no set of circumstances exists under which [the enactment] would be valid"); *see also Am. Fed'n of State, Cty. & Mun. Emps. v. Scott*, 717 F.3d 851, 857-58 (7th Cir. 2013); *NTEU v. Bush*, 891 F.2d 99, 101 (5th Cir. 1989). Plaintiffs do not meet this standard, however, because Congress frequently authorizes the executive branch to impose discretionary conditions on the receipt of federal grants.

As the Supreme Court has held, "Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (quotation marks omitted). The *Dole* Court outlined certain limitations including that "the exercise of the spending power must be in pursuit of 'the general welfare,'" that conditions on the receipt of federal funds must be stated "unambiguously" so that recipients can "exercise their choice knowingly, cognizant of the consequences of their participation," that conditions may be a concern if unrelated to the federal interest in particular national projects or programs, and that the conditions are otherwise constitutional. *Id.* at 207.

Plaintiffs' assumption that the Constitution's Spending Clause requires Congress to set out by statute every requirement of a grant program in order for the requirement to be enforceable is not supported by Supreme Court precedent, including the Supreme Court's decision upholding agency-imposed conditions on the Medicare and Medicaid programs in *Biden v. Missouri*. 595 U.S. 87, 90, 94 (2022) (per curiam) (finding that a new condition of participation in Medicare and Medicaid requiring that facilities ensure that staff are vaccinated against COVID-19 did not exceed the applicable statutory authority, as HHS had "established long lists of detailed conditions with which facilities must comply to be eligible to receive Medicare and Medicaid funds" and is not limited to issuing "bureaucratic rules regarding the technical administration of" the programs); *see also Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656 (1985) (stating that Congress cannot "prospectively resolve every possible ambiguity concerning particular applications of the requirements"); *West Virginia v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1148 (11th Cir. 2023) ("[W]e do not

21

question an agency's authority to fill in gaps that may exist in a spending condition."); *Guardians Ass'n v. Civ. Serv. Comm'n of City of N.Y.*, 463 U.S. 582, 629-30 & n.22 (1983) (Marshall, J., dissenting) (noting that assurances of compliance with Title VI as part of applications for federal assistance are "given in consideration of" federal aid, "and the federal government extends assistance in reliance on the assurance of compliance"). Disagreement with the type of requirement is not a sufficient basis to contest its unconstitutionality.

Plaintiffs contend that the Immigration Conditions cannot apply to DHS grants because those terms allegedly "coerce" the states' compliance, as the Supreme Court found that new Medicaid initiatives improperly did in *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012). Under the Plaintiffs' overbroad reading of *NFIB*, all such widely imposed conditions would be unconstitutionally coercive, simply because so much of local governments' funding derives from the federal government. But that is not the law. To the contrary, the Court's *NFIB* opinion stressed (and as Justice Ginsburg's concurrence observed) that the coercion in that case arose from the unexpected imposition on the states to accept a new, dramatically broadened, independent grant program at the risk of losing all federal assistance of longstanding, traditional Medicaid coverage. *Id.* at 579-81; *id.* at 624-25 (Ginsburg, J., concurring in judgment).

Unlike the agency in *NFIB*, DHS is not creating new grant programs, but instead modified its existing standard terms and conditions that apply to selected, existing grant programs. The Immigration Conditions, on their face, require compliance with federal law and cooperation with federal law enforcement, but do not require states to expand any particular program broadly. To the contrary, the new terms specifically say that with respect to cooperation, "[a] jurisdiction does not fail to comply with this requirement merely because it lacks the necessary resources to assist in a particular instance." *See* April Terms, at IX(1)(c) (ECF 57-3). In addition, the funding at issue in this case, as compared to Medicaid, represents a much smaller portion of federal funding to each state—another factor motivating the Court's *NFIB* decision that does not apply here. *See* 576 U.S. at 579-80.

