# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

STATE OF ILLINOIS, *et al.*,

              *Plaintiffs*,

   v.

FEDERAL EMERGENCY
MANAGEMENT AGENCY, *et al.*,

              *Defendants*.

No. 1:25-cv-206-WES-PAS

# PLAINTIFF STATES'
# REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND
# OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

BACKGROUND ......................................................................................................... 2

ARGUMENT ............................................................................................................... 6

I.   The Court Has Jurisdiction to Adjudicate the Legality of the Promulgation of the
     Civil Immigration Conditions. ........................................................................... 6

     A.   Plaintiff States' Challenge to the Civil Immigration Conditions Is Ripe............... 7

          1.   The promulgation of the Civil Immigration Conditions was final
               agency action and is fit for review. ............................................................ 8

          2.   Postponing adjudication would inflict hardship on Plaintiff States. ..........11

     B.   No Part of Plaintiff States' Challenge Is Moot. ..................................................... 13

     C.   The Tucker Act Does Not Apply to Any Part of this Case..................................... 16

II.  The Promulgation of the Civil Immigration Conditions Was Unlawful. ........................... 20

     A.   The Promulgation of the Civil Immigration Conditions Was Contrary to
          Law and Ultra Vires. ............................................................................................ 20

          1.   Defendants must, but cannot, identify statutory authority to impose
               the Civil Immigration Conditions. ........................................................... 21

          2.   Defendants lack authority to impose the Conditions on terrorism-
               related programs.................................................................................. 26

          3.   Defendants also cannot implement the Civil Immigration
               Conditions as a "priority area" within the State Homeland Security
               Program.......................................................................................... 30

          4.   The standard for facial challenges to statutes does not apply, nor
               would it rescue the Civil Immigration Conditions.................................... 32

     B.   The Promulgation of the Civil Immigration Conditions Was Arbitrary and
          Capricious. .......................................................................................................... 34

          1.   DHS's imposition of the Conditions is reviewable under the APA. ......... 34

          2.   DHS did not engage in reasoned decisionmaking. ................................... 37

     C.   The Promulgation of the Civil Immigration Conditions Was
          Unconstitutional................................................................................................ 40

III. Relief Should Be Awarded to All Plaintiff States in the Requested Form. ....................... 43

CONCLUSION................................................................................................................ 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967) ..................................................8, 11–12

*Alexander v. Sandoval*, 532 U.S. 275 (2001) .......................................................21, 23

*Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013) ...............................................16

*Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior*, 282 F.3d 818 (D.C. Cir. 2002)...................33

*Bekele v. Lyft, Inc.*, 918 F.3d 181, 186 (1st Cir. 2019) ................................34

*Bennett v. Spear*, 520 U.S. 154 (1997).........................................................8–10

*Biden v. Missouri*, 595 U.S. 87 (2022).........................................................22, 27

*Bondi v. VanDerStok*, 145 S. Ct. 857 (2025)...............................................32–33

*Bowen v. Massachusetts*, 487 U.S. 879 (1988) ......................................18–19

*Cal. Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316 (1997)............27

*City & Cnty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924 (N.D. Cal. 2018)...................9

*City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020).................................22

*City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018)........................................19

*City of Chicago v. Sessions*, 321 F. Supp. 3d 855 (N.D. Ill. 2018) ...............................9

*City of El Cenizo v. Texas*, 890 F.3d 164 (5th Cir. 2018) ...........................32

*City of Los Angeles v. Barr*, 941 F.3d 931 (9th Cir. 2019).......................................19, 22

*City of Los Angeles v. Sessions*, 2018 WL 6071071 (C.D. Cal. Sept. 17, 2018) ...........................9

*City of Philadelphia v. Attorney Gen.*, 916 F.3d 276 (3d Cir. 2019).........................................19, 22

*City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579 (E.D. Pa. 2017).............................9

*City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020).......................................19, 21, 24–25, 27

*Cody v. Cox*, 509 F.3d 606 (D.C. Cir. 2007) .........................................35

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024) ...........................12

*CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408 (D.C. Cir. 2011) .....................11

*Cummings v. Missouri*, 71 U.S. 277 (1866) ..............................................................1

*Dep't of Com. v. New York*, 588 U.S. 752 (2019) ..............................................34, 37

*Dep't of Ed. v. California*, 145 S. Ct. 966 (2025) ...........................................19–20

*Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1 (2020) ..........37–39

*Doe v. Trs. of Bos. Coll.*, 892 F.3d 67 (1st Cir. 2018) ...........................................44

*Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141 (2001) .............................................12

*Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530 (1st Cir. 1995) ..................8, 11

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ...................................33

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ..............................38

*Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234 (2024) .........................1, 15

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ...............7, 14

*FTC v. Standard Oil Co.*, 449 U.S. 232 (1980)......................................................9

*Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79 (1st Cir. 2010) ...............................30

*Harmon v. Thornburgh*, 878 F.2d 484 (D.C. Cir. 1989)...........................................44

*Harris v. F.A.A.*, 353 F.3d 1006 (D.C. Cir. 2004).....................................................12

*I.N.S. v. Nat'l Ctr. for Immigrants' Rts., Inc.*, 502 U.S. 183 (1991) .............................33

*In re Redondo Const. Corp.*, 820 F.3d 460 (1st Cir. 2016) ...........................................43

*Kidwell v. Dep't of Army, Bd. for Correction of Mil. Recs.*, 56 F.3d 279 (D.C. Cir. 1995)..........18

*King Cnty. v. Turner*, _ F. Supp. 3d. _, 2025 WL 1582368 (W.D. Wash. June 3, 2025)...........9, 20

*Kinsella v. United States ex rel. Singleton*, 361 U.S. 234 (1960)....................................24

*Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013) ...............................23

*La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355 (1986)......................................20–21

*Libertarian Party of N.H. v. Gardner*, 843 F.3d 20 (1st Cir. 2016) ...............................33

*Lincoln v. Vigil*, 508 U.S. 182 (1993).........................................................35–36

*Lincoln-Dodge, Inc. v. Sullivan*, 2007 WL 4577377 (D.R.I. Dec. 21, 2007)...........................8

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657 (2020) ........38

*Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461 (5th Cir. 2024) .............................................38–39

*Lowe v. Gagné-Holmes*, 126 F.4th 747 (1st Cir. 2025) ...................................................................16

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ............................................................................14

*MacRae v. Mattos*, 106 F.4th 122 (1st Cir. 2024) ..........................................................................44

*Massachusetts v. United States*, 435 U.S. 444 (1978) .....................................................................40

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) ...............................................................17

*Melone v. Coit*, 100 F.4th 21 (1st Cir. 2024) ...................................................................................37

*Michigan v. E.P.A.*, 576 U.S. 743 (2015) ........................................................................................37

*Milk Train, Inc. v. Veneman*, 310 F.3d 747 (D.C. Cir. 2002) ....................................................35–36

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) ..........................................................29

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ......................................................................................................................38

*Mount Evans Co. v. Madigan*, 14 F.3d 1444 (10th Cir. 1994) ...................................................35–36

*Nat. Res. Def. Council v. E.P.A.*, 643 F.3d 311 (D.C. Cir. 2011) ...................................................10

*Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731 (1st Cir. 1995) ....................................23

*Nat'l Fed. of Independent Bus. v. Sebelius*, 567 U.S. 519 (2012).............................................41–42

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803 (2003)..................................................8

*N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38 (1st Cir. 2021) ...............................................7, 12–13

*New York v. United States*, 505 U.S. 144 (1992)........................................................................9, 41

*New York v. Dep't of Just.*, 951 F.3d 84 (2d Cir. 2020) .................................................................22

*Nieves-Marquez v. Puerto Rico*, 353 F.3d 108 (1st Cir. 2003)........................................................41

*Norfolk & Western R. Co. v. Train Dispatchers*, 499 U.S. 117 (1991) ....................................31–32

*Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193 (2009) ...........................................45

*Or. Nat. Res. Council v. Thomas*, 92 F.3d 792 (9th Cir. 1996)........................................................38

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981) ...................................................42

*Perry Cap. LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017) ........................................18

*Polselli v. Internal Revenue Serv.*, 598 U.S. 432 (2023) ..............................................26

*Robbins v. Reagan*, 780 F.2d 37 (D.C. Cir. 1985) .......................................................23

*Roman Cath. Bishop of Springfield v. City of Springfield*, 724 F.3d 78
    (1st Cir. 2013) ...........................................................................7–8, 11–12

*Scenic Am., Inc. v. United States Dep't of Transportation*, 836 F.3d 42 (D.C. Cir. 2016) ............10

*Shawnee Tribe v. Mnuchin*, 984 F.3d 94 (D.C. Cir. 2021) ..............................................35

*Short v. Brown Univ.*, 320 F. Supp. 3d 363 (D.R.I. 2018) ..............................................43

*Sig Sauer, Inc. v. Brandon*, 826 F.3d 598 (1st Cir. 2016) ...............................................9

*South Dakota v. Dole*, 483 U.S. 203 (1987) ........................................................40–42

*State ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015 (N.D. Cal. 2018) ..............................9

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ................................................7

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016) ........................................10

*U.S. ex rel. Gadbois v. PharMerica Corp.*, 809 F.3d 1 (1st Cir. 2015) ..................................30

*Union of Concerned Scientists v. Wheeler*, 954 F.3d 11 (1st Cir. 2020) ............................34–35

*United States v. Comstock*, 560 U.S. 126 (2010) .......................................................24

*United States v. Louisiana*, 363 U.S. 1 (1960) .........................................................45

*United States v. Salerno*, 481 U.S. 739 (1987) .....................................................32–33

*W. Va. ex rel. Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124 (11th Cir. 2023) ................22

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008) ..............................33

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, _ F. Supp. 3d _,
    2025 WL 1116157 (D.R.I. Apr. 15, 2025) ...........................................................17

## Constitutional Provisions, Statutes & Rules

U.S. Const. art. I, sec. 8, cl. 18 ......................................................................24

Pub. L. 107-296, 116 Stat. 2135 (2002) .............................................................28–29

Pub. L. 110-53, 121 Stat. 266 (2007) .................................................................29

Pub. L. 115-31, 131 Stat. 135 (2017) ........................................................................28

Pub. L. 115-387, 132 Stat. 5162 (2018) ...................................................................28

Pub. L. 118-47, 138 Stat. 460 (2024) ........................................................................36

Pub. L. 119-4, 139 Stat. 9 (2025) ..............................................................................10

Pub. L. 119-21, 139 Stat. 72 (2025) ...............................................................25–26, 36

5 U.S.C.
   § 551 ................................................................................................................8, 10
   § 701 ...............................................................................................................34–35
   § 704 ......................................................................................................................8
   § 706 ....................................................................................................................43

6 U.S.C.
   § 111 ..................................................................................................26, 28–29
   § 112 ....................................................................................................................24
   § 596 ....................................................................................................................36
   § 596b .............................................................................................................28, 36
   § 603 ....................................................................................................................31
   § 605 ...............................................................................................................27, 31
   § 607 ....................................................................................................................27
   § 608 ....................................................................................................................27
   § 609 ....................................................................................................................31
   § 701 ....................................................................................................................27
   § 741 ....................................................................................................................27
   § 762 ....................................................................................................................27
   § 1135 ...........................................................................................................27–28, 36

8 U.S.C. § 1357 .................................................................................................6, 30, 32

28 U.S.C. § 1491 .....................................................................................................17

34 U.S.C.
   § 10102 ................................................................................................................24
   § 10153 ................................................................................................................25

42 U.S.C.
   § 1395x ................................................................................................................22
   § 5122 ..................................................................................................................27
   § 5195a ................................................................................................................27

46 U.S.C.
   § 70101 ................................................................................................................25
   § 70103 ................................................................................................................25
   § 70107 ...........................................................................................................25, 36

Fed. R. Civ. P. 15 ................................................................................................30

Fed. R. Civ. P. 56 ..........................................................................................11, 44

Fed. R. Civ. P. 65 ................................................................................................44

Fed. R. Evid. 902 ................................................................................................30

## Executive & Administrative Materials

44 C.F.R.
    § 204.25 ............................................................................................4
    § 206.44 ............................................................................................4

Exec. Order No. 14287, 90 Fed. Reg. 18761 (Apr. 28, 2025) ......................................16

## Other Authorities

10A Wright et al., *Federal Practice & Procedure* (4th ed. 2025)................................11

Brief for Appellants, *King Cnty. v. Turner*, No. 25-3664 (9th Cir. July 8, 2025)..........................20

H. Rep. 119-106 (2025) ................................................................................28

# INTRODUCTION

This spring, the Department of Homeland Security ("DHS") quietly amended its standard terms and conditions to include an unprecedented limitation on access to "all new federal awards," ECF 59-1, that it oversees: Those funds would be made available only to States and localities that assisted it in enforcing federal immigration law, irrespective of the purpose of the grant program or the statutory provisions authorizing it. That decision was unlawful in multiple separate respects: It exceeded the Department's statutory authority, it was unreasonable and unreasonably explained, and it violates the Constitution's Spending Clause.

