UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| ILLINOIS, *et al.*,<br><br>    Plaintiffs,<br><br>*v.*<br><br>FEDERAL EMERGENCY MANAGE-MENT AGENCY, *et al.*,<br><br>    Defendants. | Civil Action No.<br>25-cv-206-WES-PAS |

**DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

    The Department of Homeland Security ("DHS" or "Agency"), and specifically the Federal Emergency Management Agency ("FEMA"), has already addressed the majority of the arguments re-raised by Plaintiffs in their opposition brief (ECF 65). Rather than reiterate those arguments, the government responds to new or expanded arguments raised by Plaintiffs that are either beyond the scope of this litigation or that require further clarification. For these and all the reasons described in Defendants' prior brief, Plaintiffs' request for summary judgment should be denied and Defendants' request for summary judgment should be granted.

    **Allocation of Homeland Security Funding for National Priority Areas Is Lawful**

    In their opposition brief, Plaintiffs raise a new concern: the allocation of a portion of grant funding for National Priority Areas – a longstanding Homeland Security Grant requirement – in the recent Notice of Funding Opportunity ("NOFO") issued by FEMA for Fiscal Year 2025. ECF 65 at 30-32. This issue is entirely separate from those raised in Plaintiffs' Amended Complaint and is not appropriately before the Court. Even if it were, relief is not warranted.

    The Agency has long required grant recipients to allocate 30% of State Homeland Security Grants to National Priority Areas. *See* Decl. of David Richardson at ¶ 3 (Aug. 12, 2025), ("Richardson Decl. III"). For example, in Fiscal Year 2024, the Homeland Security Grant Program required recipients to allocate 30% of funding for the following National Priority Areas, with 3%

specifically allocated to enhancing election security and with flexibility as to where to allocate the remaining 27%: 1) enhancing the protection of soft targets/crowded places (no minimum percentage); 2) enhancing information and intelligence sharing and analysis (no minimum percentage); 3) combating domestic violent extremism (no minimum percentage); 4) enhancing cybersecurity (no minimum percentage); 5) enhancing community preparedness and resilience (no minimum percentage); and 6) enhancing election security (minimum 3% of total award). *See* Richardson Decl. III at ¶ 3; Fiscal Year 2024 Notice of Funding Opportunity, Homeland Security Grant Program, at Section 10(b) (Apr. 16, 2024), *available at* https://www.fema.gov/grants/preparedness/homeland-security/fy-24-nofo. The 2024 NOFO stated, "Failure by a recipient to propose investments and projects that align with the priority areas and spending requirements will result in a recipient having [up to 30% of the funding] placed on hold until they provide projects that sufficiently align to the National Priority Areas . . . ." *Id.* at ¶ 4.

On August 1, 2025, FEMA issued a NOFO for the Fiscal Year 2025 Homeland Security Grant Program. *See* Richardson Decl. III at ¶ 5; ECF 67-1. In keeping with past practice, the Homeland Security Grant Program NOFO for Fiscal Year 2025 includes the same structure with respect to National Priority Areas. For Fiscal Year 2025, the NOFO requires recipients to allocate 30% of funding to the following five National Priority Areas: 1) enhancing the protection of soft targets and crowded places (no minimum percentage); 2) supporting homeland security task forces and fusion centers (no minimum percentage); 3) enhancing and integrating cybersecurity resiliency (no minimum percentage); 4) enhancing election security (minimum 3% of total award); and 5) supporting border crisis response and enforcement (minimum 10% of total award). *See* Richardson Decl. III at ¶ 6; ECF 67-1 at § 3(c)(2) at 13-14.

Plaintiffs claim that the 10% allocation to border crisis response and enforcement somehow requires applicants to participate in DHS's "287(g)" program, which is a voluntary program under Section 287(g) of the Immigration and Nationality Act that allows certain immigration enforcement duties to be delegated to state and local law enforcement. But the NOFO neither requires participation in the 287(g) program nor converts this voluntary program into a mandate. Plaintiffs

2

make this argument by omitting certain language in their description of the 2025 Homeland Security Grant NOFO. More specifically, Plaintiffs selectively quote the NOFO on page 30 of their brief by listing some, but not all of the options provided in the NOFO as examples of activities that would meet the 10% allocation requirement. ECF 65 at 30.

