UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
_____
                                )
STATE OF ILLINOIS, et al.,      )
                                )
        Plaintiffs,             )
                                )
    v.                          )    C.A. No. 25-206 WES
                                )
FEDERAL EMERGENCY MANAGEMENT     )
AGENCY, et al.,                 )
                                )
                                )
        Defendants.             )
_____)
```

**MEMORANDUM AND ORDER**

WILLIAM E. SMITH, Senior District Judge.

Before the Court is Plaintiff States' Motion for Summary Judgment ("Plaintiffs' Motion"), Dkt. No. 58, and Defendants' Motion for Summary Judgment and Opposition to Plaintiffs' Motion ("Defendants' Motion"), Dkt. No. 61. In their motion, Plaintiff States ask this Court to declare that several contested conditions attached to the award of federal grants under the Department of Homeland Security ("DHS") are beyond the scope of DHS's statutory authority, are a violation of the Administrative Procedure Act ("APA"), and are unconstitutional. Defendants seek summary judgment finding the opposite. The Court finds that the contested conditions are arbitrary and capricious and thus invalid under the APA and are also a violation of the conditions attached to the Spending Clause and thus unconstitutional. Therefore, Plaintiffs'

Motion is granted, and Defendants' Motion is denied.

I.    **BACKGROUND**

   **A. Federal Grant Programs**

Since the 1950s, Congress has provided significant financial support to the States for disaster and emergency relief and management programs. Over time, this support has been expanded through various statutes such as the Stafford Act, the USA PATRIOT Act, the Maritime Transportation and Security Act, and the Post-Katrina Emergency Management Reform Act, among others. Pls.' Mot. 3-4. These programs are administered by DHS, primarily through the Federal Emergency Management Agency ("FEMA"), a sub-agency of DHS, and other DHS sub-agencies.[1] See Am. Compl. 9, Dkt. No. 57.

Congress authorizes the distribution of these funds through two main channels: (1) formula-based grant programs, which allocate funding according to fixed statutory or regulatory factors, and (2) discretionary grant programs that focus on

---

[1] Plaintiff States named several defendants in the present action – namely the Federal Emergency Management Agency ("FEMA"), the United States Department of Homeland Security ("DHS"), and the United States Coast Guard ("Coast Guard"), along with several officials in their official capacities of these agencies – David Richardson, Senior Official Performing the Duties of the Administrator of the FEMA; Kristi Noem, Secretary of DHS; and Kevin Lunday, Acting Commandant of the Coast Guard. Because both FEMA and the Coast Guard are components of DHS, we refer to Defendants collectively throughout this decision as either "Defendants" or "DHS."

specific threats and condition the receipt of grant funds on compliance with particular agency-derived requirements addressing those threats.  Pls.' Mot. 5-6.

Some examples of grants administered by DHS include the State Homeland Security Program, Urban Area Security Initiative, Port Security Grant Program, State and Local Cybersecurity Grant Program, National Dam Safety Grant Program, Nonprofit Security Grant Program, and Emergency Management Performance Grant. Collectively, grants administered by DHS deliver approximately $2 billion annually to the States, and the States have come to rely heavily on this federal funding.  Pls.' Mot. 7.

**B. Executive Order 14159 and DHS Implementation**

Based on an executive order issued by President Trump directing DHS to "ensure that so-called 'sanctuary' jurisdictions do not receive access to federal funds," Pls.' Mot. 11; Exec. Order No. 14159, § 17, 90 Fed. R. 8443, 8446 (Jan. 30, 2025), DHS Secretary Kristi Noem issued a memorandum on February 19 titled "Restricting Grant Funding for Sanctuary Jurisdictions."  Pls.' Mot. 11-12.  This memorandum instructed DHS's sub-agencies to "review all federal financial assistance awards" to identify funds being distributed to sanctuary jurisdictions, and report compliance within thirty days.  Defs.' Mot. 3.

Cameron Hamilton, then serving as the Senior Official

Performing the Duties of FEMA Administrator, subsequently sent a memorandum to Secretary Noem identifying twelve FEMA programs that, in his view, could lawfully be withheld from sanctuary states. He recommended against applying limiting conditions to disaster grants, non-disaster mitigation grants, fire departments, and similar organizations. Pls.' Mot. 12; Ex. 7 Pls.' Mot. at 2, Dkt. No. 59-7.

### C. New DHS Grant Conditions

On March 27, DHS revised the standard terms and conditions governing <u>all</u> federal grants it oversees, adding provisions requiring state and local recipients to certify that they will assist in enforcing federal immigration law. Pls.' Mot. 1; Ex. 1 Pls.' Mot. at 1, 5, Dkt. No. 59-1. Recipients that fail to certify compliance risk losing all DHS-administered federal funds. These revised conditions apply to all federal awards for fiscal year 2025. A revised version of these terms and conditions was issued on April 18; that version remains in effect today. Pls.' Mot. 12.

The terms require states receiving federal funds through DHS to "comply with" conditions "related to coordination and cooperation" with federal immigration officials, including six specific conditions related to immigration:

> 1. The Information Sharing Condition (C.IX.1.a): Grant recipients "must comply with the requirements of 8 U.S.C. §§ 1373 and 1644, [which] prohibit state restrictions on sharing

4

information with DHS concerning the citizenship or immigration status, lawful or unlawful, of any individual. . . ."

2. The Compliance Condition (C.IX.1.b): Grant recipients "must comply" with various criminal laws, including 8 U.S.C. § 1324, that prohibit, among other things, "encouraging or inducing" noncitizens to unlawfully enter the United States.

3. The Cooperation Condition (C.IX.1.c): Grant recipients must "honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer. A jurisdiction does not fail to comply with this requirement merely because it lacks the necessary resources to assist in a particular instance."

4. The Access Condition (C.IX.1.d): Grant recipients must provide federal immigration agents "access to detainees" in correctional facilities to inquire as to such individuals' right to be or remain in the United States.

5. The Publicization Condition (C.IX.1.e): Grant recipients must not "leak or otherwise publicize the existence of" any federal immigration enforcement operations.

6. The Certification and Monitoring Condition (C.IX.2): Grant recipients must certify compliance with the above conditions and require subgrant recipients to do the same.

Ex. 2.

In addition to these, another term obligates grant recipients to certify that "[t]hey do not, and will not during the term of [the] award, operate any program that benefits illegal immigrants or incentivizes illegal immigration." C.XVII.2.a.iii, Ex. 2 Pls.' Mot. 4, 6, Dkt. No. 59-2. Those terms and conditions (the

"contested conditions") form the basis of the dispute in the instant action.

