**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| ILLINOIS, *et al.*,<br><br>Plaintiffs,<br><br>*v.*<br><br>FEDERAL EMERGENCY MANAGEMENT AGENCY, *et al.*,<br><br>Defendants. | C.A. No. 25-cv-206-MSM-RLA |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' SECOND MOTION TO ENFORCE**

Plaintiffs' Motion, ECF 83, improperly seeks to use enforcement of this Court's injunction governing the FY2025 Immigration Conditions as an end run around full merits review of materially different FY2026 agency action, effectively asking the Court to expand its prior ruling beyond the actual scope of the injunction.

Together, the Court's September 24, 2025, summary judgment Order (the "September 2025 Order"), ECF 71, and its subsequent October 14, 2025, enforcement Order (the "October 2025 Order"), ECF 75, enjoined the FY2025 Immigration Conditions and "any materially similar term requiring cooperation with federal immigration enforcement as a condition on federal funds." *See* ECF 75 at 3. The Orders did not categorically prohibit every future immigration-related grant condition, particularly where, as here, the later action specifically accounts for the concerns the Court itself identified by requiring a grant-by-grant assessment of statutory authority and a program-specific nexus to immigration activities, law enforcement, or national security. *See* ECF 71 at 30 n.9, 33-34, 39-41.

Defendants complied with the existing Orders by rescinding the FY2025 conditions that were at issue in this case and amending the affected awards. The present dispute, already before the Court in *Illinois v. FEMA*, No. 1:26-cv-485-MSM-RLA, is not a continuation of the FY2025 conduct previously enjoined; it concerns different agency action

taken for a different fiscal year under revised DHS Standard Terms and Conditions, through a different administrative process, and on a separate administrative record. Whether the Court's prior reasoning bears on the merits of that FY2026 action is a question for the separate FY2026 case; it does not enlarge the injunction here.

Plaintiffs' Motion should therefore be denied. The FY2026 action is distinct from the conduct previously enjoined and, in any event, is not "materially similar" within the meaning of the October 2025 Order. The revised terms require program-specific applicability determinations, define the required cooperation with greater specificity, narrow the Benefits Condition, and include separate fusion-center requirements that were not before the Court in FY2025 and have since been revised.

Plaintiffs' Motion should therefore be denied. Alternatively, the Court should stay resolution of Plaintiffs' Motion in this case pending resolution of Plaintiffs' challenges to FY2026 grant programs in Case No. 1:26-cv-485, where the materially different administrative process and terms are already being litigated on the fuller FY2026 record (summarized, only in part, below).

**BACKGROUND**

On September 24, 2025, the Court granted Plaintiffs' Motion for Summary Judgment, vacated the challenged FY2025 Immigration Conditions, and permanently enjoined Defendants from enforcing those conditions against Plaintiff States. ECF 71. The Court resolved the FY2025 challenge on arbitrary-and-capricious and Spending Clause grounds. *See id.* at 30-41. Its analysis turned in significant part on the absence of a program-specific justification when applying the FY2025 conditions. *See id.* In particular, the Court expressed concern that DHS had not explained why the FY2025 conditions extended across grants "regardless of their statutory purpose or programmatic objectives," and observed that DHS's authority would "warrant a grant-by-grant analysis." *See id.* at 30 n.9, 33-34, 39-41.

On October 8, 2025, Plaintiffs moved to enforce that judgment, contending that

certain challenged FY2025 grant awards continued to include the conditions the Court had vacated and provisions stating that those conditions would become effective if the injunction were stayed, vacated, or extinguished. ECF 73. The Court granted that Motion in the October 2025 Order. ECF 75. Among other things, the Court enjoined Defendants from enforcing against Plaintiff States the challenged conditions, certain related award articles, and "any materially similar term requiring cooperation with federal immigration enforcement as a condition on federal funds," and directed Defendants to amend and reissue affected award documents. *Id*. at 3.