Plaintiffs rely on *City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020), with respect to the federal government's prior efforts to implement similar requirements under a specific grant program administered by DOJ. However, the First Circuit's analysis in that case was focused on the statutory language at issue, which required grant applicants to comply with "all other applicable Federal laws," and the duties and functions of the Assistant Attorney General as delegated by the statute. *See generally id.* at 36-39. Here, the grants at issue are authorized by different statutes using different language for administration by a different agency with a different purpose, and thus the questions in this case are distinct from the First Circuit's statute-specific analysis in *City of Providence*.

The federal government may, constitutionally, create incentives for states to act in accordance with federal law and policies. *See Dole*, 483 U.S. at 210 (rejecting the argument that the Spending Clause imposes "a prohibition on the indirect achievement of objectives which Congress is not empowered to achieve directly"). Congress has given DHS the authority to fund many different projects, and by allowing DHS to administer federally funded programs, Congress has necessarily given the Agency the authority to apply standard terms and conditions in line with Agency and program goals. Plaintiffs do not argue that Congress has in any way prohibited the Immigration Conditions, nor do they argue that any condition is unknown to the Plaintiffs at the time of its addition to the standard terms and conditions. As discussed below, DHS has articulated why the conditions are related to the federal interest in the grant programs to which the conditions apply. The simple fact that Congress did not spell out every conceivable condition of DHS funding by statute is not itself sufficient to declare the condition invalid or unconstitutional, and thus is not a sufficient basis for the entry of summary judgment against the government.

### 1.    Congress Has Granted DHS Broad Authority to Set Terms and Conditions for Discretionary Grants

Congress has given DHS "the authority to make contracts, grants, and cooperative agreements . . . as may be necessary and proper to carry out the Secretary's responsibilities under this

chapter or otherwise provided by law…." 6 U.S.C. § 112(b)(2). Many of the specific grant programs at issue come with broad grants of authority from Congress to implement each program, in keeping with the Agency's general authority to make grants in order to carry out its responsibilities.

For eight of the thirteen grant programs identified in the Amended Complaint to which DHS either will or might apply the Immigration Conditions, the specific recipients, the award amounts, and the conditions of grant funding are entirely within the Agency's discretion. In other words, for these eight programs (Homeland Security National Training Program - Continuing Training Grants – Competitive; Port Security Grant Program, Presidential Residence Protection Security Grant Program; Regional Catastrophic Preparedness Grant Program; Targeted Violence and Terrorism Prevention; Transit Security Grant Program, BioWatch, and Securing the Cities), DHS may properly decide under its appropriation statutes not to award *any* grant funding to *any* of the Plaintiff states *at all*.

For example, the Targeted Violence and Terrorism Prevention Grant Program is authorized through annual appropriations statutes. The specific language from DHS's 2024 annual appropriations simply states that DHS is appropriated funding: "[f]or necessary expenses of the Office of the Secretary and for executive management for Federal assistance through grants . . . of which $18,000,000 shall be for targeted violence and terrorism prevention grants . . . ." 2024 DHS Appropriations Act, Pub. L. 118-47, 138 Stat 460, 594 (Mar. 23, 2024).

Similarly, the Homeland Security National Training Program – Continuing Training Grants – Competitive Program is authorized by language appropriating funding "to sustain current operations for training, exercises, technical assistance, and other programs." *See* 2024 DHS Appropriations Act, Pub. L. 118-47, 138 Stat 460, 608 (Mar. 23, 2024). The Congressional Joint Explanatory Statement for this program adds only: "Continuing Training Grants . . . to be competitively awarded for FEMA-certified rural and tribal training." Joint Explanatory Statement—Division C, Department of Homeland Security Appropriations Act, 2024, at 42, *available at* https://appropriations.house.gov/further-consolidated-appropriations-act-2024. Even where Congress has

24

set certain minimum requirements, such as with the Port Security Grant Program, *see* 46 U.S.C. § 70107(a), these programs are distinct from formula-based programs where Congress has provided specific direction for funding.