Confronted with the reality that the Civil Immigration Conditions are flagrantly unlawful, defendants have partially retreated. They now say that most of their grant documents will one day include language carving out precisely those standard terms that Plaintiff States challenged in this suit (and no others). ECF 61-1 ("Supp. Richardson Decl.") ¶¶ 9–11. And they insist that they have not decided whether to apply the Conditions as to a range of other grant programs—including as to mandatory formula programs whose funds Congress has directed be disbursed by September 30, less than two months from now, and for which notices of funding opportunity ("NOFOs") have been posted. At the same time, defendants have repackaged the Civil Immigration Conditions into a grant-specific requirement accompanying one of FEMA's largest grant programs, the State Homeland Security Program ("SHSP"), that the States cannot satisfy without engaging in the very conduct the Conditions seek to coerce—assistance in enforcing federal immigration law.

The Court should disregard defendants' gamesmanship and declare the Civil Immigration Conditions—in all their forms—unlawful. "The Constitution deals with substance,' not strategies." *Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 241 (2024) (quoting *Cummings v. Missouri*, 71 U.S. 277, 325 (1866)). Defendants promulgated sweeping conditions that sought to use billions of dollars in federal emergency funding to coerce the States into enforcing federal immigration

law. Although defendants have now attempted to retreat—purporting to withdraw the Conditions as to some grants, asserting a state of indefinite indecision as to others, and re-imagining the Conditions entirely as to still more—the Court should see through those gambits and adjudicate the case before it. This case concerns whether defendants can lawfully impose across-the-board immigration-enforcement requirements on all federal dollars that flow through DHS. Defendants' post-litigation maneuvers do not affect the justiciability of that question, and it has an easy answer: They cannot. At bottom, defendants argue that the Conditions are justified merely because "the grants at issue in this case come from the Agency tasked with enforcing federal immigration law." ECF 61 ("Opp.") 34. That argument has no basis in law, and the Court should reject it, holding that the Conditions are contrary to law, arbitrary and capricious, and unconstitutional.

Judgment should accordingly be entered in Plaintiff States' favor and relief awarded in the requested form.

## BACKGROUND

On March 27, 2025, DHS promulgated new "standard terms and conditions" applicable to "all new federal awards of federal financial assistance" issued on or after March 27. *See* ECF 59-1, 59-3. The March 27 standard terms included most of the challenged Civil Immigration Conditions, ECF 59-1 at 4, which became the default rule for all DHS grants awarded on or after that date. *See* Supp. Richardson Decl. ¶ 6 ("The Immigration Conditions do not apply to any grant awards that had already been made *before March 27, 2025*.") (emphasis added). On April 18, defendants re-promulgated the Conditions and added to them. ECF 59-2 at 4, 6; Opp. 3 n.3.

Plaintiff States filed this suit on May 13 seeking equitable relief against the promulgation of across-the-board Civil Immigration Conditions. *See* ECF 1 ("Compl.") ¶ 7 (attacking "DHS's decision to impose this new set of conditions"); *id.* ¶ 43 n.1 ("Plaintiff States seek an injunction against enforcement of the challenged conditions as to all grants that defendants administer . . . .");

*id.* at 73 ¶ a (seeking a declaration that "promulgation of the Civil Immigration Conditions on receipt of funds under the grant programs [defendants] administer are contrary to the Constitution and laws of the United States"). Six days later, Plaintiff States moved for a preliminary injunction barring defendants from applying and enforcing the Civil Immigration Conditions with respect to Plaintiff States "as to all grants under defendants' control." ECF 20 at 46.

In May 2025—before defendants filed their initial brief in this case—DHS posted three NOFOs to govern grant programs in which States are not grantees. *See* Ex. 3 (Weaver Decl.), ¶ 12 & Ex. B at 3. None included any exception from the Civil Immigration Conditions. Instead, all three stated expressly that "[a] recipient of a federal award under this funding opportunity is required to comply with DHS Standard Terms and Conditions in effect at the time the award is issued." Ex. 3-H at 32 (Fire Prevention and Safety Grant Program); Ex. 3-I at 26 (Staffing for Adequate Fire and Emergency Response Grant Program); *see also* Ex. 3-G at 16 (National Nonprofit Organization Recreational Boating Safety Grant Program with similar language).

On June 6, 2025, in their papers opposing preliminary-injunctive relief, defendants stated publicly for the first time that the Civil Immigration Conditions would not apply uniformly across all DHS grants. ECF 52 at 3–4. Defendant Richardson, the Senior Official Performing the Duties of the FEMA Administrator, listed twelve grant programs as to which FEMA had made "a final determination that Immigration Conditions do ***not*** apply." ECF 52-1 ("Richardson Decl.") ¶ 14.[1] Defendants did not specify at that time any changes that they would make to the DHS standard terms and conditions themselves, nor to any grant documents. Still, the parties reached agreement on an expedited summary-judgment schedule under which Plaintiff States would "forego their request for preliminary relief," provided that "Plaintiffs reserve their right to seek preliminary

---

[1] Plaintiff States cite to the corrected versions of these filings as filed on June 9, 2025.

relief if they are required to agree to any of the Civil Immigration Conditions in order to secure any other federal funding before September 2025." ECF 56 ¶ 2; *see also* June 25, 2025 Text Order.

Plaintiff States moved for summary judgment on July 2. ECF 58–59 ("Mot."). Defendants responded and cross-moved for summary judgment on July 23. ECF 61 ("Opp."). In their opposition, defendants revealed for the first time their concrete plan for exempting specific grant programs from the Civil Immigration Conditions. Defendant Richardson explained that defendants intended to revise Stafford Act FEMA-State agreements, *see* 44 C.F.R. §§ 204.25, 206.44, to include language incorporating all the DHS standard terms "with the exception [of] Paragraph X.IX . . . and paragraph C.XVII(2)(a)(iii)," Supp. Richardson Decl. ¶ 9, which are precisely the Civil Immigration Conditions challenged in this suit. Richardson also averred that such language would be included in NOFOs and award documents for other programs that DHS intended to exempt from the Conditions. *Id.* ¶ 11. Richardson stated that DHS is still "analyzing" whether the Conditions "can be applied" to major preparedness grant programs, including the Emergency Management Performance Grant and the Homeland Security Grant Program. *Id.* ¶ 13.

From July 25 through August 1, DHS issued NOFOs under 24 grant programs, many of which provide funds directly to States. Defendant Noem sent letters to each State announcing the NOFOs and inviting States "to apply for this critical funding . . . which is essential for enhancing our collective security and emergency preparedness." *E.g.*, Letter from Kristi Noem, Sec'y of Homeland Sec., to Hon. JB Pritzker (July 28, 2025) (Ex. 3-A). All the recent NOFOs include identical standard language that "[a] recipient under this funding opportunity must comply with the DHS Standard Terms and Conditions in effect as of the date of the federal award." *See, e.g.*, Ex. 3-F at 41; Ex. 3-J at 21; Ex. 3-R at 35; *see also* Ex. 3 (Weaver Decl.), ¶ 13. Many of the recent NOFOs also include separate language—often in two different places—stating that the April 18,

2025, version of the standard terms will control, rather than the standard terms "in effect as of the date of the federal award," while expressly carving out the Civil Immigration Conditions from that version, in the manner described in Richardson's declaration. *E.g.*, Exs. 3-J at 21; 3-K at 24, 31; 3-L at 40; 3-R at 35, 43. But six of the NOFOs—those for the Emergency Management Performance Grant, Homeland Security Grant Program, Continuing Training Grants, Transit Security Grant Program, Port Security Grant Program, and Regional Catastrophic Preparedness Grant Program—instead include the following language, often twice:

> An immigration term and condition may be material to the Department of Homeland Security's decision to make this grant award, and the Department of Homeland Security may take any remedy for noncompliance, including termination, if the state or territorial recipient or any local government subrecipient fails to comply with this term and condition. No final agency determination has been made as of the date of this publication.

Exs. 3-M at 34; 3-F at 7, 48; 3-N at 7, 28; 3-O at 7–8, 34; 3-P at 8, 43; 3-Q at 9, 40. So, consistent with defendant Richardson's avowals in his supplemental declaration, the NOFOs for these six programs indicate that DHS may still demand compliance with the Conditions on them. And, again, the NOFOs also incorporate by reference the default rule, under which the Conditions apply. *See* Exs. 3-F at 41; 3-M at 29; 3-N at 21; 3-O at 29; 3-P at 37; 3-Q at 32.[2]

Finally, the Homeland Security Grant Program NOFO specifies a new "national priority area" ("NPA") for the State Homeland Security Program ("SHSP"), which is one component of the broader Homeland Security Grant Program. *See* Ex. 3-F at 13–14. Defendants expect to allocate over $210 million to Plaintiff States under SHSP for fiscal year 2025. *Id.* at 51–52. The new NPA "requires" that "at least 10% of total SHSP funds" be spent on "Supporting Border Crisis

---

[2] A version of the Homeland Security Grant Program NOFO posted earlier in the day on July 28, 2025, did incorporate all the Civil Immigration Conditions, including via a new mechanism creating a "prohibition" on "sanctuary jurisdiction" status, defined by reference to the Conditions. *See* Ex. 3-E at 48–50. That version has been taken down and replaced with the current version, *see* Ex. 3 (Weaver Decl.), ¶¶ 10–11, which Plaintiff States understand to be authoritative.

Response and Enforcement." *Id.* at 13; *see also id.* at 51. But despite the reference to a "border crisis," the substance of the requirement focuses on interior enforcement of civil immigration law: "Supporting collaboration between state and local law enforcement and U.S. Immigration and Customs Enforcement (ICE) through the 287(g) program to identify and remove individuals who pose a threat to public safety and national security." *Id.* at 14. The Immigration and Nationality Act § 287(g) program to which DHS refers, codified at 8 U.S.C. § 1357(g), allows state and local subdivisions to enter into written agreements with the federal government so that state and local officers can perform immigration-officer functions. 8 U.S.C. § 1357(g)(1). Failure to comply with the new national priority area for SHSP, hereinafter "the Civil Immigration NPA," "will result in a hold on affected funds until compliance issues are resolved." Ex. 3-F at 14.

## ARGUMENT

The Court should reach the merits of Plaintiff States' challenge to the Civil Immigration Conditions (in all their forms) because those claims are ripe, are not moot, and are not subject to the exclusive jurisdiction of the Court of Federal Claims under the Tucker Act. On the merits, it should declare the conditions unlawful on each of three grounds: that they are not authorized by statute, that their promulgation was arbitrary and capricious, and that they violate the Constitution's Spending Clause. Defendants' arguments to the contrary cannot salvage their reckless decision to promulgate sweeping, across-the-board requirements on billions of dollars in federal emergency funds in an effort to conscript the States into enforcing immigration law.

## I.    The Court Has Jurisdiction to Adjudicate the Legality of the Promulgation of the Civil Immigration Conditions.

Defendants promulgated new standard terms for "all new federal awards" that include the challenged Civil Immigration Conditions. ECF 59-2 at 1, 4, 6. That was a final agency action ripe for review, and no part of Plaintiff States' challenge to it has become moot. Defendants seek to re-

characterize that single, indiscriminate agency action as a series of individual decisions regarding individual grant programs. But that is simply not the path defendants chose. They imposed the Civil Immigration Conditions across the board as a default rule, the legal consequences of which become more severe day by day for Plaintiff States. And Plaintiff States' claims against that default rule belong in this Court because they arise under the Constitution and laws of the United States, not contracts with defendants. The Court should accordingly adjudicate the merits of Plaintiff States' challenge to the promulgation of the Civil Immigration Conditions.

### A.    Plaintiff States' Challenge to the Civil Immigration Conditions Is Ripe.

Plaintiff States' claims are ripe. The "jurisdictional" component of ripeness "concerns whether there is a sufficiently live case or controversy, at the time of the proceedings, to create jurisdiction in the federal courts." *Roman Cath. Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 89 (1st Cir. 2013); *see also Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000) (standing assessed "at the outset of the litigation"). Defendants do not contest Plaintiff States' Article III standing to challenge the Civil Immigration Conditions, which imminently threaten to deprive Plaintiff States of billions of dollars of funding. There can be no real dispute that this case was ripe as a jurisdictional matter when filed.

Instead, defendants' arguments appear to turn on so-called "prudential" ripeness. Opp. 13–15 (citing prudential-ripeness factors).[3] But those factors also support immediate resolution of the dispute. "There are two factors to consider in determining ripeness: 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Roman*

---

[3] Plaintiff States note that "[t]he Supreme Court has expressed doubt about whether the doctrine of prudential ripeness is consistent with the settled principle that a federal court has a 'virtually unflagging' obligation to hear and decide cases within its jurisdiction." *N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 52 n.8 (1st Cir. 2021) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014)).