For example, Plaintiffs list "[t]raining programs for state and local law enforcement officers in . . . 287(g) procedures." *Id*. However, the actual quote from the NOFO regarding that particular option for funding allocation states, "Training programs for state and local law enforcement officers in **immigration law, civil rights protections**, and 287(g) procedures." *See* ECF 67-1 at 21 (emphasis of omitted language added). By its plain text, the NOFO does not require participation in the 287(g) program, but instead offers multiple options, including funding for civil rights protection training.

In addition, the 2025 Homeland Security Grant NOFO provides the following explanation and options regarding the 10% allocation:

> This NPA supports efforts that align with this policy and promote cooperation between local and federal partners. Projects may include, but are not limited to:
>
> o Participation in the DHS/ICE 287(g) program, allowing trained local officers to support ICE with immigration enforcement;
>
> o Cooperation with ICE detainers and other jurisdictional responsibilities related to immigration enforcement; and
>
> o **Supportive activities such as officer training, technology and information sharing, operational support, and community engagement.**

ECF 67-1 at § 3(c)(2) at 18 (emphasis added); Richardson Decl. III at ¶ 7. Plaintiffs do not discuss the last option in their brief.

As expressly indicated, applicants do not need to propose plans that include participation in the DHS 287(g) program in order to receive Homeland Security Grant funding under this NOFO,

and the DHS 287(g) program remains voluntary. Richardson Decl. III at ¶ 8. Applicants may propose plans, for example, that do not include immigration enforcement activities, but that instead include allocation of the 10% of funding for supportive activities, such as community engagement. Richardson Decl. III at ¶ 9.

As with prior years, the 2025 Homeland Security Grant NOFO states that if proposed projects do not sufficiently align with the National Priority Areas, up to 30% of funds may be placed on hold until revisions are made. ECF 67-1 at 38-39; Richardson Decl. III at ¶ 10. Accordingly, if an applicant does not propose a plan for use of 10% of funds for one of the general categories offered that support the National Priority Area of border crisis response and enforcement, only 10% of funding will be placed on hold by the Agency as a result of the lack of such proposal. Richardson Decl. III at ¶ 11. In that scenario, the applicant will have another opportunity to present a plan within this National Priority Area, such as a project that involves community engagement, that does not present concerns for the applicant. *Id*.

Thus, the requirement that applicants allocate 10% of funding for the national priority area of supporting border crisis response and enforcement does not force Plaintiffs to participate in the 287(g) program and it is not a "re-packaging" of the Immigration Conditions at issue in this case. Even if it were, as discussed in Defendants' prior briefing, it is within the Agency's discretion to set certain requirements for its homeland security grant programs. The possible holding back of a small percentage of funding until an applicant provides a plan that falls under the broad options provided in the NOFO is the type of requirement that the Supreme Court has recognized as a valid federal spending incentive. *See, e.g.*, *South Dakota v. Dole*, 483 U.S. 203, 204, 210-212 (1987) (upholding the potential loss of 5% of federal funding as "not so coercive as to pass the point at which pressure turns into compulsion"); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 580-

81 (2012) (emphasizing that in *Dole* the amount of potential funding loss was too little to be considered coercive). Given the flexibility described in the requirements themselves that allow the Plaintiffs to submit plans that do not raise any of the concerns identified in this litigation, Plaintiffs are not entitled to any relief with respect to the 10% allocation of funding within the State Homeland Security Grant program.