Although Hamilton's memorandum recommended against applying immigration-related conditions to disaster grants, non-disaster mitigation grants, and funding for fire departments and similar organizations, the March 27 and subsequent April 18 revisions imposed the new conditions on all DHS-administered grants — including those supporting emergency services, disaster relief, and public safety. Ex. 7 Pls.' Mot. at 2; Pls.' Mot. 12. In practice, this meant that even programs Hamilton advised should remain untouched were subjected to the same immigration-related requirements.

### D. The Plaintiffs

Plaintiff States are twenty states and the District of Columbia: Illinois, California, New Jersey, Rhode Island, Colorado, Connecticut, Delaware, Hawai'i, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Mexico, New York, Oregon, Vermont, Washington, Wisconsin, and the District of Columbia. Since 2017, these Plaintiff States collectively have received more than $23 billion in federal funding through FEMA, excluding COVID-19 relief funds. Pls.' Mot. 7; Ex. 25 ¶ 12.

### E. The Instant Litigation

Plaintiff States filed this action on May 13, seeking

6

declaratory and injunctive relief on the grounds that the contested conditions are unlawful.  Compl. 73, Dkt. No. 1; Pls.' Mot. 1.[2] While the litigation is pending, Plaintiff States cannot access federal grant funds unless they agree to the new terms and conditions, including the contested conditions.  Pls. Mot. 14.  On May 19, 2025, Plaintiff States filed a Motion for Preliminary Injunction ("PI Mot."), Dkt. No. 20.

Shortly thereafter, on June 6, Defendants submitted an affidavit from David E. Richardson, Senior Official Performing the Duties of Administrator for FEMA, declaring that DHS had decided the contested conditions would not apply to twelve of the grants identified in the Complaint,[3] and that the applicability of the conditions to other grants remained under review.  Pls.' Mot. 1; Richardson Decl. I, Dkt. No. 50.  At a June 9 status hearing, Plaintiff States raised concerns that this change in position had not been formally reflected in DHS's standard terms and conditions,

---

[2] They subsequently filed an Amended Complaint expanding the list of grants to which the contested conditions apply.  Am. Compl. ¶ 46, Dkt. No. 57.

[3] A second declaration by Richardson filed on July 23, in support of Defendants' Motion for Summary Judgment, noted that DHS had made a "final determination" that the contested conditions would not apply to forty of the grants listed in the Amended Complaint.  Richardson Decl. II ¶ 8, Dkt. No. 61-1.  Additionally, Defendants submitted a third declaration by Richardson on August 12.  Richardson Decl. III. Dkt. No. 69-1.

which continued to state that the contested conditions applied to all new grants in Fiscal Year ("FY") 2025.

After that hearing, DHS amended its website to state that "not all of DHS's Standard Terms and Conditions apply to every DHS grant program," directing applicants to review program Notices of Funding Opportunity (NOFOs) to determine which conditions applied. Richardson Decl. II. ¶ 25, Dtk. No. 61-1.  In subsequent filings, Defendants asserted they had made a "final determination" that the contested conditions would not apply to forty of the grant programs identified in the Amended Complaint.  Richardson Decl. II, ¶ 8. DHS also stated it was "continuing to analyze the remaining [] grant programs [at issue in this case] . . . to determine whether DHS should apply the [contested] conditions . . . and if so, which ones."  Richardson Decl. II, ¶¶ 12-13.  According to Defendants, only thirteen programs from the Amended Complaint remain under DHS review, of which Defendants identified eight as being discretionary grant programs.  Defs.' Mot. 8.

Despite these representations, Plaintiff States maintain that the operative DHS terms and conditions still state that all FY 2025 grants are subject to the contested conditions.  Pls.' Mot. 16.  According to Plaintiff States, when several of the States reached out to their FEMA contacts to solicit amended agreements without the contested conditions, the States were informed that

8

the terms were still being revised.  Pls.' Mot. 16-17.  As of July, no FEMA agreement had been revised to exclude the immigration-related conditions.  Pls.' Mot. 16-17.  According to Plaintiff States, Between July 25 and August 1, DHS issued twenty-four NOFOs, all of which included the standard terms and conditions, and six of which expressly warned that "an immigration term and condition may be material" and DHS "may take any remedy for noncompliance" including "termination."  Pls.' Reply Supp. Pls.' Mot. ("Pls.' Reply") 4-5, Dkt. No. 65; Ex. 3-F, 41; Ex. 3-J, 21; Ex. 3-R, 35, Dkt. No 66-9, 13, 21.

### F. Summary Judgment Motions

Plaintiff States filed their Motion for Summary Judgment on July 7 seeking: (1) vacatur of the challenged conditions, (2) a permanent injunction preventing enforcement of the contested conditions against Plaintiff States, and (3) a declaration that the contested conditions are unlawful. Pls.' Mot. 4, 47, 52. Defendants filed their cross-motion on July 23 seeking that summary judgment instead be entered on behalf of Defendants and additionally requesting that any relief, if granted, be limited to the Plaintiff States and to the programs identified in the Amended Complaint.  Defs.' Mot. 11, 36.[4]

---

[4]Defendants also argued that summary judgment is inappropriate for six Plaintiff States — Delaware, Maine, Nevada, New Mexico,

Plaintiff States' argument is threefold.  First, they contend that DHS lacked statutory authority to impose the contested conditions, as no statute authorizes DHS to condition grants on compliance with immigration enforcement, Pls.' Mot. 23;  second, that the conditions are arbitrary and capricious under the APA because DHS failed to provide a reasoned explanation, failed to consider the reliance interests of the states, and departed from longstanding funding practices without adequate justification, Pls.' Mot. 29; and third, that the conditions are unconstitutional under the Spending Clause because they are coercive, ambiguous, unrelated to the purpose of the federal grants, and undermine the system of federalism by conscripting states into enforcing federal immigration policy. Pls.' Mot. 38.

Defendants raise multiple defenses.  First and foremost, on the issue of justiciability, Defendants argue that the case is moot because DHS has rescinded the contested conditions for forty programs, and the case is not ripe because DHS continues to review applicability for the remaining programs.  Defs.' Mot. 11, 13. They also contend that the Tucker Act and the APA bar judicial review of the contested conditions.  Defs.' Mot. 15.  On the

---

Vermont, and the District of Columbia — because they did not submit factual declarations in support of their motion.  Defs.' Mot. 36, n.8.

merits, Defendants argue that Congress delegated broad discretion to DHS to administer homeland security grant programs and to impose any conditions that advance federal objectives, including immigration enforcement. Defs.' Mot. 20. They further argue that the contested conditions are neither arbitrary nor capricious, as they were rationally connected to DHS's mission of protecting homeland security. Defs.' Mot. 33. Finally, they reject Plaintiff States' constitutional arguments, asserting that the contested conditions fall within Spending Clause authority, are sufficiently clear, and are reasonably related to the purposes of DHS-administered grants. Defs.' Mot. 21-22, 28-29, 33.