Defendants' counsel promptly communicated the Court's directives to the agencies, conferred with Plaintiffs' counsel concerning their implementation, and, consistent with the Parties' agreement, Defendants notified affected FEMA grant recipients of the amendments to their awards and informed the Court of Defendants' compliance efforts. *See* ECF 76. On October 20, 2025, Defendants reissued award letters to the eight direct recipients of Countering Weapons of Mass Destruction grants. *Id*. The following day, FEMA issued Information Bulletin No. 538 specifically "to comply with" the October 2025 Order. ECF 76-2 at 2. The Bulletin notified the twenty-one Plaintiff States that FEMA was amending affected FY2025 awards and, "[e]ffective immediately," rescinded the challenged Communication and Cooperation and Anti-Discrimination provisions, as well as the related "Compliance with Federal Immigration Law" and other award articles addressed by the Court's Order. *Id.* at 2-3. FEMA further advised recipients that it would confirm those amendments in the FEMA GO award files once the then-ongoing lapse in federal funding ended. *Id.* at 3. Defendants thereafter filed a Notice of Compliance informing the Court of these actions and the Parties' agreement concerning implementation of the Court's October 2025 Order. *See* ECF 76.

The instant Motion arises from subsequent agency action for FY2026, which incorporates safeguards directly responsive to the concerns identified by the Court in its

September 2025 Order. On August 28, 2026, DHS issued revised Standard Terms and Conditions, which were subsequently updated.[1] ECF 83-2, 83-3. Section 3-1 of those terms provides that DHS "will analyze whether the conditions [titled, 'Communication and Cooperation with the Department of Homeland Security and Immigration Officials'] will be applied to any grant program in a way that is consistent with the specific statutes that apply to each grant program." ECF 83-3 at 5. That provision identifies as relevant whether a program "has a nexus to immigration activities, law enforcement, or national security," authorizes DHS to tailor the conditions to a particular grant program, and provides that DHS will specify in the grant documents "whether and how" the conditions apply. *Id.* The operative cooperation requirements accordingly apply "[w]here applicable." *Id.*

The FY2026 substantive terms also differ from their FY2025 counterparts. The FY2025 cooperation provision broadly required recipients to "honor requests for cooperation," including participation in joint operations, information sharing, or short-term detention pursuant to a valid detainer. *See* ECF 57-3 at 5. The FY2026 provision provides greater specificity concerning what such cooperation entails. Among other things, it identifies particular categories of information recipients may be required to provide, including criminal history, expected and actual release dates, detention location, nationality, residence, and employment. ECF 83-3 at 6. It also specifies that requests for short-term detention are limited to no more than 48 hours pursuant to a valid detainer to permit DHS to assume custody. *Id*. It also specifically addresses voluntary cooperation with DHS pursuant to 8 U.S.C. § 1357(g), providing that recipients may not prohibit such cooperation. *Id.*

DHS also narrowed and clarified the provision Plaintiffs refer to as the "Benefits Condition." The FY2025 provision appeared as part of the Anti-Discrimination term and

---

[1] Unless otherwise noted, citations to the FY2026 Standard Terms refer to the version filed at ECF 83-3.

required recipients, as a condition of accepting an award, to certify broadly that they did not and would not "operate any program that benefits illegal immigrants or incentivizes illegal immigration." ECF 57-3 at 7. The FY2026 terms, by contrast, specify the conduct encompassed by that prohibition: they apply to programs that benefit or incentivize illegal immigration "by establishing or maintaining programs *providing direct financial support or public benefits* to illegal immigrants." ECF 83-3 at 6-7 (emphasis added).

FEMA then undertook the program-specific applicability process prescribed by the FY2026 Standard Terms, and, in doing so, mitigated the salient concerns identified by the Court in adjudicating the FY2025 conditions. *See* ECF 71 at 30-41.

The administrative record in the separate litigation concerning the FY2026 terms reflects that FEMA did not treat the Immigration Conditions as automatically applicable across its non-disaster grant portfolio. *See* Administrative Record, *Illinois v. FEMA*, No. 1:26-cv-485-MSM-RLA, ECF 48-1 through ECF 48-8 (D.R.I. Oct. 8, 2026), attached here as Exhibit A.[2] For instance, FEMA's September 9, 2026 memorandum (the "Sept. 9 Memo") stated that application of the Immigration Conditions would be determined through a separate "Immigration Terms & Conditions Memo" and would not extend to programs for which the Department had not approved their application. *See id.* at 30-31. On September 11, 2026, FEMA Administrator Cameron Hamilton submitted a memorandum to the Secretary (the "Sept. 11 Memo") requesting approval to apply the Immigration Conditions to specified FY2026 programs after reviewing their authorizing authorities, purposes, award criteria, and nexus to immigration activities, law enforcement, or national security. *See id.* at 39-47. The memorandum separately identified numerous non-disaster programs to which the conditions would not apply. *Id.* at 48-49. FEMA further documented its reasoning in a

---

[2] For ease of reference, unless otherwise indicated, citations to Exhibit A refer to the pagination of the PDF file rather than the original internal pagination of the documents.