For each of these eight grant programs, Congress intended to give broad discretion to the executive branch, and DHS's exercise of that broad discretion does not encroach on the Congressional spending authority that Congress chose to delegate. It is thus appropriate for DHS to allocate its federal funding in a way that is consistent with the agency's view of the purposes of the agency and the programs at issue. If the Agency were to apply the Immigration Conditions to each of the eight discretionary grant programs in order to ensure that the Agency's own funding is not spent in manner counter to the Agency's efforts to fulfill its own mandates and law enforcement actions, that decision is squarely within the Agency's discretion.

### 2.    DHS Has Limited Potential Application of the Challenged Conditions

In addition to the broad authority that Congress delegated to DHS for the implementation of terms and conditions, particularly with respect to the discretionary grant programs, at a more general level, the remaining programs at issue in this case to which the Agency will or might apply the Immigration Conditions are funded by DHS. DHS is the overarching agency tasked by Congress with enforcing federal law and policy encompassing complementary emergency, national security, and immigration objectives. *E.g.*, 6 U.S.C. § 111(b) (listing multiple parts of the Agency mission); 6 U.S.C. § 112(b)(2) (the Agency "shall have the authority to make contracts, grants, and cooperative agreements . . . as may be necessary and proper to carry out the Secretary's responsibilities under this chapter or otherwise provided by law").

Plaintiffs assert that these purposes are not necessarily tied to immigration enforcement, but Congress has clarified otherwise. For example, with respect to Operation Stonegarden, as part of the budget legislation passed earlier this month, the House of Representatives Budget Committee Report stated:

> Operation Stonegarden is part of FEMA's Homeland Security Grant Program, which provides funding to state, local, tribal, and territorial (SLTT) law enforcement agencies that are located along the borders of the United States to improve

> overall border security. . . . Operation Stonegarden is an essential part in the overall advancement of security along our borders. . . . This grant program provides cooperation and coordination among U.S. Customs and Border Protection's U.S. Border Patrol and federal, state, local, tribal, and territorial law enforcement agencies by providing funding to support joint efforts to secure the United States' borders. . . .

Report of the Committee on the Budget, House of Representatives, One Big Beautiful Bill Act, Report 119-106, Section 60005, at 794 (May 20, 2025), *available at* https://www.congress.gov/119/crpt/hrpt106/CRPT-119hrpt106-pt1.pdf. Thus, Congress viewed these objectives as falling within the State Homeland Security Grant Program's general statutory purpose of "preventing, preparing for, protecting against, and responding to acts of terrorism." 6 U.S.C. § 605(a).

Similarly, while not referencing immigration specifically, many of the Congressionally-established purposes of the other programs discuss the Agency's overall national security purpose and the Agency's need for cooperation and coordination with states as part of this effort. For example, the Port Security Grant Program authorizing statute specifically states the Agency "shall require eligible port authorities, facility operators, and State and local agencies required to provide security services, to submit an application, at such time, in such form, and containing such information and assurances as the Secretary may require . . . ." 46 U.S.C. § 70107(i)(1). Notably, the statute also provides that DHS must ensure that each grant awarded for multi-year plans is "coordinated with any applicable State or Urban Area Homeland Security Plan." 46 U.S.C. § 70107(f)(2). The Urban Area Security Initiative grant, a Homeland Security Grant Program, is also intended to "to assist high-risk urban areas in preventing, preparing for, protecting against, and responding to acts of terrorism." 6 U.S.C. § 604(a).

All of the below statutes authorizing grant programs identified in the Amended Complaint are similarly intended to protect against national homeland security threats, including terrorist or extreme acts:

| Grant Program | Statutory Authority & Program Purpose |
|---|---|
| **Emergency Management Performance Grant** | 6 U.S.C. § 762: to "continue implementation of an emergency management performance grants program" where "emergency management" means "the government function that coordinates and integrates all activities necessary to build, sustain, and improve the capability to prepare for, protect against, respond to, recover from, or mitigate against threatened or actual natural disasters, acts of terrorism, or other man-made disasters" (§ 701(7)) |
| **Homeland Security Grant Programs—Operation Stonegarden** | 6 U.S.C. § 605(a): "to assist . . . in preventing, preparing for, protecting against, and responding to acts of terrorism."<br><br>Annual appropriations acts, *e.g.*, Pub. L. 1191-21, 139 Stat 72, § 90005(a)(1)(D) (July 4, 2025) : "$450,000,000 for the Operation Stonegarden Grant Program"<br><br>"This grant program provides cooperation and coordination among U.S. Customs and Border Protection's U.S. Border Patrol and federal, state, local, tribal, and territorial law enforcement agencies by providing funding to support joint efforts to secure the United States' borders . . . ." Report of the Committee on the Budget, House of Representatives, One Big Beautiful Bill Act, Report 119-106, § 60005, at 794 (May 20, 2025), *available at* https://www.congress.gov/119/crpt/hrpt106/CRPT-119hrpt106-pt1.pdf. |
| **Homeland Security Grant Program—State Homeland Security Program** | 6 U.S.C. § 605(a): "to assist . . . in preventing, preparing for, protecting against, and responding to acts of terrorism." |
| **Homeland Security Grant Program—Urban Area Security Initiative** | 6 U.S.C. § 604(a): "to assist high-risk urban areas in preventing, preparing for, protecting against, and responding to acts of terrorism." |
| **Homeland Security National Training Program—Continuing Training Grants - Competitive** | Annual appropriations acts; *e.g.*, Pub. L. 118-47, 138 Stat 460, 608 (Mar. 23, 2024): "to sustain current operations for training, exercises, technical assistance, and other programs."<br><br>Joint Explanatory Statement to the FY 2024 DHS Appropriations Act: "Continuing Training Grants . . . to be competitively awarded for FEMA-certified rural and tribal training." Joint Explanatory Statement—Division C, Department of Homeland Security Appropriations Act, 2024, at 42, *available at* https://appropriations.house.gov/further-consolidated-appropriations-act-2024; *see also* DHS Notice of Funding Opportunity, Fiscal Year 2024, Homeland Security National Training Program Continuing Training Grants, at Section A.10.a, *available at* https://www.fema.gov/sites/default/files/documents/fema_hsntp-fy2024-ctg-nofo.pdf. |
| **Port Security Grant Program** | 46 U.S.C. §§ 70101, 70103, 70107: for implementation of Area Maritime Transportation Security Plans, to deter "transportation security incidents" defined as a "security incident resulting in a significant loss of life, environmental damage, transportation system disruption, or economic disruption in a particular area" |

27

| Grant Program | Statutory Authority & Program Purpose |
|---|---|
| **Presidential Residence Protection Assistance Program** | Annual appropriations acts; *e.g.*, Pub. L. 119-21, 139 Stat 72, 361 (July 4, 2025): "for the reimbursement of extraordinary law enforcement personnel costs for protection activities directly and demonstrably associated with any residence of the President designated . . . to be secured by the United States Secret Service." |
| | DHS NOFO FY 2023: "the FY 2023 PRPA Grant Program supports the [DHS Strategic Plan] goal to Counter Terrorism and Homeland Security Threats, Objective 1.3: Protect Designated Leadership, Events, and Soft Targets." *See* DHS Notice of Funding Opportunity Fiscal Year 2023 Presidential Residence Protection Assistance Grant Program, at § A.10.b, available at https://www.fema.gov/sites/default/files/documents/fema_prpa_grant-program-nofo_fy2023.pdf. |
| **Regional Catastrophic Preparedness Grant Program** | Annual appropriations acts, *e.g.*, Pub. L. 118-47, 138 Stat 460, 608 (Mar. 23, 2024): "$10,800,000 for Regional Catastrophic Preparedness Grants." |
| | DHS NOFO FY 2024: "The purpose of the RCPGP is to build state and local capacity to manage catastrophic incidents by improving and expanding regional collaboration . . . . The National Response Framework . . . defines a catastrophic incident as any natural or manmade incident, including terrorism, that results in extraordinary level of mass casualties, damage, or disruption. . . ." *See* DHS Notice of Funding Opportunity Fiscal Year 2024 Regional Catastrophic Preparedness Grant Program, at § 10.A, *available at* https://www.fema.gov/grants/preparedness/regional-catastrophic/fy-24-nofo. |
| **Targeted Violence and Terrorism Prevention Grant Program** | Annual appropriations acts, *e.g.*, Pub. L. 118-47, 138 Stat 460, 594 (Mar. 23, 2024): "For necessary expenses of the Office of the Secretary and for executive management for Federal assistance through grants . . . of which $18,000,000 shall be for targeted violence and terrorism prevention grants . . . ." |
| | 6 U.S.C. § 112(b)(2): the Agency "shall have the authority to make contracts, grants, and cooperative agreements . . . as may be necessary and proper to carry out the Secretary's responsibilities under this chapter or otherwise provided by law" |
| | 6 U.S.C. § 111: "The primary mission of [DHS] is to . . . prevent terrorist attacks within the United States . . . ." (listing multiple parts of the Agency mission) |
| **Transit Security Grant Program** | 6 U.S.C. § 1135: "to eligible public transportation agencies for security improvements," such as "perimeter protection systems," "explosive detection systems," "capital costs associated with security awareness, security preparedness, and security response training," "other capital security improvements determined appropriate by the Secretary," costs for "personnel assigned to…counterterrorism duties related to public transportation," and "other operational security costs determined appropriate by the Secretary . . . ." |