*Catholic Bishop*, 724 F.3d at 89 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). The legality of the Civil Immigration Conditions—in all their forms—is fit for immediate resolution, and delaying review would impose great hardship on Plaintiff States.

### 1. The promulgation of the Civil Immigration Conditions was final agency action and is fit for review.

Fitness "involves subsidiary queries concerning finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed." *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 535 (1st Cir. 1995). In the administrative context, the fitness inquiry overlaps with the question whether defendants have taken "'final agency action' within the meaning of § 10 of the APA, 5 U.S.C. § 704." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003); *accord Abbott Labs.*, 387 U.S. at 149; *Lincoln-Dodge, Inc. v. Sullivan*, 2007 WL 4577377, at *4 (D.R.I. Dec. 21, 2007). The Court also considers whether the challenge "turn[s] on legal issues not likely to be significantly affected by further factual development." *Ernst & Young*, 45 F.3d at 536. Both criteria are met here.

To start with the basics, "agency action" includes a "rule," defined broadly to include "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4), (11). Promulgating new standard grant terms has "future effect" and implements "law or policy." Defendants have imposed the Civil Immigration Conditions as a default rule governing "all new federal awards of federal financial assistance" from DHS. ECF 59-2 at 1. Absent a later exception, the Conditions bind all DHS grantees and even "flow down to [their] subrecipients unless a term or condition specifically indicates otherwise." *Id.*

Promulgating the standard terms was "final" action because it "mark[ed] the consummation of the agency's decisionmaking process" and determined "rights or obligations" such that "legal

consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotations omitted). The Civil Immigration Conditions offer "the definitive statement of the agency's position." *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 600 n.1 (1st Cir. 2016) (brackets omitted) (quoting *FTC v. Standard Oil Co.*, 449 U.S. 232, 241 (1980)). Namely, defendants believe that they may use the federal funds they control to "compel the States to . . . administer a federal regulatory program," *New York v. United States*, 505 U.S. 144, 188 (1992), the civil immigration enforcement system. When the first Trump administration attempted to attach immigration-enforcement conditions to Department of Justice ("DOJ") funding, the courts unanimously held that "the decision to attach the Conditions to the grant in the first instance" constituted final agency action, even if there remained a "not-yet-finalized decision whether to *award* the funds." *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 865 (N.D. Ill. 2018); *see also City & Cnty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 961 (N.D. Cal. 2018); *City of Los Angeles v. Sessions*, 2018 WL 6071071, at *2 (C.D. Cal. Sept. 17, 2018); *State ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1031–32 (N.D. Cal. 2018); *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 615 (E.D. Pa. 2017). Another district court recently found that similar funding conditions imposed by other federal agencies were also final agency action. *King Cnty. v. Turner*, _ F. Supp. 3d. _, 2025 WL 1582368, at *14 n.18 (W.D. Wash. June 3, 2025), *appeal docketed*, No. 25-3664 (9th Cir.).

Although DHS asserts that it is still "continuing to analyze" whether the Civil Immigration Conditions will apply to certain grant programs, Supp. Richardson Decl. ¶ 12; *see also supra* pp. 3–5, that litigation position does not undermine finality or ripeness. DHS has promulgated its definitive statement as to the *default rule* for all DHS grants going forward. The effect of the Conditions as promulgated can be nullified only by further, later agency actions to rescind the Conditions with respect to particular grants. Such after-the-fact waivers would constitute separate

9

agency actions from the original promulgation. *See* 5 U.S.C. § 551(11)(B) (agency action of "relief" defined to include "recognition of a[n] exemption, or exception"); *see also U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016) (the "possibility" of later revisions to an agency action "is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal"). For example, absent further action, even the NOFOs for the Emergency Management Performance Grant ("EMPG") and Homeland Security Grant Program ("HSGP") programs—which state that a "final agency determination" is pending on the applicability of "[a]n immigration term and condition"—still require Plaintiff States to comply with "the DHS Standard Terms and Conditions in effect as of the date of the federal award," which to this day include the Civil Immigration Conditions. Exs. 3-M at 29, 34; 3-F at 41, 48.[4]

The original promulgation of the Conditions therefore also had "legal consequences," *Bennett*, 520 U.S. at 178, because defendants' promulgation of them has altered the legal regime for all DHS grants. Henceforth, the Conditions apply to all DHS monies, unless a later grant agreement says otherwise. "[W]here agency action withdraws an entity's previously-held discretion, that action 'alter[s] the legal regime,' 'binds' the entity, 'and thus qualifies as final agency action.'" *Scenic Am., Inc. v. United States Dep't of Transportation*, 836 F.3d 42, 56 (D.C. Cir. 2016) (quoting *Nat. Res. Def. Council v. E.P.A.*, 643 F.3d 311, 320 (D.C. Cir. 2011)).

The final agency action that defendants took is fit for review because Plaintiff States' challenge turns on legal issues. Defendants may be "analyzing" whether to make additional

---

[4] Indeed, the possibility of future agency action is diminishing by the day: Congress has required FEMA to obligate the funds associated with the EMPG and HSGP grant programs, among others, no later than September 30, *see* Full-Year Continuing Appropriations and Extensions Act of 2025, Pub. L. 119-4, §§ 1101(a)(6), 1106, 139 Stat. 9, 11, 12, meaning that FEMA has less than two months remaining in which to make the "final agency determination" about whether to excise the Civil Immigration Conditions or not.

exemptions from the Civil Immigration Conditions, Supp. Richardson Decl. ¶ 13, but that analysis will not generate any "further factual development," *Ernst & Young*, 45 F.3d at 536. Defendants have "made no effort to justify the [Civil Immigration Conditions] in factual terms." *Abbott Labs.*, 387 U.S. at 149. Defendants have instead contended that they have inherent authority to fill gaps in the authority that Congress gave them, Opp. 20, or that the DHS Secretary's general power to enter grant agreements includes that power, *id.* 23–24. These arguments are egregiously wrong. *See infra* pp. 21–24. And right or wrong, they do not turn on any factual questions that have yet to be developed. Indeed, defendants' opposition brief does not contend otherwise; they identify no factual reason for withholding adjudication. *See* Opp. 13–15. "In the absence of disputed facts that would bear on the statutory question, there [is] no benefit in waiting for [DHS] to develop a record before granting judicial review." *CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 412 (D.C. Cir. 2011).

## 2. Postponing adjudication would inflict hardship on Plaintiff States.

By the same token, withholding review of the Civil Immigration Conditions would impose hardship on Plaintiff States. The hardship prong "is wholly prudential" and asks "whether the challenged action creates a direct and immediate dilemma for the parties." *Roman Catholic Bishop*, 724 F.3d at 90. Plaintiff States face direct and immediate dilemmas today, right now. Defendants demand certification to the Civil Immigration Conditions under both the BioWatch and Securing the Cities grant programs. Supp. Richardson Decl. ¶ 19. Plaintiff States and their instrumentalities have received funding under these programs for many years. *E.g.*, ECF 21-15 (Buhse Decl.), ¶ 21; ECF 59-29 (Poeschel Decl.), ¶ 5; ECF 21-34 (Kreipke Decl.), ¶ 7.[5] Defendants have also now

---

[5] The Court must consider all cited "materials in the record," including "affidavits or declarations," Fed. R. Civ. P. 56(c)(1)(A), regardless of whether Plaintiff States attached them to their preliminary-injunction motion, ECF 20, or at summary judgment, ECF 58. *See* 10A Wright et al., *Federal Practice & Procedure* § 2721 (4th ed. 2025) (court to "consider all papers of record").

announced that millions of dollars in SHSP funding will be conditioned on assistance with enforcing federal immigration law via the Civil Immigration NPA. Ex. 3-F at 13–14. And the Emergency Management Performance Grant NOFO indicates that, while a decision is allegedly still pending, "the Department of Homeland Security may take any remedy for noncompliance, including termination," based on the Civil Immigration Conditions. Ex. 3-M at 34. Withholding review would impose significant hardship on Plaintiff States on these bases alone.

Even as to the DHS programs without currently pending NOFOs, "the mere existence of" of the Civil Immigration Conditions "imposes delay, uncertainty, and expense, which is sufficient to show present injury." *Roman Catholic Bishop*, 724 F.3d at 92; *see also Harris v. F.A.A.*, 353 F.3d 1006, 1012 (D.C. Cir. 2004) ("The 'prospect' of hardship is sufficient to make a claim fit for judicial review."), *abrogated on other grounds by Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024). Plaintiff States have structured their budgets based on the reasonable expectation of continued DHS funding, which they cannot make up from other sources. *See* ECF 59-23 (Higgins Decl.), ¶¶ 20, 30, 84, 88; ECF 59-31 (Brantley Decl.), ¶ 78; ECF 59-51 (Chapman-See Decl.), ¶ 9. Practically speaking, then, the Conditions already demand "an immediate and significant change in the plaintiffs' conduct of their affairs" as to all grants, given the "serious penalties attached to noncompliance." *Abbott Labs.*, 387 U.S. at 153; c*f. Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 151 (2001) (holding that "a default rule," though it allowed for case-by-case opt outs, still inflicted a "burden of compliance").

The First Circuit's decision in *New Hampshire Lottery Commission*, 986 F.3d 38, found sufficient hardship to require immediate adjudication in closely analogous circumstances. In 2018, DOJ's Office of Legal Counsel announced a new legal position that it candidly admitted upset longstanding reliance interests. *Id.* at 46. After affected plaintiffs sued for declaratory relief, DOJ

filed a new legal opinion, "penned that same day," alongside its brief in the district court, proclaiming that it was "now reviewing" the question anew. *Id.* at 49. The First Circuit rejected DOJ's ripeness argument and held that "we cannot see why the plaintiffs should be forced to sit like Damocles while the government draws out its reconsideration," especially where DOJ "offer[ed] no reason to expect an answer favorable to the plaintiffs." *Id.* at 53.

**B.      No Part of Plaintiff States' Challenge Is Moot.**

Plaintiff States' challenge to the promulgation of the Civil Immigration Conditions is also not moot, for two separate reasons: first, because defendants have not, in fact, effected any legally binding change to the Civil Immigration Conditions; and second, because even if they had, any such change would fall squarely within the voluntary-cessation doctrine. Plaintiff States explained both points in their motion, Mot. 18–23, but defendants have no serious response.

First, before even reaching the question of voluntary cessation, defendants have not modified the Civil Immigration Conditions. The DHS standard terms, including the Conditions, remain unchanged since suit was filed. They "apply to all new federal awards." ECF 59-2 at 1. They continue to be incorporated wholesale into DHS NOFOs, only sometimes with exceptions. *See supra* pp. 4–5. A live controversy accordingly remains as to the legality of that default rule.

A live controversy also clearly remains as to the Civil Immigration Conditions' application to many large grant programs. For instance, the Emergency Management Performance Grant is "the backbone of emergency management," without which local "jurisdictions could be forced to shut down their emergency management offices entirely." ECF 59-30 (Strickland Decl.), ¶ 180; *see also* ECF 59-41 (Bray Decl.), ¶ 55; ECF 59-52 (Ezelle Decl.), ¶¶ 52–53. The State Homeland Security Program and the related Urban Area Security Initiative are also massively important to Plaintiff States, annually providing them with hundreds of millions of dollars. ECF 57 ¶¶ 68, 83. Defendants have not indicated any change in their conduct as to these programs, Supp. Richardson

Decl. ¶ 13, and in fact have now required immigration-enforcement cooperation in the SHSP NOFO, *supra* pp. 5–6. The State Recreational Boating Safety program grants approximately $50 million each year to Plaintiff States. *See* Memorandum from Chief, Grants Mgmt. Branch, U.S. Coast Guard, to Boating Law Administrators 2 (Apr. 4, 2025) (Ex. 1); ECF 57 ¶ 247. Defendants temporarily waived the Civil Immigration Conditions as to the program for this year but explicitly say that "a final decision regarding the applicability of the Conditions" has not been made for "the FY 2026 Notice of Funding Opportunity." Memorandum from Chief, Grants Mgmt. Branch, U.S. Coast Guard, to Boating Law Administrators 1 (July 24, 2025) (Ex. 2); *see also* ECF 61-2 (Oborski Decl.) ¶ 4 (same). And finally, with respect to the BioWatch program, which protects Plaintiff States from bioterrorist attack, ECF 59-29 (Poeschel Decl.), ¶ 4, defendants state that the Civil Immigration Conditions will apply. *See* Supp. Richardson Decl. ¶ 19. Again, defendants need do *nothing further* to impose the Conditions on BioWatch; the Conditions apply by default.