### Plaintiffs' Claims Are Moot Regarding the Vast Majority of Grant Programs Identified in the Amended Complaint

With respect to the jurisdictional issues raised by Defendants, Plaintiffs appear to argue that none of the grant programs raised in their Amended Complaint[1] is moot with respect to implementation of the Immigration Conditions. Plaintiffs simply ignore Defendants' prior briefing, FEMA's sworn declarations[2], statements on its public website, and the specific terms of grant program agreements that show that the Immigration Conditions do not apply to the vast majority – **40 of 53** – of the programs that Plaintiffs raise. Plaintiffs appear to argue that because the DHS Standard Terms and Conditions include the Immigration Conditions, their claims are not moot, even though the Agency has made clear that not all of the Standard Terms and Conditions apply to every grant program and the Agency has further specified in grant agreements that the Immigration Conditions do not apply to certain grant programs. *See* Richardson Decl. II at ¶¶ 8-11, 25. These specific statements control, not the general statements Plaintiffs rely upon. *See generally RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). And where they

---

[1] Plaintiffs continue to assert that they challenge the applicability of the Immigration Conditions across all of DHS. They make this blanket challenge to an unknown number of grant programs across an unknown number of subagencies within DHS without any analysis of any program beyond those identified in their pleadings. This position contrasts sharply with Plaintiffs' argument that they are not making a facial Constitutional challenge to the Immigration Conditions, as discussed below, but are somehow making as-applied challenges to each of the non-identified and unanalyzed remaining grant programs under the Agency's purview, and to which the Immigration Conditions may never apply. For the reasons articulated previously, relief as to grant programs not even identified in the Amended Complaint would be inappropriate.

[2] Plaintiffs concede that the NOFO language for the grant programs for which Defendants did not raise mootness was "consistent with defendant Richardson's avowals in his supplemental declaration." ECF 65 at 5.

argue that their claims are not moot, Plaintiffs discuss only those grant programs that Defendants never claimed were moot. *See* ECF 65 at 13-14 (discussing five grant programs that were not among the 40 programs Defendants identified as moot). Defendants do not claim that the 13 programs to which the Immigration Conditions will be, or may be, applied are moot, and refer the Court to the other arguments raised in Defendants' prior briefing regarding those programs.

Plaintiffs also state that their claims regarding the 40 programs are not moot because Defendants have not "effected any legally binding change." ECF 65 at 13. But that is a made-up standard for which Plaintiffs provide no citation. As discussed, the fact that at some point in the future a government entity could hypothetically change any particular policy – in spite of both public statements from a high level official and the language in its current contract documents – is insufficient to overcome mootness. *See* ECF 61 at 11-12; *Boston Bit Labs, Inc. v. Baker*, 11 F.4th 3, 10 (1st Cir. 2021); *see also Lowe v. Gagné-Holmes*, 126 F.4th 747, 758 (1st Cir. 2025); *Calvary Chapel of Bangor v. Mills*, 52 F.4th 40, 49 (1st Cir. 2022). Plaintiffs do not dispute that the updated FEMA-State Agreement and NOFO language state that the Immigration Conditions do not apply to certain grant programs, (*see* ECF 65 at 5), and Plaintiffs have all the relief they could seek from this Court with respect to the majority of the programs they identify.

### **Plaintiffs' Remaining Arguments Assume the Correctness of Their Position**

Defendants' remaining jurisdictional[3] and merit arguments are fully detailed in their prior briefing. The thrust of Plaintiffs' response is essentially that they are correct because of their as-

---

[3] With respect to the applicability of the Tucker Act, Defendants acknowledge that the First Circuit very recently denied the government's request for a stay in *American Public Health Association v. National Institutes of Health*, Nos. 25-1611 & -1612, 2025 WL 2017106 (1st Cir. July 18, 2025), ruling that the government was unlikely to succeed in showing that the district court lacked jurisdiction with respect to claims challenging funding prohibitions and grant terminations by the National Institutions of Health and Department of Health and Human Services. *Id.* at *4-*8. The government has filed an application for a stay of the First Circuit's ruling with the Supreme Court. *See Nat'l Insts. of Health v. Am. Public Health Ass'n,* No. 25A103 (July 24, 2025). It is the government's position that *American Public Health Association* was incorrectly decided. Regardless, the First Circuit's decision turned in part on the fact that the plaintiffs' claims did not depend on the terms or conditions of any contract. 2025 WL 2017106 at *6. In this case, by contrast, Plaintiffs expressly challenge grant terms and conditions.

sumptions about Congressional intent, the purpose of the Agency, and the scope of national security with respect to immigration. Defendants briefly respond to three of Plaintiffs' arguments for the purpose of clarity.