## II.  LEGAL STANDARD

The Court must grant summary judgment to Defendants if they show "that there is no genuine dispute as to any material fact and [they are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] dispute is genuine when the evidence is such 'that a reasonable jury could resolve the point in favor of the nonmoving party.'" Quintana-Dieppa v. Dep't of the Army, 130 F.4th 1, 7 (1st Cir. 2025) (quoting Doe v. Trs. of Bos. Coll., 892 F.3d 67, 79 (1st Cir. 2018)). A fact is material when it has "the 'potential to affect the outcome of the suit under the applicable law.'" Id. (quoting Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017)). In making its analysis, the Court must view "'the entire

record in the light most hospitable to the [nonmoving party],'" drawing "'all reasonable inferences in that party's favor.'"  Id. (quoting McCarthy v. Nw. Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995)). "Where, as here, the parties cross-move for summary judgment, the court must assay each motion 'separately, drawing inferences against each movant in turn.'"  Lawless v. Steward Health Care Sys., LLC, 894 F.3d 9, 21 (1st Cir. 2018) (quoting EEOC v. Steamship Clerks Union, Loc. 1066, 48 F.3d 594, 603 n.8 (1st Cir. 1995)).

"[T]he summary judgment rubric has a 'special twist in the administrative law context.'"  Bos. Redevelopment Auth. v. Nat'l Park Serv., 838 F.3d 42, 47 (1st Cir. 2016) (quoting Assoc'd Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997)). "In that context, a motion for summary judgment is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious."  Id.[5]

## III. DISCUSSION

The Court begins by addressing the threshold issues related

---

[5] The parties concede that the disputed issues are largely legal in nature.  See June 6, 2025 Jt. Status Rep. 2, Dkt. No. 56. Additionally, the parties requested that the Court waive the

to justiciability and jurisdiction, namely, whether the case is moot, ripe, and reviewable by this Court as a final agency action under the APA, and additionally whether this Court's review is barred by the Tucker Act.  From there, the Court discusses the parties' arguments related to DHS's authority in promulgating the contested conditions.  Finding the case both justiciable and jurisdictionally appropriate, the Court finally considers whether the contested conditions violate the APA and/or are unconstitutional.  In the end, the Court finds that the contested conditions fail, regardless of DHS's arguments related to its authority to promulgate them, because the contested conditions are both arbitrary and capricious under the APA and unconstitutional under the Spending Clause of the U.S. Constitution.

**A. Justiciability and Jurisdictional Claims**

Defendants assert several challenges to the justiciability of the issues and this Court's jurisdiction to decide the instant action.  First, Defendants argue that the case is moot as to several of the grants because DHS has rescinded the contested conditions for forty programs; second, Defendants argue that the case is not ripe as to other grants because DHS continues to review

requirement to submit statements of undisputed facts and waive the requirement that Defendants file an answer.  Id.  As such, the Court derives all relevant facts from the parties' summary judgement briefs and exhibits attached thereto.  See id.

applicability for the remaining grant programs.  Defs.' Mot. 11, 13.  In their third challenge, Defendants contend that the Tucker Act bars the Court's judicial review of the contested conditions. Defs. Mem. 15.  Finally, Defendants argue that this Court may not review agency action that is exclusively "committed to agency discretion by law" under 5 U.S.C. § 701(a)(2).  Defs.' Mot. 30. The Court addresses Defendants' arguments in turn and concludes they are all without merit.

### 1. Mootness

Standing is a fixed question, "to be assessed under the facts existing when the complaint is filed." Lujan v. Defs. of Wildlife, 504 U.S. 555, 569 n.4 (1992); see also Becker v. FEC, 230 F.3d 381, 386 n.3 (1st Cir. 2000).  Standing relates both to "questions of ripeness — whether the harm asserted has matured sufficiently to warrant judicial intervention — and of mootness — whether the occasion for judicial intervention persists." Warth v. Seldin, 422 U.S. 490, 499 n.10 (1975).

Under circumstances where, as here, Plaintiff States had standing at the outset, but Defendants' intervening conduct raises the question whether a case or controversy remains, mootness becomes a relevant inquiry. See Becker, 230 F.3d at 386 n.3 ("[A] plaintiff must have a personal interest at stake throughout the litigation of a case, [but] such an interest is to be assessed

under the rubric of standing at the commencement of the case, and under the rubric of mootness thereafter."); Arizonans for Official English v. Arizona, 520 U.S. 43, 68 n.22 (1997))).

As Defendants correctly point out, if a "case loses its live-controversy character at any point in the proceedings, the mootness doctrine generally stops [the court] from pumping new life into the dispute." Boston Bit Lab, Inc. v. Baker, 11 F.4th 3, 8 (1st Cir. 2021). Essentially, "[t]he doctrine of mootness enforces the mandate 'that an actual controversy must be extant at all stages of the review, not merely at the time the complaint is filed.'" Lowe v. Gagne-Holmes, 126 F.4th 747, 755 (1st Cir. 2025) (quoting Mangual v. Rotger-Sabat, 317 F.3d 45, 60 (1st Cir. 2003).

The doctrine of voluntary cessation, however, acts as a safeguard against some mootness claims. The doctrine stands for the principle that "a defendant cannot [. . .] automatically moot a case simply by ending its unlawful conduct once sued." Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013). The doctrine is designed to prevent defendants from manipulating a court's jurisdiction to evade judicial review of a challenged practice. See FBI v. Fikre, 601 U.S. 234, 241 (2024) ("A live case or controversy cannot be so easily disguised, and a federal court's constitutional authority cannot be so readily manipulated.").

To prevent this kind of gamesmanship, the voluntary cessation

15

doctrine creates a "formidable burden" for defendants. Id. (quoting Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc., 528 U.S. 167, 190 (2000)). For a case to be mooted by the defendant's conduct, the "defendant must prove 'no reasonable expectation' remains that it will 'return to [its] old ways.'" Id. (quoting United States v. W. T. Grant Co., 345 U.S. 629, 632-33 (1953)). Put differently, "a defendant's 'voluntary cessation of a challenged practice' will moot a case only if the defendant can show that the practice cannot 'reasonably be expected to recur.'" Id. at 241 (quoting Friends of the Earth, 528 U.S. at 189).

In support of their argument that the case is moot, Defendants explain that they "clarified through a sworn declaration by a senior official that it had made a final decision not to apply the challenged [conditions] to most of the grant programs that Plaintiff[s'] identified in their pleadings" and that as such, "Plaintiff[s'] challenge is moot concerning 40 of the 53 programs" identified in the Amended Complaint. Defs.' Mot. 1. They claim this is clearly a "final determination" worthy of the mootness doctrine. Defs.' Mot. 1. Additionally, they say, "individual Notice of Funding Opportunities [NFOs] for the grant programs at issue will clarify the applicability of the [conditions] to each program." Defs.' Mot. 2. Furthermore, they argue that any

16

discretionary grants of the remaining thirteen grants are, by definition, those that Congress has given the agency the "broad authority to administer . . . with little restriction," thus suggesting that if Plaintiff States' claims are moot as to the forty programs included in the Richardson declaration, there are no programs left for this Court to review.  Defs.' Mot. 2.