September 18, 2026 memorandum (the "Sept. 18 Memo"). *See id.* at 50-61.

That process culminated in Information Bulletin No. 582, which identifies the FY2026 non-disaster programs to which FEMA determined the Immigration Conditions would apply. ECF 83-4. Those programs comprise BioWatch; Emergency Management Performance Grant Program ("EMPG"); Homeland Security Grant Program ("HSGP"), including the State Homeland Security Program ("SHSP"), Urban Area Security Initiative ("UASI"), and Operation Stonegarden ("OPSG"); Homeland Security National Training Program ("HSNTP") – Continuing Training Grants – Competitive; Port Security Grant Program ("PSGP"); Regional Catastrophic Preparedness Grant Program ("RCPGP"); Securing the Cities ("STC"); Transit Security Grant Program ("TSGP"); and the newly established State Border Security Reinforcement Fund ("SBSRF"). *Id.* at 2-3.

With the exception of SBSRF, all of these programs were subject to the FY2025 conditions. *Compare id. with* ECF 61 at 7.[3] SBSRF was established by Congress after the FY2025 litigation commenced and specifically authorized funding for border security activities including the "detection and interdiction" of certain noncitizens unlawfully entering the United States and their "transfer or referral" to DHS. An Act to Provide for Reconciliation Pursuant to Title II of H. Con. Res. 14, Pub. L. No. 119-21, § 90005(b), 139 Stat. 72, 360 (July 4, 2025), *codified at* 8 U.S.C. § 1716(b). The statute thus presents a direct immigration and law enforcement nexus that was not before the Court when it adjudicated the FY2025 conditions.

The FY2026 HSGP awards also contain separate requirements applicable specifically to grant-funded fusion centers (the "Fusion Center Term"). Plaintiffs now include that

---

[3] The programs that were subject to the FY2025 Immigration Conditions but are not subject to the FY2026 Immigration Conditions are the Presidential Residence Protection Assistance, the Targeted Violence and Terrorism Prevention Grant Program, and the State Recreational Boating Safety program, the last of which is administered by the U.S. Coast Guard. *Compare* ECF 61 at 7, *with* ECF 83-4 at 2.

HSGP-specific term within their contention that Defendants have violated the Court's prior Immigration Conditions injunction. *See* ECF 83 at 11. Federal law defines a "fusion center" as a collaborative effort among "Federal, State, local, or tribal government agencies that combines resources, expertise, or information" to improve their ability to "detect, prevent, investigate, apprehend, and respond to criminal or terrorist activity." 6 U.S.C. § 124h(k)(1). Fusion centers occupy a distinct place in HSGP's statutory structure. Congress expressly identifies "information sharing and analysis" and the "establishing, enhancing, and staffing" of State, local, and regional fusion centers as permissible law enforcement terrorism prevention activities. *Id.* §§ 607(a)(2)(A), (G). Congress likewise identifies establishment and enhancement of fusion centers as an allowable use of HSGP funds. *Id.* § 609(a)(7).

In the initial FY2026 award packages, the challenged provisions required fusion centers to coordinate with their local Homeland Security Task Force ("HSTF"), maintain a permanent formal seat for U.S. Immigration and Customs Enforcement ("ICE") Enforcement and Removal Operations ("ERO") personnel, and report whether the fusion center's lead agency maintained an active agreement under 8 U.S.C. § 1357(g). *See* ECF 83-5 at 76-77.