| Grant Program | Statutory Authority & Program Purpose |
|---|---|
| **BioWatch** | 6 U.S.C. §§ 591 note, 592(a), 596(1): the Agency shall "operate extramural and intramural programs and distribute funds though grants, cooperative agreements, and other transactions and contracts" as part of carrying out the Agency's responsibilities to "coordinat[e] Federal efforts to detect and protect against the unauthorized importation, possession, storage, transportation, development, or use of [biological materials] in the United Sates, and to protect against attack using such devices or materials against the people, territory, or interests of the United States . . . ." |
| **Securing the Cities** | 6 U.S.C. § 596b(a): "to enhance the ability of the United States to detect and prevent terrorist attacks and other high-consequence events utilizing nuclear or other radiological materials that pose a high risk to homeland security in high-risk urban areas" including to "provide resources to enhance detection, analysis, communication, and coordination to better integrate State, local, Tribal, and territorial assets into Federal operations . . . ." |

Plaintiffs' contention that these grants are unrelated to immigration enforcement ignores the fact that immigration enforcement and national security are related, *see* Richardson Decl. II, ¶¶ 21-23, and that these grant programs promote DHS's core, national security mission, 6 U.S.C. § 111(b), including by preventing, preparing for, protecting against, and responding to acts of terrorism and extremism. Each of these programs is designed to provide federal funding to build state and local capabilities to prevent and potentially respond to acts of terrorism. And because partnership and coordination are essential elements of the terrorism prevention and national security mission, and because that mission includes immigration enforcement, DHS and FEMA could reasonably determine that state and local governments that refuse to cooperate with, refuse to share information with, or actively obstruct immigration enforcement hinder their ability to build effective terrorism prevention capabilities. Congress's intent for Operation Stonegarden funding to be used for "cooperation and coordination among U.S. Customs and Border Protection's U.S. Border Patrol and federal, state, local, tribal, and territorial law enforcement agencies . . . to support joint efforts to secure the United States' borders" would be counterproductive if recipients could choose not to agree to cooperate with federal immigration enforcement.

All of these programs are intended to promote national security, including by preventing, preparing for, protecting against, and responding to acts of terrorism and extremism, often with

few Congressional restrictions on how DHS could spend or allocate the money and what policy objectives those funds may promote within the broad program purpose. Thus, DHS may reasonably determine that the Immigration Conditions promote these complementary national security and immigration goals that are central to the mission of DHS and its subagencies, including FEMA. Federal agencies have a legitimate interest in ensuring state cooperation to protect national security interests. Plaintiff states have declared that they will not agree to comply with the Immigration Conditions. *See, e.g.*, ECF 59-21 at ¶¶ 88-90; ECF 59-23 at ¶¶ 79-80. It follows, then, that DHS may determine that those entities are not appropriate recipients of DHS funding for grants designed to support coordinated and cooperative national security efforts, including preventing and responding to acts of terror. Thus, summary judgment in favor of the defendants is appropriate.