The above points suffice to show that Plaintiff States' challenges are not moot. Defendants promulgated an across-the-board policy; that policy remains in place; and it harms Plaintiff States today. Nothing more is needed. A plaintiff need not show imminent injury from every conceivable application of a law or policy to establish "the irreducible constitutional minimum of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

In any event, if any part of Plaintiffs' claims would otherwise be moot, defendants also fail to carry their "formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 190. Every detail of the timing of events in this case confirms that defendants have carved out exceptions from the Civil Immigration Conditions only because Plaintiff States filed suit challenging them.

On March 25, 2025, defendant Noem signed the March 20 Hamilton memorandum, which proposed tailoring Civil Immigration Conditions to particular grants. *See* ECF 59-7; Supp. Richardson Decl. ¶ 7. But two days later, the DHS standard terms and conditions issued, ECF 59-1, without any qualifying language, ECF 59-3, and made clear that they "appl[ied] to all new federal awards," ECF 59-1 at 1. No reasonable factfinder could determine, as of that date, that DHS had done anything but "ignore[] the March 25 Memo." Opp. 34. The Civil Immigration Conditions thus governed in April and May. In fact, defendants issued three NOFOs in May that incorporated the Civil Immigration Conditions, without exception, by default. *See supra* p. 3; Exs. 3-G at 16; 3-H at 32; 3-I at 26. Plaintiff States filed their complaint on May 13 and moved for a preliminary injunction six days later. ECF 1, 20.

It was news to Plaintiff States when, on June 6 in response to the preliminary-injunction motion, defendants suddenly took the position that "all" did not mean "all" and that DHS had been "completing the additional analysis for the identified grant programs." ECF 50-1 ("Richardson Decl.") ¶ 7. DHS said that it had made a "final determination" that the Civil Immigration Conditions did not apply to some grant programs, *id.* ¶ 14, which it reiterates in its July 23 filings, Supp. Richardson Decl. ¶ 8. Plaintiff States pointed out in their motion that "Richardson did not specify in his declaration the form that the final determination took nor the date when it was made." Mot. 15. In opposition to summary judgment, Richardson does not provide any more detail on when and how he made his determination, even though defendants bear the burden of proof on the issue. *See Fikre*, 601 U.S. at 243 ("In all cases, it is the defendant's 'burden to establish' that it cannot reasonably be expected to resume *its* challenged conduct."). The only reasonable inference is that this "determination" is a litigation position of recent vintage. *See supra* p. 3 (describing May 2025 NOFOs, which included all the standard terms).

15

The plan defendants now describe in their July 23 filings—to introduce carve-out language into individual grant agreements—demonstrates further that their partial retreat resulted from this litigation. Defendants intend to incorporate *all* DHS standard terms "with the exception" of the Civil Immigration Conditions and nothing else. *See* Supp. Richardson Decl. ¶ 9; *supra* pp. 4–5 (recent NOFOs). Defendants have presented no evidence that, in any other circumstance, they have ever excised DHS standard terms from DHS grant documents in this manner. Nothing other than this suit "reasonably explain[s] defendants' decision" to resect the Civil Immigration Conditions from some of their grant programs. *Lowe v. Gagné-Holmes*, 126 F.4th 747, 759 (1st Cir. 2025).

Finally, as Plaintiff States set out in their motion for summary judgment, Mot. 21, defendants' repeated public statements have emphasized, time and again, their desire to punish Plaintiff States using the tool of federal spending. The President has proclaimed that Plaintiff States are in "lawless insurrection." Exec. Order No. 14287, § 1, 90 Fed. Reg. 18761, 18761 (Apr. 28, 2025). Defendant Noem posted a list of "sanctuary jurisdictions," took it down under criticism, but then said that the list "is absolutely continuing to be used and it is going to be identifying those cities and those jurisdictions that aren't honoring law and justice." ECF 59-15. Defendants do not even acknowledge, let alone retreat from, their public statements, which show that they intend to "engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where [they] left off, repeating this cycle until [they] achieve[] all [their] unlawful ends." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). The Court should reject that gambit.

**C.     The Tucker Act Does Not Apply to Any Part of this Case.**

Defendants finally argue that this case presents a contract dispute between DHS and Plaintiff States that should have been filed in the U.S. Court of Federal Claims pursuant to the Tucker Act. Opp. 15–20. But Plaintiff States do not assert contract claims, and defendants' contrary

reading would call into question a long line of caselaw—caselaw from Article III courts, not the Court of Federal Claims—granting relief in cases that look identical to this one.

The Tucker Act grants exclusive jurisdiction to the Court of Federal Claims over "any claim against the United States founded . . . upon any express of implied contract with the United States" for amounts over ten thousand dollars. 28 U.S.C. § 1491(a). To determine whether a plaintiff has filed a claim founded on a contract, subject to the Tucker Act, courts assess whether the "essence" of the plaintiff's claim is in contract, by examining (1) source of the rights upon which the plaintiff bases its claim and (2) the type of relief sought (or appropriate). *See Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, _ F. Supp. 3d _, 2025 WL 1116157, at *12 (D.R.I. Apr. 15, 2025); *see also Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). Both factors make clear that Plaintiff States' claims are not contractual in nature.

First, the sources of Plaintiff States' rights are the APA and the U.S. Constitution, not any agreement with the federal government. Plaintiff States sue to ensure their future participation in the robust emergency preparedness and response system established by Congress. Compl. ¶¶ 38–238. The APA affords them the right to such participation without the imposition of arbitrary, unreasoned, unauthorized, and unconstitutional conditions by federal agencies. Mot. 29–38. And the Constitution's Spending Clause gives Plaintiff States the right to future participation in these programs without the need to comply with coercive, unrelated, or vague conditions imposed by the federal government. *Id*. 38–46. But for defendants' violations of the APA and the Spending Clause, Plaintiff States would continue to participate in programs they have relied on for decades.

These rights do not flow from any contract. Indeed, there *are* no contracts between Plaintiff States and DHS as to the funds at issue. This is not a case, as defendants suggest, about whether DHS "must perform" under an agreement. Opp. 19. Instead, this case raises the question of whether

17

defendants' grant administration conduct—prior to any agreement—violates the APA and the Spending Clause. This is a quintessential question for an Article III court.

The mere fact Plaintiff States' participation in DHS grant programs involves agreements with DHS does not automatically transform this into a contract dispute, as Defendants argue at length. Opp. 17–19. The relevant question is whether the Plaintiff States have filed suit *on* a contract, not whether the case *involves* contracts. *See, e.g.*, *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) ("[W]e do not think that any case requiring some reference to . . . a contract is necessarily on the contract and therefore directly within the Tucker Act."). Ultimately, Defendants' fixation on the Plaintiffs States' "contractual relationship with the federal government" is a red herring. Opp. 15. Defendants have not pointed to a single contract *on which* Plaintiff States' rights to relief turn.

Second, Plaintiff States do not seek a contract remedy, such as money damages. Instead, Plaintiff States seek an equitable remedy: the removal of the unlawful conditions from all grant programs. Compl., Prayer for Relief. The fact that such relief would result in the flow of money to Plaintiff States does not transform this case into one for money damages. That is the rule of *Bowen v. Massachusetts*, 487 U.S. 879 (1988), which rejected exactly this argument in the context of a dispute over a federal order denying reimbursement payments from Medicaid, notwithstanding that the dispute was fundamentally one about money. In the Supreme Court's words, "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Id.* at 893; *see also Kidwell v. Dep't of Army, Bd. for Correction of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995) (a claim does not become one for money damages merely because "success on the merits may obligate the United States to pay the complainant"). *Bowen* distinguished money damages, which "substitute" for a suffered loss and

are subject to the Tucker Act, from a specific remedy, which simply gives the plaintiff something to which it was entitled. *Bowen*, 487 U.S. at 895. Here, the Plaintiff States seek access to funding authorized and appropriated by Congress not to substitute for any loss, but because they are statutorily entitled to participate in the grant programs at issue. That places Plaintiff States' claims within the heartland of *Bowen*.

Indeed, any contrary rule would call into question a long line of cases—in Article III courts, not the Court of Federal Claims—adjudicating claims indistinguishable from those here. During the first Trump Administration, DOJ sought to impose a set of immigration-related conditions like those imposed by defendants here on a specific funding program, the Byrne JAG Program. *See City of Providence v. Barr*, 954 F.3d 23, 30 (1st Cir. 2020). States and localities challenged that decision in Article III courts—including this Court—all of which exercised jurisdiction without objection from the federal government. *See, e.g.*, *Providence*, 954 F.3d at 26 (municipalities challenged conditions in "federal district court"); *City of Los Angeles v. Barr*, 941 F.3d 931, 934 (9th Cir. 2019) (same); *City of Philadelphia v. Attorney Gen.*, 916 F.3d 276, 279 (3d Cir. 2019) (same); *City of Chicago v. Sessions*, 888 F.3d 272, 287 (7th Cir. 2018) (same). Plaintiffs in these cases brought substantively identical claims and sought identical relief—declaratory and injunctive relief barring the Department from imposing the unlawful conditions—as Plaintiff States do here. If these claims were contract claims that had to be brought in the Court of Federal Claims, in other words, all of these opinions—including the First Circuit's decision in *Providence*—were wrongly decided. That cannot be right, but defendants offer not a single word to explain the discrepancy.

Defendants invoke the Supreme Court's recent three-page per curiam order in *Department of Education v. California*, 145 S. Ct. 966 (2025), but that order is irrelevant here. Most basically,

the claims at issue in *California* looked nothing like the claims here (and in *Providence*). Plaintiff states in *California* had executed grant agreements with the federal government and brought suit to challenge the termination of those grants. *See California*, 145 S. Ct. at 968 (characterizing the claims at issue as "enforc[ing] a contractual obligation to pay money"). Plaintiff States' claims in this case cannot plausibly be characterized as an attempt to enforce contracts between the States and the federal government, because, as discussed, *supra* pp. 17–18, no such contracts exist, or at least none with any terms relevant here. *Cf.* Supp. Richardson Decl. ¶ 4 (Civil Immigration Conditions "do not apply to grants awarded before FY2025"); *see King Cnty.*, 2025 WL 1582368, at *12 (rejecting analogy to *California* in grant conditions case); Brief for Appellants, *King Cnty. v. Turner*, No. 25-3664 (9th Cir. July 8, 2025) (United States declined to appeal the adverse Tucker Act holding). The stay order has no bearing on Plaintiff States' claims here.

## II.    The Promulgation of the Civil Immigration Conditions Was Unlawful.

As Plaintiff States explained in their motion, the promulgation of the Civil Immigration Conditions was unlawful multiple times over: The agency lacked statutory authority to impose the Conditions, its decision to adopt them was arbitrary and capricious, and its attempt to use them violates the Spending Clause. Defendants' efforts to defend the Conditions lack merit, and the Court should vacate the Conditions and enjoin their application and enforcement, in all forms.

### A.    The Promulgation of the Civil Immigration Conditions Was Contrary to Law and Ultra Vires.

Defendants' efforts to defend the Civil Immigration Conditions rests mainly on their view that "[s]pecific Congressional authority for each grant condition is not required by either the Constitution or the APA." Opp. 20. That argument is seriously—and dangerously—flawed. "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 357 (1986). "An agency may not confer power upon itself."

*Id.* Administrative agencies enjoy no free-floating "discretion to implement" conditions on federal funds that Congress is required to "limit . . . by setting specific terms and conditions." Opp. 20. Under that rule, administrative agencies could conjure up any conditions they sought to impose on any federal funds, demanding adherence to new administration's political priorities every time a new President were elected. *Cf. Alexander v. Sandoval*, 532 U.S. 275, 291 (2001) ("Agencies may play the sorcerer's apprentice but not the sorcerer himself."). But that is not the law. Pressed to identify any statute that could authorize the promulgation of the Conditions, defendants come up short. The small handful of statutory provisions that defendants cite do not confer on them the power they claim, and the fact that certain grant programs relate generally to terrorism says nothing at all about whether defendants can condition funding under those programs on States' cooperation with immigration enforcement efforts. The Conditions are contrary to law.