First, with respect to the lack of APA jurisdiction over discretionary decisions, Plaintiffs attempt to distinguish the Supreme Court's ruling in *Lincoln v. Vigil*, 508 U.S. 182 (1993), by stating that the programs at issue in *Lincoln* were the agency's "own creation" and whose authorizing statutes "did not so much as mention" the programs. ECF 65 at 35. But Plaintiffs do not address how that is materially different from the multiple grant programs at issue in this case that are created by the Agency as the result of general appropriations bills. *See* ECF 61 at 32-33. For example, the Homeland Security National Training Program – Continuing Training Grants – Competitive Program is authorized by language approving funding "to sustain current operations for training, exercises, technical assistance, and other programs." *See* 2024 DHS Appropriations Act, Pub. L. 118-47, 138 Stat 460, 608 (Mar. 23, 2024). The Congressional Joint Explanatory Statement for this program simply states: "Continuing Training Grants . . . to be competitively awarded for FEMA-certified rural and tribal training" Joint Explanatory Statement—Division C, Department of Homeland Security Appropriations Act, 2024, at 42, *available at* https://appropriations.house.gov/further-consolidated-appropriations-act-2024. Similarly, the specific language from DHS's 2024 annual appropriations for the Targeted Violence and Terrorism Prevention Grant Program was: "[f]or necessary expenses of the Office of the Secretary and for executive management for Federal assistance through grants . . . of which $18,000,000 shall be for targeted violence and terrorism prevention grants . . . ." 2024 DHS Appropriations Act, Pub. L. 118-47, 138 Stat 460, 594 (Mar. 23, 2024). The authorizing language for the Regional Catastrophic Preparedness Grant program in 2024 was simply: "$10,800,000 for Regional Catastrophic Preparedness Grants." Pub. L. 118-47, 138 Stat 460, 608 (Mar. 23, 2024).

By definition, these and the other discretionary grant programs at issue are awarded at the Agency's discretion, within broad parameters, and without a meaningful standard that would allow for judicial review under the APA. Plaintiffs assume that their view of what justifies homeland

7

security funding should be the prevailing view, but that discretion does not belong to the Plaintiffs; it was given to the Agency by Congress. Thus, the Court lacks jurisdiction under the APA to review Plaintiffs' claims as to the discretionary grant programs, and further, there can be no violation of the Spending Clause where Congress made general funding allocations for use at the Agency's discretion.

      Second, with respect to their Constitutional claims, Plaintiffs appear to argue that they are not presenting a facial challenge to the Immigration Conditions because, in their view, this is not a situation where the Immigration Conditions could even potentially apply to any of the Agency's grant programs. ECF 65 at 32-33. But that is simply the ruling the Plaintiffs request from this Court, not an explanation for why Plaintiffs are excused from the requirements of bringing a facial challenge, which require Plaintiffs to establish that "no set of circumstances exists" under which the Immigration Conditions would be valid. *See United States v. Salerno*, 481 U.S. 739, 745 (1987). As noted above, Plaintiffs assume the unconstitutionality of the application of the Immigration Conditions across all of the Agency's grant programs without identifying all of the grant programs at issue, which subagencies award the grant programs, or the purposes of the grant programs, and even where Congress has expressly tied the grant program to immigration enforcement. The Agency, by contrast, has gone program by program and identified the grant programs to which the Immigration Conditions will not apply and the ones which require further analysis. *See* Richardson Decl. II at ¶¶ 8, 12-13. The fact that the expedited briefing schedule in this case has meant that the Agency is finalizing some of its decision-making while the litigation is ongoing neither proves that any Agency decision is the result of this litigation nor that the Agency's decision-making is arbitrary or capricious. Plaintiffs have not successfully established, nor have they attempted to establish, why the Immigration Conditions violate the Constitution as to every DHS grant program, and thus their facial challenge cannot succeed.