In response, Plaintiff States argue that the "agency's change in position does not moot Plaintiff States' challenge to the Conditions as originally promulgated" because (1) "it is unclear whether defendants have effected any legally binding change to their position on the scope of the [conditions]" given that Richardson's declaration "does not clearly accomplish any binding recission of the [conditions]" and the DHS website still reflects the April standard terms and conditions are operative; and (2) if Defendants did make a legally binding change at this stage, it would fall under the voluntary-cessation exception to mootness. Pls.' Mot. at 2, 18-19.

In support of their second point, Plaintiff States point out that the Richardson declaration only mentions FY 2025, which ends at the end of September.  Pls.' Mem. 21.  They further argue that "[D]efendants' past actions suggest that defendants will press forward with imposing the [conditions]," pointing to Executive Order 14159 directing that "sanctuary jurisdictions" not receive

17

federal funds, Executive Order 14218 directing DHS and all other executive departments to not "abet so-called 'sanctuary' policies," Noem's statement that any state not agreeing with the DHS mission will "not receive a single dollar of the Department's money unless Congress has specifically required it," further public statements by Noem, and subsequent executive orders. Pls.' Mot. 21.

What the Court must decide, then, is whether, because of the Defendants' claims that DHS has made a "final determination" that the contested conditions will not apply to forty programs named in Plaintiff States' Amended Complaint, Plaintiff States' claims are moot as to those forty programs or all programs. In Defendants' words, just because "the Agency <u>could</u> take action in future fiscal years . . . [that is not sufficient] to create a reasonable expectation that the Agency <u>will</u>. . . ." Defs.' Mot. 12 (emphasis added). But the Court disagrees.

Plaintiffs are correct to question whether DHS's revised terms and conditions — including the immigration-related requirements — are no longer operative for all FY 2025 grants. Although the Richardson declaration claimed forty programs would be exempt, DHS has not amended the governing terms to reflect that exemption. Instead, the operative language continues to apply the contested conditions across the board. Plaintiff States point to

18

the twenty-four NOFOs issued between July 25 and August 1, all of which incorporated the challenged provisions, as evidence that the conditions remain in force.

Defendants have not met the "formidable burden" of showing the conduct cannot reasonably be expected to recur because it has preserved its discretion to reapply them. See Fikre, 601 U.S. at 241. Until DHS formally rescinds or modifies the operative terms, Plaintiff States remain bound by conditions that attach to every FY 2025 award, including the programs Hamilton advised should remain untouched. The harm is therefore neither speculative nor hypothetical. Defendants' partial rescission cannot moot the controversy where the government continues to assert the authority to enforce the challenged policy. See Friends of the Earth, 528 U.S. at 189. Here, DHS still asserts it was authorized to impose these immigration-related conditions, continues to publish them in its standard terms, and has not issued amended agreements to Plaintiff States reflecting any exemption. As such, the Court finds there remains an ongoing and live controversy and the case is not moot as to any of the programs listed in the Amended Complaint.

### 2. Ripeness

The second jurisdictional component, ripeness, "concerns whether there is a sufficiently live case or controversy, at the

time of the proceedings, to create jurisdiction in the federal courts." Roman Cath. Bishop of Springfield v. City of Springfield, 724 F.3d 78, 89 (1st Cir. 2013). Importantly, "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." Blanchette v. Conn. Gen. Ins. Corps., 419 U.S. 102, 143 (1974) (quoting Pennsylvania v. West Virginia, 262 U.S. 553, 593 (1923)).

"There are two factors to consider in determining ripeness: 'the fitness of the issue for judicial decision and the hardship to the parties of withholding court consideration.'" Roman Cath. Bishops of Springfield, 724 F.2d at 89 (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967)). Fitness involves "subsidiary queries" into finality and the extent to which further facts may affect the resolution of the controversy. Ernst & Young Depositors Econ. Prot. Corp., 45 F.3d 530, 535 (1st Cir. 1995).

In the administrative law context, fitness for review requires that the action be "final agency action" within the meaning of the APA. Nat'l Park Hosp. Ass'n v. Dep't of Interior, 538 U.S. 803, 812 (2003). To be considered "final," the agency action must satisfy two sub-conditions. First, it "must mark the 'consummation' of the agency's decisionmaking process." Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (quoting Chi. & S. Air Lines,

20

Inc. v. Waterman S.S. Corp., 333 U.S. 103, 113 (1948)).  Second, "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  Id. at 178 (quoting Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatl., 400 U.S. 62, 71 (1970)); see also Harpel v. Werfel, 118 F.4th 100, 116 (1st Cir. 2024).

When considering the second factor of ripeness – the hardship to the parties – courts ask "whether the challenged action creates a direct and immediate dilemma for the parties."  Roman Cath. Bishop, 724 F.3d at 90.  In the administrative law context, this often includes analyzing whether withholding resolution "imposes delay, uncertainty, and expense, which is sufficient to show present injury."  See id. at 92.  Specifically, courts will consider whether there will be an "immediate and significant change in the plaintiffs' conduct of their affairs" and "serious penalties attached to noncompliance."  See Abbott Labs, 387 U.S. at 153.

In support of their argument, Defendants first contend that no funds are available for any states until NOFOs are issued, which appear to still be in the process of revision as to all the grants.  Defs.' Mot. 13-14.  Thus, Defendants argue, at this stage, and "[w]ithout the Agency's determination regarding whether the [contested conditions] will apply . . . , there is no final agency action" at all.  Id. at 14.  Second, they argue that "there is no

21

hardship to the Plaintiffs" if this Court declines to review the contested conditions. Id. at 15.

Plaintiff States plainly disagree and argue that DHS's promulgation of the contested conditions was a final agency action. Pls.' Mot. 9. Furthermore, they argue that, despite DHS's representations, the standard terms and conditions, to this day, contain the contested conditions. Pls.' Mot. 10. Plaintiff States represent that they have already structured their budgets on the expectation of continued DHS funding, which they cannot make up from other sources, and that expectation is based on the reasonable belief of decades of continued support. Higgins Decl. ¶¶ 20, 30, 84, 88; Brantley Decl., ¶ 78.