FEMA has since amended the FY2026 Fusion Center Term. On October 9, 2026, FEMA issued Information Bulletin No. 589, attached as Exhibit B, which, "[e]ffective immediately," replaced the fusion center article in all FY2026 HSGP awards. Among other changes, the operative term no longer requires fusion centers to maintain a permanent, formal seat for ICE ERO officials, or require 8 U.S.C. § 1357(g) participation, and it modifies the provisions concerning HSTF coordination. Exhibit B. As of October 19, 2026, FEMA had reissued all affected FY2026 HSGP awards with the revised term. *See* Exhibit C at 1, 43-44 (Email from FEMA and sample revised FY2026 HSGP Award). The operative fusion center requirements are not the same provisions Plaintiffs quote from the initial award packages. More fundamentally, the Fusion Center Term is an HSGP-specific

provision that was not part of the FY2025 DHS Standard Terms adjudicated by this Court.

Plaintiffs now seek to enforce the Court's October 2025 Order against that subsequent—and distinct—FY2026 agency action.

## ARGUMENT

### I. PLAINTIFFS CANNOT USE ENFORCEMENT OF THE COURT'S FY2025 INJUNCTION TO ADJUDICATE DISTINCT FY2026 AGENCY ACTION.

Plaintiffs' Motion does not arise from any continuing failure to implement the Court's prior Orders concerning FY2025 grants. As described above, Defendants complied with those Orders by rescinding the FY2025 terms from the affected awards, reissuing the relevant award documents, and notifying Plaintiff States that those amendments were effective immediately. *See* ECF 76; ECF 76-2; Background, *supra*.

The Court's September 2025 Order defines the violation the injunction was intended to remedy. *See* ECF 71 at 18 ("Plaintiffs are correct to question whether DHS's revised terms and conditions — including the immigration-related requirements — are no longer operative for all FY 2025 grants. Although the Richardson declaration claimed forty programs would be exempt, DHS has not amended the governing terms to reflect that exemption. Instead, the operative language continues to apply the contested conditions *across the board*.") (emphasis added). The Court emphasized, "Until DHS formally rescinds *or modifies* the operative terms, Plaintiff States remain bound by conditions that attach to every FY 2025 award, including the programs Hamilton advised should remain untouched. The harm is therefore neither speculative nor hypothetical." *Id.* at 19 (emphasis added).

The FY2026 action Plaintiffs attempt to collaterally challenge here accounts for the underlying concerns that prompted that FY2025 remedy. It comprises revised terms for FY2026, adopted through a new administrative process on a separate administrative record. The administrative record for the FY2026 action reflects that FEMA evaluated identified programs individually; examined their authorizing statutes, purposes, award criteria, and

asserted nexus to immigration activities, law enforcement, or national security; identified programs to which the Immigration Conditions would not apply; sought Department-level approval of its recommended applicability determinations; and separately documented the reasoning supporting the programs selected. *See* Exhibit A at 30-31, 39-61.[4] Those features distinguish the FY2026 action from the FY2025 action adjudicated by the Court.

Federal Rule of Civil Procedure 65 requires an injunction to "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(B)-(C). Consistent with that requirement, the First Circuit has explained that "the party enjoined must be able to ascertain from the four corners of the order precisely what acts are forbidden." *Project B.A.S.I.C. v. Kemp*, 947 F.2d 11, 17 (1st Cir. 1991); *see also Axia NetMedia Corp. v. Mass. Tech. Park Corp.*, 889 F.3d 1, 12-13 (1st Cir. 2018). The enforcement inquiry thus requires a Court to determine only whether Defendants engaged in conduct the injunction actually precludes; it does not permit the scope of the injunction to expand by implication to reach different agency action merely because that action implicates legal questions similar to those the Court previously considered.

Plaintiffs' Motion tries to erase that distinction. The Court's reasoning concerning the FY2025 conditions may bear on the merits of Plaintiffs' challenge to the FY2026 conditions. But the legal force of that reasoning as precedent is distinct from the binding force of the injunction as an order directed to the parties. A district court decision does not acquire the binding precedential force of an appellate decision merely because the same parties later litigate a similar legal question or because the later dispute is before the same court. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("A decision of a federal

---

4 Although the administrative record will be addressed more fully in Case No. 1:26-cv-485, those materials are relevant here insofar as they demonstrate that the FY2026 action Plaintiffs challenge in their Motion arises from a distinct agency process and determination.

district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case."). Plaintiffs remain free to argue in Case No. 1:26-cv-485 that the Court's reasoning concerning the FY2025 conditions should lead to the same result when applied to the FY2026 conditions. What they cannot do is convert that reasoning into an enlargement of the injunction entered in this case.