### C.    Defendants Have Not Violated the APA

#### 1.    Allocation of Discretionary Grant Funding is Committed to Agency Discretion and Is Unreviewable Under the APA

A number of the grant programs at issue in this case (eight of the remaining thirteen) are discretionary in nature. For these grants, as detailed above, Congress has not directed that a specific amount of funding be directed to recipients who meet all applicable criteria, terms, and conditions. Instead, Congress has simply appropriated funding for the program generally, for the Agency to in turn distribute as appropriate.

The APA does not permit judicial review of "agency action" that "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Agencies have broad discretion in creating, awarding, and terminating specific grants, and thus review of the terms and conditions set by agencies, as contemplated by Congress, is outside of the jurisdiction of the Court. At a minimum, the discretionary grants at issue in this case are, by their very nature, committed to Agency discretion, and DHS's determination as to the conditions of those grants are unreviewable under the APA.

In *Lincoln v. Vigil*, the Supreme Court held that the Indian Health Service's decision to discontinue a program it had previously funded and to instead reallocate those funds to other pro-

grams was committed to agency discretion by law and thus not reviewable under the APA's reasoned-decision-making standards. 508 U.S. 182, 185-88 (1993). The Supreme Court explained that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion," because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id*. at 192.

Indeed, "an agency's allocation of funds from a lump-sum appropriation requires 'a complicated balancing of a number of factors which are peculiarly within its expertise': whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'" *Id*. at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)). "Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Id*. But as long as the agency abides by the relevant statutes (and whatever self-imposed obligations may arise from regulations or grant instruments), the APA "gives the courts no leave to intrude." *Id*.; *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984) (Scalia, J.) ("A lump-sum appropriation leaves it to the recipient agency (as a matter of law, at least) to distribute the funds among some or all of the permissible objects as it sees fit.")

Although *Lincoln* involved lump-sum appropriations, its logic extends to funding programs that leave to the agency "the decision about how the moneys" for a particular program "could best be distributed consistent with" the statute. *Milk Train, Inc.* v. *Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Such decisions—like those about how best to allocate lump-sum appropriations—"clearly require[] 'a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise.'" *Id.* at 752 (citation omitted); *see Policy & Rsch., LLC* v. *U.S. Dep't of Health & Human Servs.*, 313 F. Supp. 3d 62, 75-76 (D.D.C. 2018) (Jackson, J.); *Cmty. Action of Laramie Cnty., Inc. v. Bowen*, 866 F.2d 347, 354 (10th Cir. 1989) ("Funding determinations are 'notoriously unsuitable for judicial review, for they involve the inherently subjective weighing of the large

number of varied priorities which combine to dictate the wisest dissemination of an agency's limited budget.'") (quoting *Alan Guttmacher Inst. v. McPherson*, 597 F. Supp. 1530, 1536-37 (S.D.N.Y. 1984)).

As another court recently held, although an agency "is required to use earmarked funds for their specified purpose, an agency may still exercise discretion *within* the earmark. If, for example, Congress earmarks funds for the Navy to build a certain type of ship, the Navy has discretion to use the money to complete construction of two less expensive ships or to spend the money on one more expensive ship." *Amica Ctr. for Immigrant Rights, et al. v. U.S. Dep't of Justice*, No. 25-298 (RDM), 2025 WL 1852762, at *14 (D.D.C. July 6, 2025) (emphasis in original) (finding an agency's decision to terminate certain grant programs not subject to judicial review under the APA).