### 1. Defendants must, but cannot, identify statutory authority to impose the Civil Immigration Conditions.

Defendants' primary theory—that they have inherent authority to condition federal funds on the States' compliance with any and all policy priorities, absent statutory prohibition—is plainly wrong. Indeed, the First Circuit flatly rejected exactly that argument when the previous Trump administration sought to impose similar conditions on the Byrne JAG program. The bottom line was that DOJ could not "impose . . . conditions that Congress had not vested [it] with authority to impose." *Providence*, 954 F.3d at 45. "No provision in the statute authorize[d] the DOJ to condition Byrne JAG grants on cooperation with federal immigration enforcement efforts in so many words." *Id.* at 32. Failing that, DOJ proffered four different statutory provisions that could potentially have authorized the conditions, and the First Circuit found all wanting. *Id.* at 32–45. Because "the DOJ lacked statutory authority to impose the challenged conditions," none of the plaintiffs' other claims even needed to be assessed. *Id.* at 45 n.9. Other courts of appeals performed the same statutory

analysis and reached the same conclusion. *See City of Chicago v. Barr*, 961 F.3d 882, 892 (7th Cir. 2020) ("Congress has thus far refused to pass legislation that would do precisely what the Attorney General seeks to do here."); *Philadelphia*, 916 F.3d at 284 ("[W]e must determine whether Congress empowered the Attorney General to promulgate the Challenged Conditions."); *Los Angeles*, 941 F.3d at 938 ("DOJ advances two possible bases for its statutory authority to introduce the notice and access conditions."). Even the Second Circuit, which upheld the challenged conditions based on a different reading of the statutes, shared the premise that "the APA requires that executive action taken in the absence of statutory authority be declared invalid." *New York v. Dep't of Just.*, 951 F.3d 84, 100 (2d Cir. 2020).

Defendants cite a handful of cases for a contrary rule, Opp. 21, but those cases rest on no such holding. In *Biden v. Missouri*, 595 U.S. 87 (2022), Congress had authorized the Secretary of Health and Human Services to set "such other requirements as the Secretary finds necessary in the interest of the health and safety of individuals who are furnished services in" Medicare-eligible hospitals, 42 U.S.C. § 1395x(e)(9), and other provisions granted the agency similar authority as to other types of institutions. *See* 595 U.S. at 90–91. The majority and dissenting opinions disagreed whether a vaccine mandate "fit[] neatly within the language of the statute," on the one hand, *id.* at 93; or instead whether the "the Government ha[d] not made a strong showing that it ha[d] statutory authority to issue the rule," *id.* at 98 (Thomas, J., dissenting). But all Justices, again, shared the basic premise that the Secretary's action needed to "fall[] within the authorities that Congress has conferred upon him." *Id.* at 92 (majority op.). Similarly, the Eleventh Circuit acknowledged that "an agency can resolve some ambiguity in a funding condition," but "the condition itself must still be ascertainable on the face of the statute." *W. Va. ex rel. Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1148 (11th Cir. 2023). Were it otherwise, administrative agencies could condition

access to federal funds of any kind on compliance with any executive policy priority—meaning that conditions on federal funds would fluctuate wildly with every change in administration. That chaotic result cannot be the law.

That is true even for so-called "discretionary" grant programs—that is, programs in which Congress has conferred more latitude on an agency to choose the recipients of federal funds. Even when an agency has discretion to choose the recipients of funds, it cannot "tak[e] irrelevant or impermissible factors into account." *Robbins v. Reagan*, 780 F.2d 37, 48 (D.C. Cir. 1985). Defendants suggest that if DHS can "decide . . . not to award *any* grant funding to *any* of the Plaintiff states" under a given program, then DHS may also freely impose any condition it wants on that program. Opp. 24. But greater-includes-the-lesser arguments of this sort mislead more often than they clarify, because the general power to confer a benefit almost never implies the invidious power to deny that benefit for any reason at all, no matter how arbitrary. *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 608 (2013) ("Even if respondent would have been entirely within its rights in denying the permit for some other reason, that greater authority does not imply a lesser power to condition permit approval on petitioner's forfeiture of his constitutional rights."); *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 747 (1st Cir. 1995) (the government may not "condition[] the grant of a benefit on the surrender of a constitutional right," even though it "might have refused to grant the benefit at all"). Even as to discretionary grant programs, that is, an agency must locate affirmative authority to establish a condition on access to federal funds; it is not free to "conjure up" such a condition, *Sandoval*, 532 U.S. at 291, unless Congress has given it instructions not to do so.

Pressed to identify any statutory provision that could authorize the Conditions, defendants fall short. They point to a catch-all provision authorizing the DHS Secretary to "make contracts,

grants, and cooperative agreements . . . as may be necessary and proper to carry out the Secretary's responsibilities." 6 U.S.C. § 112(b)(2). But this provision does not expand by one inch the Secretary's authority to condition federal funds. In the Byrne JAG litigation, the First Circuit addressed a similar provision authorizing the assistant attorney general to "exercise such other powers or functions" vested or delegated to him, "including placing special conditions on all grants." 34 U.S.C. § 10102(a)(6). The court rejected the argument that this general grant of power could justify the imposition of substantive policy terms on federal funds: The provision, it held, did "not constitute an independent grant of authority to the Assistant AG to impose whatever conditions he may deem advisable"; rather, such authority would need to derive from "another statute that vests authority in the Assistant AG to impose the challenged conditions." *Providence*, 954 F.3d at 45. The statutory provision on which defendants here rely is even less helpful: It does not authorize the Secretary to impose *any* "conditions" on federal grants, but simply to "make" grants where doing so is "necessary and proper" to carry out her other duties. Like the constitutional provision of the same name, *see* U.S. Const. art. I, sec. 8, cl. 18, this provision "is not itself a grant of power," but merely "a caveat that the [Secretary] possesses all the means necessary to carry out the specifically granted" responsibilities. *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 247 (1960); *see also United States v. Comstock*, 560 U.S. 126, 134 (2010) ("necessary and proper" means "rationally related to the implementation of" an "enumerated power"). Section 112(b)(2), in other words, does not grant the Secretary *extra* authority to condition federal funds. Under *Providence*, such authority would need to be found elsewhere, in some other statute detailing "the Secretary's responsibilities." 6 U.S.C. § 112(b)(2).

Defendants have one more specific argument as to the Port Security Grant Program, established by the Maritime Transportation Security Act. Under the heading of "administration,"

that law authorizes the DHS Secretary to require "an application, at such time, in such form, and containing such information and assurances as the Secretary may require." 46 U.S.C. § 70107(i)(1); *see* Opp. 26. This language also does not write a blank check to DHS to impose any funding conditions it wishes under the cover of "assurances." Yet again, the First Circuit resolved this question in the Byrne JAG litigation. The statute there had a similar provision titled "applications" that allowed the Attorney General to require a "certification, made in a form accepted to the Attorney General" that "the applicant will comply with all provisions of this part and all other applicable Federal laws." 34 U.S.C. § 10153(a)(5)(D). The First Circuit held that the provision did not entitle the Attorney General to demand that grantees "certify compliance with any of the wide array of federal laws that touch upon law enforcement cooperation." 954 F.3d at 38. Noting that the Byrne JAG statute spoke of the "'form' of the Byrne JAG application"—just like the Maritime Transportation Security Act—the First Circuit held that it did not "allow [DOJ] to mandate certification of compliance with only those 'applicable Federal laws' that further its own policy priorities." *Id.* at 38 n.6. The Maritime Transportation Security Act's "administration" provision likewise allows only those assurances with a "nexus" to the Port Security Grant Program. *Id.* at 37. And the Port Security Grant Program is not about immigration enforcement. It helps States "to deter a transportation security incident," 46 U.S.C. § 70103(b)(2)(A), meaning a terrorist attack or other large disaster at a port, *id.* § 70101(7). Commandeering local law enforcement for routine enforcement of civil immigration law has no relationship with that purpose.

Finally, a recent enactment starkly contrasts with the above provisions and illustrates the implausibility of defendants' arguments. In the budget reconciliation bill signed into law on July 4, 2025, Congress directed DHS to create a new program called the "State Border Security Reinforcement Fund." Pub. L. 119-21, § 9005(b), 139 Stat. 72, 360 (2025). When implemented,

this program will allow defendants to reimburse States for "[d]etection and interdiction of . . . aliens who have unlawfully entered the United States and have committed a crime . . . and transfer or referral of such aliens to [DHS]," as well as "[r]elocation of aliens who are unlawfully present" in the interior of the United States in some circumstances. *Id.* § 9005(b)(2)(C)–(D). Congress thus knows how to create a program where DHS funds efforts by state and local law enforcement who choose to assist with federal civil immigration enforcement; indeed, it *just did so*. *Cf. Polselli v. Internal Revenue Serv.*, 598 U.S. 432, 439 (2023) ("Had Congress wanted to include a legal interest requirement, it certainly knew how to do so."). But none of the *existing* grant programs overseen by DHS—to which the Civil Immigration Conditions now apply—were created for that purpose. Defendants thus acted contrary to law in promulgating the Conditions.

### 2. Defendants lack authority to impose the Conditions on terrorism-related programs.

Absent specific statutory authority to impose immigration-enforcement grant terms on any program they administer, defendants turn to an argument based on the general mission of DHS to "prevent terrorist attacks" and "reduce the vulnerability of the United States to terrorism," 6 U.S.C. § 111(b)(1)(A)–(B), which they say underpins each of the grant "programs . . . to which [DHS] will or might apply the Immigration Conditions," Opp. 25. Defendants do not genuinely appear to argue that any of the statutes authorizing these programs affirmatively authorizes imposition of the Civil Immigration Conditions; rather, they assert that that their mission to combat terrorism allows them to impose the conditions on these grants because "immigration enforcement and national security are related." Opp. 29. That claim is flawed on multiple levels.

First, and most basically, defendants are required to point to specific statutory authority to impose grant terms as a condition on federal funds; it is not enough to simply assert that the subject of a grant condition may be "related"—at the highest level of generality—to the subject of a grant

program. *See Missouri*, 595 U.S. at 92; *Providence*, 954 F.3d at 45; *cf. Cal. Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 335 (1997) (Scalia, J., concurring) ("[A]s many a curbstone philosopher has observed, everything is related to everything else."). Here, none of the statutes that defendants identify furnishes that authority.

To start, the most consequential programs to which defendants wish to apply this argument are preparedness grants: the Emergency Management Performance Grant, the State Homeland Security Program, and the Urban Area Security Initiative ("UASI"). Defendants observe that these statutes, "while not referencing immigration specifically," name "acts of terrorism" as one of the catastrophes to be prevented. Opp. 28–29. But all three statutes also provide extensive context on what Congress meant by "acts of terrorism," and none mentions immigration. The EMPG statute assists States "in preparing for all hazards," 6 U.S.C. § 762(b), with "hazard" defined by cross-reference to the Stafford Act, *see id.* § 741(3)—a statute focused on *natural* disasters that does not expressly identify immigration as in-scope. *See* 42 U.S.C. §§ 5195a(1), 5122(1)–(2); *see also* 6 U.S.C. § 701(7) (similar). The SHSP and UASI programs are more narrowly focused on "terrorism prevention activities," but that phrase has a ten-part definition that does not mention immigration enforcement. *Id.* § 607(2)(A)–(J). Minimum SHSP funds are allocated on a pure formula basis. *Id.* § 605(e)(1). Some SHSP and UASI funds are separately allocated based on risk, but Congress provided a prescriptive list of criteria for how risk was to be assessed, *see id.* § 608(a)(1), (b), none of which refer to immigration. These statutes plainly do not authorize the imposition of the Civil Immigration Conditions.

The other programs that defendants contend connect with terrorism also lack any statutory connection to interior immigration enforcement. The Transit Security Grant Program statute lists 21 specific uses for the funds, only one of which mentions "counterterrorism duties," and none of

which reference immigration. *See* 6 U.S.C. § 1135(b). BioWatch and Securing the Cities, operated out of the Countering Weapons of Mass Destruction Office, *see* Pub. L. 115-387, § 2(e)(1)(A)(ii), 132 Stat. 5162, 5168 (2018), protect against extremely specific hazards: "a bioterrorism event," Pub. L. 115-31, § 302(5), 131 Stat. 135, 419 (2017), and attacks using "nuclear or other radiological materials," 6 U.S.C. § 596b(a). Defendant Richardson asserts that he is concerned that "an individual immigrating illegally" will mount a biological or nuclear attack, Supp. Richardson Decl. ¶ 22, but defendants identify no basis to think that *Congress* shared that concern, and certainly no textual authority to impose the Conditions on these programs. Even Operation Stonegarden, which defendants emphasize, Opp. 25–26, does not provide the necessary authority. That program "support[s] joint efforts to secure borders, including land and water routes, and critical travel corridors," and only law enforcement agencies "located along the U.S. borders" are eligible for assistance. *See* Ex. 3-F at 22, 52–53. The committee report that defendants cite likewise emphasizes that extra Stonegarden funds will help "secure our land and maritime borders from traffickers and smugglers" who violate criminal laws, H. Rep. 119-106, at 794 (2025), not pay state and local officials to undertake civil immigration enforcement in the interior of the United States.[6]

All this reflects the basic fact that Congress has not treated "terrorism" and "immigration" as cognates in articulating the duties of DHS. The mission statement that Congress gave DHS after the September 11 attacks does not even specifically mention DHS's immigration-enforcement role. *See* Homeland Security Act of 2002, Pub. L. 107-296, § 101, 116 Stat. 2135, 2142 (codified as

---

[6] Defendants' counterterrorism argument also cannot possibly justify imposing the Civil Immigration Conditions on any grant programs other than the ones identified in the relevant portion of their cross-motion. Opp. 26–30. That includes the Recreational Boat Safety grant program, about which defendants have—again—identified not a single statutory provision that could plausibly justify the imposition of the Civil Immigration Conditions. *See* Mot. 26, 39.

amended at 6 U.S.C. § 111). Clauses (A) through (C) address terrorism. 6 U.S.C. § 111(b)(A)–(C). Clause (D) directs DHS to "act[] as a focal point regarding natural and manmade crises and emergency planning," *id.* § 111(b)(D)—that is, the FEMA operations that defendants are now holding hostage to the Civil Immigration Conditions. Clause (D) also refers to "all functions of entities transferred to [DHS]." *Id.* This phrase constitutes the only oblique reference to immigration enforcement in the mission statement, as Subtitles D through F of Title IV of the Homeland Security Act abolished the Immigration and Naturalization Service and transferred its functions to DHS. *See* 116 Stat. 2192–212. The only reference in the mission statement to international borders comes in Clause (H), which directs DHS to "monitor connections between illegal drug trafficking and terrorism." 6 U.S.C. § 111(b)(H). Indeed, in specifically naming illegal drug trafficking's connection to terrorism, Congress signaled that immigration more broadly *lacked* that connection. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992) ("[I]t is a commonplace of statutory construction that the specific governs the general.").