      Third, Plaintiffs dispute that Department of Homeland Security funding for national security-related grant programs can be tied to immigration enforcement as a subset of the Agency's

8

national security responsibilities. But that is simply Plaintiffs' interpretation of the scope of national security, and inserts Plaintiffs' own unsupported views of Congressional intent.

This is clearest with respect to Plaintiffs' argument regarding Operation Stonegarden, where Congress specifically stated that the purpose of the program was to secure the country's borders:

> Operation Stonegarden is part of FEMA's Homeland Security Grant Program, which provides funding to state, local, tribal, and territorial (SLTT) law enforcement agencies **that are located along the borders** of the United States **to improve overall border security**. . . . Operation Stonegarden is an essential part in the overall advancement of **security along our borders**. . . . This grant program provides cooperation and coordination among U.S. Customs and Border Protection's U.S. Border Patrol and federal, state, local, tribal, and territorial law enforcement agencies by providing funding to support joint efforts **to secure the United States' borders**. . . .

Report of the Committee on the Budget, House of Representatives, One Big Beautiful Bill Act, Report 119-106, § 60005, at 794 (May 20, 2025) (emphases added), *available at* https://www.congress.gov/119/crpt/hrpt106/CRPT-119hrpt106-pt1.pdf. Thus, by its own description, Congress viewed these immigration enforcement objectives as falling within the State Homeland Security Grant Program's general statutory purpose of "preventing, preparing for, protecting against, and responding to acts of terrorism." 6 U.S.C. § 605(a).

It is difficult to envision a clearer statement of Congress's authorization to fund immigration enforcement than this one, which mentions border security four times. Plaintiffs state that "only law enforcement agencies 'located along the U.S. borders' are eligible for assistance" and that Operation Stonegarden was not intended for "the interior of the United States." ECF 65 at 28. That argument embraces Defendants' point and the validity of the application of the Immigration Conditions to Operation Stonegarden.

More broadly, Plaintiffs repeatedly point out that there are many aspects of the Agency's mission, but that fact cannot remove immigration enforcement from the Agency's responsibilities or from the umbrella of homeland security. It may be that Plaintiffs do not see immigration enforcement as an important or effective part of homeland security efforts, but that is not a decision for Plaintiffs. The Agency has determined that immigration enforcement is part of its national

9

security duties, *see* Richardson Decl. II at ¶¶ 21-23, and Congress has clarified that immigration enforcement is within the Agency's homeland security responsibilities, as exemplified with its description of Operation Stonegarden. It follows that requiring recipients of homeland security-related funding to cooperate and not impede immigration enforcement efforts is both lawful and appropriate.

Plaintiffs have expressed clear disagreement with the Defendants' view of immigration enforcement, and the Defendants recognize that disagreement. However, disagreement is not sufficient to establish a violation of the law. Plaintiffs have not established any violation here, and thus summary judgment should be denied as to the Plaintiffs and entered on behalf of the Defendants.

Dated: August 12, 2025

Respectfully submitted,

FEDERAL EMERGENCY MANAGEMENT AGENCY; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES COAST GUARD; DAVID RICHARDSON, in his official capacity as Senior Official Performing the Duties of the Administrator of the Federal Emergency Management Agency; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; and KEVIN E. LUNDAY, in his official capacity as Acting Commandant of the U.S. Coast Guard,

By their Attorneys

SARA MIRON BLOOM
Acting United States Attorney

*/s/ Bethany N. Wong*
BETHANY N. WONG
Assistant United States Attorney
One Financial Plaza, 17th Floor
Providence, RI 02903
(401) 709-5000
(401) 709-5001 (Fax)
Email: Bethany.Wong@usdoj.gov

**CERTIFICATION OF SERVICE**

      I hereby certify that on August 12, 2025, I electronically filed the forgoing and it is available for viewing and downloading from the Court's CM/ECF system, and that the participants in the case that are registered CM/ECF users will be served electronically by the CM/ECF system.

                                                */s/ Bethany N. Wong*
                                                Bethany N. Wong
                                                Assistant United States Attorney