Defendants' argument is unconvincing. In the administrative law context, finality requires consummation of the decision-making process and legal consequences flowing from the action. See Bennett, 520 U.S. at 178. Both prongs are met here: the new terms mark the consummation of DHS's rulemaking process and impose legal obligations on states by conditioning FY 2025 funding on immigration enforcement compliance. Pls.' Mot. 9-10. As numerous other courts[6] have likewise explained, the decision to attach the

---

[6] See City of Chicago v. Sessions, 321 F. Supp. 3d 855, 866 (N.D. Ill. 2018); see also City & Cnty. of San Francisco v. Sessions, 349 F. Supp. 3d 924, 961-62 (N.D. Cal. 2018); City of

conditions can be final even if the final decision to award the funds and issue the NOFOs is still pending.  Plaintiff States emphasize that, to this day, the controlling DHS grant documents still contain the contested terms, which means the agency's policy is operative and reviewable now.  Pls.' Mot. 19.

When considering the hardship prong, the Court finds merit in the Plaintiff States' contention that withholding review would cause serious and immediate injury.  Their budgets are structured in reliance on billions in DHS-administered grants, and they cannot replace those funds from other sources.  Higgins Decl. ¶¶ 20, 30, 84, 88; Brantley Decl. ¶ 78.  Because the challenged conditions remain applicable to all FY 2025 grants, Plaintiff States face a dilemma: either certify compliance with contested federal immigration policies or risk losing critical emergency and disaster-relief funding.  But the law does not require them to "await the consummation of threatened injury to obtain preventive relief."  Blanchette, 419 U.S. at 143 (quoting Pennsylvania v. West Virginia, 262 U.S. at 593).  On one hand, if DHS applies the conditions in the sweeping manner that Plaintiff States fear, the controversy is plainly ripe.  But even on the other hand, if DHS

---

Los Angeles v. Sessions, No. CV 17-7215-R, 2018 WL 6071071, at *2 (C.D. Cal. Sept. 17, 2018); State ex rel. Becerra v. Sessions, 284 F. Supp. 3d 1015, 1031-32 (N.D. Cal. 2018); City of Philadelphia v. Sessions, 280 F. Supp. 3d 579, 615 (E.D. Pa. 2017).

implements only the narrower version described in the Richardson declaration, Plaintiff States still face ongoing uncertainty and reliance costs that make the dispute sufficiently concrete for judicial review.

### 3. Jurisdiction Under the APA

Having found the instant action to be both not moot and sufficiently ripe, the Court now turns to Defendants' jurisdictional arguments. The first is whether the Court's review is barred by the Tucker Act.

"[T]he APA's limited waiver of [sovereign] immunity does not extend to orders 'to enforce a contractual obligation to pay money . . . .'" Dep't of Educ. v. California, 604, U.S. 650, 651 (2025) (quoting Great-West Life & Annuity Ins. v. Knudson, 534 U.S. 204, 212 (2002)). "Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" Id. (quoting 28 U.S.C. § 1491(a)(1)).

Defendants argue that the Tucker act prohibits this Court from reviewing the Plaintiff States' claims. Defs.' Mot. 15. They propose that "any right that Plaintiff[s'] have to this funding . . . . [is granted by] the language of the grant agreements themselves," and that "[t]he heart of the dispute is about the unilateral change of grant terms used year after year by the

24

parties." Defs.' Mot. 17, 19. It follows, they say, that because "Congress intended for the Agency to set terms and conditions . . . and this is a dispute about a change in those terms," Plaintiff States' claims are contractual in nature. Defs.' Mot. 18. But, as Plaintiff States point out, the remedy they seek is not contractual in nature. Pls.' Mot. 18.

There is no need to spend much time on this argument. The Court is, however, mindful of the uncertainty created by the Supreme Court's recent emergency docket rulings addressing jurisdiction over grant-termination disputes. To state the obvious, this Court must follow the precedent of the Supreme Court and the First Circuit. Nat'l Institutes of Health v. Am. Pub. Health Ass'n (APHA), 2025 WL 2415669 (U.S. Aug. 21, 2025), at *3-5 (Gorsuch, J., concurring in part and dissenting in part) (citation omitted); see also Hutto v. Davis, 454 U.S. 370, 375 (1982) (per curiam). The recent decisions from the Supreme Court regarding grants have arisen in the specific context of grant terminations and damages claims that fall within the Tucker Act framework, not the promulgation of grant conditions that govern eligibility for future funding. See APHA, 2025 WL 2415669; see also Dep't of Educ. V. California, 604 U.S. 650, 650 (2025) (per curiam). Those opinions cited Bowen v. Massachusetts as good law but offered nothing to suggest whether its reasoning applies in

cases like this one.  487 U.S. 879, 900-01 (1988).  Here, Plaintiff States challenge the validity of DHS's promulgated conditions under the APA and the Constitution, not a termination decision sounding in contract or seeking monetary relief.  For that reason, and consistent with its recent decisions, see Rhode Island Coal. Against Domestic Violence v. Bondi, No. 25-279, 2025 WL 2271867, *5 (D.R.I. Aug. 8, 2025), the Court concludes that these claims remain within the jurisdiction of the federal district courts notwithstanding the recent lack of consensus at the Supreme Court.  See President & Fellows of Harvard Coll. V. Dep't of Homeland Sec., No. 25-cv-11048, 2025 WL 2528380, *12-13 (D. Mass. Sept. 3, 2025) (noting similar jurisdictional concerns in the context of grant-termination claims).

### 4. Review of Agency Action under 5 U.S.C. § 701(a)(2)

In their final argument against the jurisdiction of this Court, Defendants argue that the federal courts may not review "agency action" when the action was exclusively "committed to agency discretion by law."  Defs.' Mot. 30 (quoting 5 U.S.C. § 701(a)(2)).  On this point, Defendants argue that "[at] a minimum, the discretionary grants at issue in this case, are, by their very nature, committed to [a]gency discretion" and thus non-reviewable under the APA.  Id.  Defendants rely on Lincoln v. Vigil to support their argument that the discretionary grants at issue

here are not reviewable under the APA and contend that despite these grants not being lump-sum grants like those at issue in Lincoln, they are similarly discretionary.  508 U.S. 182, 192 (1993); Defs.' Mot. 30-32.

Defendants are correct that judicial review under the APA does not apply when "agency action is committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  But because "[t]he [APA] embodies a 'basic presumption of judicial review,'" the Supreme Court has narrowly construed this provision, finding that it only applies in "'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" Dep't of Com. v. New York, 588 U.S. 752, 771-72 (2019) (first quoting Abbott Laboratories, 387 U.S. at 140; and then quoting Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv., 586 U.S. 9, 23 (2018)).  Historically, these "rare circumstances" have been limited to only a few specific categories of decisions.  Id. at 772.