Nor does the Court's inherent authority to enforce its judgment supply a basis for adjudicating the separate FY2026 challenge through this enforcement proceeding. A federal court may act to "vindicate its authority, and effectuate its decrees," *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 379-80 (1994), but that authority remains tied to enforcement of the judgment actually entered. It does not furnish a shortcut to treat materially different post-judgment conduct as prohibited simply because the court's prior reasoning might bear on the legality of that later conduct. *See Peacock v. Thomas*, 516 U.S. 349, 357-59 (1996) (declining to extend ancillary enforcement jurisdiction to claims based on post-judgment conduct and "entirely new theories of liability" and explaining that such jurisdiction does not encompass relief "of a different kind or on a different principle" from the prior order).

Here, the FY2026 action involves revised substantive terms, a new program-specific applicability process, differentiated application across FEMA programs, and HSGP-specific fusion center provisions not adjudicated in the FY2025 case. *See* Background, *supra*. And while those facts may bear on questions similar to those the Court considered in this case, similarity in the legal questions presented does not transform a distinct agency action into a violation of the prior injunction. *See NBA Props., Inc. v. Gold*, 895 F.2d 30, 31-32 (1st Cir. 1990) (reversing contempt finding even though the later conduct implicated the same underlying trademark problem that had produced the injunction, and explaining that courts must "read court decrees to mean rather precisely what they say" and resolving ambiguities in favor of the party charged with contempt). An injunction must instead be enforced

according to its terms, and those terms must have "clearly and unambiguously forbidden *the precise conduct on which the contempt allegation is based*." *United States v. Saccoccia*, 433 F.3d 19, 28 (1st Cir. 2005) (emphasis in original).

Plaintiffs improperly seek to enforce the spirit of the Court's prior Orders in this case beyond their actual terms, extending those Orders to materially different FY2026 agency action arising from a different set of facts, terms, and administrative circumstances that the Orders themselves do not constrain. Whether the FY2026 conditions independently satisfy the Administrative Procedure Act, the Spending Clause, and the statutes governing the affected programs is a merits question presented in Plaintiffs' separate action before this Court in Case No. 1:26-cv-485-MSM-RLA. Those independent claims do not provide a basis for enlarging the injunction entered in this case.

## II. EVEN IF THE COURT REACHES THE OCTOBER 2025 ORDER'S "MATERIALLY SIMILAR" LANGUAGE, THE FY2026 CONDITIONS DO NOT FALL WITHIN IT.

Even if the Court proceeds beyond that threshold distinction and asks whether the FY2026 conditions fall within the October 2025 Order's prohibition on "materially similar" terms, it should find that they do not.

The October 2025 Order does not prohibit Defendants from *ever* imposing a grant condition concerning cooperation with federal immigration authorities. It enjoins the FY2025 conditions adjudicated in this case and any "materially similar term requiring cooperation with federal immigration enforcement as a condition on federal funds." ECF 75 at 3. That language prevents Defendants from circumventing the Court's judgment through nominal changes to the conditions the Court already vacated concerning FY2025 funding. It should not be construed to adjudicate prospectively every future DHS grant condition touching immigration enforcement, irrespective of changes in the language of the conditions, their scope, the programs to which they apply, or the statutory bases for those programs.

Although certain substantive requirements overlap with provisions contained in the FY2025 conditions, the FY2026 conditions must be considered together with the limitations governing when they apply and the program-specific process through which FEMA determined their applicability, rather than by isolating individual requirements that appear in both versions.

The most significant change in the FY2026 Standard Terms is the new program-specific applicability requirement. Unlike the FY2025 conditions, the FY2026 Standard Terms require DHS to determine, for each grant program, whether application of the Immigration Conditions is consistent with the program's governing statute and whether the program has a nexus to immigration activities, law enforcement, or national security. *See* ECF 83-3 at 5; *compare with* ECF 57-3 at 5-6. The FY2026 Standard Terms also authorize program-specific tailoring and require DHS to specify in the grant documents "whether and how" the Immigration Conditions apply. ECF 83-3 at 5.