This case primarily involves discretionary grants that fit within *Lincoln*'s analytical framework for agency discretion. For example, as discussed in Section IV(B)(1), *supra*, many of the grants at issue are authorized through annual appropriations that give little guidance to the Agency beyond allocating funding. *See, e.g.*, Pub. L. 118-47, 138 Stat 460, 608 (Mar. 23, 2024): ("$10,800,000 for Regional Catastrophic Preparedness Grants."); *id.* at 594 ("For necessary expenses of the Office of the Secretary and for executive management for Federal assistance through grants . . . of which $18,000,000 shall be for targeted violence and terrorism prevention grants . . . .").

For the discretionary grants at issue in this case, not only did Congress expressly provide for significant discretion by the executive branch, but it did not provide any "meaningful standard against which to judge the agency's exercise of discretion." *See Lincoln*, 508 U.S. at 191. The Agency is left to determine whether any particular applicant is the best recipient for DHS funding within the purpose of each specific grant program, including through conditions set by the Agency in keeping with the Agency's purpose and mandate.

Plaintiffs do not argue that the Agency is refusing to spend the money allocated by Congress for the grant programs at issue; only that it is possible that the Agency will not give money

to the Plaintiffs. But with respect to the discretionary grant programs, Congress has not required that Plaintiffs receive this funding. Instead, the Agency has discretion as to how to use its funding within the purpose Congress proscribed. Thus, with respect to the discretionary grants at issue, the APA does not allow for judicial review.

### 2. The Agency's Actions Are Neither Contrary to Law Nor Arbitrary or Capricious

The APA provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The scope of review under the "arbitrary and capricious" standard under § 706 is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

This standard "deems the agency action presumptively valid provided the action meets a minimum rationality standard." *Sierra Club v. EPA*, 353 F.3d 976, 978 (D.C. Cir. 2004) (citation omitted); *see also Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015) (noting narrowness of arbitrary-and-capricious standard and that "a reviewing court 'may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions.'") (citing *River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009)). At bottom, this deferential standard requires only that "agency action be reasonable and reasonably explained." *F.C.C. v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The explanation need only be clear enough for "the agency's path [to] reasonably be discerned" and to facilitate effective review, not an explanation of "ideal clarity." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

DHS's priorities in this context are matters of policy discretion and not of "factual findings." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). And all the APA requires for a policy change is that an agency "display awareness that it *is* changing position." *Id.* The agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that

there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.*

Plaintiffs' argument that the Agency's actions are contrary to law rests on Plaintiffs' contention that the Defendants violated the Spending Clause of the Constitution. For the reasons discussed above, the Plaintiffs have not established that all applications of the Immigration Conditions would violate the Constitution, and thus they also have not established that the Immigration Conditions are contrary to law under the APA. *See* Section IV(B) *supra.*

With respect to Plaintiffs' arbitrary and capricious claims, as discussed above, the grants at issue in this case come from the Agency tasked with enforcing federal immigration law. The requirement that states that receive DHS funding comply with federal law, and do not impede DHS's duties to enforce federal law, follow from DHS's core purpose. It is neither arbitrary nor capricious for DHS to ensure that states will provide such cooperation when receiving funding specifically for those purposes. These are all "rational reasons" that support the Agency's decision to add the new challenged condition and withstand arbitrary and capricious review. *See Ohio v. Becerra*, 87 F.4th 759, 775 (6th Cir. 2023) (upholding HHS's implementation of a requirement that Title X projects offer pregnant patients with an opportunity to receive information and non-directive counseling on all options, including abortion).

Plaintiffs seem to assume that the Agency ignored the March 25 Memo, which involved a thorough review of FEMA's grant programs. But that is not the case. In fact, the Agency did make a final determination that the Immigration Conditions do not apply to certain FEMA grant programs analyzed in the March 25 Memo. Richardson Decl. II, ¶ 8. As recommended in the March 25 Memo, the Agency has undertaken additional review of the remaining FEMA programs, which remains ongoing. Richardson Decl. II, ¶¶ 12-13. As clarified both by the sworn declaration of the Senior Official Performing the Duties of the FEMA Administrator—a defendant in this case—as well as on DHS's public website, not all provisions of DHS's Standard Terms and Conditions apply to each grant program, and the Agency will clarify through its NOFOs which grant programs will ultimately apply the Immigration Conditions. Richardson Decl. II, ¶ 25. Whether Plaintiffs