The major preparedness programs were codified in their current forms five years later by the Implementing Recommendations of the 9/11 Commission Act of 2007, Pub. L. 110-53, §§ 101, 201, 121 Stat. 266, 271, 273, 294. But congressional findings in that law *rejected* defendants' view of a mechanical link between terrorism and immigration, as if just enforcing federal immigration law would axiomatically combat terrorism. Indeed, Congress expressly found that "[r]adicalization leading to ideologically-based violence cannot be prevented solely through law enforcement and intelligence measures" and instead expressed its sense that "the Secretary of Homeland Security, in consultation with other relevant Federal agencies, should make a priority . . . pursuing broader avenues of dialogue with minority communities." *Id.* § 2402, 121 Stat. 546–47. Defendants, in short, are simply wrong that Congress had immigration enforcement in mind—much less supplied

29

them with authority to require assistance with immigration enforcement efforts as a condition of receiving national-security funds—when it established these programs to support state efforts to prepare for terrorist attacks and other disasters.

### 3. Defendants also cannot implement the Civil Immigration Conditions as a "priority area" within the State Homeland Security Program.

FEMA's just-announced attempt to enforce the Civil Immigration Conditions as a grant-specific condition limited to the SHSP program—the Civil Immigration NPA—is unlawful for substantially the same reasons.[7]

As discussed, *supra* pp. 5–6, on July 28, 2025, FEMA announced that any SHSP recipient that does not spend 10% of its grant funds on "Border Crisis Response and Enforcement Support" will face a "hold on affected funds." Ex. 3-F at 13–14. The SHSP NOFO describes this "national priority area" as "[s]upporting collaboration between state and local law enforcement and U.S. Immigration and Customs Enforcement (ICE) through the 287(g) program to identify and remove individuals who pose a threat to public safety and national security." *Id.* at 14. And it identifies examples of activities that would satisfy the Civil Immigration NPA, including "[p]articipation in the DHS/ICE 287(g) program, allowing trained local officers to support ICE with immigration enforcement," "[c]ooperation with ICE detainers and other jurisdictional responsibilities related to immigration enforcement," "expand[ing] 287(g) screening operations within correctional facilities," "[t]raining programs for state and local law enforcement officers in . . . 287(g) procedures," and more. *Id.* at 18, 21. These examples appear to assume that States will participate

---

[7] The Civil Immigration NPA post-dates the operative complaint, but the HSGP NOFO containing the Civil Immigration NPA is subject to judicial notice and self-authenticating. *See Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010); Fed. R. Evid. 902(5). If the Court disagrees that the Civil Immigration NPA is properly before the Court, then Plaintiff States respectfully seek leave to file a supplemental pleading under Civil Rule 15(d). *See U.S. ex rel. Gadbois v. PharMerica Corp.*, 809 F.3d 1, 4 (1st Cir. 2015) ("supplementation under Rule 15(d)" "helps courts and litigants to avoid pointless formality" of "separate actions").

in enforcing federal immigration law—the express purpose of this "priority area." The Civil Immigration NPA, in other words, appears to be simply another mechanism for DHS to achieve the same end as the Civil Immigration Conditions: Both require Plaintiff States to devote their own law enforcement resources to enforcing federal civil immigration law to obtain federal funds. Notably, of all NOFOs defendants have posted in recent days for fiscal year 2025, only the SHSP NOFO requires the recipient to promise to invest in a particular NPA to receive the maximum amount of funding.

The Civil Immigration NPA is unlawful on substantially the same bases as the Conditions. As discussed, Congress did not authorize defendants to condition States' access to federal funds on their willingness to enforce federal immigration law. *See supra* pp. 20–26. And defendants identify no basis on which to conclude that Congress gave them that authority as to the SHSP program, in particular: Congress gave FEMA authority to award SHSP grants "to assist State, local, and tribal governments in preventing, preparing for, protecting against, and responding to acts of terrorism." 6 U.S.C. §§ 603(a), 605(a). When Congress said "acts of terrorism," it did not mean "violations of civil immigration law." *See supra* pp. 27–29. Indeed, Congress specifically listed the activities for which recipients may use SHSP funds, none of which reference civil immigration enforcement. 6 U.S.C. § 609(a)(1)–(15). And to the extent that defendants believe that the section's catch-all provision, allowing the use of funds for "any other appropriate activity, as determined by the Administrator," could somehow authorize the Civil Immigration Conditions, or the NPA, that, too, is wrong: The other enumerated activities all concern counterterrorism support, and, as discussed, Congress did not intend to permit funds earmarked for counterterrorism purposes to be used as a cudgel to force States to assist in enforcing federal immigration law. *See Norfolk & Western R. Co. v. Train Dispatchers*, 499 U.S. 117, 129 (1991) ("Under the principle of *ejusdem*

*generis*, when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration.").

FEMA's attempt to induce States to participate in the so-called 287(g) program in order to receive SHSP funds likewise violates that program's own authorizing statute. The 287(g) program is a *voluntary* one: It permits a State or its subdivision to "enter into a written agreement" with the federal government to allow state or local officers to "perform a function of an immigration officer . . . to the extent consistent with State and local law." 8 U.S.C. § 1357(g)(1). But such an agreement must be voluntary, not coerced; indeed, section 287(g) itself expressly states that the statute shall not "be construed to require any State or political subdivision of a State to enter into an agreement with" the federal government. *Id.* § 1357(g)(9); *see also City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) ("Section 1357 does not require cooperation at all."). At bottom, this effort to bootstrap the Civil Immigration Conditions into a grant-specific term accompanying the SHSP grant program is unlawful for the reasons that the Conditions themselves are unlawful—and more. Defendants cannot use a "priority area" for grant spending as a mechanism to coerce a change in conduct that they could not otherwise require.

### 4.    The standard for facial challenges to statutes does not apply, nor would it rescue the Civil Immigration Conditions.

Defendants make one final attempt to invert the burden of persuasion, contending that in this "facial challenge" to the Civil Immigration Conditions, Plaintiff States must satisfy the standard for facial challenges to statutes articulated in *United States v. Salerno*, 481 U.S. 739, 745 (1987), that "no set of circumstances exists under which the Act would be valid." Opp. 20–21. Just this Term, the Supreme Court expressly reserved the question of how, if at all, *Salerno* and its progeny should apply to the judicial review of agency action. *See Bondi v. VanDerStok*, 145 S. Ct. 857, 866 & n.2 (2025). Plaintiff States do not concede either that their challenge to the

promulgation of the Civil Immigration Conditions is properly called "facial" in the *Salerno* sense or that the *Salerno* standard applies here, *see, e.g.*, *Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior*, 282 F.3d 818, 828 (D.C. Cir. 2002) (holding only that challengers must show something more than a "possibility" of "*some*" invalid applications) (emphasis in original), but Plaintiff States' claims prevail even under that standard.

As *VanDerStok* held, the question in a case presenting a "facial" statutory challenge to a rule or other measure is whether the measure is "inconsistent on [its] face with the" authorizing statute. 145 S. Ct. at 866. That test is easily satisfied here because the Civil Immigration Conditions (and the NPA) are indiscriminate and unsupported by statutory authority. This is a not a case, like *VanDerStok*, where there was a debatable question whether certain *applications* of the rule "can ever satisfy the statute's two requirements." *Id.* Defendants have taken no action that "may be improperly imposed on some [persons]," but not others. *I.N.S. v. Nat'l Ctr. for Immigrants' Rts., Inc.*, 502 U.S. 183, 188 (1991). Instead, they promulgated new standard grant terms that are "one-size-fits-all, for all comers." *Libertarian Party of N.H. v. Gardner*, 843 F.3d 20, 24 (1st Cir. 2016). "[T]he components of the burden [that action] imposes are defined by its facial terms, not by any anticipated exercise of discretion in its application." *Id.* at 24–25. In such circumstances, the distinction between facial and as-applied challenges collapses. The Civil Immigration Conditions (including the NPA) cannot possibly be capable of "being implemented in a manner consistent with the Constitution," *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008), because they lack any grounding statutory authority at all. Instead, the action challenged in this case is "unconstitutional *without regard* to its application—or *in all* its applications, as *Salerno* requires." *Ezell v. City of Chicago*, 651 F.3d 684, 698–99 (7th Cir. 2011).

**B.     The Promulgation of the Civil Immigration Conditions Was Arbitrary and Capricious.**

"Reasoned decisionmaking under the Administrative Procedure Act calls for an explanation for agency action." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). DHS provided not a single word of explanation for its dramatic shift in policy to suddenly condition all federal funds it distributes on grantees' cooperation with federal civil immigration enforcement. Defendants' opposition to summary judgment further offers no meaningful rebuttal to the specific oversights that Plaintiff States identified in defendants' decisionmaking process. The promulgation of the Civil Immigration Conditions was subject to arbitrary-and-capricious review, and it cannot withstand that scrutiny.

**1.     DHS's imposition of the Conditions is reviewable under the APA.**

Defendants advance a threshold barrier to Plaintiff States' arbitrary-and-capricious claim, albeit a circumscribed one: They argue that the promulgation of the Civil Immigration Conditions and their application to eight "discretionary" programs was action "committed to agency discretion by law" under 5 U.S.C. § 701(a)(2). Opp. 30–33.[8] That argument fails for multiple reasons. Most basically, again, defendants did not promulgate grant conditions as to particular grant programs; they imposed standard terms across-the-board without regard to their statutory authority to do so. *See supra* pp. 8–10. The Court can plainly adjudicate the legality of that decision, given that defendants have identified no statute that could be read to confer on it the "discretion" to establish a term of that sort. *See Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 18 n.5 (1st Cir.

---

[8] Defendants concede that their § 701(a)(2) argument does not apply to five other grant programs that they administer: the EMPG program, the three HSPG programs (SHSP, the Urban Area Security Initiative, and Operation Stonegarden), and the State Recreational Boating Safety program. *See* Opp. 7–8 (listing "eight discretionary grant programs," not including those); *id.* at 30 (contending that "eight" programs "are discretionary in nature" and "unreviewable under the APA"). Any argument that § 701(a)(2) applies more broadly is affirmatively waived. *See Bekele v. Lyft, Inc.*, 918 F.3d 181, 186–87 (1st Cir. 2019).

2020) (distinguishing, in § 701(a)(2) context, between an "agency-wide policy" not committed to agency discretion by law and discretionary hiring decisions made by the agency).

Regardless, defendants' § 701(a)(2) argument is wrong on the merits, too. As the Supreme Court has explained, its caselaw has read § 701(a)(2) "quite narrowly, restricting it to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *New York*, 588 U.S. at 772 (cleaned up). Defendants bear the "burden" of "rebut[ting] the presumption that agency action is judicially reviewable," *Cody v. Cox*, 509 F.3d 606, 610 (D.C. Cir. 2007), and they have failed to make that showing here.