Furthermore, The APA requires a court to "hold unlawful and set aside agency action" found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).  As the Supreme Court has recently explained, "the command of the APA" is "that 'the reviewing court'

27

— not the agency whose action it reviews — is to 'decide all relevant questions of law' and 'interpret . . . statutory provisions.'" Loper Bright Enters. v. Raimondo, 603 U.S. 369, 398 (2024) (quoting 5 U.S.C. § 706).   Therefore, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." Id. at 412.   Indeed, even where an agency's authorizing statute is ambiguous with respect to the question at issue, the agency's interpretation of that statute is "not entitled to deference." Id. at 392.

Here, the Court has jurisdiction to review the challenged conditions.   The central question is whether DHS exceeded its statutory authority by adding immigration-related terms to all grants under its purview — a question that falls squarely within the APA's command that courts decide "all relevant questions of law" and set aside agency action "in excess of statutory jurisdiction, authority, or limitations."   5 U.S.C. §§ 706, 706(2)(C); Loper Bright, 603 U.S. at 398, 412.   Defendants' reliance on Lincoln is misplaced: unlike the lump-sum funding decisions in Lincoln, 508 U.S. at 192, the grants at issue here are governed by statutory and regulatory frameworks that provide judicially manageable standards for review.   See Dep't of Com. v. New York, 588 U.S. at 771–72.   Moreover, numerous federal courts

28

are presently reviewing discretionary grant conditions under the APA, and this Court finds no merit in Defendants' claim that discretionary grants are somehow categorically unreviewable.[7] Furthermore, other federal courts across the country have already granted injunctive relief halting compliance with other executive orders.[8]

### B. Substantive Claims

Having disposed of Defendants' arguments related to justiciability and jurisdiction, the Court now turns to the merits of the case. Plaintiff States advance three substantive claims, namely that the contested conditions: (1) exceed DHS's statutory authority; (2) are invalid for being arbitrary and capricious under the APA; and (3) are unconstitutional because they violate the Spending Clause. Pls.' Mot. 23, 29, 38. The Court finds that

---

[7] Cf. e.g., Harris Cnty. v. Kennedy, No. 25-cv-1275 (CRC), 2025 WL 1707665 (D.D.C. 2025); Widakuswara v. Lake, 779 F. Supp. 3d 10 (D.D.C. 2025); S. Educ. Found. v. Dep't of Educ., 784 F. Supp. 3d 50 (D.D.C. 2025); City of Fresno v. Turner, No. 25-cv-07070, 2025 WL 2469330 (N.D. Cal Aug. 27, 2025).

[8] See, e.g., Chi. Women in Trades v. Trump, 778 F. Supp. 3d 959 (N.D. Ill. 2025); City & Cnty. of San Francisco v. Trump, 779 F. Supp. 3d 1077 (N.D. Cal. 2025), opinion clarified, 782 F. Supp. 3d 830 (N.D. Cal. 2025); S. Educ. Found. v. United States Dep't of Educ., 784 F. Supp. 3d 50 (D.D.C. 2025); Martin Luther King, Jr. Cnty. v. Turner, No. 2:25-CV-814, 2025 WL 1582368 (W.D. Wash. June 3, 2025); San Francisco A.I.D.S. Found. v. Trump, No. 25-CV-01824-JST, 2025 WL 1621636 (N.D. Cal. June 9, 2025).

Plaintiff States succeed in their second and third arguments, and thus, it need not address the issue of statutory authority that Defendants so strongly advance.[9]

### 1. Arbitrary and Capricious Under the APA

Under the APA, an agency action is arbitrary and capricious when the agency "relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise." Assoc'd Fisheries, 127 F.3d at 109. Under Section 706(2)(A), the Court's "scope of review is 'narrow': [it] determines only whether [the Office] examined 'the relevant data' and articulated 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'" Dep't of Com., 588 U.S. at 773 (quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm

---

[9] City of Providence v. Barr, 954 F.3d 23, 39 (1st Cir. 2020), clearly explains that an agency may not "create qualification requirements unrelated to the grant program simply to advance its own policy priorities." Here, this would warrant a grant-by-grant analysis in order to determine whether DHS had the requisite statutory authority to impose the contested conditions on any of the grant programs. Indeed, Defendants advance several statutory arguments that are largely specific and reliant on the nature of each individual grant. The exhaustive review such an analysis would require is unnecessary given the Court's conclusions on Plaintiffs' other claims.

Mut. Auto. Ins., 463 U.S. 29, 43 (1983)). Thus, the Court concerns itself only with ensuring that the Office "remained 'within the bounds of reasoned decisionmaking.'" Id. (quoting Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc., 462 U.S. 87, 105 (1983)). The Office's action must be both "reasonable and reasonably explained." Ohio v. EPA, 603 U.S. 279, 292 (2024) (quoting FCC v. Prometheus Radio Project, 592 U.S. 414, 423, (2021)).

Plaintiff States first argue that DHS did not consider if the authorizing statutes permitted this type of condition, Pls.' Mot. 29-30; second, that applying the contested conditions indiscriminately across all grants was inherently "arbitrarily broad," Pls.' Mot. 32 (citations omitted); third, that DHS failed to "consider the states' reliance interests in the . . . federal funding," Pls.' Mot. 34, where states have "structured their budgets and operations on the reasonable expectation of continued funding," and also "failed to consider the effects on public safety," id. at 35-37; see Regents, 591 U.S. at 30; and finally, that the Department failed to consider more discrete alternatives to this "sweeping policy," like pauses for targeted grants, Pls.' Mot. 27-38.

In response, Defendants argue that the conditions are not arbitrary and capricious because the agency is tasked with

enforcing federal immigration law and the conditions requiring the states to not impede the agency in those duties follow DHS's core purpose; this, they say, means there are sufficient "rational reasons" for drafting and implementing the contested conditions to meet the standard under the APA.    Defs.' Mot. 34 (citations omitted).    Furthermore, Defendants contend, without much explanation, that the April 25th memorandum and the Richards declaration demonstrate that the agency did not violate the APA because they made a final determination that the contested conditions would not apply to all grants. Defs.' Mot. 34-35.  This demonstrates, they say, that DHS conducted a thorough review of the grant programs.  Id. at 34.  Finally, they argue that the conditions are a reaction to the agency's recognition of a "significant problem: states impeding the enforcement of federal law."  Id. at 35.  All of their goals, they say, are in the name of public safety, and thus they must have considered the public safety, contrary to Plaintiff States' arguments.  Id.

There is no dispute that the string of memoranda on which the Defendants rely were drafted in direct response to the Executive Order calling upon the agencies to terminate funding to "sanctuary jurisdiction[s]."  See Id. at 3-4; see Pls.' Mot. 15.  But even if DHS was acting on the instruction of Executive Order 14159, DHS cannot avoid the arbitrary and capricious analysis simply by

claiming it was acting at the instruction of the President.  See, e.g., Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget, 763 F. Supp. 3d 36, 55 (D.D.C. 2025).