Those changes respond directly to concerns the Court identified in adjudicating the FY2025 action. The Court expressly observed that DHS's statutory authority would "warrant a grant-by-grant analysis," ECF 71 at 30 n.9, and separately faulted DHS for imposing the FY2025 conditions across programs without adequately explaining their relationship to each program's statutory purpose or programmatic objectives, *id.* at 33-34, 39-41. That reasoning necessarily leaves room for DHS to impose immigration-related conditions in a future fiscal year where the Agency identifies and substantiates the requisite relationship to a particular grant program. Put differently, the Court's conclusion that the FY2025 conditions lacked an adequate program-specific nexus cannot reasonably be read as a categorical prohibition on future immigration-related grant conditions even where DHS later undertakes the very nexus inquiry the Court found absent. Whether FEMA's FY2026 nexus determinations ultimately suffice is a merits question for Case No. 1:26-cv-485-MSM-RLA; the October 2025 injunction does not resolve that question in advance.

Indeed, the FY2026 process reflects precisely the sort of program-specific inquiry that was absent from the FY2025 action. FEMA's Sept. 9 Memo treated application of the Immigration Conditions as requiring a separate determination, stating that they would not apply to programs for which the Department had not approved their application and that the ultimate decision would be made through the separate Immigration Terms and Conditions memorandum. Exhibit A at 30-31. FEMA's Sept. 11 Memo likewise requested approval to apply the Immigration Conditions only to specified programs after reviewing their authorizing authorities, purposes, award criteria, and asserted nexus to immigration activities, law enforcement, or national security. *See id.* at 39-47. The same memorandum separately identified numerous non-disaster programs for which the condition would not apply. *Id.* at 48-49.

The resulting determinations were not mechanically uniform even within a single program. For instance, FEMA determined that the conditions would not apply to the New Jersey RCPGP award but would apply to the Miami-Dade RCPGP award. *Id.* at 43. FEMA then supplied further program-specific reasoning in its Sept. 18 Memo. *See id.* at 50-61. For example, FEMA tied OPSG to its border security and joint law enforcement mission and reasoned that restrictions on communication or cooperation could impede information sharing, joint planning, and the effectiveness of border security operations. *Id.* at 56-57. Information Bulletin No. 582 reflects the resulting subset of programs to which the conditions apply. *See* ECF 83-4 at 2-3. The fact that FEMA undertook that separate inquiry is directly relevant to whether the FY2026 action is simply a "materially similar" substitute for the FY2025 action already enjoined. It is not.

The substantive provisions also changed. The FY2026 cooperation term replaces the FY2025 provision's general direction to "honor requests for cooperation" with more specific descriptions of the information and detention-related cooperation at issue. ECF 83-3 at 6. And the FY2026 Benefits Condition narrows the earlier prohibition by specifying that it

addresses programs providing "direct financial support or public benefits to illegal immigrants." *Id.* at 6-7. These revisions provide recipients with materially greater specificity as to both whether the conditions apply and what compliance requires. That some requirements retain subject-matter overlap with their FY2025 predecessors does not necessarily render the FY2026 action "materially similar" within the meaning of the Court's Order. The comparison must account for the conditions as a whole, including the newly prescribed limitations on applicability, the revised substantive language, and the program-specific determinations through which FEMA applied them.

The particular programs selected for application of the FY2026 conditions further underscore the impropriety of Plaintiffs' attempt to extend the 2025 injunction to materially distinct agency action. SBSRF, for instance, which did not exist as a FEMA grant program when this litigation commenced, expressly funds activities involving the detection and interdiction of certain unlawfully-entering noncitizens and their transfer or referral to DHS. Pub. L. No. 119-21, § 90005(b), 139 Stat. at 360, *codified at* 8 U.S.C. § 1716(b). The October 2025 Order thus cannot reasonably be read to have adjudicated in advance the application of immigration-related conditions to a later-created federal grant program expressly directed toward border security and immigration-related activities.