agree or disagree with the Agency's ultimate conclusion, Plaintiffs have not established that the Agency's initial review, as detailed in the March 25 Memo, and its subsequent decision-making, which remains ongoing, violates the APA. Similarly, the Agency has determined that the Immigration Conditions will apply to BioWatch and Securing the Cities based on the Agency's view of the connection between national security and immigration enforcement. *See* Richardson Decl. II, ¶¶ 19-23.

Although Plaintiffs claim that DHS failed to consider an important aspect of the problem, the reality is that DHS implemented these conditions precisely because it had recognized a significant problem: states impeding the enforcement of federal law. While the Plaintiff states may have valid concerns regarding the use of limited resources or law enforcement strategies, so too does the federal government. And the federal government's primary immigration enforcement agency took the action it determined was needed to ensure that state partners who receive DHS funding to promote national security do not act in a way that impedes DHS's efforts to do the same.

Plaintiffs argue that the government failed to consider the states' reliance on federal funding, the effects on public safety, and alternative options, but as discussed above, the Immigration Conditions are designed with the stated goal of improving public safety, and the states' reliance on federal funding from the grant programs to which DHS may apply the conditions is limited in that they make up a small portion of overall federal funding. The fact that Plaintiffs disagree with DHS's assessment of the efficacy or need for these conditions is not sufficient to establish a violation of the APA.

**V.    The Court Should Limit Any Relief to the Grant Programs Identified in Plaintiffs' Amended Complaint and to the Plaintiff States**

As detailed above, Plaintiffs seek a sweeping order regarding the implementation of the Immigration Conditions to all DHS grant programs, specifically identifying 53 programs at issue. Plaintiffs do not provide additional support or analysis with respect to other grant programs administered by DHS. Of the broad concerns identified in Plaintiff's Amended Complaint, the number of actual programs at issue is limited, for the reasons described in this brief.

If the Court is inclined to issue relief in this case, it should not be issued as to grant programs or states beyond those identified in the Amended Complaint. Thus, any order should (1) not enjoin the potential implementation of the Immigration Conditions to grant programs not identified in Plaintiffs' Amended Complaint, and (2) only apply to grants to the Plaintiff states.[8]

## CONCLUSION

For the foregoing reasons, the Defendants ask the Court to deny Plaintiffs' Motion for Summary Judgment and enter summary judgment on behalf of the Defendants.

Dated: July 23, 2025

Respectfully submitted,

FEDERAL EMERGENCY MANAGEMENT AGENCY; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES COAST GUARD; DAVID RICHARDSON, in his official capacity as Senior Official Performing the Duties of the Administrator of the Federal Emergency Management Agency; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; and KEVIN E. LUNDAY, in his official capacity as Acting Commandant of the U.S. Coast Guard,

By their Attorneys

SARA MIRON BLOOM
Acting United States Attorney

/s/ Bethany N. Wong

BETHANY N. WONG
Assistant United States Attorney
One Financial Plaza, 17th Floor
Providence, RI 02903
(401) 709-5000
(401) 709-5001 (Fax)
Email: Bethany.Wong@usdoj.gov

---

[8] The following Plaintiff states have not submitted factual declarations in support of their motion for summary judgment, and thus have not established that judgment is appropriate with respect to their state: Delaware, Maine, Nevada, New Mexico, Vermont, and the District of Columbia. Summary judgment should not be entered in favor of these states.

## CERTIFICATION OF SERVICE

I hereby certify that on July 23, 2025, I electronically filed the forgoing and it is available for viewing and downloading from the Court's CM/ECF system, and that the participants in the case that are registered CM/ECF users will be served electronically by the CM/ECF system.

/s/ Bethany N. Wong
Bethany N. Wong
Assistant United States Attorney