To start, Defendants' argument rests primarily on *Lincoln v. Vigil*, 508 U.S. 182 (1993), *see* Opp. 30–32, but that case has no bearing here. *Vigil* involved an effort to obtain judicial review of an agency's allocation of funds to a program from unrestricted lump-sum appropriations. *See* 508 U.S. at 186–87. "[N]o statute or regulation even mention[ed] the [p]rogram" in question, *id.* at 190; rather, the program was the administrative agency's own creation. The Court rejected the argument that, in such a case, the agency's decision to defund the program was reviewable under the APA. *Id.* at 192. It explained that, "as long as [an] agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives, § 701(a)(2) gives the courts no leave to intrude." *Id.* at 193. Because the relevant statutes "d[id] not so much as mention" the defunded program and its replacement program "clearly f[ell] within the [agency's] statutory mandate," the decision to defund it was unreviewable. *Id.* at 194. Courts have thus read *Lincoln* to preclude review only where Congress does not provide even a "statutory reference point" by which to assess the legality of an agency's action. *See Milk Train, Inc. v. Veneman*, 310 F.3d 747, 752 (D.C. Cir. 2002); *accord Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 100 (D.C. Cir. 2021); *Mount Evans Co. v.*

*Madigan*, 14 F.3d 1444, 1449–50 (10th Cir. 1994).

The statutes that defendants invoke, Opp. 32, look nothing like *Vigil*, in that they offer (at minimum) a "statutory reference point," *Milk Train*, 310 F.3d at 752, by which to assess whether Congress permitted the agency to condition access to finds on an agreement to enforce immigration law. *Supra* pp. 27–28. The statute establishing the Port Security Grant Program, for instance, not only identifies that program's purpose (to support implementation of "Area Maritime Transportation Security Plans and facility security plans among port authorities, facility operators, and State and local government agencies required to provide port security services and to train public safety personnel," 46 U.S.C. § 70107(a)), but also sets out a lengthy set of procedures for seeking and obtaining reimbursement for eligible costs, requirements for state matching funds, coordination with other state and local governments, and more, *see id.* § 70107(b)–(g). Likewise, in creating the Transit Security Grant Program, Congress set out 23 separate permissible uses of funds, ranging from fire suppression equipment to canine patrol support, each connected to the statutory purpose of supporting "security improvements" at transportation agencies. 6 U.S.C. § 1135(a), (b). These statutes could not look less like that at issue in *Vigil*, which "d[id] not so much as mention" the terminated program. 508 U.S. at 194.[9]

---

[9] The same is true for each of the other six discretionary programs. *See* 6 U.S.C. §§ 596, 596b(a) (describing purposes of BioWatch and Securing the Cities, including "enhance[ing] the ability of the United States to detect and prevent terrorist attacks and other high-consequence events utilizing nuclear or other radiological materials that pose a high risk to homeland security in high-risk urban areas"); Pub. L. 119-21, § 90006, 139 Stat. 72, 361 (2025) ("for protection activities directly and demonstrably associated with any residence of the President"); Department of Homeland Security Appropriations Act of 2024, Pub. L. 118-47, div. C, 138 Stat. 460, 594 ("targeted violence and terrorism prevention grants"); *id.* at 608 ("Regional Catastrophic Preparedness Grants" and "to sustain *current operations* for training") (emphasis added). The statutes requiring these programs—including appropriations statutes—provide a "statutory reference point," *Milk Train*, 310 F.3d at 752, by which to assess the legality of defendants' decision to apply the Civil Immigration Conditions.

### 2.    DHS did not engage in reasoned decisionmaking.

Defendants' response on the arbitrary-and-capricious claim ignores a basic and uncontested fact: They offered no explanation whatsoever for promulgating the new standard terms and conditions on March 27 and April 18, 2025. *See* Mot. 30, 37. There was no accompanying material, of any kind, that gave the public any reasons at all for their precipitous imposition of across-the-board Civil Immigration Conditions on all DHS funds. But "[i]t is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 20 (2020) (quoting *Michigan v. E.P.A.*, 576 U.S. 743, 758 (2015)). The invoked reasons must not be secret, internal reasons but rather "reasons that can be scrutinized by courts and the interested public." *New York*, 588 U.S. at 785. DHS publicly invoked *no grounds* for what it did on March 27 and April 18. That alone requires judgment on the APA claim in Plaintiff States' favor.

The March 20 Hamilton memorandum is not a legally cognizable explanation of defendants' actions. For one, on the substance, it belies not explains their actions: the Hamilton memorandum recommended tailored Civil Immigration Conditions, but defendants then immediately adopted blunderbuss Conditions. *See supra* p. 15. In any event, the memorandum has never been issued by DHS to explain anything. Defendant Richardson's avowals that the March 20 memorandum justifies DHS's actions have come solely in the context of this litigation. *E.g.*, Richardson Decl. ¶ 6 (filed June 9, 2025); Supp. Richardson Decl. ¶ 7 (filed July 23, 2025). A "belated post hoc rationalization" "invoked . . . in litigation" does not suffice. *Melone v. Coit*, 100 F.4th 21, 31 (1st Cir. 2024). Any effort to go back in time and explain what DHS did on March 27 must ultimately still be "limited to the agency's original reasons," *Regents*, 591 U.S. at 21—that is, no reasons at all.

Even if the Court were to examine defendants' litigation position as their explanation, moreover, that explanation still fails. Defendants attempt to dodge Plaintiffs' arbitrary-and-capricious argument by incorrectly arguing that "all the APA requires" is that they "display awareness" of their "policy change." Opp. 33 (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). But the cited passage of *Fox Television* did not say that. Two sentences later, the Supreme Court reemphasized that "of course," when changing policy, "the agency must show that there are good reasons for the new policy." 556 U.S. at 515. Changes in agency policy, just as much as factfinding or any other regulatory pronouncement, require that the agency " 'examine the relevant data and articulate a satisfactory explanation for its action,' " *id.* at 513 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))—a standard the agency cannot meet if it "failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43. So when, as here, an agency makes a "policy change," it "must consider the 'alternatives' that are 'within the ambit of the existing policy'" and assess "whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 30, 33 (alterations omitted) (quoting *State Farm*, 463 U.S. at 51). Here, defendants did none of this.

First, they broadly imposed the Civil Immigration Conditions on all funding administered by DHS without regard to whether such conditions were authorized by, or effectuated the purposes of, the "relevant substantive statute." *Or. Nat. Res. Council v. Thomas*, 92 F.3d 792, 799 (9th Cir. 1996); *see also Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 682 (2020) (explaining that agencies face "arbitrary and capricious" claims for "failing to consider an important aspect of the problem" if they do not consider legal boundaries of authority to act); *Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 470–72 (5th Cir. 2024) (agency did not

"reasonably consider the relevant issues" where it was "unclear how or why [the agency] thinks it has *any* statutory authority" for regulation). Although DHS has now exempted, after the fact, certain grant programs from the categorical Conditions, DHS still does not claim that anyone at the agency ever considered whether any statute authorizes blanket imposition of the Conditions. Indeed, even their brief is entirely silent on this point.

DHS attempts to sidestep its glaring failure of reasoned decisionmaking by asserting that the Conditions cannot be arbitrary and capricious because "the grants at issue in this case come from the agency tasked with enforcing federal immigration law." Opp. 34. But the fact that one of the myriad functions with which Congress has charged DHS is immigration enforcement does not excuse DHS from having to consider its statutory authority to impose immigration conditions on *unrelated* funding streams that Congress has *separately* tasked it with administering. Its undisputed failure to do so renders its decision arbitrary and capricious.

Nor do defendants dispute that it failed to consider Plaintiff States' reliance interests, the Civil Immigration Conditions' effects on public safety, and any alternatives to its sweeping policy at the time it adopted the Conditions. Defendants ignore Plaintiff States' concerns that compliance with the Conditions—even if applied only to a single grant—would compromise public safety by undermining local law enforcement efforts. Their only response is to assert that the Conditions have a "goal of improving public safety," Opp. 35, but an agency cannot consider only the claimed upsides of its policy without regard for any of its important negative impacts. *See Regents*, 591 U.S. at 35. Likewise, DHS's assertion that its grants "make up a small portion of overall federal funding," Opp. 35, is no response to the serious reliance interests at stake. Plaintiff States have relied on DHS public safety and emergency preparedness grants for decades. *See, e.g.*, ECF 59-17 (Buccieri-Harrington Decl.), ¶¶ 7–8; ECF 59-26 (Khayyat Decl.), ¶¶ 18, 30, 40, 78, 84; ECF 59-38

(Ottobre Decl.) ¶ 61. And DHS says nothing at all about its failure to consider alternatives, such as seeking permission from Congress to establish a grant program that was actually meant to support immigration enforcement. As noted, Congress has now actually done that, *supra* pp. 25–26, further demonstrating that imposing the Civil Immigration Conditions on all the prior grants is arbitrary and capricious.

### C.    The Promulgation of the Civil Immigration Conditions Was Unconstitutional.

Finally, promulgation of the Civil Immigration Conditions violated the Spending Clause because the Conditions (i) are not reasonably related to the statutory purpose of DHS grants to States; (ii) are unconstitutionally coercive; and (iii) are impermissibly ambiguous. Defendants largely ignore these points, and the few responses they offer fall flat.

First, Defendants fail to demonstrate how the Immigration Conditions are in any way "reasonably related to the federal interest in [the] particular national projects or programs" funded by the grants at issue. *Massachusetts v. United States*, 435 U.S. 444, 461 (1978); *accord South Dakota v. Dole*, 483 U.S. 203, 207 (1987). Instead, Defendants first broadly contend that DHS has effectively unbridled discretion to "impose discretionary conditions on the receipt of federal grants." Opp. 20. But that is nonresponsive to the Supreme Court's clear directive that, pursuant to the Spending Clause, conditions on federal funding must be "reasonably related" to the purpose of that federal funding. *Massachusetts*, 435 U.S. at 461; *Dole*, 483 U.S. at 207–09. The only real argument defendants make on this point is that immigration relates to terrorism, Opp. 25–30, which, as discussed, *supra* pp. 28–29, is incorrect.

At various points, defendants appear to suggest that they can impose the Civil Immigration Conditions on *any* grant administered by an agency within DHS simply because DHS also has responsibility for immigration enforcement. Opp. 25, 34. But the fact that DHS funds happen to flow through an executive department that is separately involved in immigration enforcement is

irrelevant because the conditions are not "reasonably calculated" to support "a purpose *for which the funds are expended*." *Dole*, 483 U.S. at 209 (emphasis added); *see also id*. at 208 (rejecting challenge to condition on highway funding because it was "directly related to one of the main purposes for which highway funds are expended"); *New York*, 505 U.S. at 167 (conditions on federal funds must "bear some relationship to the purpose of the federal spending"); *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 128 (1st Cir. 2003) (conditions imposed under the spending clause "must not be 'unrelated to the federal interest in particular national projects or programs' funded under the challenged legislation").

Second, defendant Noem stated as plain fact that the Conditions serve to ensure that so-called "sanctuary" States do "not receive a single dollar of the Department's money" and thus pressure such States into changing their policies. ECF 59-6. Defendants contend, however, that the Conditions are not coercive but merely "incentives." Opp. 23. But unlike in *Dole*, the challenged conditions here preclude the States from receiving *all* funding from affected programs—not just "5% of the funds . . . under specified highway grant programs." *Dole,* 483 U.S. at 21. Defendants do not dispute this. Instead, they mischaracterize *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012) ("*NFIB*"), by attempting to limit its holding to "new, dramatically broadened, independent grant program[s]." Opp. 22. The principles of unconstitutional coercion are not limited to such facts. They prohibit "[c]onditions that do not govern the use of funds" and those that "take the form of threats to terminate other significant independent grants" to "pressur[e] the States to accept policy changes." *NFIB*, 567 U.S. at 581. That is exactly the situation here: DHS has coercively inserted immigration conditions into the entirely separate matter of disaster preparedness and response funding to compel States to change their policies. *See id*.

Further, Defendants' reasoning assumes that Plaintiff States can withdraw from their general funds to cover the shortfall that would be caused by the loss of these federal grants. But Plaintiff States' unrebutted declarations prove the contrary. Plaintiff States' budgets are generally committed to other or preexisting obligations, and no state appropriations are available to cover the loss of federal funding. *See* ECF 59-26 (Khayyat Decl.), ¶¶ 140–147 (discussing the impacts of the funding freeze that FEMA imposed between February and April of this year); *see also* ECF 59-36 (Shabazz Decl.), ¶ 6; ECF 59-51 (Chapman-See Decl.), ¶ 9. And even the Plaintiff States could use their own funds to continue these programs without DHS grant funds in a given year, those agencies would be prohibited from accepting federal funds to support those same programs for all future years under the "non-supplanting" provisions of DHS grant awards. *See, e.g.*, ECF 59-36 (Doran Decl.), ¶ 69; ECF 59-38 (Ottobre Decl.), ¶ 86. The end result is that the States would be left with "no real option" to turn down the funds. *NFIB*, 567 U.S. at 582.