Instead, "[t]he reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." Dep't of Com., 588 U.S. at 785.  Based on the present record, Defendants have failed to meet this baseline requirement.  DHS made no attempt to claim that it examined the relevant data or articulated a fact-based reason for its actions.

Based on the limited justifications offered in Defendants' papers and exhibits to this Court, the Court can only conclude that DHS engaged in a wholly under-reasoned and arbitrary process. Defendants provide, as nearly the only basis for their decision, that DHS is tasked with homeland security and that many of the grants, as well as the overarching objective of DHS, are designed to prevent and potentially respond to acts of terrorism, and "that mission includes immigration enforcement." Defs.' Mot. 29.  But such platitudes cannot substitute for an actual explanation of why it is necessary to attach sweeping immigration conditions to all the grants at issue here, regardless of their statutory purpose or programmatic objectives.  The indiscriminate application of these

33

conditions across the entire spectrum of DHS-administered grants demonstrates the absence of tailoring and the failure to consider whether such conditions are appropriate for particular programs.

The APA requires that agencies "must consider the 'alternatives' that are 'within the ambit of existing policy'" and determine "whether there are reliance interests, determine whether they are significant, and weigh any such interests against competing policy concerns." Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 30 (2020) (brackets omitted). Here, DHS failed to consider any of these interests. Its own internal record included recommendations that disaster grants, non-disaster mitigation grants, and fire department programs not be subjected to the conditions, yet DHS initially imposed them across the board without explanation. The failure to even consider reasons to not impose the contested conditions highlights the arbitrariness of the process. Moreover, DHS did not meaningfully evaluate the states' reliance interests, even though the record shows that states have structured their budgets and emergency preparedness planning for decades around consistent federal support.

This failure is compounded by the vague and confusing language in the challenged conditions, which makes compliance a nearly impossible-to-achieve moving target. With these conditions, states are left to guess at what conduct satisfies the requirements

34

under threat of losing billions in essential funding.  Nor did DHS
consider the public safety consequences of undermining state
emergency budgets in this way.  As a result, the conditions not
only jeopardize states' fiscal planning but also threaten their
capacity to protect public safety in the areas where federal and
state cooperation is most critical.  The combination of
overbreadth, disregard for reliance interests, and failure to
consider public safety and possible alternatives makes it clear
that DHS's decision does not comply with the APA.  See Motor
Vehicle Mfrs. Ass'n, 463 U.S. at 43.  The contested conditions are
arbitrary and capricious and, thus, violate the APA.

## 2. Constitutionality under the Spending Clause

Finally, the Court addresses whether the contested conditions
are constitutionally invalid.  "The Constitution empowers Congress
to 'lay and collect Taxes, Duties, Imposts, and Excises, to pay
the Debts and provide for the common Defence and general Welfare
of the United States.'"  South Dakota v. Dole, 483 U.S. 203, 206
(1987) (quoting Art. I, § 8, cl. 1.).  "Incident to this power,
Congress may attach conditions on the receipt of federal funds and
has repeatedly employed the power 'to further broad policy
objectives by conditioning receipt of federal moneys upon
compliance by the recipient with federal statutory and
administrative directives.'"  Id. (quoting Fullilove v. Klutznick,

448 U.S. 448, 474 (1980)).

The spending power is, of course, not unlimited, but is instead subject to several general restrictions. "The first of these limitations is derived from the language of the Constitution itself: the exercise of the spending power must be in pursuit of 'the general welfare.'" Id. at 207. "Second, we have required that if Congress desires to condition the States' receipt of federal funds, it must do so unambiguously . . . , enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation." Id. (citations omitted). Third, "conditions on federal grants might be illegitimate if they are unrelated 'to the federal interest in particular national projects or programs.'" Id. at 207-08 (citations omitted). This final condition has come to mean "reasonably calculated" to support "a purpose for which the funds are expended." See id. at 209.

In addition, the conditions may not be coercive. See Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 577-78 (2012). Although "[t]hese offers may well induce the States to adopt policies that the Federal Government itself could not impose," the Supreme Court has "recognized limits on Congress's power under the Spending Clause to secure state compliance with federal objectives." Id. at 537. Accordingly, the Court asks whether "the financial inducement offered by Congress" was "so coercive as

36

to pass the point at which 'pressure turns into compulsion.'" Id. at 580 (quoting Dole, 483 U.S. at 211).  When the inducement is only "relatively mild encouragement to the States," it is permissible.  See id. (quoting Dole, 483 U.S. at 211).  If, however, the conditions are akin to "economic dragooning that leaves the States with no real option but to acquiesce," they may be unduly coercive and invalid under the Constitution.  See id. at 582.

Plaintiff States argue, first, that the conditions were not "reasonably related to the funding programs to which they apply." Pls.' Mot. 38.  Second, they argue that the contested conditions coerce the states by "threatening to withhold billions annually in necessary federal emergency and disaster funds."  Id. at 2.  And, because failure to comply with the contested conditions would result in "withholding a staggering amount of money —- billions of dollars in federal emergency funding that the States cannot realistically turn down," the States "lack 'a realistic option' to turn down access to the federal funding . . . ."  Id. at 40.  As the Plaintiff States note, the funds "amount[] to a substantial — and irreplaceable – part of their disaster and terrorist preparedness and response budgets," particularly due to the "preexisting commitment of state resources" where states cannot "pay for these programs" . . . "in the absence of federal funds."

37

Pls.' Mot. 42, 43. Plaintiff States also point out that the nature of the funds, being earmarked for disaster relief and public safety, makes the withholding of the funding even more coercive. Id. at 42.

Lastly, Plaintiff States argue that the contested conditions are "unlawfully ambiguous." Id. at 43. In particular, they point to conditions such as "cooperation," without describing what that entails; "joint operations," without noting what that requires; "information" that recipients must share, without specifying what that information is, id. at 43-44; and the requirement that recipients will not "operate any program that benefits illegal immigrants or incentivizes illegal immigration," with no way to know what incentivizes individuals or what constitutes a benefit. Pls.' Mot. at 45-46.

In rebuttal, Defendants repeat the mantra that the contested conditions are reasonably related to the grants to which they attach because the "Agency has determined that immigration enforcement is part of its national security duties." Defs.' Resp. Supp. Summ. J. (Defs.' Resp.") 9-10, Dkt. No. 69; Richardson Decl. II ¶¶ 21-23. To support this claim, Defendants cite one of FEMA's grants, Operation Stonegarden, which mentions, several times, the programs intent to improve overall "border" security. Defs.' Resp.

9-10.