A recent decision addressing enforcement of a similar immigration-related funding injunction illustrates the distinction. In *City & County of San Francisco v. Trump*, the court clarified that its preliminary injunction against broad federal-funding restrictions was "not intended to hamstring the Government's lawful evaluation of federal funds to States and localities that have sanctuary policies." 782 F. Supp. 3d 830, 836 (N.D. Cal. 2025). The court separately recognized that the Government could identify particular grants and funding programs it believed could lawfully be conditioned on immigration-related objectives, including programs with a plausible nexus to those policies. *See id.*[5] The same principle

---

[5] Specifically, the court stated,

applies here. The October 2025 Order forecloses an end run around the FY2025 injunction; it does not prevent DHS from evaluating later grant programs individually and defending materially revised conditions based on the statutory purposes of those programs.

Plaintiffs' new challenge to the Fusion Center Term only reinforces that conclusion. That term is not another iteration of the FY2025 Standard Terms enjoined by this Court. It is an HSGP-specific requirement governing grant-funded fusion centers—entities Congress expressly incorporated into HSGP's law enforcement and information-sharing structure. *See* 6 U.S.C. §§ 607(a)(2)(A), (G), 609(a)(7), 124h(k)(1). The administrative record from 2026—which was not before the Court in this 2025 case—reflects that FEMA separately considered the Fusion Center Term as an HSGP-specific requirement, distinct from the DHS-wide Immigration Condition. *See, e.g.*, Exhibit A at 30-35. Moreover, as of October 19, 2026, FEMA has reissued FY2026 HSGP awards and replaced the version of the term Plaintiffs quote in their Motion with the correct term, which eliminates the requirement to maintain a permanent, formal ICE ERO seat, does not require participation in an agreement under 8 U.S.C. § 1357(g) participation, and modifies the provisions governing HSTF coordination. *See* Exhibit B; Exhibit C at 1, 43-44. Whether the operative Fusion Center Term is lawful is a merits question for the FY2026 case; it is not properly treated as a repackaged FY2025 Standard Term already adjudicated by this Court.

At bottom, Plaintiffs rely on similarities in subject matter and on the Court's reasoning concerning the FY2025 conditions as grounds to expand the existing injunction to

---

> It seems relatively easy to identify categories of funds that have little or nothing to do with sanctuary policies (such as healthcare, transportation, emergency relief and so forth), that would have an unlawfully coercive effect on the Cities and Counties if those categories of funds were identified for suspension or termination; to do so would violate the Preliminary Injunction.

*Id.*

a later, materially distinct FY2026 action. The revised FY2026 conditions, FEMA's individualized program determinations, separate administrative record, and distinct Fusion Center Term do not comprise conduct already prohibited by that Order. Any contention that the Court's FY2025 reasoning should otherwise control the merits of Plaintiffs' FY2026 challenge belongs in Case No. 1:26-cv-485, not in a motion to enforce the FY2025 injunction. The Court should therefore deny Plaintiffs' Motion.

## CONCLUSION

Defendants complied with the Court's Orders concerning the FY2025 Immigration Conditions. The present dispute concerns subsequent FY2026 agency action under revised terms, a new program-specific applicability and approval process, and separate HSGP-specific fusion center provisions that were not before the Court in FY2025. Those actions are not materially similar substitutes for the FY2025 conditions prohibited by the October 2025 Order. The Court's prior Orders in this case do not provide a shortcut to adjudicate the merits of that distinct agency action. Plaintiffs' Motion to Enforce should therefore be denied or, in the alternative, stayed pending resolution of Case No. 1:26-cv-485-MSM-RLA.

Respectfully submitted,

TODD BLANCHE
Attorney General

CHARLES C. CALENDA
First Assistant United States Attorney

*/s/ Rachna Vyas*
RACHNA VYAS
KEVIN BOLAN
Assistant U.S. Attorney
One Financial Plaza, 17th Floor
Providence, Rhode Island 02903
(401) 709-5000
(401) 709-5001 (Fax)
Email: Rachna.vyas@usdoj.gov

**CERTIFICATION OF SERVICE**

I hereby certify that on October 21, 2026, I electronically filed the foregoing document and it is available for viewing and downloading from the Court's CM/ECF system, and that the participants in the case that are registered CM/ECF users will be served electronically by the CM/ECF system.

/s/ Rachna Vyas
Assistant United States Attorney