Third, Defendants do not contest that several of the Conditions flunk the requirement that "condition[s on] States' receipt of federal funds" must be "unambiguous[]," such that recipients can "exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207; *see also NFIB*, 567 U.S. at 577 (opinion of Roberts, C.J.); *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 24–25 (1981) ("There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it."). Both the Cooperation Condition (C.IX.1.c) and the Benefits Condition (C.XVII.2.a.iii), among others, require states to certify to hopelessly ambiguous terms that provide no guidance as to what is meant by "benefits [to] illegal immigrants" or "cooperation" with undefined "joint operations" and "requests for short term detention of an alien." Defendants fully acknowledge the general principle that conditions "must be stated 'unambiguously,'" Opp. 21, but then they never discuss

the issue again, offering no counterargument on this point. They have forfeited the issue. *See In re Redondo Const. Corp.*, 820 F.3d 460, 466 (1st Cir. 2016) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by argumentation are waived.") (quotation omitted); *Short v. Brown Univ.*, 320 F. Supp. 3d 363, 368 n.4 (D.R.I. 2018) (holding that a "failure to substantively respond to [a] Motion . . . operates as a waiver or forfeiture") (quotation omitted). Their wholesale failure to defend the clarity of the Conditions is telling: The Conditions are hopelessly ambiguous and thus violate the Spending Clause.

### III.    Relief Should Be Awarded to All Plaintiff States in the Requested Form.

Defendants' brief is devoted entirely to reasons why, in their view, judgment should not be entered against them. Opp. 11–34. As to remedy, they offer no argument why Plaintiff States are not entitled, under 5 U.S.C. § 706(2), to an order simply vacating the promulgation of the Civil Immigration Conditions in the first place. *See* Mot. 46–47. Defendants also offer no argument as to why the equitable factors would not also favor a permanent injunction against implementation or enforcement of the Civil Immigration Conditions as to Plaintiff States, including their subdivisions and instrumentalities. *See id.* 47–52. Defendants have thus forfeited all arguments opposing these forms of relief.

A permanent injunction against implementation or enforcement of the Civil Immigration Conditions should also prohibit defendants from imposing the Civil Immigration NPA on the State Homeland Security Program. As discussed above, *supra* pp. 30–32, the Civil Immigration NPA amounts to nothing more than a mechanism of coercing compliance with the Civil Immigration Conditions. The Conditions require grantees to engage in "coordination and cooperation with the Department of Homeland Security and immigration officials" in order to receive federal funds. ECF 59-2 at 4. The NPA demands that States "[s]upport[] collaboration between state and local law enforcement and U.S. Immigration and Customs Enforcement (ICE) through the 287(g)

program." Ex. 3-F at 14. The "acts restrained" by an injunction against implementation of the Civil Immigration Conditions, Fed. R. Civ. P. 65(d)(1)(C), would necessarily encompass the Civil Immigration NPA.

Finally, in a footnote, defendants contend that judgment should not be entered in favor of Plaintiff States Delaware, Maine, Nevada, New Mexico, Vermont, and the District of Columbia because they "have not submitted factual declarations in support of their motion for summary judgment." Opp. 36 n.8. First, this argument is factually incorrect as to Delaware, for which there is a declaration "in the record." Fed. R. Civ. P. 56(c)(1)(A). *See supra* p. 11 n.5 (entire record to be considered); ECF 21-19 (Schall Decl.) (declaration of the director of the Delaware Emergency Management Agency). Regardless, this argument fails on multiple grounds as to all States. First, having been raised "only in a footnote [and] in a perfunctory manner," it is "waived" twice over. *Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 83 n.7 (1st Cir. 2018). Plaintiff States also seek vacatur of the Civil Immigration Conditions across the board—a remedy that would apply irrespective of the parties to the case (or, at bare minimum, to all Plaintiff States here, whose standing is not disputed). *See Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989).

In any event, defendants make no actual argument for why the absence of declarations for certain States creates "any genuine disputes of material fact" that would preclude summary judgment in their favor. *MacRae v. Mattos*, 106 F.4th 122, 132 (1st Cir. 2024). Defendants do not dispute that these States have standing, in that they are recipients of FEMA funds threatened by the Civil Immigration Conditions. And they offer no basis to think that the legal issues would differ from State to State. It is impossible that defendants might have statutory authority to impose the Civil Immigration Conditions on some States but not others, or that defendants' decision to promulgate the Civil Immigration Conditions was arbitrary as to some States but reasoned as to

others. *See supra* pp. 21–26, 37–40; *cf. Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009) ("[A]ll the States enjoy 'equal sovereignty.'") (quoting *United States v. Louisiana*, 363 U.S. 1, 16 (1960)). Defendants present no state-specific defense under which a state-specific declaration would affect any legal issue in this case. The Court should thus reject their undeveloped suggestion that it arbitrarily limit any judgment to a subset of those States whose emergency management funds have been threatened by defendants' unlawful conduct.

## CONCLUSION

The Court should enter judgment in Plaintiff States' favor, declare that defendants' promulgation of the Civil Immigration Conditions was contrary to the Constitution and laws of the United States, vacate the promulgation of the Civil Immigration Conditions, and permanently enjoin defendants from implementing or enforcing the Civil Immigration Conditions and Civil Immigration NPA against Plaintiff States, including their subdivisions and instrumentalities.

August 4, 2025

**ROB BONTA**
  ATTORNEY GENERAL OF CALIFORNIA

Michael L. Newman
  *Senior Assistant Attorney General*
Joel Marrero
James E. Stanley
  *Supervising Deputy Attorneys General*
Luke Freedman
Newton Knowles
Christopher Medeiros
Alexis Piazza
Deylin Thrift-Viveros
Delbert Tran
  *Deputy Attorneys General*

/s/ Lee I. Sherman
Lee I. Sherman
  *Deputy Attorney General*
California Department of Justice
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6000
lee.sherman@doj.ca.gov

*Attorneys for the State of California*

Respectfully submitted,

**KWAME RAOUL**
  ATTORNEY GENERAL OF ILLINOIS

/s/ Alex Hemmer
Alex Hemmer
  *Deputy Solicitor General*
Christopher G. Wells
  *Chief of the Public Interest Division*
Darren Kinkead
  *Public Interest Counsel*
R. Sam Horan
Michael M. Tresnowski
R. Henry Weaver
  *Assistant Attorneys General*
Office of the Illinois Attorney General
115 LaSalle Street
Chicago, IL 60603
(773) 590-7932
alex.hemmer@ilag.gov

*Attorneys for the State of Illinois*

46

**MATTHEW J. PLATKIN**
  ATTORNEY GENERAL OF NEW JERSEY

/s/ Shankar Duraiswamy
Shankar Duraiswamy
  *Deputy Solicitor General*
Mayur P. Saxena
  *Assistant Attorney General*
Surinder K. Aggarwal
Anaiis Gonzalez
Christopher J. Ioannou
Olivia C. Mendes
Phoenix N. Meyers
Sarah Nealon
Daniel Resler
  *Deputy Attorneys General*
New Jersey Office of Attorney General
25 Market Street, PO Box 093
Trenton, NJ 08625-0093
(609) 376-2745
shankar.duraiswamy@law.njoag.gov

*Attorneys for the State of New Jersey*

**PETER F. NERONHA**
  ATTORNEY GENERAL OF RHODE ISLAND

/s/ Kathryn M. Sabatini
Kathryn M. Sabatini (R.I. Bar No. 8486)
  *Chief, Civil Division*
  *Special Assistant Attorney General*
Paul Meosky (RI Bar No. 10742)
  *Special Assistant Attorney General*
Rhode Island Attorney General's Office
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 1882
ksabatini@riag.ri.gov

*Attorneys for the State of Rhode Island*

**PHILIP J. WEISER**
  ATTORNEY GENERAL OF COLORADO

/s/ David Moskowitz
David Moskowitz
  *Deputy Solicitor General*
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov

*Attorneys for the State of Colorado*

**WILLIAM TONG**
  ATTORNEY GENERAL OF CONNECTICUT

/s/ Ashley Meskill
Ashley Meskill
  *Assistant Attorney General*
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5270
ashley.meskill@ct.gov

*Attorneys for the State of Connecticut*

**KATHLEEN JENNINGS**
  ATTORNEY GENERAL OF DELAWARE

/s/ Ian R. Liston
Ian R. Liston
  *Director of Impact Litigation*
Vanessa L. Kassab
  *Deputy Attorney General*
Delaware Department of Justice
820 North French Street
Wilmington, DE 19801
(302) 683-8899
ian.liston@delaware.gov

*Attorneys for the State of Delaware*


**ANNE E. LOPEZ**
  ATTORNEY GENERAL OF HAWAIʻI

/s/ Kalikoʻonālani D. Fernandes
David D. Day
  *Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes
  *Solicitor General*
Department of the Hawaiʻi Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Attorneys for the State of Hawaiʻi*


**BRIAN L. SCHWALB**
  ATTORNEY GENERAL FOR THE DISTRICT OF COLUMBIA

/s/ Mitchell P. Reich
Mitchell P. Reich
  *Senior Counsel to the Attorney General*
Office of the Attorney General for the District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 279-1261
mitchell.reich@dc.gov

*Attorneys for the District of Columbia*


**AARON M. FREY**
  ATTORNEY GENERAL OF MAINE

/s/ Vivian A. Mikhail
Vivian A. Mikhail
  *Deputy Attorney General*
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800
vivian.mikhail@maine.gov

*Attorneys for the State of Maine*

**ANTHONY G. BROWN**
  ATTORNEY GENERAL OF MARYLAND

/s/ James C. Luh
James C. Luh
  *Senior Assistant Attorney General*
Office of the Maryland Attorney General
200 Saint Paul Place
20th Floor
Baltimore, MD 21202
(410) 576-6411
jluh@oag.state.md.us

*Attorneys for the State of Maryland*


**DANA NESSEL**
  ATTORNEY GENERAL OF MICHIGAN

/s/ Neil Giovanatti
Neil Giovanatti
Adam de Bear
  *Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa Street
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov

*Attorneys for the People of the State of
  Michigan*


**ANDREA JOY CAMPBELL**
  ATTORNEY GENERAL OF MASSACHUSETTS

/s/ Hannah C. Vail
Katherine Dirks
  *Chief State Trial Counsel*
Hannah C. Vail
  *Assistant Attorney General*
Office of the Massachusetts Attorney General
1 Ashburton Place
Boston, MA 02108
(617) 963-2512
hannah.vail@mass.gov

*Attorneys for the Commonwealth of
  Massachusetts*


**KEITH ELLISON**
  ATTORNEY GENERAL OF MINNESOTA

/s/ Brian S. Carter
Brian S. Carter
  *Special Counsel*
Minnesota Attorney General's Office
445 Minnesota Street
Suite 1400
St. Paul, MN 55101
(651) 757-1010
brian.carter@ag.state.mn.us

*Attorneys for the State of Minnesota*

49

**AARON D. FORD**
  ATTORNEY GENERAL OF NEVADA

/s/ Heidi Parry Stern
Heidi Parry Stern
  *Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
hstern@ag.nv.gov

*Attorneys for the State of Nevada*

**RAÚL TORREZ**
  ATTORNEY GENERAL OF NEW MEXICO

/s/ Steven Perfrement
Steven Perfrement
  *Senior Litigation Counsel*
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
sperfrement@nmdoj.gov

*Attorneys for the State of New Mexico*

**LETITIA JAMES**
  ATTORNEY GENERAL OF NEW YORK

/s/ Julie Dona
Julie Dona
  *Special Counsel*
Zoe Levine
  *Special Counsel for Immigrant Justice*
Rabia Muqaddam
  *Special Counsel for Federal Initiatives*
28 Liberty Street
New York, NY 10005
(212) 416-8494
julie.dona@ag.ny.gov

*Attorneys for the State of New York*

**DAN RAYFIELD**
  ATTORNEY GENERAL OF OREGON

/s/ Thomas H. Castelli
Thomas H. Castelli
  *Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
thomas.castelli@doj.oregon.gov

*Attorneys for the State of Oregon*

**CHARITY R. CLARK**
  ATTORNEY GENERAL OF VERMONT

/s/ Julio A. Thompson
Jonathan T. Rose
  *Solicitor General*
Julio A. Thompson
  *Co-Director, Civil Rights Unit*
Officer of the Vermont Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-5519
julio.thompson@vermont.gov

*Attorneys for the State of Vermont*


**NICHOLAS W. BROWN**
  ATTORNEY GENERAL OF WASHINGTON

/s/ Tyler Roberts
Tyler Roberts
Benjamin Seel
Cristina Sepe
Marsha Chien
  *Assistant Attorneys General*
Washington State Office of the Attorney
  General
800 Fifth Avenue
Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Tyler.Roberts@atg.wa.gov

*Attorneys for the State of Washington*


**JOSHUA L. KAUL**
  ATTORNEY GENERAL OF WISCONSIN

/s/ Frances Reynolds Colbert
Frances Reynolds Colbert
  *Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-9226
frances.colbert@wisdoj.gov

*Attorneys for the State of Wisconsin*