Additionally, Defendants argue that the contested conditions are not coercive, because, unlike in <u>NFIB</u>, DHS is not creating any new grant programs but is instead merely "modifying" its existing grant programs.  Defs.' Mot. 22.  They aver that "simply because so much of [the] local governments' funding derives from the federal government," does not mean that the conditions are coercive.  <u>Id.</u> at 22.  Defendants fail to meaningfully address whether the contested conditions are unconstitutionally ambiguous.

First, the Court finds that the contested conditions are not reasonably related to the purposes of the grants to which they attach.  DHS justifies the conditions by pointing to its broad homeland security mission, but the grants at issue fund programs such as disaster relief, fire safety, dam safety, and emergency preparedness.  Sweeping immigration-related conditions imposed on every DHS-administered grant, regardless of statutory purpose, lack the necessary tailoring.  The Spending Clause requires that conditions be "reasonably calculated" to advance the purposes for which funds are expended, <u>Dole</u>, 483 U.S. at 209, and DHS has failed to demonstrate any such connection outside of a few programs like Operation Stonegarden.  The Court therefore concludes that the conditions are overbroad and unrelated to the underlying programs.

Second, the Court finds that the conditions are coercive.

39

The record shows that states rely on these grants for billions of dollars annually in disaster relief and public safety funds that cannot be replaced by state revenues. Denying such funding if states refuse to comply with vague immigration requirements leaves them with no meaningful choice, particularly where state budgets are already committed. The financial pressure here goes well beyond the "relatively mild encouragement" approved in <u>Dole</u>, 483 U.S. at 211, and amounts instead to "economic dragooning" of the sort condemned in <u>NFIB</u>, 567 U.S. at 582. The coercion is even more pronounced because the threatened funds involve essential public safety responsibilities rather than optional or peripheral programs.

Third, the Court holds that the conditions are unlawfully ambiguous. The Spending Clause requires clarity so that states may exercise their choice knowingly. Here, DHS required states to provide "cooperation" and participate in "joint operations" and "information sharing," but without defining what compliance entails. Likewise, the prohibition on operating programs that "benefit illegal immigrants" or "incentivize illegal immigration" provides no meaningful standards and is hopelessly vague. States cannot predict how DHS will interpret these vague terms, yet they risk losing billions in federal funding for any perceived violation. Such ambiguity deprives the states of the ability to

make informed decisions, rendering the conditions constitutionally invalid.

## C. Remedy

Plaintiff States ask for three remedies: declaratory relief, vacatur of the contested conditions, and a permanent injunction against any future implementation of the contested conditions against the Plaintiff States.  Pls.' Mot. 46.

Their first two requests are intrinsically linked, and so are addressed together.  Declaratory judgment states the law; when a court makes a declaratory judgment in the administrative law context, it declares the agency action unlawful.  But declaratory relief itself does not compel an affirmative action like an injunction does; instead, it establishes the legal rights and obligations at issue.  See 28 U.S.C. § 2201(a).  Related, but different, when a court vacates agency action, it nullifies the action and removes its legal force.  This remedial act available under the APA ensures that the unlawful agency action cannot bind the parties to the instant case, as well as all other entities affected.  So, declaratory relief provides the legal determination, and vacatur is the logical consequence of that determination.  They are two sides of the same coin.

"In a case of an actual controversy within its jurisdiction . . . any court of the United States, . . . may declare the rights

41

and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). This type of "declaratory relief, both by its very nature and under the plain language of 28 U.S.C. § 2201(a), is discretionary." El Dia, Inc. v. Hernandez Colon, 963 F.2d 488, 493 (1st Cir. 1992).

In addition, the APA specifically directs courts to "hold unlawful and set aside agency action" when that action is determined by the reviewing court to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A),(B). The "federal courts have long understood § 706(2) to authorize vacatur" of the challenged agency action. Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys., 603 U.S. 799, 826 (Kavanaugh, J., concurring); see also New York, et al. v. Kennedy, et al., No. 25-1780 2025 WL 2658233, *1 (1st Cir. Sept. 17, 2025).

The holding in Trump v. Casa restricted universal injunctions, but the Court expressly left unaffected the APA's command to "set aside" unlawful agency action. 606 U.S. 831, 847 n.10 (2025) ("Nothing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate agency action."). It appears to this Court, then, that

vacatur under the APA remains, for now, a valid remedy.

Based on its findings above, the Court declares that the contested conditions are both arbitrary and capricious under the APA and unconstitutional under the Spending Clause.  As such, the contested conditions are vacated.

In light of this holding, a permanent injunction enjoining Defendants from enforcing the contested conditions against Plaintiff States is also appropriate.

For a district court to grant a permanent injunction, the plaintiff must show (1) "actual success on the merits of its claims;" (2) that he/she "would be irreparably injured in the absence of injunctive relief;" (3) that the harm suffered "from the defendant's conduct would exceed the harm to the defendant accruing from the issuance of an injunction;" and (4) that "the public interest would not be adversely affected by an injunction."  Doe v. Rhode Island Interscholastic League, 137 F.4th 34, 40 (1st Cir. 2025) (citations omitted).  "District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief."  K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 915 (1st Cir. 1989).  In the context of analyzing claims under the APA, some courts have held that "once the court reache[s] the conclusion that the rule was indeed illegal . . . there [is]

no separate need to show irreparable injury . . . ." Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (internal citations omitted).

Under either theory, Plaintiff States are entitled to injunctive relief. First, Plaintiff states have succeeded on the merits of their claims: the contested conditions are both arbitrary and capricious and unconstitutional. Second, Plaintiff States stand to suffer irreparable harm; the effect of the loss of emergency and disaster funds cannot be recovered later, and the downstream effect on disaster response and public safety are real and not compensable. Third, withholding disaster aid harms Plaintiff States and their residents directly, whereas injunctive relief is the status quo. The balance of equities clearly tips in favor of Plaintiff States. And finally, protecting access to disaster and emergency relief is squarely aligned with the public interest. As other courts have noted before, "there is generally no public interest in the perpetuation of unlawful agency action." Kennedy., 2025 WL 2658233 at *6 (quoting Somerville Pub. Schs. V. McMahon, 139 F.4th 63, 76 (1st Cir. 2005)). Given all the above, the Court finds a permanent injunction is warranted and thus permanently enjoins Defendants from enforcing the contested conditions against Plaintiff States.

If Plaintiff States believe the injunction as stated falls

short of complete relief, the Court instructs them to provide briefing on this issue within fourteen (14) days of the date of this order; Defendants will have seven (7) days to respond; and Plaintiffs will have seven (7) days to reply.

## IV.    CONCLUSION

For the reasons explained above, Plaintiffs' Motion for Summary Judgment, Dkt. No. 58, is GRANTED and Defendants' Cross-Motion for Summary Judgment, Dkt. No. 61, is DENIED.


IT IS SO ORDERED.

_____
William E. Smith
Senior District Judge
Date: September 24, 2025